In re: Nathan Benjamin Damigo
United States Bankruptcy Court, Eastern District of California
Case No. 19-90003-E-7
Adv. Pro. No. 19-09006

**Index of Exhibits to Amended Complaint Seeking Determination that Debts are Non-Dischargeable Pursuant to 11 U.S.C. § 523(a)(6) and Not Discharged Pursuant to 11 U.S.C. § 727(b)**

| Exhibit No. | Document | Page No. |
|:---:|:---|:---:|
| A. | Second Amended Complaint (the "***Second Amended Complaint***") filed by Plaintiffs as Dkt. No. 557 in the Charlottesville Action on September 17, 2019 | 2 |
| B. | Memorandum Opinion entered as Dkt. No. 1622 in the Charlottesville Action on December 30, 2022 | 114 |
| C. | Amended Judgment (the "***Amended Judgment***") entered as Dkt. No. 1691 in the Charlottesville Action on October 8, 2024 | 204 |

# Exhibit A

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
09/17/2019
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE, <br><br>                             Plaintiffs, <br><br> v. <br><br> JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE, <br><br>                             Defendants. | **Civil Action No. 3:17-cv-00072-NKM** <br><br><br> **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiffs, by their undersigned attorneys, allege upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Over the weekend of August 11 and 12, 2017, hundreds of neo-Nazis and white supremacists traveled from near and far to descend upon the college town of Charlottesville, Virginia, in order to terrorize its residents, commit acts of violence, and use the town as a backdrop to showcase for the media and the nation a neo-nationalist agenda.

2.      Plaintiffs in this action are University of Virginia undergraduates, law students and staff, persons of faith, ministers, parents, doctors, and businesspersons—white, brown, and black; Christian and Jewish; young and old.  While Plaintiffs come from different backgrounds, they share a deep love of this country, their city, and our values.  They also share a fierce determination to defend those values.  Each Plaintiff in this action was injured as a result of the events in Charlottesville on August 11 and 12.  Four plaintiffs were struck in a car attack.  Others suffered and continue to suffer deep and debilitating psychological and emotional distress that prevents them from resuming their former lives or from enjoying the basic sense of peace, safety, and tranquility that most in this country can take for granted.

3.      Defendants are the individuals and organizations that conspired to plan, promote, and carry out the violent events in Charlottesville.  They are neo-Nazis, Klansmen, white supremacists, and white nationalists.  They embrace and espouse racist, anti-Semitic, sexist, homophobic, and xenophobic ideologies.  Defendants brought with them to Charlottesville the imagery of the Holocaust, of slavery, of Jim Crow, and of fascism.  They also brought with them semi-automatic weapons, pistols, mace, rods, armor, shields, and torches.  They chanted "Jews will not replace us," "blood and soil," and "this is our town now."  Starting at least as early as the beginning of 2017 and continuing through today, they have joined together for the purpose of

2

Pg. No. 4

inciting violence and instilling fear within the community of Charlottesville and beyond, wherever their messages are received.

4.     There is one thing about this case that should be made crystal-clear at the outset—*the violence in Charlottesville was no accident*.  Under the pretext of a "rally," which they termed "Unite the Right," Defendants spent months carefully coordinating their efforts, on the internet and in person.  They exhorted each other:  "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August," and, "Next stop:  Charlottesville, VA.  Final stop:  Auschwitz."  In countless posts on their own websites and on social media, Defendants and their co-conspirators promised that there would be violence in Charlottesville, and violence there was.  As Defendant Eli Mosley, one of the lead organizers for the rally, declared:  "We are [] going to Charlottesville.  Our birthright will be ashes & they'll have to pry it from our cold hands if they want it.  They will not replace us without a fight."

5.     The violence, suffering, and emotional distress that occurred in Charlottesville was a direct, intended, and foreseeable result of Defendants' unlawful conspiracy.  It was all according to plan—a plan they spent months working out and whose implementation they actively oversaw as events unfolded on the ground.

6.     The events of August 11 and 12—now commonly referred to simply as "Charlottesville"—were part of Defendants' coordinated campaign to intimidate, harass, incite, and cause violence to people based on their race, religion, ethnicity, and sexual orientation in violation not only of the values that thousands of American soldiers have died for, but also numerous state and federal laws.  As the Utah Senator Orrin Hatch said:  "We should call evil by

its name.  My brother didn't give his life fighting Hitler for Nazi ideas to go unchallenged here at home."

7.        By this lawsuit, Plaintiffs seek to challenge Defendants' actions under the laws of the United States of America and the Commonwealth of Virginia.  Plaintiffs seek compensatory and injunctive relief.  The aim of this lawsuit is to ensure that nothing like this will happen again at the hands of Defendants—not on the streets of Charlottesville, Virginia, and not anywhere else in the United States of America.

## JURISDICTION AND VENUE

8.        The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9.        Venue is properly in the Western District of Virginia pursuant to 28 U.S.C. § 1391(b) because Plaintiffs' claims arose in Charlottesville, Virginia, which is located in the Western District of Virginia.

## THE PARTIES

**A.        Plaintiffs**

10.        Plaintiff Reverend Seth Wispelwey was born and raised in Charlottesville and attended UVA.  He moved back to Charlottesville four years ago with his wife and daughter. Wispelwey has worked at numerous non-profit organizations that advocate for human rights, including as the head of an organization protecting victims of human trafficking.  Wispelwey is an ordained Minister with the United Church of Christ and the Directing Minister of Restoration Village Arts.  He is also the co-founder of a membership organization for clergy of different faiths from across the country, called Congregate, which organized numerous trainings in non-violent protest for residents of Charlottesville leading up to the events of August 11 and 12.  As a result of Defendants' intentional and coordinated plans to commit violence against those who

4

stood up for minority residents in Charlottesville, Wispelwey was harassed, intimidated, and assaulted by Defendants and their co-conspirators. Since the events of the weekend, Wispelwey has suffered extreme emotional distress that has manifested in physical symptoms including constricted chest pain, difficulty sleeping (including nightmares concerning the events of August 11 and 12), and the inability to return full-time to work.

11.     Plaintiff April Muñiz is a Mexican-American resident of the Commonwealth of Virginia. Before the events of August 12, she was the Director of Clinical Operations at a company that helps develop new treatments for patients suffering from incurable diseases. On August 12, Muñiz peacefully protested Defendants' planned event. As a result of Defendants' intentional and coordinated plans to commit violence against minority residents, Muñiz was intimidated and harassed on multiple occasions on August 12. Among other things, Muñiz was close to being hit by the car that Defendant Fields intentionally drove into a crowd of protestors in an act of domestic terrorism. Muñiz has suffered severe emotional injury, has been diagnosed with acute stress disorder and trauma, and was unable to return to work for months. She has suffered economic loss as a result of her injuries.

12.     Plaintiff John Doe is an African-American resident of the Commonwealth of Virginia and a student at UVA. On August 11, John Doe peacefully protested Defendants' planned event. On the basis of his race, John Doe was intimidated, harassed, assaulted, and sprayed with caustic substances.

13.     Plaintiff Hannah Pearce is a dermatologist who lives in Charlottesville with her husband and four children. Pearce and her family are active members of Congregation Beth Israel. On August 12, Pearce and her son peacefully protested Defendants' planned event. On the basis of her religion, Pearce was threatened, harassed, intimidated, and physically assaulted.

Subsequently, a few days after the Unite the Right "rally," Defendants Andrew Anglin and

Moonbase Holdings, LLC's website, Daily Stormer, intending to intimidate Pearce and her son,

posted their picture online.

14.     Plaintiff Elizabeth Sines, a resident of the Commonwealth of Virginia, is a

second-year law student at UVA Law School, and a graduate of Cornell University.  On August

11 and 12, Sines peacefully protested Defendants' planned events.  As a result of witnessing the

events of the weekend, including the domestic terrorist attack on August 12 where Defendant

Fields drove a car into a crowd, Sines has suffered from severe emotional distress and shock.

15.     Plaintiff Marissa Blair is a multi-racial resident of the Commonwealth of Virginia.

She works as a paralegal.  On August 12, Blair was peacefully protesting when Defendant Fields

drove his car into a crowd of protestors, killing Blair's co-worker and friend, Heather Heyer.

Fields's car narrowly missed Blair only because her fiancé, Plaintiff Marcus Martin, pushed her

out of the way before being hit himself.  Blair suffered physical injuries and continues to suffer

from severe emotional distress as a result of Defendants' actions.

16.     Plaintiff Marcus Martin is an African-American resident of the Commonwealth of

Virginia.  He works as a landscaper.  On August 12, Martin was peacefully protesting the Unite

the Right "rally."  He was struck by Defendant Fields, who drove his car into a crowd of

protestors in an act of domestic terrorism.  Martin pushed his fiancée out of the way of the

speeding car, but he was severely injured by the attack, including sustaining a broken leg and

ankle that required surgery.  He continues to suffer severe emotional distress as a result of

Defendants' actions.

17.     Plaintiff Natalie Romero is a Colombian-American undergraduate at UVA.  On

August 11, Romero was one of a group of community members and students who were

surrounded by torch-bearing neo-Nazis and white supremacists at the Rotunda.  On August 12, Romero peacefully protested Defendants' planned event.  Romero was on Fourth Street when Defendant Fields intentionally drove a car into the crowd of protestors in an act of domestic terrorism.  Romero was struck by the vehicle driven by Fields and sustained many injuries.  The car knocked her unconscious, fracturing her skull and leaving her with a concussion.  The car also fractured the root of one tooth and left severe contusions across her body.  Romero continues to suffer vertigo and debilitating headaches.  It is unclear when Romero's symptoms will subside.  In addition to her physical injuries, Romero also suffered severe emotional distress as a result of the planned event and terrorist attack on August 12, and has feared returning to the UVA campus.  As a result of her physical and emotional trauma, Romero has already missed a semester of school.

18.     Plaintiff Chelsea Alvarado is a resident of Richmond, Virginia.  She works as a crisis counselor for the homeless and mentally ill.  On August 12, Alvarado peacefully protested Defendants' planned event.  She was struck by Defendant Fields when he drove his car down Fourth Street into a crowd of protestors.  She narrowly missed being hit again by Fields when he drove his car backwards up the street.  The car knocked Alvarado to the ground, causing her to suffer serious injuries, including a concussion and severe contusions on her legs.  Alvarado continues to experience side-effects of the concussion including confusion, forgetfulness, and difficulty processing normal conversations.  Alvarado has also suffered severe emotional distress as a result of the August 12 events.

19.     Plaintiff Thomas Baker is a resident of Charlottesville.  He works as conservation biologist for a landscape architecture company.  On August 12, Baker observed the Unite the Right event.  He was walking on Fourth Street with a group of counter-protestors after the event

when Defendant Fields drove into the crowd.  Fields rammed Baker with his car, hurling Baker

through the air.  Baker suffered severe injuries from the attack, including a concussion, torn

ligament in his left wrist, and a torn labrum in his right hip.  He had to undergo major surgery,

many hospital visits and medical treatments, and physical therapy, among other things, because

of his injuries.  He had to miss more than a month of work while he recovered, and he still

cannot lift heavy weights, run, jump, or play competitive team sports, or stay still or stand for

long periods without pain.  He will likely need a hip replacement and may never fully regain his

strength.  He suffered severe emotional injuries and continues to suffer severe emotional distress

as a result of Defendants' actions.

**B.    Defendants**

20.    Defendant Jason Kessler is a white nationalist and a member of the Proud Boys.

A resident of Charlottesville, Virginia, Kessler uses the handle "MadDimension" on Discord and

@The_MadDimension on Twitter.  Together with Defendant Mosley, Kessler led the organizing

efforts for the Unite the Right "rally" in Charlottesville.  Kessler is also the president and

founder of Unity and Security for America, a grassroots organization that claims it is dedicated

to "defending Western civilization" and is a contributor to websites like VDare.com, a

xenophobic, nativist publication, and the Daily Caller, a conservative news outlet.  Kessler was

the lead organizer for the Unite the Right "rally" and was one of the names featured on a

promotional poster for the "rally."  In January 2017, Kessler attacked a man in downtown

Charlottesville while collecting signatures for his petition to remove the African-American vice

mayor, Wes Bellamy, from the Charlottesville City Council.  In April, Kessler pleaded guilty to

a misdemeanor charge for the assault and was then charged with felony perjury for lying to the

police in connection with the assault.

21.     Defendant Richard Spencer, a resident of the Commonwealth of Virginia who attended UVA, is the head of the white nationalist "think tank," National Policy Institute.  In 2010, Spencer created an online publication called altright.com.  Spencer organizes his followers to act in furtherance of his ideology, calling for an "ethnic cleansing."  Spencer planned and led the violent torchlight rally at his alma mater on Friday evening.  Spencer actively promoted the Unite the Right "rally" on Saturday to his numerous followers on social media and encouraged and incited intimidation and violence based on racial, religious, and ethnic animosity.

22.     Defendant Christopher Cantwell is a resident of New Hampshire and is a white nationalist and a self-proclaimed fascist.  He hosts "Radical Agenda," a podcast and YouTube show streamed live multiple times a week, and runs the website christophercantwell.com.  Cantwell has stated that once he "realized that [Jewish people] were responsible for the communism," he decided, "let's fucking gas the kikes and have a race war." He has written:  "I think chemical and biological weapons can do a great deal of good for mankind.  Releasing nerve gas or some kind of lethal virus into a left wing protest could prepare the bodies for physical removal without making a big scene for the cameras or destroying anything of value."  In connection with the Unite the Right "rally" in Charlottesville on August 11 and 12, Cantwell was charged with two felony counts of illegal use of tear gas and one felony count of malicious body injury by means of a caustic substance.  He was indicted on December 4 on a felony charge of illegal use of tear gas.

23.     Defendant James Alex Fields, Jr., a resident of Ohio, is a member of Defendant Vanguard America.  Motivated by racial, religious, and ethnic animosity, and in furtherance of Defendants' conspiracy, on August 12, Fields committed an act of domestic terrorism by driving a Dodge Challenger into a crowd of protesters, injuring dozens and killing a 32-year old woman,

9

Pg. No. 11

Heather Heyer.  On December 18, he was indicted on one count of first degree murder, three counts of malicious wounding, three counts of aggravated malicious wounding, two counts of felonious assault, and one count of hit and run (leaving the scene of an accident).

24.     Defendant Vanguard America is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of Vanguard America voluntarily join for the common purpose of promoting white nationalism and believe that people with "white blood" have a special bond with "American soil."  It was formed in California in 2015 and is comprised of twelve chapters across the country.  The group's website states that to join the group, a person must be "of at least 80% white/European heritage."  Defendant Fields is a member of Defendant Vanguard America; he wore their uniform and carried a Vanguard America shield at the Unite the Right event on August 12.

25.     Defendant Andrew Anglin is a resident of Ohio, a neo-Nazi, and the founder of Daily Stormer—an organization that operates through a website that Anglin publishes.  Daily Stormer has called its website the "world's most genocidal" website.  Daily Stormer was named after Der Stürmer, a Nazi propaganda tabloid known for virulently anti-Semitic caricatures and published by Julius Streicher, who was later convicted of crimes against humanity at Nuremberg.  Until recently, Daily Stormer had a website at www.dailystormer.com.  Anglin and his associates at Daily Stormer, including Defendant Robert "Azzmador" Ray, use Daily Stormer "as a hardcore front for the conversion of masses into a pro-white, Anti-Semitic ideology," to "sell [] global white supremacy," and to "make a racist army."  The website, which became the most visited hate site on the Internet in 2016, includes sections entitled "Jewish Problem" and "Race War."  The Chief Technical Officer of Daily Stormer has posited that Daily Stormer "has been effective at what [it is] doing" by "the manifestation of our people on the ground in the real

world."  Followers of Anglin and Daily Stormer, who call themselves "Stormers," communicate on the website's forum, which is moderated by Anglin and accessible only with a special "dark web" tor browser.  On Anglin's orders and under his continuing supervision, Stormers have formed local chapters, called "Stormer Book Clubs," as part of Anglin's plan to "build an invisible empire."  Anglin uses the Daily Stormer forum to actively monitor the Book Clubs and uses the website to issue orders on how to organize.  "Official Operations" of Stormer Book Clubs include firearms training, organizing for protests, and being ready to respond to "challenges" issued by Anglin.  Daily Stormer established "meet ups" and chat rooms that co-conspirators and attendees used throughout the August 11 and 12 weekend to coordinate their violence.  The Daily Stormer released its own poster promoting the "rally" that read, "UNITE THE RIGHT/ Join Azzmador and the Daily Stormer to end Jewish influence in America," accompanied by a Nazi-like figure wielding a hammer, ready to smash a Jewish star.  For months before the Unite the Right events on August 11 and 12, Anglin organized his followers to attend and prepared them to commit racially motivated violent acts in Charlottesville.  Although Anglin did not attend the rally himself because he is currently in hiding to evade service in connection with a separate lawsuit relating to events in Whitefish, Montana, Anglin orchestrated the movements of Daily Stormer followers and incited them to violence on a live feed that streamed contemporaneously with the events as they occurred on August 11 and 12 in Charlottesville.  Moreover, Anglin uses the Daily Stormer to entice his followers to harass and intimidate "Jew/feminist/etc." individuals by mandating in its "style guide" that the authors always include the targeted individuals' social media accounts because "[w]e've gotten press attention before when I didn't even call for someone to be trolled but just linked them and people went and did it."

11

26.     Defendant Moonbase Holdings, LLC is an Ohio, for-profit, limited-liability corporation registered by Defendant Anglin that operates the Daily Stormer's website. Defendant Anglin has encouraged readers to financially support the Daily Stormer by sending donations using bitcoin, checks, and credit cards, noting that "it won't say 'Daily Stormer' on your credit card bill, but will instead say 'Moonbase Holdings,' which either sounds like a hobby shop or a multi-level marketing scheme run by reptoids.  Anyway, it looks innocuous on your statement."

27.     Defendant Robert "Azzmador" Ray, a resident of Texas, is a neo-Nazi and a writer for Daily Stormer's website.  He has held himself out as a representative of Daily Stormer, and served as an agent of Daily Stormer in organizing the Unite the Right events.  He is the leader of the "Dallas Fort Worth Stormer Book Club," which is one of many local Daily Stormer groups across the country.  In his articles published on Daily Stormer's website, Ray encouraged extremists to attend the events in Charlottesville on August 11 and 12 and incited them to violence.  Ray attended the "rally" himself and had a planning meeting with certain other Defendants in Charlottesville on August 11.

28.     Defendant Nathan Damigo, a resident of California, is a white nationalist and the founder of a white supremacist organization, Defendant Identity Evropa.  Defendant Damigo was arrested on April 15, 2017 for assaulting a woman at the "Battle for Berkeley" rally, which Damigo described as a test run for the "rallies" in Charlottesville.  Defendant Spencer has stated that Damigo and his group, Identity Evropa, took the lead in organizing white supremacist participation among people from outside Charlottesville in connection with the events on August 11 and 12.

29.     Defendant Eli Mosley, who is a resident of Pennsylvania, is a white supremacist and was the leader of Identity Evropa from August to November 2017.  He is also a co-founder with Defendant Richard Spencer of Operation Homeland, a new organization that aims to take white nationalist activism "to the next level."  He has described himself as the "command soldier major of the 'alt-right'" and as the organizer of the Unite the Right "rally."  On certain social media networks, Mosley has used the handles @NotEliMosley and @ThatEliMosley.  Mosley was one of the key figures who planned and led the events of August 11 and 12.

30.     Defendant Identity Evropa is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of Identity Evropa voluntarily joined for the common purpose of promoting a "white American identity."  It was founded in March 2016 by Defendant Damigo, and on August 27, 2017, Defendant Mosley succeeded him as "chief executive officer."  The group is currently led by Patrick Casey, Identity Evropa's former Chief of Staff.  The group adopted and popularized the white supremacist slogan, "You will not replace us" that Defendants and co-conspirators chanted as they marched on August 11 and 12.

31.     Defendant Matthew Heimbach, a resident of Indiana, is the chairman of Defendant Traditionalist Worker Party ("TWP").  In 2013, Heimbach and Defendant Matthew Parrott founded the neo-Nazi Traditionalist Youth Network, a white nationalist group that promotes a racist interpretation of Christianity.  Alongside Defendant Jeff Schoep, the leader of National Socialist Movement ("NSM"), Heimbach co-chairs the Nationalist Front, an umbrella organization of approximately twenty white supremacist organizations, including racist skinhead crews, Klan groups, and neo-Nazi groups.  He has said, "Of course we look up to men like Adolf Hitler . . . as inspirations for what we can achieve."  Heimbach organized and led marchers from TWP on August 12.

13

32.     Defendant Matthew Parrott, a resident of Indiana, is the co-founder of the Traditionalist Youth Network along with his stepson-in-law, Defendant Heimbach.  He is currently the Chief Information Officer and Director of Defendant TWP.  On August 12, Parrott refused to leave Emancipation Park after a state of emergency was declared and was arrested by the police for failing to disperse.  Parrott wrote an account of his experiences at the Unite the Right "rally," in "Catcher in the Reich: My Account of my Experiences in Charlottesville."  In it, he wrote that Defendants TWP, League of the South, NSM, and other Nationalist Front groups joined together to "help create two shield walls" for "the fight."

33.     Defendant Traditionalist Worker Party ("TWP") is an unincorporated association pursuant to Virginia Code § 8.01-15, and a national political party committee registered with the Federal Election Commission since 2015.  Members of TWP voluntarily joined for the common purpose of promoting anti-Semitism.  According to Defendant Heimbach, the TWP has three dozen active chapters and an estimated 500 members across the country.  The TWP was created by Defendants Heimbach and Parrott.  The TWP has said:  "Trust nobody who fails to name the Jew, who fails to explicitly and consistently oppose the Jew, and who preaches cleverness or nuance on the JQ [Jewish Question]."  Members of the TWP prompted, attended, and fully participated in the events in Charlottesville on August 11 and 12, including by engaging in violence.

34.     Defendant Michael Hill, a resident of Alabama, is the co-founder and President of Defendant League of the South, a white nationalist organization.  In 2014, Hill and the League of the South announced the formation of an armed, paramilitary unit dubbed "the Indomitables," tasked with advancing southern secession by any means necessary.  In May 2015, Hill published an article in which he asserted:  "We Southern nationalists do not want a race war (or any sort of

14

Pg. No. 16

war). But if one is forced on us, we'll participate. . . . Southern whites are geared up and armed

to the teeth. . . . So if negroes think a "race war" in modern America would be to their

advantage, they had better prepare themselves for a very rude awakening." Hill, whose name

was featured on a promotional poster for the "rally," encouraged League of the South followers

to attend by urging them not to "miss out on the fun" in dealing with counter-protestors—their

purported enemies. On August 12, League of the South, led by Hill, marched through

Charlottesville after Vanguard America. Like Vanguard America, they marched with

coordinated shields and flags and carried rods and other weapons.

35.     Defendant Michael Tubbs, a resident of Florida, is the "Chief of Staff" of

Defendant League of the South. Tubbs is captured on a video from August 12 ordering League

of the South to attack by yelling "charge!" After receiving this command, the group streamed

past him to attack counter-protestors. Defendant Hill later boasted that "Mr. Tubbs was

everywhere the chaos was." Tubbs previously served a four-year prison sentence for planning to

bomb Jewish- and black-owned businesses in Florida.

36.     Defendant League of the South, a privately held company located in Alabama, is

a white supremacist group that advocates Southern secession. Prior to the events on August 11

and 12, Defendant Hill posted in the League's Facebook group that he wanted "no fewer than

150 League warriors, dressed and ready for action, in Charlottesville, Virginia, on 12 August."

Numerous members of the League of the South participated in Saturday's violent events together

with co-defendants.

37.     Defendant Jeff Schoep, a resident of Michigan, is the leader of Defendant

National Socialist Movement, the largest neo-Nazi coalition in the United States. On April 22,

2016, Schoep formed the Aryan Nationalist Alliance, later renamed the Nationalist Front, which

is the umbrella organization for hate groups such as the TWP, the Aryan Terror Brigade, and many regional factions of the Ku Klux Klan.  Schoep has said that if he could meet Adolf Hitler today, he would say, "Thank you for your sacrifice, and I hope we have honored you in some small way by carrying on the fight."  Schoep participated actively in the events of August 11 and 12 and tweeted afterwards that, "It was an Honor to stand with U all in C'Ville this weekend.  NSM, NF, TWP, LOS, VA, ECK, CHS, and the rest, true warriors!"[1]

38.    Defendant National Socialist Movement ("NSM") is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of NSM voluntarily joined for the common purpose of promoting a "greater America" that would deny citizenship to Jews, non-whites, and LGBT persons.  Located in Michigan, NSM is paramilitary in structure; its members claim to be lieutenants, sergeants, or other military ranks.  Defendant Schoep, the head of NSM, has served as its "Commander" since 1994.  Chapters of the groups are termed "units."  NSM maintains a business through NSM88 Records LLC selling neo-Nazi flags, swastikas, gear, etc.  Members of NSM participated in the violence that took place in Charlottesville on August 11 and 12.

39.    Defendant Nationalist Front is an unincorporated association pursuant to Virginia Code § 8.01-15, whose members voluntarily joined for the common purpose of promoting white nationalism and white supremacy.  Formerly known as the Aryan National Alliance, Nationalist Front is an umbrella organization consisting of white supremacist and white nationalist groups, including neo-Nazi and Klan groups.  The Nationalist Front is led by Defendants Schoep, Heimbach, Hopper, and Hill.  The Nationalist Front was conceived to be "the thread that would

---

[1] This tweet refers to Defendants Nationalist Front, TWP, League of the South, Vanguard America, and East Coast Knights.

unite white supremacist and white nationalist circles." Various members of the Nationalist Front engaged in acts of violence and intimidated residents of Charlottesville on August 11 and 12.

40.     Defendant Augustus Sol Invictus, formerly Austin Mitchell Gillespie, a resident of Florida, is a white nationalist, a white supremacist, and a member of Defendant Fraternal Order of Alt-Knights ("FOAK"), the "military wing" of the Proud Boys, a group described as a "'pro-Western fraternal organization' for men who 'refuse to apologize for creating the modern world.'" He has said that a violent, second Civil War is necessary in order to preserve "Western civilization." On August 14, 2017, Invictus announced his candidacy as a Republican for the 2018 Senate election in Florida. Invictus, whose name was featured on a promotional poster for the "rally," drafted the "Charlottesville statement" along with Spencer and others, and participated in the torchlit rally on August 11 with co-Defendants.

41.     Defendant Fraternal Order of the Alt-Knights ("FOAK") is an unincorporated association pursuant to Virginia Code § 8.01-15 and is self-described as the "tactical defensive arm" of Proud Boys, formed to focus on "street activism, preparation, defense, and confrontation." Defendant Invictus is second in command at FOAK and FOAK attended the "rally" in part to provide security to him.

42.     Defendant Loyal White Knights of the Ku Klux Klan ("Loyal White Knights") is an unincorporated association pursuant to Virginia Code § 8.01-15. Members of Loyal White Knights voluntarily joined for the common purpose of promoting white nationalism and white supremacy. Based in Pelham, North Carolina, the association only accepts "native-born white American Citizen[s]" as members. Following the events in Charlottesville on August 11 and 12, the Loyal White Knights changed their outgoing voicemail message to say: "Nothing makes us more proud at the KKK than when we see white patriots such as James Fields, Jr., age 20, taking

17

Pg. No. 19

his car and running over nine communist anti-fascist, killing one nigger-lover named Heather

Heyer.  James Fields hail victory.  It's men like you that have made the great white race strong

and will be strong again."

      43.    Defendant East Coast Knights of the Ku Klux Klan a/k/a East Coast Knights of

the True Invisible Empire ("East Coast Knights") is an unincorporated association pursuant to

Virginia Code § 8.01-15.  Members of East Coast Knights voluntarily join for the common

purpose of promoting white nationalism and white supremacy.  It is active in several states, and

has a subdivision or "klavern" in the state of Maryland.  Tom Larson is the imperial wizard of

the East Coast Knights of the True Invisible Empire.  The East Coast Knights, using the handles

@tightrope33_6 and @Tightrope336, frequently tweets racist images and comments; on

September 19, 2017, it tweeted pictures of burning crosses, labeled an image of lynched black

men as "Alabama wind chimes," and tweeted a cartoon of a Klansman using two black men

hung from trees as a hammock in which to read the newspaper and drink an iced tea.  The East

Coast Knights was a key participant in the July 8 Klan rally, and conspired with the Nationalist

Front and other Defendants to organize and participate in the violent events of August 12.

## FACTS

      44.    Defendants are white supremacist, white nationalist, and neo-Nazi organizations

and individuals, who have as part of their mission to engage in racial, religious, and ethnically

motivated violence, threats, intimidation, and harassment.  The events in Charlottesville are part

of Defendants' recent concerted efforts to move from the shadows of anonymous, disassociated,

online chatrooms and into a more open, organized, physical presence in our parks and on our

streets.  Defendants are co-conspirators with each other and others unnamed.

I. **Defendants And Unnamed Co-Conspirators Conspired To Commit Acts Of Violence, Intimidation, And Harassment Against The Citizens Of Charlottesville, Virginia**

A. **Defendants Targeted Charlottesville in the Months Prior to August 11 and 12 ("the Summer of Hate")**

> When the Jews took over our society and turned it into a kiked-out living hell, they marked their achievement by declaring a "Summer of Love." . . . They took everything away from us. That age is ending now. We are taking back our birthright. This summer, a Black Sun will pass over America. . . . I am declaring the summer of 2017 the Summer of Hate.

> *Defendant Andrew Anglin*

45.　　In furtherance of their above-stated goal, Defendants plotted to target Charlottesville, Virginia as part of what they called the "Summer of Hate."

46.　　Defendants selected Charlottesville because, among other things, the city was engulfed at the time in a debate over the statue of General Robert E. Lee in a small city park. In February 2017, the Charlottesville City Council voted to remove the Lee statue and, in June 2017, it voted to rename the park in which it stood from Lee Park to Emancipation Park.

47.　　Defendants used the planned removal of the Lee statue as a rallying cry for their followers, seeking to preserve its place in the park, and use the debate about the statue as a means to stir up violence and harass, threaten, and intimidate the residents of Charlottesville.

48.　　For example, Defendants Kessler and Spencer invited white supremacist groups to visit and hold events around the statue with the intent of intimidating nonwhite and Jewish individuals and their allies.

49.　　On May 13, 2017, hundreds of neo-Nazis and white supremacists carried lit torches and surrounded the statue of Robert E. Lee, in an event organized and planned by, among others, Defendants Kessler, Spencer, Damigo, Heimbach, Identity Evropa, Vanguard America,

TWP, and League of the South.  Defendants and participants carried altright.com-branded signs[2] reading "we will not be replaced."  They chanted "you will not replace us" and "blood and soil."  "Blood and soil" is a translation of "Blut und Boden," a German nationalist philosophy that lay at the heart of Nazi policies.  The slogan expresses the idealization of a racially defined national body ("blood") unified with a settlement area ("soil").  It is inextricably linked with the contemporary German idea of *Lebensraum*—the belief that the German people needed to reclaim historically German areas of Eastern Europe into which they could expand—which was the driving ideology behind Hitler's invasion of neighboring countries and the mass murder of their citizens.

50.     The May 13 event was planned and intended to intimidate, threaten, and harass Charlottesville residents on the basis of race, religion, and ethnicity.  Defendant Kessler said he hoped that the May event would be a "fantastic first event" in a "cultural 'civil war.'"  Defendants' avowed goal was to promote and create an atmosphere of religious and racial subordination on the streets of Charlottesville, ideally through the infliction of violence or emotional distress.

51.     At a lunch before the event, Defendant Spencer—sharing a podium with Peinovich, Defendants Damigo and Kessler, as well as co-conspirator Sam Dickson—explained: "What brings us together is that we are white, we are a people.  We will not be replaced."

52.     Defendants later acknowledged the success of their careful, deliberate, and months-long planning.  The Daily Stormer's website reported that "[t]he 200+ honorable whites marched to the base of the statue as they carried torches reminiscent of the 3[rd] Reich."  In an essay about the May 13 event, entitled "Why We Fight," Vanguard America explained:

---

[2] Altright.com is Defendant Spencer's website.

20

Pg. No. 22

"The purpose of the gathering was not simply over some metal sculpture atop a pedestal in a small Southern City. It was about defending the images of white history, white heroes, and white America. . . .

[T]he greatest spectacle of the event came as we lit our torches for the night march. As we approached Lee Park for the last time, our footsteps shook the whole city. . . . This movement must begin as a spiritual movement. . . . To quote a wise /pol/lak, "If you want to gas the Jews, you must first gas the Jew within yourself."

After a few words from Spencer and Dickson, we blew out our torches, our spiritual cups filled for perhaps the first time in all of our lives and once again shouted our deafening chants, shaking the entire city with our might.

There will be many more of these events. This march on Charlottesville was just the beginning of the inevitable Revolution of our people.

Hail Victory!

53.  This May event would later be referred to by conspirators as "Charlottesville 1.0."

54.  Capitalizing on the perceived success of the May event, and motivated by the same desire to achieve racial and religious subordination of city residents, Defendants began planning for additional events in Charlottesville. On May 30, Kessler submitted an application for a permit to hold the Unite the Right "rally" on the weekend of August 11 and 12.

55.  In June, Defendant Kessler invited Defendants and others to come to Charlottesville for a "Proud Boys" event, which was designed to promote violence and intimidate minority residents in advance of the Unite the Right "rally." [3]  As one of the Proud

---

[3] As part of the weekend, Kessler was beaten in an alley in Charlottesville by Proud Boys members until he could name five breakfast cereals. This "cereal beat-in" is the "second degree" of initiation into the Proud Boys. The first degree is a declaration of allegiance to the Proud Boys. The second degree is the cereal beat-in and a renouncement of masturbation (although Proud Boys "Pope" Dante Nero has framed the rule as requiring that a man should only ejaculate within a yard of a woman). The third degree involves getting a tattoo and the fourth degree requires a "major fight for the cause," meaning you "kick the crap out of antifa" and possibly get arrested.

21

Pg. No. 23

Boys in attendance noted, the group wanted to bait protestors because "a lot of us kinda like to see them bleed." Another Proud Boy reminded others: "This of course is just the beginning. There are also bigger [ ] events planned for . . . Charlottesville on August 12."

56.     On July 8, 2017, a third white supremacist event was held in Charlottesville, this time by Defendant Loyal White Knights. Nearly fifty Klansmen marched through the streets shouting "white power," and carrying signs that read: "Jews are Satan's children." Some wore white Klan robes, and many carried guns.

57.     Plaintiff Romero peacefully protested at the July 8, 2017 Klan march. Following July 8, Romero received the first of four harassing phone calls from a member of the Klan. In the first call, the man explained that as a member of the Klan, he loved going to Charlottesville to demonstrate the organization's power, and asked Romero if she understood that white people are the superior race. As described in paragraphs 274 and 275 below, the later calls, which occurred after Romero was seriously injured by Fields's act of domestic terror on August 12, were more threatening.

58.     Kessler attended and live-streamed the Klan march on Twitter. He shared a tweet with his followers: "#UniteTheRight against these shitlibs in Charlottesville on August 12th is going to be so much fun. You've got a month to be there."

**B.      Defendants Planned and Coordinated a Scheme to Incite Violence, Threaten, Intimidate, and Harass Charlottesville Residents on August 11 and 12**

The age of ultraviolence is coming. I don't know when, but I do know that most of you will live to see it.

There is rapidly approaching a time when in every white Western city, corpses will be stacked in the streets as high as men can stack them.

And you are either going to be stacking or getting stacked . . .

22

Pg. No. 24

> There will be leaders.  You need to be prepared to recognize them
> for who they are, and you need to be prepared to do whatever they
> tell you to do, exactly as they tell you to do it . . .

*Defendant Andrew Anglin*

59.     Defendants and their co-conspirators conspired to incite violence and to threaten, intimidate, and harass the civilian population of Charlottesville, and in particular, racial, ethnic or religious minorities, and to commit other unlawful acts as described herein.  For weeks, Defendants acted on the basis of racial, religious, and/or ethnic animus, and with the intention to deny Jewish people and people of color, as well as people advocating for the rights of Jewish people and people of color, equal protection and other rights that they are guaranteed under state and federal law.  Defendants' conspiracy ultimately achieved its stated goals and did in fact repeatedly, systematically, and unmistakably violate the rights of religious and racial minorities in Charlottesville.

60.     The application for the Unite the Right permit submitted by Defendant Kessler claimed that the event would be a protest of the removal of the Lee monument, but Defendants also intended that the rally would instill fear in Charlottesville's minority population and cause violence.  They wanted to use the events of the weekend to intimidate the broader civilian population and recruit more followers to Defendants' groups.

61.     An article by Defendants Anglin and Ray published on the Daily Stormer's website on August 8 explained that the purpose of the "rally" had shifted from being "in support of the Lee Monument, which the Jew Mayor and his Negroid Deputy have marked for destruction" to "something much bigger than that . . . .  It is now an historic rally, which will serve as a rallying point and battle cry for the rising Alt-Right movement."

62.    Defendants Kessler, Spencer, Anglin, Ray, Cantwell, Mosley, Damigo, Invictus, Heimbach, Parrott, Hill, Tubbs, Fields, and Schoep, on behalf of themselves and the groups to which they belong, and Defendants Identity Evropa, FOAK, Vanguard America, TWP, League of the South, NSM, Nationalist Front, Loyal White Knights, and East Coast Knights, along with Daily Stormer (Defendant Moonbase Holdings), through their leadership and members, all agreed and coordinated with and among each other to plan, organize, promote, and commit the unlawful acts that injured Plaintiffs and countless others in Charlottesville.  They also coordinated with numerous named and unnamed co-conspirators.

63.    Defendant Spencer and co-conspirator Evan McLaren, a member of Defendant Identity Evropa, met in person at the Trump Hotel in Washington, D.C. to organize and direct the "rally" in Charlottesville, with the purpose and result of committing acts of violence, intimidation, and harassment against the citizens of Charlottesville.

64.    Defendants Cantwell and Kessler met in Charlottesville on August 9 to plan and direct the unlawful acts of violence, intimidation, and denial of equal protection of law.

65.    Defendants Ray, Cantwell, and Mosley and co-conspirator David Duke attended another in-person meeting on August 11 to plan and direct the unlawful acts of violence, intimidation, and the denial of equal protection of law.

66.    Defendants Nationalist Front, NSM, TWP, League of the South, Vanguard America, East Coast Knights, and "other allies," coordinated their attendance as a "joint operation" in advance of August 12 to plan, direct, and prepare for unlawful acts of violence, intimidation, harassment, and denial of equal protection to Charlottesville citizens.

67.    Defendants also frequently coordinated the illegal acts planned for the Unite the Right event online.  They made use of websites, social media (including Twitter, Facebook,

4chan, and 8chan), chat rooms, radio, videos, and podcasts to communicate with each other and with their co-conspirators, followers and other attendees and did so to plan the intended acts of violence, intimidation, and the denial to citizens of the equal protection of laws.

68.    For years, Defendants and others unnamed have used the Internet to, in Defendant Anglin's terms, "solidify a stable and self-sustaining counter-culture."  Use of the Internet is part of the ways, manner, and means of how Defendants' conspiracy operated and operates.

69.    Defendants and co-conspirators coordinated by posting articles on their own websites, and by using social media to send and share messages for the "rally" and to encourage attendance and the commission of illegal acts.  They interviewed one another about the plans for the "rally," and shared those messages on podcasts or other video-streaming services.  They agreed to mobilize their respective members and followers to attend and be violent and suppress the equal rights of Charlottesville citizens.  According to Spencer, for example:  "Damigo and his group [Identity Evropa] took the lead to organize white supremacist participation among people from outside Charlottesville."

70.    One Internet tool Defendants used extensively to plan and direct illegal acts was the chat platform Discord.  Originally developed as a messaging platform for group "game play," Discord is set up as a series of private, invite-only servers, each providing a space for real-time group discussion.  Each server is organized into "channels," indicated by a "#" before the name. Participants in the chat use "handles" or nicknames to identify themselves.  Participants can request to be "tagged" as a member of a group.   Once tagged, the participants can read and participate in that group's chats.

71.    A "Charlottesville 2.0" server was established on Discord in June 2017.  This server was used to direct and plan unlawful acts of violence, intimidation, and denial of equal

25

Pg. No. 27

protection of law at the Unite the Right "rally." One user explained that Discord was "for closed, top super secret communications intended for the elite inner circle of the alt-right."[4] Defendants used Discord as a tool to promote, coordinate, and organize the Unite the Right "rally," and as a means to communicate and coordinate violent and illegal activities "in secret" during the actual events of that weekend.

72.    Discord was moderated, reviewed, directed, and managed by Defendants Kessler and Mosley, along with their co-conspirators. As moderators of the group, they were able to view all of the posts, invite or reject participants, and delete messages they did not condone. The group was "invite only" and not open to the public.

73.    Individual Defendants, including Heimbach, Parrott, Cantwell, and Ray, were all participants on Discord, and participated in the direction, planning, and inciting of unlawful and violent acts through Discord.

74.    These Defendants and their co-conspirators used Discord for regular "leadership" meetings through which they shared information and plans. Defendants also used Discord to distribute what they called "Orders" to co-conspirators and attendees. One document posted by Defendant Mosley was entitled "General Orders" for "Operation Unite the Right Charlottesville 2.0."

75.    There were at least 43 channels set up on Discord as a means of sharing specific information. Those channels included:

| | | |
|---|---|---|
| #announcements | #news | #ma_ct_ri |
| #dixie-lyrics | #safety_planning | #vt_nh_me |
| #mod_help | #alex_jones_chat | #great_lakes_region |
| #confirmed_participants | #pictures_and_video | #midwest_region |
| #shuttle_service_information | #beltway_bigots | #ky_tn |

---

[4] Another user explained, "unless Jason or Eli made this server public without telling me. . . this isn't a public server. It's invite only through our trusted, pre-vetted alt-right servers. Not sure who told you it's public."

26

Pg. No. 28

| | | |
|---|---|---|
| #code_of_conduct | #voice_chat | #tx_ok |
| #self_promotion | #friday-night | #florida |
| #flags_banners_signs | #sunday-night | #georgia |
| #promotion_and_cyberstrike | #chants- | #carolinas |
| #gear_and_attire | #virginia_laws | #california_pacific_nw |
| #antifa_watch | #lodging | #carpool_available |
| #demonstration_tactics | #lodging_wanted | #ny_nj |
| #sponsors_only | #lodging_available | #pennsylvania |
| #i_need_a_sponsor | #carpool_wanted | #dc_va_md |

76.　　　They also had a channel called #questions_for_coordinators, where participants could ask questions of the organizers, and a channel for the "leadership," reserved for conversations among the main organizers of the event about "planning" and "infrastructure," as a leader of Defendant Vanguard America later described it.  With the permission of a moderator, individuals could be "tagged" as members of certain organizations.  Defendants Vanguard America, Identity Evropa, TWP, and League of the South, as well as Daily Stormer (Moonbase Holdings) and its "book club" chapters, all had "private organization channel[s]" on the Charlottesville 2.0 Discord server that allowed their tagged members to participate in private group communications in advance of the "rally."

77.　　　Defendants enlisted other co-conspirators to coordinate and organize the "rally," through Discord and other means.  For example, one individual, using the Discord handle "Tyrone" (hereinafter Tyrone), agreed with Defendant Kessler that he would coordinate transportation for attendees on August 12.  Others were tasked with helping Defendants Kessler and Mosley moderate the Discord server.  Another individual, using the Discord handle "Caerulus Rex," was the coordinator between various "security details" that were established by Defendants and their co-conspirators.  "Caerulus Rex" has also been identified as a frequent bodyguard of Defendant Spencer.

78.     Promotional materials, often promoting and inciting violence, were added to Discord in order to be shared and utilized more broadly.

79.     Defendants also used Discord to coordinate how they would communicate on other social media.  For example, they told followers to use #UniteTheRight and #Charlottesville on Twitter, so that they and their followers could closely communicate during the weekend of the "rally."  They shared that hashtag through Discord.

80.     Additional Discord servers were used by Defendants and co-conspirators to spread the word about the events in Charlottesville and to encourage followers to show up and be prepared for violence.[5]  For example, Defendant Vanguard America has at least one Discord server, called Southern Front, which was established for members of the group living in southern states.  Vanguard America leaders, who were active on the Charlottesville 2.0 Discord server, used the Southern Front server to coordinate attendance of additional Vanguard members and to provide channels of communication between Vanguard members and the main organizers of the Charlottesville event.

81.     Certain co-conspirators in a self-styled "anti-Antifa" group, called "Anticom,"which purports to provide defensive violence at white supremacist events like the "Battle for Berkeley," organized in their own Discord server.  The leader of Anticom was active on the Charlottesville 2.0 server, and then used the Anticom server to tell followers to attend the event and bring weapons, pursuant to the directives of the "rally" organizers.

82.     Although certain posts on the Charlottesville 2.0, Southern Front, and Anticom Discord servers have been made public, numerous other Discord servers and channels were used

---

[5] In this First Amended Complaint, references to "Discord" are to the Charlottesville 2.0 Discord server, except where otherwise indicated.

along with the aforementioned servers to plan and coordinate attendance and violent acts at the

events of August 11 and 12. These additional servers and channels have not yet been made

public. Likewise, the #leadership channel on the Charlottesville 2.0 server remains undisclosed.[6]

83. Defendants Anglin and Ray likewise established "meet ups" and chat rooms

through the Daily Stormer's website that co-conspirators and attendees were told to use

throughout the weekend to coordinate their actions.

84. A "Charlottesville Statement" was distributed by Defendant Spencer, setting out

the philosophy and ideology underlying the "rally." He was aided in drafting his manifesto by

Defendant Invictus, co-conspirator McLaren, and others. Among other things, the

Charlottesville Statement holds that "'Judeo-Christian values' might be a quaint political slogan,

but it is a distortion of the historical and metaphysical reality of both Jews and Europeans" and

that "Nations must secure their existence and uniqueness and promote their own development

and flourishing. . . . Racially or ethnically defined states are legitimate and necessary."

## C. Defendants Promoted Attendance, Violence, and Imagery Designed to Threaten, Intimidate and Harass

> [T]his will clearly be an earth-shaking day that will go down in the history books . . . our time has come.
>
> August 12, 2017 is going to be a shot heard around the world . . . . There will be before Charlottesville 2.0, and there will be after Charlottesville 2.0. there is no way to exaggerate the significance of this. We can make all the noise on the internet that we want, and this is great, but our real power will come only from numbers in the streets. . . .
>
> [T]hanks to the magnitude of this event, I truly believe— more than I ever did before—that we will eventually win this

---

[6] One co-conspirator, an organizer of the Unite the Right event and leader of Defendant Vanguard America, who was active on the Southern Front and Charlottesville 2.0 Discord servers, posted in the Southern Front server in response to reports that certain Discord conversations had been made public: "We have been aware of that. The chat logs were released to unicorn riot. They have months of conversations. It was the general chat not the leadership though so they got very little in the way of planning or infrastructure."

29

Pg. No. 31

struggle and secure the existence of our people and future for white children. It is our destiny. **Next stop: Charlottesville, VA. Final stop: Auschwitz**. See ya there, faggots.

*Daily Stormer*

85. Defendant Anglin, through Daily Stormer, told followers: "We are angry . . . There is a [sic] atavistic rage in us, deep in us, that is ready to boil over. *There is a craving to return to an age of violence. We want a war*." He advised followers that "the hardcore message is what sells" and told them to "[b]e ready to die for [the fight]."

86. On Defendant Spencer's website, altright.com, one article on the upcoming August "rally" explained: "Our ideas dominate the internet . . . Now it's time to dominate the streets. . . . You might think it's just a rally, but really, it's so much more . . . . We are telling the anti-White establishment and it's [sic] attack dogs that we are not going to give another inch . . . And now we have come to the tipping point."

87. Defendant Ray declared: "We are stepping off the Internet in a big way. . . . We have been organizing on the Internet. And so now they are coming out. We have greatly outnumbered the anti-white, anti-American filth. At some point we will have enough power that we will clear them from the streets forever . . . you ain't seen nothing yet."[7] In an interview during the torchlight rally, Defendant Ray also stated that Defendants' goal was to "stop" the "usurp[ation]" of "our country" "by a foreign tribe called the Jews."

88. Defendant Mosley tweeted: "We are [] going to Charlottesville. This is our country and it is our right that me and thousands fought for already . . . Our birthright will be

---

[7] Vice released a 22-minute documentary following Defendants throughout the day. The video can be found at https://news.vice.com/story/vice-news-tonight-full-episode-charlottesville-race-and-terror.

ashes & they'll have to pry it from our cold dead hands if they want it. They will not replace us without a fight."

89. One promotional image created by Defendant TWP and distributed on Discord stated: "This is not an attack on your heritage this is an attack on your racial existence. FIGHT BACK OR DIE."

90. The Daily Stormer released its own poster, which was later shared by Defendant Vanguard America:



91. Using Daily Stormer's website, Defendants Anglin and Ray commanded the Daily Stormer community to attend ("You must make it there!"). They told their members:

31

"[w]e need to do everything we can to get as many people to attend this rally as possible. . . . There is a rising nationalist movement in America and it is not going away. Having thousands of nationalists come out for this rally will put the fear of god into the hearts and minds of our enemies." A writer on Spencer's website, altright.com, enthused that Daily Stormer was "going to bring a lot of young new cadres to the rally," including Identity Evropa.

92.     Anglin also urged his followers: "We are now taking these [Stormer Book Clubs] to the next level . . . We are going to have challenges (which will include getting you in fit and fighting shape and learning useful masculine skills) . . . . We are going to build an invisible empire. This has all been worked out in my mind a long time ago, and this summer, the Summer of the Black Sun, is when we are going to bring it all together." On Defendant Vanguard America's Southern Front Discord server, Defendant Ray told Vanguard members in July 2017, "You don't think the [Daily Stormer Book Clubs] have anything to do with books do you? . . . Think boots, not books."

93.     Defendant Hill encouraged followers of Defendant League of the South to attend by urging them not to "miss out of the fun" in dealing with their purported enemies. Defendant East Coast Knights exhorted individuals to attend: "We will be there! Join us!"

94.     Another co-conspirator on Discord posted an image of a raised fist holding a dagger by its blade, dripping blood, over the words "FIGHT UNTIL THE LAST DROP."



95.     Defendants' intent to engage in violence, to ensure that others engaged in violence, and to orchestrate and direct that violence against racial and religious minorities was open and explicit.  For example, on a podcast run by Michael Peinovich, the Daily Shoah, a co-conspirator, discussing the "rally," asked: "Now come on, beating up the wrong negro . . . is that even a possibility?  Beat up the wrong nigger . . . ."  A member of Defendant Vanguard America blithely asked on Discord, "When can we gas the reprobates. . . ."  Tyrone, a co-conspirator, wrote:  "Most efficient is how you get six million Jews in a Cadillac.  3 in the front 3 in the rear 5,999,994 in the ash tray."

96.     On Discord, moderated and controlled by Defendants Kessler and Mosley, there were countless exhortations to violence, including:

- "I'm ready to crack skulls."

- "If you don't have a flame thrower you're wrong,"

- "It's going to get wild.  Bring your boots."

- "Studies show 999/1000 niggers and feminists fuck right off when faced with pepper spray."

- "Bringing women to a protest/rally where we expect violence is fucking retarded . . . even if you aren't expecting violence you should prepare for it."

- "Let there be no mistake – these two side have irreconciable [sic] differences that will never reach compromise – the only question is the level of conflict to decide the victor."

- "You have a week, bros.  Best spend it having four or five of your friends simulate jumping you.  Go light, don't get injured before the event, and focus on blocking and pushing back in ways that don't look like assault."

- "Let's make this channel great again. The Carolinas (kind of) started the Revolutionary War and the Civil War, so why not add the Race War / Second Civil War to the list?"

97.     Defendants took no steps to prevent any violence.  To the contrary, consistent with their conspiracy to encourage and enable violence, Defendants and co-conspirators reinforced a false narrative of a larger—necessarily violent—racial and religious war in which Unite the Right events were a critical moment.  This strategy was intended to—and foreseeably resulted in—violence directed at the racial and religious minorities.

98.     For example, Defendant Hill tweeted on July 24:  "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August."

99.     Defendant Mosley published "General Orders" for the "rally" which divided attendees into "Friendlies" and "Enemies/Counter Protesters."  Individuals opposed to the ideas advanced by the Unite the Right "rally" were described as "hostile."

100.     The General Orders further instructed co-conspirators and attendees that if they ended up losing their permit to gather in the park then they may "have to initiate plan red or have to take the ground by force with plan yellow."  Plan Red was described as "incredibly dangerous" and called for meeting early at a rally point and marching to the park.  The General Orders also promised that there would be "security forces . . . to reduce the threat" presented by "hostiles."

34

Pg. No. 36

101.    Co-conspirators on Discord incited attendees to bring weapons and engage in violence.  This incitement was known to and promoted by Defendants.

102.    Tyrone posted a quote from Hitler's close associate and "Reich Plenipotentiary for Total War," Paul Joseph Goebbels, on Discord: "Whoever can conquer the street will one day conquer the state, for every form of power politics and any dictatorship-run state has its roots in the street."

103.    Defendants expressly acknowledged that their false narrative of "self-defense" was merely a pretext for violence.  Tyrone, for example, had the following exchange on Discord:

> Tyrone:  "What if we are sociopathic and want [antifa] to show up, for . . . self defense purposes?"
>
> Americana – MD:  If you're concerned about antifa showing up and being violent I present you 2 valid options.  1.  Don't attend [emoji of a woman] or 2.  Be better at violence than they are.
>
> Tyrone:  It's not just about you (collective you not personal) violence like this is a team game.

Tyrone then told others:  "The best defense is a good offense, my grandpappy taught me."

104.    One Discord participant told people to "purchase self defense insurance," while another quipped that the ability to make out a self-defense claim "[d]epends how much of a jew your lawyer is."

105.    Using Discord and other mediums, Defendants gave orders to each other, co-conspirators, and followers in advance of the Unite the Right weekend, including what weapons to bring, what protective armor to wear, and instructions for uniforms.  In particular, they advised other participants to bring firearms or improvised weapons.  They engaged in these acts with the intention that they and their co-conspirators would in fact engage in violence and

harassment against racial and religious minorities and threaten the broader Charlottesville population.

106.    Defendant Cantwell expressly "encourage[d]" Radical Agenda followers "to carry a concealed firearm."

107.    One co-conspirator, who was active on the Charlottesville 2.0 Discord server as the "Head Representative" of Anticom on the server, told his followers in the Anticom server on August 7:  "@everyone Bring as much gear and weaponry as you can within the confines of the law. I'm serious. . . .  You still have a few days to get some protection from Home Depot and bring any guns you have . . .  This isn't just Anticom.  Spencer, organizers, everyone are behind this."  He added: "This is the time to get off Discord and take action."  On August 8, he simultaneously posted on the Charlottesville 2.0 and Anticom servers the a photograph of himself in tactical gear carrying a rifle (see images below from the Charlottesville 2.0 server, left, and Anticom server, right).  He told his followers:  "I wasn't kidding when I made an announcement to bring as much weaponry as legally feasible. . .  This was discussed with the organizers."  An Anticom follower responded: "Yeah I also recommended crowdfunding a 50 dollar campaign to hand out pepper spray to fellow goers."

 

108.    Defendants and co-conspirators posted photos of themselves posing with

automatic weapons and tactical gear, and boasted about the weapons they were bringing.

Tyrone, for example, bragged on the Charlottesville 2.0 server that he would be bringing

"Mosin-Nagants with bayonets attached," referring to military rifles used by Russian and Soviet

armed forces, which "will shoot clean through a crowd at least four deep."  Tim "Baked Alaska"

Gionet, a co-conspirator and attendee of the events of August 11 and 12, posted the following on

Twitter:



109.    Defendant Ray wrote on Discord: "Well I also come barehanded and barefisted, bc officers don't duck lol.  But my guys will be ready with lots of nifty equipment."

110.    One co-conspirator on Discord posted a fake advertisement for a product that looked like pepper spray called "Nig-Away"—"a no-fuss, no-muss 'nigger-killer,'" promised to "kill[] on contact . . . dissolv[ing] all tissue, leav[ing] only bone matter" in order to "rid the area of niggers."  He commented beneath the photo, "stock up now."



Discord was rife with discussions by co-conspirators of weapons and the use of everyday

objects to inflict harm:

- "I'm conceal carrying."

- "[A] real man knows how to make a shield a deadly weapon."

- "[K]nives and guns are more legal than blunt weapons or batons, but its [sic] better to only carry what would only be perceived as a defensive tool.  I figure knives would cause the police more alarm over a can of pepper spray or a rugged and abrasive shield."

- "[G]et standard OC spray.  I personally use Fox Labs."

- "[R]emember that newspapers can be your greatest ally / toss a few pennies in there, roll it up and fold it and bam."

- "[A]void batons . . . just get hardwood dowel (that fits in your hand) from a store and cut it to size."

- "If you get PVC get schedule 80 for thicker thumping."

- "Don't carry anything that's explicitly a weapon.  Flag poles and signs work, but openly carrying obvious weaponry is probably not a good idea."

- "A wrench with a wrist lanyard gets the same job [as a blackjack/billyclub] accomplished."

39

Pg. No. 41

● "Just carry a pocket full of rocks.  They can be in a sock or something."



111.     On June 7, 2017, Kessler posted in the #announcement channel of the

Charlottesville 2.0 Discord server, "@everyone . . . I recommend you bring picket sign post,

shields and other self-defense implements which can be turned from a free speech tool to a self-

defense weapon should things turn ugly."

112.     One co-conspirator on Discord posted a link to his store, Resistance Tools, along

with a coupon code (UNITETHERIGHT2017), and wrote "FOR PEOPLE NOT CONCEALED

CARRYING IN C'VILLE:  I sell stun guns, tasers, pepper spray, batons, and other self-defense

stuff."

113.     Defendant Vanguard America, through its leaders and members, encouraged its

members to attend the rally on its own Discord server, Southern Front.  An individual with the

username "Thomas Ryan," on information and belief Thomas Ryan Rousseau, a leader of

Vanguard America, repeatedly urged members to contact him directly if they planned to attend

the "Unite the Right" event and if they wanted to travel together in a "hate bus," saying:  "This

event is a **BIG DEAL** and offers a chance to link up Vanguard Guys from across the

nation."  He also issued orders on the proper Vanguard uniform for the event.

114.    Defendant Vanguard America members were instructed to arrive at the rally in matching khaki pants and white polos, about which one member on the server commented: "I like the polos. it's a good fighting uniform."  Rousseau also told his Vanguard America co-conspirators, "Self defense items are not listed on the gear list, some individuals will have concealed carry, some will not."  On August 7, one co-conspirator asked: "Serious question, why are they saying not to bring fire arms?"  Another replied, "Sounds like they are scared lol . . . I always carry a collapsible baton now it's my new favorite."  "Thomas Ryan" replied:  "It's concealed carry only . . . Concealed knives have dozens of laws around them. Open knives do not, but it looks really dumb to carry an open large knife so we're not doing that . . . Not sure about batons."

115.    Defendant Ray, a "good friend" of Defendant Vanguard America, according to their leader Rousseau, also used the Southern Front server to encourage Vanguard America members to attend the rally, posting a link to the Daily Stormer article "Charlottesville:  Why You Must Attend and What to Bring and Not to Bring!"  A Vanguard America member responded to Ray's post with a violent drawing of Defendant Heimbach wearing a shirt bearing Nazi and Defendant TWP symbols and the words "nigger killer" above a tally of "communists killed," smiling in front of decapitated black men wearing logos associated with anti-fascist movements:

41

Pg. No. 43



116.    One member of Defendant Vanguard America explained on the Southern Front

server after the event that Vanguard America had coordinated with Defendant National Socialist

Movement because the Charlottesville event was about violence:  "In cville we needed numbers,

NSM fought so hard regardless of their optics.  Do we need them at normie events?  No.  We

need them in a fight?  Yes."

117.    In addition to directives being circulated on Discord, Defendants Ray and Anglin

issued directives using Daily Stormer's website in advance of the Unite the Right weekend.  In

articles titled "Operational Security for Right Wing Rallies" and "Charlottesville:  Why You

Must Attend and What to Bring and Not to Bring!," "Stormers" were told that they were required to bring tiki torches and should also bring pepper spray, flag poles, flags, and shields.

118. Indeed, the evidence that Defendants were planning to arm themselves in advance of the "rallies" was so pervasive that the Charlottesville Police Department received private threat assessments from the Federal Bureau of Investigation indicating that "Unite The Right supporters would bring bats, batons, flag sticks, knives, and firearms to confront their political opponents."

119. Defendants and co-conspirators provided guidance and instructions to co-conspirators and participants about how to try to avoid the legal ramifications of their violence. For example, they set up a channel on Discord devoted to understanding Virginia law, where one co-conspirator suggested that rallygoers buy self-defense insurance. Defendants also assured co-conspirators that they would be protected when they engaged in violent acts intended, incited, strategized, and encouraged by Defendants. The "General Orders" told attendees that if they found themselves arrested, there would be "money and a legal team set aside for you after." Defendant Spencer put out a call for attorneys on his website, altright.com. Daily Stormer advised attendees:

> [I]f you end up in some heavy stuff and are not yet charged with anything, use your moments of freedom to get really difficult to find. Do not wait around for bad processes to begin against you. Exit from any risky situation as quickly as you can. If you make yourself easy to serve with legal process, legal process will be likely be served to you.

120. Defendants and co-conspirators told each other to bring shields, uniforms, flags, and signs decorated with iconography that would instill fear along racial and religious lines, while also identifying rallygoers with the hate groups to which they belong. The Texas and

Louisiana chapters of Defendant Vanguard America, for example, planned to have shields with their logos painted on.

121.    Defendants also discussed and intended for followers to come with paraphernalia bearing racist and anti-Semitic imagery. Defendant Kessler, for example, explained: "The Confederate flag is THE BEST optics because it's beloved by legions of Southerners who are on the doorstep of becoming just like us if we can move them beyond 'heritage not hate.'"

122.    The "official" poster for the event contained Nazi and confederate iconography, including imperial eagles reminiscent of Nazi Germany's national emblem, confederate flags and monuments, and confederate soldiers in formation.



### D.    Defendants Coordinated Funding, Logistics, Transportation, and Legal Support For Co-Conspirators and Attendees

123.    Defendants furthered their conspiracy and its illegal, injurious objectives by coordinating attendance at the rally through Discord, the Daily Stormer website, and other media.

124.    On Discord, Defendants established the #sponsors_only and #i_need_a_sponsor channels to provide financial support to others who wanted to travel to Charlottesville.

44

Pg. No. 46

Defendants also used channels like #carpool_wanted and #carpool_available to organize carpools in "Hate Van[s]" and "full blown hate convoy[s]."[8]

125.    On the Daily Stormer website, attendees were advised:  "If you want to come but can't find a way, get on the BBS [a Daily Stormer forum] and ask for help.  Go to the Book Club section and find the nearest book club to you and post in that thread that you want to go but need assistance.  If you happen to have hit a dead thread, start a thread in General Discussion asking for help.  If you are going and have an extra seat or seats, start a thread to offer a ride."

126.    Cantwell asked listeners of his Radical Agenda podcast and readers of his website to send money to him if they "want[ed] to help," but could not attend the "rally."

127.    RootBocks, and WeSearchr—sites that were set up to raise money for hate-based causes—facilitated the attendance of co-conspirators.  On July 28, for example, RootBocks tweeted "@BakedAlaska was banned from @GoFundMe so go help him out here."  Baked Alaska a/k/a Tim Gionet has advocated racial and religious based violence, including by circulating an image of a Jewish woman in a gas chamber.  David Duke also tweeted, "Help my friend Baked Alaska get to the #UniteTheRight rally. Please donate to make this happen. rootbocks.com/projects/get-b . . ."

---

[8] The "Hate Van" and "hate convoy" suggested by conspirators in this case has historical precedent. During the Civil Rights Era, George Lincoln Rockwell, the founder of the American Nazi Party, and his supporters drove a two-vehicle caravan that included a blue and white van dubbed the "Hate Bus" through the South.  The exterior of the van was plastered with the words "LINCOLN ROCKWELL'S HATE BUS" and the phrases, "WE DO HATE RACE MIXING" and "WE HATE JEW-COMMUNISM."  Rockwell pledged solidarity with the Klansmen who attacked the Freedom Riders (black and white civil rights activists who rode interstate busses in a campaign of desegregation) and hoped to confront the "Communist, nigger-loving" Riders when they arrived in New Orleans. In New Orleans, they demonstrated with signs that read "America for Whites, Africa for Blacks" and "Gas Chamber for Traitors."  After Rockwell's assassination in 1967, the American Nazi Party broke into two factions, one of which became the Defendant NSM, run by Defendant Schoep.  See RAYMOND ARSENAULT, FREEDOM RIDERS: 1961 AND THE STRUGGLE FOR RACIAL JUSTICE 195 (1961).

128.     On the August 8 "Charlottesville Unite the Right Announcement Special" podcast with Peinovich, Defendant Mosley told listeners that they'd be setting up a general legal fund using Rootbocks.  On that same program, Mosley told listeners how to get help with transportation.

129.     Defendants and co-conspirators also coordinated travel for the day of the "rally" on Saturday.  After consulting with Defendant Kessler, Tyrone took responsibility for helping organize shuttles.  One co-conspirator instructed Discord participants:  "Nobody is going to the park on their own.  We will be arriving as a group."

**E.**     **When Plaintiffs and Others Sought to Prepare for the Events of August 12, They Were Targeted for Additional Threats and Harassment**

130.     Plaintiffs and community members understood that August 12 could be (and ultimately was) the largest public gathering of hate groups in decades.

131.     Anticipating a need for a designated, separate space for peaceful protesters, a UVA professor received permits for McGuffey Park and Justice Park for the periods during which the Unite the Right "rally" was to take place.

132.     A broad group of concerned citizens, including Plaintiff Wispelwey, recognized the need to organize community members in advance of the rally weekend in order to provide a sense of solidarity for Charlottesville and give guidance on non-violent protest.

133.     Wispelwey, an ordained minister, co-created a membership-organization, "Congregate," to join interfaith clergy from around the country to "stand against white supremacy and bear witness to love and justice."  Congregate's goal was to bring 1000 clergy-members to Charlottesville to stand up for equality and against hate.  Working with other religious leaders and community organizers and organizations, Congregate planned an interfaith service for August 11 at St. Paul's Memorial Church on University Avenue ("St. Paul's"), the

46

Pg. No. 48

night before Defendants' permit to gather in Emancipation Park. Congregate also helped plan an interfaith "sunrise service" for August 12 at the African-American First Baptist Church on West Main Street so that community members could gather, feel supported, and pray.

134.    As a result of its work in support of the Charlottesville community, Congregate was targeted. Defendant Kessler advised his followers of Congregate's work in a video released prior to the Unite the Right weekend. In doing so, Kessler intended to have others threaten, and potentially cause violence to, the organization—a practice that is not uncommon among Defendants and co-conspirators. For example, after a photograph was published of a young woman giving the middle finger to a man in a confederate army uniform, a prominent member of the East Coast Knights tweeted out the young woman's home address and wrote: "We will be having a rally at this address next week. Bring your own torch."

135.    On August 2, one co-conspirator posted on Discord screenshots from a Facebook event for an upcoming community "Back to School Block Party" in Charlottesville. He commented: "Negro block party about 1 mile SW of Lee park." Following that post, one Discord participant suggested that a white supremacist group "go to the bloc party after and beat them at kick ball." Another replied, asking, "What happens if we lose? I hear niggers are pretty good at sports ball." A third replied, "We shank them."

136.    Defendant Kessler along with other co-conspirators posted various photographs on Discord and provided names and identifying information of individuals planning to protest in Charlottesville, as well as the community groups organizing the protest. On August 10, Kessler, Defendant Mosley, and others hosted a voice chat on Discord, during which an unidentified voice offered a "solid gold medal" to any person who would shave the "Bearded Lady," referring to a photograph of an expected protestor.

47

Pg. No. 49

137.     Congregation Beth Israel, the synagogue to which Plaintiff Pearce belongs, also learned of Defendants' online, public threats to Charlottesville's Jewish population.  In reasonable fear and apprehension of Defendants and their co-conspirators, the Temple made the painful decision to move and hide its sacred Torah scrolls off site in advance of the weekend. Among the Torahs at the Synagogue was one salvaged from a neighborhood of Eastern European Jews who were massacred during the Holocaust that is displayed in a glass cabinet. Unfortunately, that Holocaust Torah could not be moved because of its fragile condition. Plaintiff Pearce thought at the time of how ironic it was that a Torah that managed to survive the Holocaust was again being threatened by Nazis.

138.     The Temple also decided it needed to move its Saturday Shabbat services up an hour, so that it could close in the afternoon when Defendants and other neo-Nazis and white supremacists were expected to be in Charlottesville.  The Temple took further safety precautions, including hiring a security guard, to keep the congregation safe while they were there for services, re-directing substantial resources.

139.     Stores, restaurants, and bars around town created signs that they posted in their windows showing the businesses' support for equality and diversity.  Those stores and restaurants were also targeted by Defendants.

140.     In June, for example, Defendant Kessler encouraged Discord participants to obtain the names of local businesses whose owners signed a petition to ask the government to cancel Kessler's permit.  In August, co-conspirator Griffin tweeted about targeting a local restaurant, Brazos Tacos.  Defendant Mosley also tweeted about targeting several restaurants, namely Brazos Tacos, Cinema Taco, Commonwealth Restaurant and Skybar, Mudhouse, and the Whiskey Jar.  Defendant Spencer tweeted a picture of Commonwealth Restaurant, which had a

48

sign in the window reading:  "If equality & diversity aren't for you then neither are we."  On

August 10, Peinovich tweeted, "Do these white business owners and shitlibs in CVille think that

their virtue signaling mean they will be spared somehow? Lol."

141.    By identifying these businesses, Defendants intended that their co-conspirators

and followers would threaten these businesses.  A number of these businesses thereafter received

in person and mailed threats:



II.    **On August 11 and 12, Defendants Successfully Implemented the Violence and Intimidation They Had Planned**

A.    <u>**Friday, August 11, 2017**</u>

1)    <u>The "Secret" Torch Parade</u>

142.    Defendants, including Mosley, Spencer, Kessler, Ray, Anglin, Cantwell, and Invictus, along with their co-conspirators, organized a torchlight march through campus culminating at the statue of Thomas Jefferson near the Rotunda on August 11 at the Grounds at UVA.

143.    The permit Defendant Kessler applied for and received was for the following day, August 12, in Emancipation Park.  Defendants did not publicly disclose the time or location for the August 11 torch parade "because it was a secret arrangement."

144.    The torch parade was the result of weeks of planning by Defendants and co-conspirators.  They had established a #friday_night channel on Discord to coordinate attendance, dress code, and plans.  They advised co-conspirators that the event was intended to be a secret and that they should bring torches.

145.    For example, the Daily Stormer website stated:

> Tiki Torches:  Yes – required.  Pick up tiki torches before you leave your hometown.  There will be a torchlight ceremony and the tiki torches will all be gone from the shelves of the local stores.  Dollar stores are your best bet.  Wal-Mart has them cheap as well.  Make sure and get some tiki torch fuel/oil too.  Otherwise they won't burn.

146.    On a planning call conducted through Discord, Defendant Mosley instructed Defendants and co-conspirators:  "We are doing a torch light event on Friday. . . . Anyone who doesn't have tiki stuff now should go out and get it tonight or tomorrow morning and if you could get extras that would be great."  Defendant Kessler ordered attendees to buy torches for

Friday, but to do so outside of Charlottesville, so that they would not "tip our enemy off."  He instructed that people "buy extras for those who are flying in or unprepared."

147.    Defendant Mosley ordered individuals to arrive at Nameless Field, a large area behind UVA's Memorial Gymnasium, at 9:30 p.m., so that they could march once darkness fell at 9:47 p.m.  He told them not to arrive earlier to avoid tipping off counter-protestors, and stressed that "it's extremely important that nobody mention this outside our circle."

148.    While planning their torchlight march, Defendants were aware of the fact that open fires are illegal on UVA's campus without authorization.  Nearly one month before the planned torchlight march, a Discord participant posted a link to UVA's guidelines against open fires.  A co-conspirator, and moderator on Discord, "pinned" the regulation to the chat, meaning that it was highlighted for participants.

149.    The choice to use lit torches was a deliberate decision to harass and intimidate the people of Charlottesville and counter protesters, especially people of color and Jewish people. Defendants and co-conspirators intentionally drew on the history of torch-bearing mobs, and in particular, the Ku Klux Klan's use of torches in the late 1800s and in the twentieth century, and the Nazi's use of torches in their rallies in the 1930s.  In both historical cases, just as with cross-burning, the use of torches was connected with racial violence; torches were chosen by Defendants and co-conspirators as part of a deliberate plan to evoke fear of the same kind of violence.  As one co-conspirator on Discord explained:  "Tiki torches are the last stand of implicit whiteness."  Defendant Ray explained the purpose of the torch parade as follows:  "Our country is being usurped by a foreign tribe, called the Jews.  We are going to stop it." Defendant Invictus explained to a reporter, "Somebody forgot the pitchforks at home, so all we got is torches."

150.    On the morning of August 11, Defendant Cantwell and other co-conspirators gathered at a Walmart outside of Charlottesville.  Cantwell then travelled to McIntire Park to prepare for the evening.  In an interview with a reporter from *Vice*, Cantwell said:  "I'm trying to make myself more capable of violence. . . .  I'm here to spread ideas, talk, in the hopes that somebody more capable will come along and do that."

151.    On Friday evening, using Discord, Defendant Mosley alerted co-conspirators that they should go to UVA:  "Everyone can start assembling at nameless field right now with your torches to start staging.  We will step off from the field at 10 pm."

152.    Starting around 7:30 p.m., approximately 300 neo-Nazis and white supremacists—Defendants and their co-conspirators—began arriving at Nameless Field.  They carried unlit tiki torches, and many wore khaki pants and white polo shirts (the uniform of Defendant Vanguard America) and pins marking their affiliations with different hate groups.  A little after 8:00 p.m., Defendant Spencer texted a reporter:  "I'd be near campus tonight, if I were you.  After 9:00 p.m., Nameless field."

153.    By early evening, Plaintiff Wispelwey was inside St. Paul's Church, along with an overflow crowd of an estimated 1,000 people.  Dozens of local and national clergy members visiting Charlottesville for the weekend participated and spoke at the service.

154.    Plaintiff John Doe, along with other UVA students, peacefully walked to the Rotunda where Defendants were believed to be holding their event.

155.    Plaintiff Natalie Romero had spent the afternoon of August 11 painting banners and posters for use during the planned peaceful protest of the August 12 "rally."  Romero then learned that Defendants would be holding a rally on the UVA campus at the Rotunda.  With a group of other UVA students, Romero peacefully made her way to the Rotunda.

52

Pg. No. 54

156.    At the same time, at Nameless Field, Tyler Magill observed Defendants and their co-conspirators barking and grunting loudly, making sounds that resonated for blocks. Defendants Cantwell, Kessler, Ray, and other co-conspirators were issuing orders to the other white supremacists and neo-Nazis, telling them to get in specific formations and assigning people either to march with a torch or on the side as "security."

157.    Defendants and their co-conspirators filled their tiki torches with fuel, formed a long column, and lit the flames.  They then started marching two-by-two from Nameless Field to the Rotunda, and down to the Jefferson Statue.  Defendants and co-conspirators deliberately took a circuitous route that included marching through student housing on the Lawn, which Plaintiff Sines observed, and which was intended to threaten, intimidate, and harass as many bystanders as possible.

158.    Defendants marched in an organized, coordinated fashion.  Organizers, including Defendant Cantwell, wore earpieces, carried radios, and shouted specific orders at the marchers. They shouted to keep pace, avoid gaps, stay in line "two-by-two," and march alongside a "security guard."  Defendant Invictus said it was a "tight operation" and, in his live video feed, frequently enthused "high T!," meaning high testosterone.

159.    Defendant Cantwell marched on the outside of the column, along with other "guards" who were selected for their willingness to "get physical" with counter-protestors.

160.    Plaintiffs Sines and Romero heard the marchers chanting slogans chosen for their intimidating and racially harassing effect.  These slogans included, "You will not replace us!" "Jews will not replace us!" "Blood and soil!" "White lives matter!" and "This is our town now!" Romero also heard the marchers chant "go back to where you came from," an apparent reference to Romero's Hispanic heritage.

161.　　The marchers also barked like dogs and performed Nazi salutes. Again, these actions were intentionally chosen for their racially threatening, intimidating, and harassing effect.

162.　　Defendants intended to send a clear message through the torch parade: Jewish people, black people, and their allies should be afraid for their safety, livelihoods, and lives.

　　　　2)　　<u>The Attack at the Rotunda</u>

163.　　The torch march eventually reached the steps on the far side of the Rotunda. Hundreds of neo-Nazis and white supremacists, including Defendants Kessler and Spencer, charged toward a small group of fewer than 30 people, mostly students and community members, including Plaintiffs John Doe and Romero, who had locked arms around the statue of Thomas Jefferson.

164.　　As Defendants and their co-conspirators rushed down the steps that surround the Rotunda and streamed toward the Jefferson statue, they continued to shout "Blood and soil," "Jews will not replace us," and "You will not replace us," and to bark like dogs. They also made monkey noises at the black protesters. Plaintiff John Doe, one of the few African-American men present, was terrified and feared for his life. Plaintiff Romero, one of the few Hispanic-Americans present, had never been more afraid in her entire life.

165.　　As they reached the statue, Defendants and co-conspirators stood shoulder to shoulder and encircled the students to trap them. Seeing the mob surround the students, Magill, who had followed the white supremacists and was warning others to steer clear, ran through the crowd and locked arms with the small group, which included Plaintiffs John Doe and Romero. One co-conspirator yelled, "we need some more people to fill in this way to block these people off." After the fact, one protestor tweeted: "They surrounded us at the statue / They wouldn't let us out"; Defendant Spencer retweeted this, adding "Fact check: true."

166.     One co-conspirator on Defendant Vanguard America's Southern Front Discord server posted a tweet from Hatewatch, saying "Anti fascists are surrounded by hundreds of fascists at Jefferson statue.  No police."  Another replied: "DO IT . . . TIME TO PHYSICALLY REMOVE THEM"

167.     Defendants and co-conspirators began to kick and punch the protesters around the statue, using their torches as weapons, and to beat individuals onto the ground.  Defendant Ray claimed that the group of white supremacists "went through [the protestors] like shit through a goose!"

168.     From the crowd, Defendants, co-conspirators, and others threw an unidentified fluid at the peaceful protesters around the statue, including on Plaintiffs John Doe and Romero. Looking down at the fluid on their clothing, which they feared was fuel or other flammable liquid, and the hundreds of lit torches around them, John Doe believed that he might be killed. Co-Conspirators and others then threw their lit torches through the air, aimed and directed at many of the protesters around the statue. At one point, Defendant Ray shouted, "The heat here is nothing compared to what you're going to get in the ovens!"

169.     Plaintiff Sines witnessed co-conspirators throwing fuel and tiki torches at the peaceful protestors around the statute.

170.     Plaintiff Romero witnessed co-conspirators removing their helmets and swinging them at peaceful protestors.  Romero was also spit on by co-conspirators.

171.     Defendants and co-conspirators, including Defendant Cantwell, attacked the protestors with mace. The Daily Stormer included the below photo of Cantwell spraying a protestor in the eyes in its live feed with the caption ". . . might be the greatest photo I've ever

55

Pg. No. 57

seen." The same photo was retweeted by Defendant Mosley under a caption: "He protect / He

atack / But most importantly he got your back."



172.      Due to Defendants' conduct, and consistent with their intention to terrorize,

Plaintiff John Doe feared that he was in imminent danger. Encircled by Defendants and co-

conspirators, John Doe felt trapped and did not believe that he could escape safely. He knew that

as an African-American man, if he had tried to escape before the group dispersed, he would have

been attacked. For approximately ten minutes, he remained in place, and while confined within

the circle of Defendants and co-conspirators, was sprayed with mace.

173.      Fearing for their lives, Plaintiffs John Doe, Romero, and the other protesters

struggled to escape the mob. Once away from the mob, Romero attempted to wash off the mace

that had been sprayed in her eyes and all over her shoulders by Defendants and co-conspirators.

After the trauma of the torchlight rally, Romero had trouble sleeping that night.

174. Defendants and their co-conspirators climbed to the top of the Thomas Jefferson statue and waved their torches high in the air, yelling, "Hail Spencer! Hail victory!"  Defendant Spencer spoke briefly to the crowd, saying, "We own these streets!  We occupy this ground!"  He told the crowd that they were "risking their lives" for their future.  This was consistent with the unlawful plan developed by Defendants through their conspiratorial acts in the weeks and months preceding these events, and as operationalized and modified by Defendants in response to developments on the ground.

175. These acts of violence were not isolated or unplanned incidents.  The torch rally was planned with the specific intent of engaging in racially-motivated violence, threats, intimidation, and harassment.  The attacks upon the students were coordinated both in advance and on the day that they occurred.  Defendants and co-conspirators intentionally formed a circle trapping the students and either directly participated in the ensuing violence or continued to incite it—including through the chants described above—as the violence was occurring.

3)  <u>St. Paul's Memorial Church</u>

176. During the attack at the Rotunda, hundreds of people were across the street at St. Paul's Church, listening to civil rights and religious leaders speak of peace and equality.  At least one white supremacist, Defendants' co-conspirator, was within the church, live-streaming the interfaith service to his followers.

177.  Some of the individuals within the church, including Plaintiff Wispelwey, along with people who had volunteered to serve in a security role outside the church, could see and hear the mob charging through the Rotunda, chanting and wielding torches.

178. After seeing the mob surround and attack the peaceful protestors at the Rotunda, Plaintiff Wispelwey and others were reasonably afraid that the mob would come

towards the church to cause violence to the building and the individuals inside, particularly given the racial and religious make-up of the assembled group and the fact that Defendant Kessler had specifically targeted Congregate, in advance, for harassment and intimidation.

179.    At around 10:00 p.m., when the service at St. Paul's ended, the organizers asked everyone in attendance to leave in groups through the back doors to avoid the neo-Nazis and white supremacists. However, after learning more details of the violence occurring at the Rotunda, Plaintiff Wispelwey reasonably apprehended that force would be used against those still within the church if they went outside. The church was filled with children and elderly individuals who were particularly vulnerable to any violence that could occur. Accordingly, a few minutes later, everyone at St. Paul's was asked to return to their seats. They remained in the church for nearly an hour after the service was supposed to end.

180.    After the church re-opened its doors, Plaintiff Wispelwey drove some of his fellow clergy back to their hotels to make sure they were safe. From his car, Wispelwey saw co-conspirators carrying baseball bats and torches—carried for the purpose of threatening, intimidating, and harassing residents.

181.    Directly outside of the Graduate Hotel, Plaintiff Wispelwey saw Defendant August Invictus harass and intimidate a friend. Invictus then walked towards Wispelwey, who was wearing a collar, until they were mere inches apart. Invictus kept moving forward even as Wispelwey pulled back. Once he was directly face-to-face with Wispelwey, Invictus began demanding, in a challenging and highly aggressive tone, that Wispelwey reveal what church he belongs to. Defendant Augustus Invictus then asked "What the hell are you doing," and continued hounding Wispelwey to state his church denomination.

4) <u>Defendants Celebrated the Torch Parade as an Advertisement for the "Unite the Right" Rally the Following Day</u>

182. David Duke, the former Grand Wizard of the Ku Klux Klan, and co-conspirator, posted the following:



183. Co-conspirator McLaren posted a photo of the march and tweeted: "White peoples never agreed to become minorities in their own lands, in numbers and spirit." Defendant Kessler tweeted a picture of the torchlight marchers surrounding the protestors at the statue and wrote: "Incredible moment for white people who've had it up to here & aren't going to take it anymore. Tomorrow we #UniteTheRight #Charlottesville." Spencer retweeted that tweet.

59

Pg. No. 61



Jason Kessler @TheMadDimension · Aug 11
Incredible moment for white people who've had it up to here & aren't going to take it anymore. Tomorrow we #UnitetheRight #Charlottesville

🗨 1.0K    ⟲ 1.5K    ♡ 3.6K

184.    Co-conspirator Thomas Ryan Rousseau, a leader of Defendant Vanguard America, kept his co-conspirators informed on the Southern Front Discord server, posting "All VA members safe and accounted for," while another co-conspirator wrote "I had a lot of fun tonight.  Can't wait for the big event tomorrow."

185.    Defendant Invictus told watchers of his livestream to come on Saturday to the most important "rally" of the year.  Anticipating and strategizing violence, Defendant Anglin wrote on his Daily Stormer website that people should "be at Lee Park by noon, preferably by 11:00."  Although he wouldn't be there, Anglin said that he had given Defendant Ray words to relay to the crowd.  He told readers:  "Make sure you're with a crew.  Don't park alone, don't walk to your car alone . . .  If you wanna stay up all night with Stormers, or arrange to travel to the park together tomorrow, get in this thread and start sending people PMs."  He signed off for the evening saying "[w]e are on the verge of breaking through into a whole other realm."

60

Pg. No. 62

B.    **Saturday, August 12, 2017**

    1)    Defendants Intentionally Planned A Violent Confrontation With Counter-
Protesters

186.    On August 12, Defendants, their co-conspirators, and others acting at their

direction executed their plan to carry out racial, religious, and ethnic violence, intimidation, and

harassment.  Defendants Kessler, Cantwell, Mosley, Heimbach, Hill, Invictus, Ray, Spencer,

Damigo, Fields, Parrott, Tubbs, the Nationalist Front, League of the South, NSM, TWP,

Vanguard, the East Coast Knights, the Loyal White Knights, FOAK, and hundreds of Stormers

(many of them from Stormer Book Clubs) all participated in the violent events of the day

together with co-conspirators, including Duke and the Proud Boys.

187.    Defendants and co-conspirators planned to arrive early and anticipated and

encouraged the use of violence to assist the rally.  As one co-conspirator explained:  "Me, the

rest of TWP and LS [League of the South] have been to more than one rodeo. / And shit NSM

will be there early too / Those guys are nuts / In a good way."  Defendant Kessler promised that

there would be hundreds of members of TWP and League of the South at the park as early as

8:00 a.m.

188.    Defendants Mosley, Kessler, and co-conspirators exhorted rallygoers to arrive

before the park opened to form "a white bloc barrier or square around the entire statue + podium

. . . . given that they know we're coming, we'll all need as many people as possible to be there

right when the park opens."

189.    Defendant Kessler told Discord participants:  "EVERYONE needs to get to the

park as early as possible and defend our territory."  He suggested that camping out at the

monument the night before would give them "[t]he most extremely prepared position."  In these

remarks, Kessler referred to (and actively encouraged) preparation for violence against racial and religious minorities and anyone who supported their cause.

190.    A co-conspirator asked the Discord group: "So are we going to occupy very early? Or try and force this commie scum out after the fact? I'm good with either." Another participant responded, "We will be fine as long as we have bodies there and willing to remove whoever is in our way. Vanguard is fabricating 20 additional shields. We should have a good amount between organizations. We just need to make sure we have bodies there ready to rock."

191.    Consistent with the conspiracy's effort to organize and maximize violent acts, a co-conspirator and moderator on Discord told participants "we'll be putting out a video for basic formation, roles, and commands to all of the group leaders shortly," and posted a "Shields & Shield Tactics Primer" made by the "Detroit Right Wings," as well as a video illustrating shield fighting techniques, to be studied by participants. Defendant Mosley said: "I run this [the Unite the Right "rally"] as a military operation . . . I was in the army."

192.    Defendants took no steps to prevent, or aid in preventing, the intimidating, threatening, and otherwise illegal conduct they knew was being planned and coordinated.

2)    The Events On August 12 Were Intentionally Violent In Accordance with Defendants' Planning

193.    According to former Charlottesville Police Chief Al S. Thomas, Jr., Defendants refused to follow a plan that had been worked out to keep them separated from the counter-protesters. For example, instead of entering the park from one entrance, they came in from all sides.

194.    Most of the Defendant groups arrived in military formations, armed like paramilitary forces—carrying, among other things, guns, shields, protective gear, flags, and rods. They shouted commands at their groups to "move forward" or "retreat." Governor Terry

62

Pg. No. 64

McAuliffe stated that "80 percent of the people here had semiautomatic weapons . . . you saw the militia walking down the street, you would have thought they were an army."

195.     Four members of Defendants Nationalist Front, League of the South, NSM, TWP, and Vanguard America met at a pre-set location in order to march to Emancipation Park in formation.

196.     Defendant Vanguard America marched to the Park first, chanting "Blood and soil!"  Members of the group were in uniforms, as instructed, dressed in helmets, white or black polos, and khakis, and wielded matching shields and flags.  Defendant Fields (who was wearing the uniform white polo, khakis and carrying a black shield with the Vanguard logo) marched with Vanguard America.

197.     Defendant League of the South, led by defendant Michael Hill, followed.  Like Defendant Vanguard America, they marched with coordinated shields and flags and carried rods and other weapons.



**Michael Hill**
@MichaelHill51

Follow



6:59 PM - 24 Aug 2017

198.    One member of Defendant League of the South explained that he attended the Unite the Right "rally" because:  "I intend to stand for the South and die for it if need be.  They will not replace us."

199.    Defendant TWP marched behind Defendant League of the South, and Defendant Parrott marched with TWP.  Defendant Heimbach guided the group, wearing a black combat helmet with a bodyguard close on his heels.

200.    As the Nationalist Front groups and other Defendants and co-conspirators marched towards Emancipation Park, they shouted threatening, harassing, and intimidating language at Charlottesville residents and protesters on the basis of their race, religion, and ethnicity or their support for people of different races, religions, and ethnicities.  These included

64

statements like, "Get the fuck out of our country, bitches! Yeah, come up to me! Come up to me, bitch!"

201.　　Marching down Jefferson Street, Defendants and co-conspirators passed the synagogue where Plaintiff Pearce is a member.　During the Shabbat services, three co-conspirators in uniforms and semi-automatic rifles stood across from the temple.　As others paraded past, they shouted, "There's the synagogue!" followed by chants of "Sieg Heil" and other anti-Semitic language.　Some carried flags with swastikas and other Nazi symbols. Defendant Ray, intending to threaten, intimidate, and harass Charlottesville's Jewish population, carried a banner (later posted on Daily Stormer's website) that read "Gas the kikes, race war now!"[9] Defendant Ray also told a woman to "put on a fucking burka" and called her a "sharia whore."　He ended by proclaiming: "Hitler did nothing wrong."　These acts were fully consistent with the broader campaign of racial and religious suppression at the heart of Defendants' conspiracy.

202.　　Later that day, in a thread with Daily Stormer, co-conspirators suggested meeting at 3:00 p.m. to "torch those Jewish monsters."　After seeing their exchange, the Charlottesville mayor made a frantic appeal to the Secretary of Public Safety asking for police protection at the Temple.

---

[9] As made clear in the Daily Stormer "style guide," references like this are only meant to seem hyperbolic to the uninitiated.　The Daily Stormer is aware that "[m]ost people are not comfortable with material that comes across as vitriolic, raging, non-ironic hatred," and so "[t]he undoctrinated should not be able to tell if we are joking or not. There should also be a conscious awareness of mocking stereotypes of hateful racists."　But according to Defendant Andrew Anglin, who drafted the style guide, "[t]his is obviously a ploy and I actually do want to gas kikes."

65

Pg. No. 67



203.　　By contrast, Plaintiff Wispelwey had organized a 6:00 a.m. interfaith prayer "sunrise" service that was held at the historical African-American First Baptist Church on West Main Street.

204.　　After the service, a number of community members left the church to hold a peaceful march from the nearby Jefferson School African American Heritage Center to McGuffey Park. Others, including Plaintiff Wispelwey, silently marched with other clergy members directly from the sunrise service to Emancipation Park.

66

Pg. No. 68



205.    When Plaintiff Wispelwey and his fellow clergy arrived at Emancipation Park,

around 8:00 a.m., they were confronted by heavily armed militiamen and extremists, many in full

military attire with semiautomatic rifles and pistols.  Plaintiff Wispelwey and other clergy

members locked arms and knelt before them.

206.    As they had planned, Defendants and their co-conspirators approached

Emancipation Park in coordinated waves of passenger vans.  Peinovich, flanked by his "security

team," approached Emancipation Park in the "third or the fourth wave."

207.    Consistent with their elaborate planning and lessons in battlefield tactics,

Defendants and their co-conspirators charged through the peaceful clergy when they arrived at

the park.  Many of the clergy were pushed to the ground, and Plaintiff Wispelwey was knocked

into a bush.  A co-conspirator stood staring Plaintiff Wispelwey directly in the eyes and

repeatedly shouting "fuck you, faggot" at him.

67

Pg. No. 69

208.     The violence by the Defendants at the entrance to Emancipation Park followed a consistent pattern according to their pre-set plan.  The Defendants would "use shields, flags, or fists" to break through the blockade of counter-protestors, would succeed in entering the park, and then another wave would arrive.  In between each wave, counter-protestors would attempt to reassemble before the next arrived.  This played out at least half a dozen times.

209.     After the being assaulted, Plaintiff Wispelwey and other clergy were afraid that they could get seriously injured or would suffer another, more serious attack.  As a result of Defendants' and their co-conspirators' actions, and as the violence escalated, Plaintiff Wispelwey was forced to end his peaceful protest and leave the park where he and others were lawfully standing.

210.     Plaintiff Romero experienced a similar attack by Defendants and their co-conspirators.  Having linked arms with a group of women facing Defendants and co-conspirators, who were clad in shields and helmets outside Emancipation Park, Romero was pushed against a police car as the Defendants and co-conspirators sought to move through Romero's group.  During this assault, Romero was also spit on.

211.     Defendants bragged about their violence after the fact.  Defendant Parrott, for example, wrote an account of the Unite the Right "rally" in "Catcher in the Reich:  My Account of my Experience in Charlottesville."  He wrote that Defendants TWP, League of the South, NSM, and other Nationalist Front groups joined together "to help create two shield walls" for "the fight."  He explained, "While most of the Identity Evropa men were occupied on other fronts, they sent a detachment of fighters to assist us and to relay intelligence to Jason Kessler and other organizers.  They offered more fighters, but we had our positions amply covered."  He further said, in an interview with the *Los Angeles Times*:

With a full-throated rebel yell, the League broke through the wall of degenerates and TradWorker managed to enter the Lee Park venue itself while they were largely still reeling. Michael Tubbs, an especially imposing League organizer towered over and pushed through the antifa like a Tyrannosaurus among raptors as league fighters with shields put their training to work.

212.    Defendant Hill later exclaimed that: "Mr. Tubbs was everywhere the chaos was."



213.    By around 10:00 a.m., having charged through protesters, pushing and shoving them with their shields and rods, Defendants TWP, NSM, and League of the South lined up inside Emancipation Park, led by, among others, Defendants Schoep, Hill, Heimbach, and Parrott. Defendant Parrott explained that they had "stuck with the original plan to define and secure the event perimeter."

214.    Once inside the Park, Defendants' racial, religious, and ethnically motivated violence did not stop. It escalated.

215.    As they had planned, Defendants used their shields and rods to plow through people and knock them over. They used rods and flags to assault protesters.

216.    Defendants also encouraged violence by others.  Over the course of the morning, Daily Stormer, through a livefeed maintained by Defendants Anglin and Ray and other Daily Stormer staff on the ground, encouraged followers to organize in groups and deliberately incited them to engage in violent acts.  Among other exhortations, they told followers: "WHITE SHARIA NOW!" and "WE HAVE AN ARMY! THIS IS THE BEGINNING OF A WAR!"

217.    Members of Defendant Vanguard America also communicated over the Southern Front server, sharing live feed streams and encouraging co-conspirators on the ground in Charlottesville to "Just incite a riot already."  One co-conspirator on the Anticom Discord server, reported to the group: "Vanguard shields are holding the line."

218.    Having witnessed the events of Friday and the anti-Semitic chants of defendants and their co-conspirators, Plaintiff Pearce struggled with whether she should attend the peaceful protest and whether she should identify herself as Jewish.  On the one hand, she believed that it was important to peacefully protest, but she also feared for her safety.  As she left her house, she made a Star of David out of duct tape and attached it to her shirt which bore a Hebrew letter in rainbow colors to show her support for the LGBT community.  She went to Emancipation Park to peacefully protest the neo-Nazis and white supremacist presence in Charlottesville.

219.    One of the rallygoers, a co-conspirator, saw Plaintiff Pearce on the street, pointed at her, and, shouted: "Oh good, they are marking themselves for us, so it is easy to find them."  At the Park, Pearce was joined by her son, who also wore a Star of David and carried a rainbow flag.

220.    While Plaintiff Pearce was standing, peacefully, outside of the Park, expressing her solidarity with other Jewish and non-white members of her community, another white-supremacist and co-conspirator threw an open bottle filled with a foul liquid at her—a common

tactic of Defendants and their co-conspirators.  Indeed, in advance of the rally, co-conspirators

had encouraged others to "[p]ee in balloons and throw them at communists / In self defense,"

and to "[f]eel free to urinate and defacate on your nearest antifa terrorist faggot pussy."  The

bottle struck Pearce on her leg and she could smell the foul liquid on her body.

221.　　In short order, peaceful protesters, including Plaintiffs Wispelwey and Pearce,

were forced to leave the area of Emancipation Park as Defendants and co-conspirators attacked

people with clubs, smoke bombs, and pepper spray, in fulfillment of their premeditated strategy

of inflicting injury.

3)　　The Authorities Declared the Rally an Unlawful Assembly and Defendants and
　　　　Co-Conspirators Intentionally Spread the Violence Outside Emancipation Park

222.　　By 11:22 a.m., before the permit for the "rally" even began, Charlottesville

officials declared the gathering in Emancipation Park an unlawful assembly, defined under

Virginia law as "whenever three or more persons assembled share the common intent to advance

some lawful or unlawful purpose by the commission of an act or acts of unlawful force or

violence likely to jeopardize seriously public safety, peace or order."

223.　　At 11:28 a.m., Governor McAuliffe declared a state of emergency, stating: "It is

now clear that public safety cannot be safeguarded without additional powers, and that the

mostly out-of-state protestors have come to Virginia to endanger our citizens and property.  I am

disgusted by the hatred, bigotry and violence these protestors have brought to our state over the

past 24 hours."

224.　　Daily Stormer wrote shortly thereafter: "Someone is getting gassed! . . .  LET'S

HOPE IT'S JEWS!"

225.　　Jason Kessler and other Defendants directed the mob to move to McIntire Park.

Some Defendants and co-conspirators, loaded into white vans, and Defendants Cantwell and Ray

71

Pg. No. 73

shared one van.  In his interview with *Vice* that day, Ray explained:  "We're showing to this parasitic class of anti-white vermin that this is our country.  This country was built by our forefathers.  It was sustained by us.  It's going to remain our country."

226.    Daily Stormer encouraged its followers to go to McIntire Park and assemble "behind" Defendants Ray and Cantwell, and incited the crowd to violence:

**12:42 PM:**

STREETS BELONG TO US!

COPS WON'T INTERVENE!

> Clash between protesters and counter protesters. Police says "We'll not intervene until given command to do so." #Charlottesville
> pic.twitter.com/UkRDINn2mv
>
> — ACLU of Virginia (@ACLUVA) August 12, 2017

**GET TO MCINTIRE PARK NOW AND FIND AZZMADOR, CANTWELL OR SACCO VANDAL! STAY IN THE GROUP! DO NOT SEPARATE ONCE YOU ARE BEHIND ONE OF THESE THREE MEN!**
**12:33 PM:**

# EVERYONE GO TO MCINTIRE PARK!

GOOGLE MAP COORDINATES HERE!

**12:31 PM:**

FUCK YOU FAGGOTS!

227.    Among those who followed their direction was Defendant Vanguard America. Defendant Schoep also marched to McIntire Park, attacking protestors along the way.  He explained, "I was offered a ride to safety and declined to leave until the women and others were safe, so we just marched back through antifa . . . We went right through [antifa] like warriors." Defendant Parrott refused to leave Emancipation Park and was arrested by the police for failing to disperse.  Parrott described his detention as being "a political prisoner for about 20 minutes."

228.    By 1:00 p.m., Defendant Spencer and Peinovich, and their followers, had mostly

reassembled in McIntire Park. Violence again broke out.  One woman protesting Defendants'

message was choked by co-conspirator Steven Balcaitis, who was wearing a t-shirt advertising a

white nationalist and anti-Semitic website, Red Ice.  As he grabbed her neck, he looked at a

bystander and said, "Don't save her."

229.    Defendant Spencer and Peinovich spoke to their followers at McIntire Park.

Peinovich called the counter-protestors "savages."

230.    Defendants at McIntire Park discussed returning to Emancipation Park in defiance

of police orders.  Defendant Mosley sought people with guns:  "I need shooters," he said. "We're

gonna send 200 people with long rifles back to that statue."  According to a Defendant NSM

twitter account, Defendant Schoep "led a group of 40 back the 1.3 miles from the 2nd park back

to Lee Park, through Antifa and police interference!"  They jeered:  "So much respect for my

Commander Jeff Schoep.  I will go into battle with you anytime Sir 83/88!"

231.    A few minutes after 1:00 p.m., Daily Stormer posted:

> **1:08 PM:**
>
> Apparently everyone is getting kicked out of McIntire park.
>
> Everyone is getting kicked out of everywhere.
>
> My advice is this:
>
> # HOLD YOUR FUCKING GROUND WHERE YOU ARE.
>
> **12:56 PM:**
>
> | Daily Stormer reccomendation: HOLD YOUR FUCKING GROUND.
> | DON'T RETREAT. DON'T GIVE AN INCH. https://t.co/rYlXmSBidS
>
> | — Daily Stormer Status (@rudhum) August 12, 2017

73

Pg. No. 75

232.    Defendants took no steps to prevent, or aid in preventing, the violent actions that they knew was being planned.

233.    Some Defendants and co-conspirators stayed in the parks while others dispersed and began to terrorize residents in the downtown area of Charlottesville, near the pedestrian mall. Muñiz, wearing a t-shirt with a representation of women of color, witnessed the marchers walk back to town from McIntire Park and then followed herself to join a group of peaceful counter-demonstrators.

234.    On the mall, Defendants and co-conspirators again brought violence.  One co-conspirator, for example, was caught on video punching two peaceful counter-protestors directly in the face.

4)      <u>The Car Attack</u>

235.    "Run Them Over" is a popular anti-Black Lives Matter and anti-racial justice protest catchphrase and shows up in memes and comments across the Internet.[10]  In late January 2017, Fox Nation, the opinion website operated by Fox News, tweeted out a "Reel Of Cars Plowing Through Protestors Trying To Block The Road."  The author of the video piece, which originally appeared on the Daily Caller, wrote: "Here's a compilation of liberal protesters getting pushed out of the way by cars and trucks" and "Study the technique; it may prove useful in the next four years."  On Facebook, the author bragged about the popularity of the piece, boasting that he "[m]ade a profit for the company today. Went from 400,000 to 2 million views in a 24 hour timespace #winning."

---

[10] Over the past two years, the imagery of running protestors over with a car has gained currency among Defendants and others.  Defendant Heimbach encouraged a police car to mow down peaceful protestors.  An article reports that Heimbach was walking near the parade route when he encountered a group of demonstrators holding signs about water preservation.  A black SUV with police plates drove up and stopped in front of the demonstrators.  An officer leaned out the window and asked them to step aside so that they could pass. "Don't stop, officer," shouted Heimbach as the SUV made its way through the group, "Fucking step on the gas!"

74

Pg. No. 76

236.    The same trope was used as part of planning for the Unite the Right "rally."  On

Discord, for example, in response to a post from Tyrone that if "something happens . . .

adjustments will have to be made to remove people from the scene," co-conspirator

"AltCelt(IL)" responded with an image from a famous scene in the movie *Dawn of the Dead*, in

which the protagonists retrofit buses with chainsaws and barbed wire to escape a mall by running

over thousands of swarming zombies.  AltCelt(IL) added a "crying laughing" emoji and wrote

"This will be us."



237.    Tyrone replied with picture of a John Deere tractor captioned "Introducing John

Deere's new multi-lane protestor digestor" and commented, "I know NC law is on the books that

driving over protesters blocking roadway isn't an offense… Sure would be nice."



238.     On the same day (July 17, 2017), Tyrone asked the #virginia_laws channel, "*Is it legal to run over protestors blocking roadways? I'm NOT just shitposting. I would like clarification. I know it's legal in NC and a few other states. I'm legitimately curious for the answer.*"  Two participants reacted to this post with red heart emojis.

239.     Another co-conspirator on Discord, using the #virginia_laws channel, posted a photo of an armored military tank and wrote:  "Is this legal in VA?"  Eleven participants responded with emojis expressing approval.

240.     Similarly, when Defendant Kessler asked the #demonstration_tactics channel for advice on planning a march, one co-conspirator, "PrimitveXaoc," encouraged the use of sidewalks because "straight through the streets like they did a few weeks ago for the 'community defense' March was awful (Antifa)."  He posted several photos from that march and wrote: "These fools had babies and children in the streets dragging banners over cars blocking their

view and such. Too bad the civilians didn't just make new speed bumps for some of these scum."

241.    At approximately 1:40 p.m., in furtherance of the conspiracy, Defendant Fields drove his Dodge Challenger onto Fourth Street, idled for a moment while his vehicle faced the peaceful protesters, and then deliberately accelerated into the crowd.

242.    Plaintiffs Martin, Blair, Sines, Muñiz, Alvarado, Baker, and Romero were marching up Fourth Street when Fields attacked. Plaintiff Muñiz had walked to the front of the crowd when it was at the intersection of Fourth Street and Water Street to take a picture of the gathering. When the crowd turned left onto Fourth Street, Muñiz was still towards the front of the crowd.

243.    Plaintiffs Martin and Blair were approaching the same intersection, walking up Fourth Street towards the downtown mall, with their friend, Heather Heyer. As he saw the car speeding down the road, Martin pushed Blair out of the path of the moving car. She fell to the ground and sustained injuries, including a hematoma on her left side and a gash on her right arm. Martin was hit directly by the car, sustaining serious injuries, including a broken leg, fractured ankle, and multiple bruises.

244.     He is pictured below, flying through the air after the car slammed into his body.



245.     Looking for Martin on the street, Blair saw people lying on the ground and bleeding.  She stepped over them looking for Martin.

246.     Blair found Martin on the ground, where people were trying to help him.  Fifteen minutes after the attack, Martin was taken to the hospital and Blair rode in the ambulance with him.  Blair did not receive immediate treatment for her injuries because she was looking after Martin.

247.     While waiting in the hospital, Blair learned that a woman had died in the car attack.  She feared that she knew who it was, and began asking everyone around her if they knew who it was.  Eventually she learned that it was her friend, Heather Heyer, who had been struck and killed.

248.    Plaintiff Baker also was thrown through the air when he was struck by Defendant Fields's car.  In the picture above, he is upside-down as he flipped over the car during the attack. Baker suffered severe injuries, including a concussion, torn ligament in his left wrist, lacerations, and a torn labrum in his right hip.

249.    Plaintiff Romero was hit directly by Defendant Fields's car.  The impact threw her against a parked car, which she hit before falling to the ground.  Plaintiff Romero recalls wanting to lie down and close her eyes, but she thought that if she closed her eyes and gave up, she would die.  She attempted to get up, but struggled and was told by a bystander to sit back down.

250.    Romero is pictured below receiving initial care from bystanders:



251.    Covered in blood from a skull fracture sustained during the attack, Romero was carried to an ambulance, where a medic informed her that she had been unconscious as they

helped her down Fourth Street.  Before falling unconscious, Romero had begged bystanders to call her mother, as she had lost her phone when struck by Fields's car.

252.     Plaintiff Alvarado, who attended the events with Plaintiff Romero, was also hit by Defendant Fields's car.  The impact of the car knocked her to the ground.  Initially filled with adrenaline, she immediately picked herself up and looked for her friend Romero, who had been hit.  Alvarado then watched as Defendant Fields drove his car in reverse into the crowd she was standing in.  Fields narrowly missed hitting Alvarado again because she was able to press closer to the adjoining wall.  Alvarado continued to fear that the car would come back down the street.

253.     Plaintiff Alvarado then went to assist Plaintiff Romero.  She supported Romero as they walked up the street until Romero was put into the ambulance.  Alvarado was subsequently directed to the medical tent, where she was treated for her injuries.

254.     Plaintiffs Muñiz and Sines narrowly escaped being struck by the car.  They witnessed belongings and bodies flying in the air.  When they saw Defendant Fields speed his car in reverse—backing over many of the bodies he already hit—they were sure that he was going to come charging back into the crowd.  Plaintiff Muñiz feared that the cars would be coming from all directions.

255.     Plaintiff Muñiz ran away and collapsed on the side of the road.  She suffered an acute stress reaction.   Plaintiff Sines ran into an alleyway and was so shocked that she had difficulty forming any words.  Fearing other attacks, she ran to her closest friend's house downtown.

256.     Plaintiff Muñiz saw volunteer medics arriving.  Muñiz was shaken and terrified and could not stand up.  Muñiz feared that the incident was no longer over.  Finally, when Muñiz

felt that no other attack was forthcoming, the medic got Muñiz to her feet and walked her to the trauma center.

257.    Plaintiff Wispelwey was not at Market Street when the car attack occurred.  When he learned of what happened, he sprinted to the site with other clergy to provide assistance, to support victims, and to help control the crowds so that medical vehicles could reach victims.

258.    Plaintiff Pearce also rushed to the scene to provide care and, with the help of her son, tried to suppress the crowds so that medical vehicles could reach those injured.

259.    But as Plaintiffs mourned and tried to care for one another, Defendants and co-conspirators celebrated and encouraged others to leave town immediately, before they found themselves in trouble.

260.     Defendant Spencer tweeted "My recommendation:  Disperse.  Get out of Charlottesville city limits."  Defendant Kessler retweeted him.  At 2:25 pm, Defendant Hill tweeted "The League of the South had a good day in Charlottesville, Virginia.  Our warriors acquitted themselves as men.  God be praised!"

261.    Concluding its live feed for the day, Daily Stormer posted: "THE STREET WAR HAS ENDED.  WE WON.  WE SHOWED THAT OUR IDEAS HAVE TO BE SHUT DOWN WITH VIOLENCE."

5)    After the Fact, Defendants Celebrated Their Successful Plan to Incite Violence

262.    As news about the car attack spread, Defendants celebrated what they believed was their "victory" and mocked the death of Heather Heyer.

263.    Only one hour after the car attack, Defendant East Coast Knights's prominent member "Kneuss" tweeted:  "At least nobody important got hurt. #Charlottesville," followed by

another tweet stating, "Dirty apes playing in the street gotta learn the hard way #Charlottesville."[11]  Both tweets were liked by the East Coast Knights Twitter account.

264.    Later that evening, Defendant Anglin posted a message:  "Roadkill Nights Powered by Dodge.  It's going down Saturday Aug. 12th from 11am to 10 pm."

265.    The following day, Discord participants posted memified photos of Defendant Fields driving his car into the crowd, one labeling the car "RESPECT" and the crowd "WOMEN." Another meme circulated online labeled the image "BACK TO THE FHURER."



---

[11] Kneuss, who uses the handle "@realDRKNEUSS" on Twitter, interacts frequently with the East Coast Knights on Twitter and they retweet each other frequently; often they are each other's only retweet.  On August 12, at 3:43 p.m., Kneuss tweeted "Big shout out to League of the South, TWP, and NSM the East Coast Knights greatly appreciate you and everything you do. #Charlottesville."  The East Coast Knights' Twitter account retweeted this tweet.  On September 19, Kneuss tweeted a stylized image saying ECK 33/6, which is a reference to the East Coast Knights.

82



266.     In Southern Front, the Discord server set up for southern members of Vanguard

America, and the organization to which Defendant Fields belonged, members posted similar

memes, such as a picture of Plaintiff Martin flying through the air with the caption "Can't Dodge

This" and another labeling Fields a "USA Patriot."  One co-conspirator wrote: "I don't think we

should hand out shields anymore @everyone . . . We should hand out dodge challengers

instead."



267.    Daily Stormer encouraged followers to find out the details of Heather Heyer's funeral and to attend.  A tweet from Defendant Kessler's account referred to Heather Heyer as a communist and said:  "Communists have killed 94 million.  Looks like it was payback time."  Kessler claimed he was on a mixture of prescription drugs and alcohol when he wrote that message and did not remember it; an agent of Daily Stormer claimed credit for hacking Kessler's account and posting the tweet.

268.    Defendant Heimbach said of the rally:  "We achieved all of our objectives.  We showed that our movement is not just online, but growing physically.  We asserted ourselves as the voice of white America.  We had zero vehicles damaged, all our people accounted for, and

moved a large amount of men and materials in and out of the area.  I think we did an incredibly

impressive job."

269.    White supremacists debriefed on Discord, celebrating that protesters "got btfo

[blown the fuck out] by all objective measures / only people who moved us a single inch were

the zog-cops."  "Kneuss" of the Defendant East Coast Knights celebrated:  "3 fatalities in

#Charlottesville.  How many WN's [white nationalists]?  NOT 1.  Fuck the left, Fuck commies,

and all kayaks belong in ovens.  Amen."  This tweet was liked by the East Coast Knights'

official Twitter account.

270.    A Vanguard America co-conspirator posted a Daily Stormer article on the

Southern Front Discord server and wrote: "This was the biggest victory for our movement

history.  It was glorious. https://www.dailystormer.com/charlottesville-complete-victory-event-

debriefing/" they celebrated, "We fucked up many commies . . .  We hospitalized dozens . . .  We

got our guys out, without police help.  We won. . . .  Now you make the next rally and fight for

your people."  After the Saturday events, Thomas Ryan Rousseau, a leader of Vanguard

America, reassured co-conspirators on the Southern Front Discord server:  "I'm safe, with a

dozen or so guys hanging out at a hotel sharing stories of the day."

271.    Defendant Schoep tweeted:  "It was an Honor to stand with U all in C'Ville this

weeknd.  NSM, NF, TWP, LOS, VA, ECK, CHS, and the rest, true warriors!"  "Kneuss" and

other co-conspirators retweeted and liked this.  A co-conspirator posted on Facebook: "Don't feel

ashamed of Cville.  This is your future.  This is the enemy."

272.    Speaking of Charlottesville in an interview, the Grand Dragon for Defendant

Loyal White Knights, said:  "I'm sorta glad that them people got hit and I'm glad that girl died.

They were a bunch of Communists out there protesting against somebody's freedom of speech,

so it doesn't bother me that they got hurt at all."  Defendant Loyal White Knights also changed their outgoing voicemail message to say:  "Nothing makes us more proud at the KKK than we see white patriots such as James Fields, Jr, age 20, taking his car and running over nine communist anti-fascist, killing one nigger-lover named Heather Heyer.  James Fields hail victory.  It's men like you that have made the great white race strong and will be strong again."

273.    Likewise, Defendant Spencer told the *New York Times* that August 12 was "a huge moral victory."  Defendant Cantwell told a *Vice* reporter: "I'd say it was worth it.  Nobody on our side died . . . none of our people killed anybody unjustly . . . our rivals are just a bunch of stupid animals who don't pay attention that couldn't just get out of the way of the car."  Speaking of counter-protesters like Plaintiffs, he said:  "These people want violence and the right is just meeting market demand."

274.    In addition to celebrating the August 12 "rally" as a success, Plaintiff Romero continued to be harassed and intimidated.  Following her release from the hospital, Romero received three more phone calls from the same Klansman who had harassed her in July.  On these phone calls, the man explained that he was trying to sell silver Dodge Challengers—the color, make, and model used by Defendants Fields in his car attack—in  Charlottesville.  Five minutes after Romero hung up, he called again with the same foreboding pitch.

275.    Later, Romero received a fourth call, again from the same individual, in which the caller said, "Don't you hate it when there are random pedestrians blocking the road, and shit like that?  There was one girl named Natalie Romero, she got caught in the accident?  She should have died in the hospital."   These calls terrified Romero and she continues to worry about her safety.

276.     Plaintiff Romero, and several other of the Plaintiffs, also appeared on a list purporting to identify "members of Antifa" who had attended the August 12 "rally." The list identified who had been injured, and who among those "members of Antifa" were "known to be violent."[12] None of the Plaintiffs were identified on the list as among those "known to be violent." The list was created by a former member of Defendant Identity Evropa, who then joined Vanguard America in July 2017 and became an active participant on its Southern Front Discord server, bragging "I really can help track most Antifa" and "[m]y info is good and I will do everything I can to help VA [Vanguard America]."

277.     The list he created was circulated on Gab, a Twitter-like social media site where neo-Nazis and white supremacists, many of whom have been kicked off of traditional social media platforms, share and post information. On Gab, at least one distribution of the purported "Antifa" list was directed to Defendant Cantwell, among others.

## III.     Defendants' Actions Have Caused and Will Continue to Cause Damage to Plaintiffs

### A.     The Unlawful Acts By Defendants, Co-Conspirators, and Others Acting at Their Direction Caused Serious Injury, Including To Plaintiffs

#### 1)     Defendants' Actions Caused Serious Bodily Injury and Damage to Property

278.     The planned violence brought about by Defendants in Charlottesville on August 11 and 12 left an indelible mark on Plaintiffs, Charlottesville, and the rest of the country. Three innocent people lost their lives: a peaceful protestor, Heather Heyer, and two state law enforcement officers, Lieutenant H. Jay Cullen and Trooper Pilot Berke M.M. Bates. At least 34 individuals, including Plaintiffs, were injured and countless others were victims of assault. Hundreds, if not thousands, were subjected to verbal abuse, threats, harassment, and intimidation

---

[12] Defendants considered any individual opposing their "rally" as being "Antifa," regardless of whether they were violent or intended to be violent.

87

Pg. No. 89

when Defendants, co-conspirators, and their followers chanted and shouted overtly anti-Semitic, racist, xenophobic, and homophobic messages.

279.    Countless public officials, including Virginia's governor Terry McAuliffe, Attorney General Jeff Sessions, and Senators Cory Gardner, Ted Cruz, and Ron Wyden, have recognized that the Unite the Right "rallygoers" were motivated by racism, xenophobia, and anti-Semitism, that the "rallygoers" engaged in hate-based violence, and that the events that unfolded were properly characterized as domestic terrorism.

280.    On September 12, 2017, Congress passed a unanimous and bipartisan joint resolution "rejecting white nationalists, white supremacists, the Ku Klux Klan, neo-Nazis, and other hate groups," recognizing that they engaged in a "horrific and violent display of bigotry" in Charlottesville, and condemning "the violence and domestic terrorist attack that took place during events between August 11 and August 12, 2017."

281.    The joint resolution also documented that the hate-based groups are "organizing similar events" around the country, and urged the President to "speak out against hate groups that espouse racism, extremism, xenophobia, anti-Semitism, and white supremacy," and address "the threats posed by those groups," which are currently growing within the United States.

282.    President Trump signed the resolution, and issued a signing statement "oppos[ing] hatred, bigotry, and racism in all forms."

2)      <u>Plaintiffs Suffered And Continue To Suffer Serious Injuries</u>

283.    <u>Plaintiff Martin</u>:  As a result of the car attack, Martin was diagnosed with a shattered tibia in his left leg, a fractured ankle, and significant ligament damage.  He underwent surgery and had two screws placed in his ankle.  He experienced swelling in both ankles, and he could not walk for 3 or 4 days.  He has been told to expect swelling in his left ankle for at least a

year. Due to the nature of his job, he will not be able to work for at least 8-9 months. He has suffered severe emotional distress that includes having mental flashbacks to the events of the "rally." Martin is going to mental counseling twice a week to seek support for his emotional trauma.

284. <u>Plaintiff Blair</u>: For days after the attack, Blair found herself short of breath, shaking, and crying uncontrollably at times. To this day she has trouble focusing, including at work, and finds herself often uncharacteristically angry. She is scared of Dodge challengers and loud noises. She is also experiencing flashbacks. She is withdrawn and reticent in ways she never was before. She has lost about ten pounds since the attack due to lack of appetite. She cannot walk by the location of the attack.

285. <u>Plaintiff Romero</u>: As a result of her assault and false imprisonment at the torchlight rally, Romero experienced burning in her eyes and on her shoulders, and the fear and anxiety she felt that night prevented her from sleeping. The car attack the following day left Romero with severe physical injuries and emotional trauma. Romero suffered a skull fracture, concussion, severe contusions, a fractured tooth, and scratches all over her body. She suffers from severe vertigo and experiences debilitating headaches that prevent her from leaving the house. She also cannot be exposed to bright light or look at white paper without experiencing pain. Her doctors are unsure of when these symptoms will subside. In addition to her physical injuries, Romero suffered severe emotional trauma as a result of the torchlight rally and car attack. Romero did not return to campus for classes this fall because of anxiety and fear associated with her assaults on August 11 and 12.

286. <u>Plaintiff Alvarado</u>: The car attack on August 12 caused Alvarado serious physical injuries and emotional trauma. Alvarado suffered a concussion and severe contusions to her

legs.  As a result of her concussion, she continues to experience confusion, forgetfulness, and difficulty processing conversations.  In addition to her physical injuries, the car attack also left her with severe emotional trauma.  Alvarado suffers from depression, which has led to weight gain, isolation from her family and friends, and an inability to do daily tasks.

287.    <u>Plaintiff Baker</u>:  Baker suffered severe physical injuries and emotional distress.  He tore the ligament in his left wrist, tore the labrum in his right hip, and suffered a concussion and several lacerations from the car attack.  His arm was in a cast for six weeks.  His injury required major surgery, with an eight-month recovery, including four months of physical therapy and four weeks out of work to heal.  He cannot run or jump, and he had to give up some of his favorite activities, including soccer, lacrosse, and weight lifting.  Baker will likely need a hip replacement as a result of the attack.  He still suffers from these injuries, and cannot use his hip as well as he could before the attack.

288.    Additionally, Baker continues to suffer from emotional distress.  Everyday situations now make him anxious and can trigger flashbacks.  He gets panic attacks.  He feared making public statements about his experience for over 18 months.  Baker was justifiably afraid for the safety of himself and his wife if he spoke out.

289.    <u>Plaintiff Wispelwey</u>:  Wispelwey continues to suffer from emotional distress.  Wispelwey's emotional distress has manifested in physical symptoms including constricted chest pain, difficulty breathing, and chronic sleep issues.  He regularly wakes up with night terrors recalling the events of August 11 and 12 and has had to take time off from his work in order to cope with the trauma of the weekend.  He has seen a trauma-informed therapist, has been proscribed with sleep medication, and diagnosed with acute stress disorder.  Wispelwey has also become hyper-vigilant, especially in crowds.

290.   <u>Plaintiff Muñiz</u>:  After experiencing the car attack, and being verbally harassed on August 12, Muñiz has suffered severe emotional injury.  For the first week following the attack, Muñiz could not drive a car.  She was afraid even to be a passenger without covering her left eye, because the sight of oncoming traffic was terrifying.  Muñiz has since experienced triggers—moments where she relives the fear of that day and she shakes and trembles.  She has suffered a few episodes, in which she has fallen to the ground in a catatonic state and can do nothing but cry and drool for long periods.  She has been sleeping erratically, has suffered short term memory issues, and has become socially withdrawn.  She has been unable to obtain medical care for other conditions due to her stress, so she continues to suffer from other ailments.  She is seeing a therapist multiple times per week and has started therapy for post-traumatic stress.  At work, Muñiz used to manage a department of around twenty people, with two managers beneath her.

291.   Unable to return to work, Muñiz was on leave for disability during which time she was paid 70% of her pay, and has lost other financial benefits, such as tuition reimbursement.  She returned to work on a reduced schedule on November 1, but her company made a decision that she is not capable of doing that job anymore so she was placed in a new role with less responsibility.  Medical professionals have diagnosed Muñiz with acute stress disorder.  Muñiz returned to work full-time on January 2, although in her new role with less responsibility.  She is undergoing weekly therapy for her symptoms.

292.   <u>Plaintiff John Doe:</u>  As a result of being barked at, yelled at, and physically assaulted, John Doe has suffered numerous emotional injuries.  He has had difficulty focusing in school and is constantly recalling the trauma of Friday evening.  When he walks past the Thomas Jefferson statue on his campus, he is immediately triggered by the recollection of the events on

August 11. Since the "rally," John Doe has had difficulty sleeping and has developed a heightened, anxious, sense of awareness in public spaces. John Doe also had to miss two weeks of work.

293. <u>Plaintiff Sines</u>: Upon witnessing the car attack and nearly being hit, Sines suffered extreme emotional distress and shock. She often wakes up with nightmares of the car attack and her academic performance has suffered in law school as a result. Sines is unable to focus, and has missed classes due to her emotional distress. Sines is also now hyper-vigilant, and afraid in her own home.

294. <u>Plaintiff Pearce</u>: In addition to the physical and verbal, religious-based assault Pearce experienced on August 12, she continues to suffer serious emotional distress. In his Hebrew school class, Pearce's son was asked to answer several writing prompts. In response to the question, "what makes me uncomfortable about being Jewish," he wrote "neo Nazis."



Since August 12, and in response to threats made against it by Defendants and co-conspirators,

Pearce's synagogue Beth Israel has adopted a new, elaborate security protocol that limits

parents' ability to pick up their children from Hebrew school. Whereas prior to August 11,

student pick up was a relaxed, joyful process during which parents would chat and children

would play, parents must now enter a code to a locked, secure door, after which they are

permitted to wait quietly inside the door for their child to be retrieved. Moreover, Plaintiff

Pearce is now afraid for her safety and for the safety of her family at the Synagogue. And since

the attack, she has had to explain to her son why there are always police officers standing guard outside the synagogue.

**B.**  **Defendants Will Continue to Cause Violence and Intimidation Unless Restrained: "We Will Be Back"**

295.    In the weeks after the "rally" and the mass of injuries in Charlottesville, Defendants not only claimed "victory," but swore that they would return.  Already, they have followed through on their promise.

296.    Defendant Spencer said:  "To Mayor Mike Signer and Wes Bellamy and all these little creeps of this little town who don't understand who they're dealing with—the local little losers—we are never backing down.  We are going to be back."

297.    Defendant Anglin wrote on August 14:  "As for media rumors that the [Daily Stormer] site will be shut down . . . .  You should know better.  It's going to take bullets to stop us."

298.    Co-conspirator McLaren tweeted:  "Brothers & sisters across the Alt Right—this is a taste of how it feels to be the tip of the spear entering our civilizational crisis." A few days later, he tweeted:  "If you were there in #Charlottesville, you're amused at the pronouncements of the Alt Right's death.  We are only just beginning."

299.     "There's no way in hell I'm not going back to Charlottesville," Defendant Spencer declared at a press conference with Defendant Damigo.  Defendant Mosley told the Huffington Post:  "Our people are feeling real good right now…This day was a milestone pushing us into our next stage.  We had a large turnout.  We're coming back to Charlottesville."

300.    The Daily Stormer also vowed that it would hold similar events "soon."  A post on the website read: "We are going to start doing this nonstop.  Across the country . . . We are

94

Pg. No. 96

going to go bigger than Charlottesville.  We are going to go huge."  Furthermore, it told readers

that "[w]e are now at war," and promised to "take over the country."

301.     Defendant Kessler promised:  "We're going to have bigger and bigger events in

Charlottesville."

302.     Defendants plan for these other events to be violent.  After the Unite the Right

"rally," Defendant Cantwell explained, "I came pretty well prepared for this thing today," while

pulling out three pistols, two semi-automatic machine guns, and a knife.  Of the next "alt-right

protest," he said, "it's going to be tough to top but we're up to the challenge . . . I think a lot

more people are going to die before we're done here, frankly."

303.     Following his release on bond for the offenses committed on August 12,

Defendant Cantwell remarked that after his stint in prison, he wants to "turn it up to 11."

304.     One week after the Unite the Right "rally," Richard Spencer's website, Vincent

Law, published "The Alt-Right is Finished Debating:  No More Words, Only Preparation Now":

> Now, what happens next?  Our side certainly isn't ready for
> mass action . . . yet.  And there are no street actions planned for the
> near future.  Still, the lines have been drawn.  Think about those
> brave young men at Charlottesville.  There is no going back for
> them. . . .
>
> The public will see very soon that debate is pointless.
> There are no principles at play anymore.  Only our tribe and theirs.
> And only one group out there has drawn a line in the clay and
> decided to make a stand for what is theirs by birth, by blood and
> by the will of God.  The Alt-Right is finished debating, negotiating,
> surrendering.  We're ready to close ranks and fight for what is ours.
> Post-Charlottesville our fleet lies at the bottom of a deep and
> troubled sea and we can only march on forward like Cortez once
> did.  And like him, we stand poised to conquer the continent.

305.     On Saturday, October 7, Defendant Spencer and other co-conspirators returned to

Charlottesville.  The called the event "Charlottesville 3.0."  Again, they carried tiki torches, and

again they chanted "You will not replace us."  But this time, they added: "We will be back, we will be back."

306.    On November 27, 2017, Defendant Kessler filed an application for a permit to hold another "rally" in Charlottesville.  Although that application was denied, Kessler has indicated that it will proceed nonetheless.  It is scheduled to occur on August 11 and 12, 2018.

C.  **Defendants Continue Their Efforts of Mutual Support and Coordination**

307.    Using many of the same platforms the Defendants used to fund their pre-"rally" coordination and planning, Defendants have since provided mutual support to defray the costs associated with their unlawful conduct.

308.    Defendant Cantwell posted bail in connection with his felony indictment by crowdfunding on white-supremacist supportive sites Hatreon and GoyFundMe.  Cantwell's GoyFundMe page solicited donations for the "1433 Justice Fund," a personalized version of the popular white supremacist numeric symbol "1488."  The "14" stands for the 14 Words slogan, which is the heart of Cantwell and his co-conspirators' ideology:  "We must secure the existence of our people and a future for white children."  In place of the usual "88," which is shorthand for "Heil Hitler" (H being the 8th letter of the alphabet), "33" is a stand-in for "CC" or "Chris Cantwell."

309.    While in prison, Defendant Cantwell continued to broadcast his podcast Radical Agenda with the assistance of Peinovich.  Moreover, Peinovich assisted Cantwell in his fundraising by distributing recordings of phone calls from jail in which Cantwell makes pleas for donations.

310.    Similarly, Defendant Damigo, founder of co-Defendant Identity Evropa, established a purported "Identity Evropa Defense Fund," and solicited donations for himself,

Defendant Mosley, and Defendant Identity Evropa. Mosley and Damigo also appeared together with Defendant Spencer on "Red Ice TV" to solicit donations.

## **CONSPIRACY ACTS**

311.　As detailed above, all Defendants had an agreement and understanding to engage in, promote, and incite racial, religious, and ethnicity-based harassment and violence. They did so through, among other things, using and encouraging the use of weapons and caustic substances, military-style marches, burning torches, intimidating iconography, and threats of violence. They did so in order to (a) injure black and Jewish residents of Virginia by denying them the equal privileges and immunities of citizenship, and the use, benefits and privileges of property and/or contractual relationships, (b) further Defendants' cause of recruiting new followers to engage in racial, religious, and ethnically-motivated violence referenced above both at the Unite the Right "rally" and in the future, and (c) compel the city of Charlottesville to maintain the statue of Robert E Lee in Emancipation Park as a means of furthering their aforementioned goals.

312.　All Defendants, with the exception of Defendant Fields, on behalf of themselves or the organizations for which they are agents, planned and coordinated the Unite the Right "rally," encouraged attendance, actively organized followers to attend, coordinated logistical support to attendees, promoted the "rally" as violent, and encouraged attendees to prepare for and commit violent acts.

313.　Among other things, they used online and media platforms to encourage attendance at the Unite the Right "rally," to discuss and promote causing harm to Jewish people and people of color, and to promote violence.

314.　　Defendant Spencer and co-conspirator McLaren met in person to plan unlawful acts of violence, intimidation, and denial of equal protection for the Unite the Right events.

315.　　Defendants Cantwell and Kessler met in person in Charlottesville to plan unlawful acts of violence, intimidation, and denial of equal protection for the Unite the Right events.

316.　　Defendants Ray, Cantwell, and Mosley and co-conspirator David Duke attended an in-person planning meeting on August 11 to plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

317.　　Defendants Anglin and Ray (using, among other things, Daily Stormer's website), Hill, and East Coast Knights organized and caused others to attend the Unite the Right events and commit acts of violence, intimidation, and denial of equal protection.

318.　　Defendants Nationalist Front, NSM, TWP, League of the South, Vanguard America, East Coast Knights, and "other allies," coordinated their attendance as a "joint operation" in advance of August 12, in order to plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

319.　　Defendant Damigo and his group Identity Evropa took a lead role in organizing white supremacist participation among people from outside Charlottesville to engage in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

320.　　Defendants Kessler and Mosley organized the "rally" and coordinated logistics, along with co-conspirator Tyrone, for attendees on August 12 in Charlottesville so that they would engage in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

321.     Defendant Kessler and Mosley moderated, reviewed, and managed the Charlottesville discussion forum on the application named Discord to direct and plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events. Along with Kessler and Mosley, Defendants Heimbach, Parrott, Cantwell, Ray, an agent of Daily Stormer (and, hence, Defendants Anglin and Moonbase Holdings), and co-conspirator Tyrone were all participants in Discord and in the direction, planning, and inciting of such unlawful acts through Discord, including the use of weapons and objects to inflict harm and intimidate. Defendants Vanguard America, Identity Evropa, TWP, League of the South, and Moonbase Holdings (through Daily Stormer) all had members on the Discord channel.

322.     Defendants Cantwell, Ray, and Anglin, among others, advised rallygoers on bringing weapons.

323.     Using Discord, Defendants Kessler and Mosley set up a channel for co-conspirators to coordinate unlawful acts at the Unite the Right events, including acts of violence, intimidation, and denial of equal protection.

324.     Defendants Anglin, Ray, and, through Daily Stormer, Moonbase Holdings, set up a channel for co-conspirators to coordinate unlawful acts, including acts of violence, intimidation, and denial of equal protection, at the Unite the Right events.

325.     Defendants Cantwell, Kessler, Mosley, Anglin, Ray, and others, raised funds, planned for legal support, and arranged travel for the participants who engaged in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

326.     Defendants Invictus, Kessler, Spencer, Cantwell, Heimbach, and Hill were featured in the promotional poster for the Unite the Right "rally."

327.    Defendants Cantwell, Mosley, Spencer, Kessler, Ray, Anglin, and co-conspirators planned and organized a "secret" torch parade at UVA for August 11, with a plan and intent to intimidate, threaten and harass Charlottesville residents, particularly Jews, blacks, and other minority residents.

328.    Defendants Cantwell, Mosley, Spencer, Kessler, Ray and Invictus attended and participated in the violent August 11 torch parade, and directed and incited physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens.

329.    Defendant Cantwell assaulted peaceful protestors with mace, a caustic substance, during the August 11 march.

330.    Co-conspirators attended the torchlight march on August 11 and engaged in acts of intimidation, harassment, and violence.

331.    All Defendants, with the exception of Anglin, attended and participated in the Unite the Right "rally" on August 12, during which they threatened, intimidated, and harassed protestors and minority residents, and incited and engaged in violence.  Defendant Fields attended with Vanguard America, wearing the uniform white polo and khakis, and carrying a black shield with the Vanguard logo.

332.    All Defendants, with the exception of Defendant Fields, directed and incited acts of violence and intimidation at the Unite the Right "rally" on August 12.

333.    Co-Conspirators attended the Unite the Right "rally" on August 12 and engaged in acts of intimidation, harassment, and violence.

334.    Defendant Fields deliberately drove his Dodge Challenger into a crowd of peaceful protestors on August 12, intending to instill fear in the community and to cause injuries on a mass scale.

## CAUSES OF ACTION

## COUNT I: 42 U.S.C. § 1985(3)

335.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

336.    This Count is brought against all Defendants by all Plaintiffs except that (i) Plaintiff Baker asserts this claim only against Defendants Kessler, Spencer, Cantwell, Fields, Vanguard America, Ray, Damigo, Mosley, Identity Evropa, Heimbach, Parrott, Traditionalist Worker Party, Hill, Tubbs, League of the South, Schoep, National Socialist Movement, and Nationalist Front; and (ii) Plaintiff Pearce asserts this claim only against Defendants Anglin, Moonbase Holdings, LLC, East Coast Knights, FOAK, Invictus, and Loyal White Knights.

337.    Defendants plotted, coordinated, and executed a common plan to engage in violence and intimidation in the streets of Charlottesville.

338.    In furtherance of a conspiracy to violate the rights of Plaintiffs and other black and Jewish people and their supporters, Defendants repeatedly engaged in campaigns of violence, threats, and intimidation at Lee Park and throughout the city of Charlottesville.

339.    Defendants have committed numerous overt acts in furtherance of the conspiracy to violate Plaintiffs' rights, which are set forth in the paragraphs above.  Defendants have sought to create an atmosphere of violence against Plaintiffs, and to violate Plaintiffs' equal rights, including those under U.S.C. § 1982.

340.     Co-conspirators whose identities are not known committed numerous additional acts in furtherance of the conspiracy to violate Plaintiffs' rights, including those alleged herein.

341.     The illegal activities described were undertaken by Defendants, their agents, and co-conspirators as express overt acts pursuant to an unlawful conspiracy, the purpose of which was and is to discriminatorily deprive black, Jewish, nonwhite individuals, and their white supporters, of their rights to the equal protection of the laws and their rights to the equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, because of their race, religion, and open and obvious advocacy for the rights of nonwhite individuals.

342.     As a result of the acts set out in the above paragraphs committed in furtherance of this conspiracy, Plaintiffs suffered injuries to their person or property and/or suffered the discriminatory deprivation of one or more of their rights or privileges guaranteed by the Constitution or laws because of one or more of the illegal overt acts of Defendants and their agents.  These rights include but are not limited to their rights to be free of the badges and incidents of slavery pursuant to the Thirteenth Amendment, as well as their rights protected by 42 U.S.C. § 1982.

343.     Because of Defendants' violation of Plaintiffs' rights, Plaintiffs have suffered numerous and various injuries, including bodily injury, injuries to property, lost income, and severe emotional distress.

### **COUNT II: 42 U.S.C. § 1986**

344.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

102

Pg. No. 104

345.　　This Count is brought against all Defendants by all Plaintiffs except that (i) Plaintiff Baker asserts this claim only against Defendants Kessler, Spencer, Cantwell, Fields, Vanguard America, Ray, Damigo, Mosley, Identity Evropa, Heimbach, Parrott, Traditionalist Worker Party, Hill, Tubbs, League of the South, Schoep, National Socialist Movement, and Nationalist Front; and (ii) Plaintiff Pearce asserts this claim only against Defendants Anglin, Moonbase Holdings, LLC, East Coast Knights, FOAK, Invictus, and Loyal White Knights..

346.　　Defendants all possessed actual knowledge of the Section 1985(3) anti-civil rights conspiracy described in this complaint that was planned and then undertaken against the class of American citizens described—including a number of the Plaintiffs named herein.

347.　　Defendants, as organizers, planners, promoters, and leaders of the conspiracy, were each in a position and had the power to have stopped the anti-civil rights conspiracy or to aid in stopping it.

348.　　Each of the Defendants failed and refused to take any steps to attempt to stop this conspiracy or any of the overt acts committed in furtherance of the conspiracy so as to stop the injuries which occurred to Plaintiffs or to other members of the class of citizens targeted by the anti-civil rights conspiracy described.

349.　　 The failure of Defendants to take any steps to aid in preventing the actions described herein, by informing the lawful authorities or otherwise, violated the command of 42 U.S.C. § 1986.

350.　　Plaintiffs suffered their injuries as a result of the individual Defendants' failure to stop the described conspiracy.

## COUNT III: CIVIL CONSPIRACY

351.　　Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

352.　　This Count is brought against all Defendants by all Plaintiffs except that (i) Plaintiff Baker asserts this claim only against Defendants Kessler, Spencer, Cantwell, Fields, Vanguard America, Ray, Damigo, Mosley, Identity Evropa, Heimbach, Parrott, Traditionalist Worker Party, Hill, Tubbs, League of the South, Schoep, National Socialist Movement, and Nationalist Front; and (ii) Plaintiff Pearce asserts this claim only against Defendants Anglin, Moonbase Holdings, LLC, East Coast Knights, FOAK, Invictus, and Loyal White Knights.

353.　　 Each Defendant conspired together and combined with one or more other persons to accomplish, through the concerted action described above, unlawful and tortious acts, including:

　　　　a.　Subjecting persons to acts of intimidation or harassment, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

　　　　b.　Directing violence at another person, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

　　　　c.　Directing vandalism at a person's real or personal property, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

　　　　d.　Causing or producing a riot, in violation of Virginia Code § 18.2-408.

　　　　e.　Directing, inciting, or soliciting other persons participating in a riot to acts of force or violence in violation of Virginia Code § 18.2-408.

　　　　f.　Causing public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof in violation of Virginia Code § 18.2-415.

g.  Assembling a collection of people for the purpose and with the intention of committing, and actually committing, an assault or battery on another person, in violation of Virginia Code §§ 18.2-38, 18.2-42, and 18.2-42.1.

h.  Assembling a collection of people for the purpose and with the intention of committing, and actually committing, an act of violence (as defined in Virginia Code § 19.2-297.1), in violation of Virginia Code §§ 18.2-38, 18.2-42, and 18.2-42.1.

i.  Maliciously causing another person bodily injury by use of any explosive or fire, in violation of Virginia Code § 18.2-52.

j.  Burning an object with the intent to intimidate on a highway or other public place in a manner having a direct tendency to place another person in reasonable fear of apprehension of death or bodily injury, in violation of Virginia Code § 18.2-423.01.

k.  Burning an object with the intent to intimidate on the private property of another without permission, in violation of Virginia Code § 18.2-423.01.

l.  Committing an act of violence with the intent to intimidate a civilian population at large, or influence the conduct or activities of a government through intimidation, in violation of § 18.2-46.5.

m.  Possessing, using, selling, giving, distributing, or manufacturing a weapon or imitation weapon that could cause serious bodily harm in connection with an act of terrorism in violation of Virginia Code § 18.2-46.5.

n.  Inviting, soliciting, recruiting, encouraging, or otherwise causing another to participate in an act of terrorism in violation of Virginia Code § 18.2-46.5.

o.　Knowingly providing material support to an individual or organization whose primary objective is to commit an act of terrorism, with the intent to further the individual or organization's objectives, in violation of Virginia Code § 18.2-46.5.

p.　Engaging in an overt act intended to inflict bodily harm, or intended to place the victim in fear or apprehension of bodily harm (assault).

q.　Committing an unwanted touching that was neither consented to, excused, or justified (battery).

r.　Causing reasonable apprehension that force will be used unless a person willingly submits and causing him to submit to the extent that he is denied freedom of action (false imprisonment).

354.　Each of the Plaintiffs suffered damages resulting from acts committed in furtherance of the conspiracy.

355.　As co-conspirators, Defendants are civilly liable to Plaintiffs for the actions of all individuals who acted in pursuit of the common conspiratorial scheme.

## COUNT IV: NEGLIGENCE PER SE

**(By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, Baker, and Romero Against Defendant Fields)**

356.　Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

357.　Pursuant to Virginia Code 18.2-46.5, any person who commits or conspires to commit or aids and abets the commission of an act of terrorism is guilty of a felony.

358.　Virginia Code 18.2-46.4 defines an "act of terrorism" as, among other things, an act of violence committed with the intent to intimidate the civilian population at large.

359.     Virginia Code 18.2-46.5 was enacted to protect the civilian population from acts of terrorism and violence.

360.     Fields intentionally drove his vehicle into a group of civilians and counter-protestors with the intent to murder, injure, and intimidate the civilian population at large, in violation of Virginia Code § 18.2-46.5.

361.     Plaintiffs, as members of the civilian population, belong to the class of persons for whose benefit Virginia Code § 18.2-46.5 was enacted and the violation of the Statute constitutes negligence per se.

362.     The injuries suffered by Plaintiffs were the type of harm against which Virginia Code 18.2-46.5 was designed to protect.

363.     Defendant's violation of Virginia Code § 18.2-46.5 directly and proximately caused the Plaintiffs harm.

## COUNT V: VIOLATION OF VIRGINIA CODE § 8.01-42.1
## CIVIL ACTION FOR RACIAL, RELIGIOUS, OR ETHNIC HARASSMENT

### (By Plaintiffs Wispelwey, Muñiz, John Doe, Sines, Blair, Martin, Alvarado, and Romero Against Defendants Fields, Mosley, Spencer, Kessler, Ray, Cantwell, and Invictus)

364.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

365.     Virginia Code 8.01-42.1 creates a civil cause of action for any person who is subjected to the following if motivated by racial, religious, or ethnic animosity: (1) acts of intimidation or harassment; (2) violence directed at his or her person; or (3) vandalism directed against his or her real or personal property.

107

Pg. No. 109

366.　　Plaintiffs Wispelwey, Muñiz, John Doe, Sines, Blair, Martin, Alvarado, and Romero were subjected to acts of intimidation and/or harassment, violence directed at their persons, and/or vandalism directed against their real and/or personal property.

367.　　These acts were motivated by Defendants' racial, religious, or ethnic animosity.

## COUNT VI: ASSAULT AND BATTERY

### (By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, Baker, and Romero Against Defendant Fields)

368.　　Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

369.　　As a result of the intentional and unlawful acts of Defendants as described herein, Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, Baker, and Romero were placed in apprehension of harmful and/or offensive bodily contact, and suffered harmful, offensive bodily touching which was neither consented to, excused, or justified.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, Baker, and Romero Against Defendant Fields)

370.　　Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

371.　　Defendant Fields intentionally and/or recklessly drove his car into a crowd of counter-protestors with the intent to murder, severely injure, and intimidate a civilian population.

372.　　As a result of Defendant Fields's outrageous and extreme actions, Plaintiffs Muñiz, Blair, Martin, Alvarado, Baker, and Romero suffered severe emotional distress that no reasonable person could be expected to endure.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request an award of the following relief:

373.    A declaratory judgment that the actions described herein deprived Plaintiffs of

their rights under federal and state law.

374.    Injunctive relief enjoining Defendants from future violations of rights guaranteed

by state and federal law.

375.    Compensatory and statutory damages in an amount to be determined at trial.

376.    Punitive damages in an amount to be determined at trial.

377.    Such other relief as the Court deems necessary and just.

Respectfully submitted,

*s/ Robert T. Cahill*
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
Email: rcahill@cooley.com

*Of Counsel for all Plaintiffs:*

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Gabrielle E. Tenzer (*pro hac vice*)
Joshua A. Matz (*pro hac vice*)
Michael Low Bloch (*pro hac vice*)
KAPLAN HECKER & FINK, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
Email: rkaplan@kaplanhecker.com
Email: jfink@kaplanhecker.com
Email: gtenzer@kaplanhecker.com
Email: jmatz@kaplanhecker.com
Email: mbloch@kaplanhecker.com

Alan Levine (*pro hac vice*)
Philip M. Bowman (*pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Fax: (212) 479-6275
Email: alevine@cooley.com
Email: pbowman@cooley.com

David E. Mills (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
Email: dmills@cooley.com

110

Pg. No. 112

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica E. Phillips (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
Email: kdunn@bsfllp.com
Email: wisaacson@bsfllp.com
Email:  jphillips@bsfllp.com

Joshua J. Libling (*pro hac vice*)
Yotam Barkai (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: jlibling@bsfllp.com
Email: ybarkai@bsfllp.com

J. Benjamin Rottenborn (VSB 84796)
Erin B. Ashwell (VSB 79538)
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone:  (540) 983-7600
Fax: (540) 983-7711
Email:  brottenborn@woodsrogers.com
Email:  eashwell@woodsrogers.com

# Exhibit B

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
12/30/2022
LAURA A. AUSTIN, CLERK
BY: s/ C. Amos
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| ELIZABETH SINES, CHELSEA ALVARADO, THOMAS BAKER, MARISSA BLAIR, MARCUS MARTIN, APRIL MUÑIZ, NATALIE ROMERO, and SETH WISPELWEY, | |
| *Plaintiffs*, | CASE NO. 3:17-cv-00072 |
| v. | MEMORANDUM OPINION |
| JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT AZZMADOR RAY, NATHAN DAMIGO, ELLIOTT KLINE (a/k/a ELI MOSELY), MATTHEW HEIMBACH, MATTHEW PARROTT (a/k/a DAVID MATTHEW PARROTT), TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN (a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE), | JUDGE NORMAN K. MOON |
| *Defendants*. | |

This matter is before the Court on numerous post-trial motions arising out of Plaintiffs'

injuries suffered during the Unite the Right rally in Charlottesville on August 11 and 12, 2017.

The jury found Defendants liable for their conduct planning and participating in Unite the Right, including finding all Defendants liable for Virginia state law civil conspiracy; finding Jason Kessler, Richard Spencer, Elliott Kline, Robert "Azzmador" Ray, Christopher Cantwell, and James Alex Fields, Jr., liable for racial, religious, or ethnic harassment or violence; and finding Fields liable for assault and battery and intentional infliction of emotional distress.

The Court affirms the jury verdict finding all Defendants liable, reduces the punitive damages award as compelled by the Virginia statutory cap on punitive damages, and otherwise affirms the jury verdict.

### **Standard of Review**

Rule 50(b) of the Federal Rules of Civil Procedure permits a party to bring a renewed motion for judgment as matter of law after the jury has returned its verdict. Fed. R. Civ. P. 50(b). "When a jury's verdict has been returned, judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 610 (4th Cir. 2021) (quoting *Int'l Ground Transp. v. Mayor & City Council of Ocean City, Md.*, 475 F.3d 214, 218–19 (4th Cir. 2007)). The court "may not make credibility determinations or weigh the evidence," as those "are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citation omitted).

Rule 59 permits a party aggrieved by a jury verdict to request a new trial. "A district court may grant a new trial only if the verdict: (1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." *E.E.O.C. v. Consol.*

*Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017) (citing *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)). A district court's decision on a Rule 59 motion is a discretionary one. *See Consol. Energy*, 860 F.3d at 145.

## Trial

The jury trial in this case lasted more than four weeks—comprising twenty-two trial days. The nine Plaintiffs proceeding to trial were represented by numerous firms and dozens of lawyers, seeking to try their claims against twenty-three Defendants, of which thirteen appeared at trial and presented an active defense. Separate defense counsel represented five different groups of Defendants. Two defendants (Christopher Cantwell and Richard Spencer), represented themselves *pro se*. Two defendants (Cantwell and James Alex Fields, Jr.) were incarcerated at the time of trial—Cantwell appeared in person in court with Marshals present, while Fields was represented in person by counsel.

Nearly 50 motions in *limine* or other pretrial motions were filed and resolved by this Court and the Magistrate Judge, in addition to dozens more filings relating to the trial. The parties admitted 917 exhibits during trial, and 35 witnesses were called to testify, or depositions played to the jury, and some counsel examined witnesses remotely by videoconference. In addition, as this trial was being conducted in the midst of the COVID-19 pandemic, the Court issued a number of directives related to preventing the risk of spread of the virus. These included providing proof of vaccination or negative tests and limiting the persons in the Courthouse and Courtroom—measures that appear to have been successful. Given the many challenges inherent in conducting a trial of this scope and magnitude at that unique point in time, the Court considers that the collegiality of counsel and their efforts to present their cases in a constructive and

efficient manner were indispensable to completing this trial. After three days of deliberations, the jury returned its verdict.

## **Jury Verdict**

The jury returned a verdict finding that Plaintiffs had proven each element of their Virginia state law civil conspiracy claim against all Defendants, including that each Defendant was a member of that conspiracy, and therefore finding all Defendants liable for Virginia state law civil conspiracy (Count III). Dkt. 1478 at 3. The jury did not reach a verdict on Plaintiffs' claim that Defendants conspired to commit racially motivated violence in violation of 42 U.S.C. § 1985(3) (Count I), or Plaintiffs' claim that Defendants had knowledge of a conspiracy under § 1985(3) and failed to prevent it, in violation of 42 U.S.C. § 1986 (Count II). Dkt. 1478 at 1–2. On Count III, the jury awarded nominal damages to Plaintiffs (except Elisabeth Sines and Seth Wispelwey) and awarded punitive damages of $500,000 against each individual Defendant and $1,000,000 against each organizational Defendant. *Id.* at 5.

The jury also returned a verdict in favor of Plaintiffs Natalie Romero and Devin Willis, finding Defendants Jason Kessler, Richard Spencer, Elliott Kline, Robert "Azzmador" Ray, and Christopher Cantwell liable for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). Dkt. 1478 at 6–7. On Count IV, the jury awarded Plaintiffs Romero and Willis each $250,000 in compensatory damages, and awarded $200,000 in punitive damages each against Kessler, Spencer, Kline, Ray and Cantwell. *Id.* at 6. On Count IV, the jury also found Defendant James Alex Fields, Jr., liable for violating § 8.01-42.1, but did not assess any compensatory or punitive damages against him on that Count specifically. *Id.* at 7.

The jury returned a verdict in favor of Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Marissa Blair and Marcus Martin, finding Defendant Fields liable for assault and battery

(Count V), and determined total compensatory damages to be $803,277. Dkt. 1478 at 8.[1] On

Count V, the jury further assessed $6,000,000 in punitive damages against Fields. *Id.*

Finally, the jury returned a verdict in favor of Plaintiffs Romero, Muñiz, Baker, Sines,

Blair, and Martin, finding Defendant Fields liable for intentional infliction of emotional distress

(Count VI), and calculating total compensatory damages in the amount of $701,459. Dkt. 1478

at 9.[2] On Count VI, the jury further assessed $6,000,000 in punitive damages against Fields.

## — LIABILITY —

### <u>Jason Kessler, Nathan Damigo, and Identity Evropa</u>

Defendants Jason Kessler, Nathan Damigo, and Identity Evropa argue in their post-trial

motions that they are entitled to a directed verdict on Plaintiffs' conspiracy claims. Dkt. 1522

at 1–6. They argue that Plaintiffs failed to prove their participation in any unlawful conspiracy.

*Id.* Defendant Kessler separately contends that he is entitled to a directed verdict on Count IV. In

his view, Plaintiffs' evidence of his activities at the torch march on August 11, 2017, established

nothing more than his "engaging in First Amendment protected expressive activity," and he says

he "had nothing to do with the violence at the Rotunda" on that date. *Id.* at 8–9.

The jury heard not only substantial but overwhelming evidence that Kessler, Damigo,

Identity Evropa, and their codefendants planned for months to provoke Antifa and its followers

into a violent battle at Unite the Right—which they called the "Battle of Charlottesville." And

---

[1] The jury found Defendant Fields liable for the following compensatory damages on Count V: Romero ($217,715), Muñiz ($108,000), Baker ($318,575), Blair ($2,000), and Martin ($156,987). The jury did not award Sines any compensatory damages specifically on this count. Dkt. 1478 at 8.

[2] The jury found Defendant Fields liable for the following compensatory damages on Count VI: Romero ($155,715), Muñiz ($50,000), Baker ($246,757), Sines ($50,000), Blair ($100,000), and Martin ($98,987). Dkt. 1478 at 9.

they strategized how any punch thrown by an Antifa supporter would give them the chance to respond with brutal and overwhelming violence, as the Unite the Right supporters would be prepared to do battle in helmets, shields, and body armor, and armed with weapons. Upon its review of the evidence and the parties' arguments, the Court concludes that substantial evidence and a legally sufficient evidentiary basis supported the jury's verdict on Count III finding Kessler, Damigo, and Identity Evropa liable for Virginia state law civil conspiracy, and further that they are not entitled to a directed verdict on Counts I or II. The Court also concludes that substantial evidence and a legally sufficient evidentiary basis supported the jury's verdict finding Kessler liable for racial, religious, or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1 on Count IV.

**A.  Nathan Damigo**

Defendant Nathan Damigo argues that Plaintiffs have failed to prove his participation in an unlawful conspiracy, and so he is entitled to a directed verdict as to all the conspiracy claims. Dkt. 1522 at 3–4. The Court disagrees. There is more than substantial evidence to support the jury's verdict finding Damigo liable for Virginia state law civil conspiracy, and Damigo is not entitled to a directed verdict on any of the conspiracy counts.

In Virginia, common law civil conspiracy "consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *CBS v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995); *The Country Vintner,  Inc. v. Louis Latour, Inc.*, 634 S.E.2d 745, 751 (Va. 2006) (same); Dkt. 1461 at ECF 38–40 (jury instructions). At the outset, the Court notes that Damigo has conceded that he (1) "was friends with Richard Spencer and Spencer's friends and associates," (2) "had weekly calls with Richard Spencer's friends and associates," (3) "was present at Alt Right parties where planning for Unite the Right was discussed," (4) "asked for

fake Antifa accounts to be set up," and (5) "admitted that he and/or Identity Evropa were working with other Alt Right groups as to August 11th and 12th." *Id.* at 3–4 (grammatical marks omitted). However, Damigo contends that this and other "substantially similar evidence" is not evidence that "would allow the jury to find either unlawful agreement or foreseeability of any acts that injured any plaintiff." *Id.* at 4. He argues that the content of his communications was either not proven or was "innocuous[,] such as 'working with other Alt Right groups.'" *Id.* He also cites testimony from Samantha Froelich that "she never heard any plans calling for [Identity Evropa] members to engage in any violence at Unite the Right." *Id.*

The facts that Damigo concedes are far from innocuous and do much work toward establishing the requisite factual basis for the conspiracy finding. And, significantly, Damigo overlooks other substantial evidence in the record from which the jury could find both his participation in an unlawful conspiracy and foreseeability of the acts that injured Plaintiffs. Damigo was the founder and the leader of Identity Evropa in the Summer of 2017—the period when Unite the Right was being planned. Dkt. 1419 (Nov. 10) 166:3-4, 185:6-8, 211:22-24; Dkt. 1397 (Nov. 4) 35:24-25. Damigo testified that he considered himself to be a white supremacist and that in 2017 he was advocating for "a white ethnostate." Dkt. 1419 (Nov. 10) 158:2-9. In fact, Damigo founded Identity Evropa to promote a white ethnostate. Dkt. 1419 (Nov. 10) 166:3-7. Only "white people of European heritage" were allowed to join Identity Evropa—Black and Jewish persons would be excluded. *Id.* at 166:14-23. Damigo also testified that he believed violence might be necessary to secure that white ethnostate. Dkt. 1419 (Nov. 10) 158:20–159:16.

Damigo communicated regularly with the lead figures in the "Alt-Right" and white supremacist groups involved in planning Unite the Right. For instance, Damigo and Richard Spencer communicated regularly in the Summer of 2017, including about Unite the Right.

Dkt. 1397 (Nov. 4) 100:12–101:5. Jason Kessler invited Damigo to Unite the Right, and by July 2017, Damigo agreed to attend and further agreed to promote Unite the Right to Identity Evropa members. *Id.* at 101:16-18; Dkt. 1419 (Nov. 10) 181:23–182:5, 184;10-18. Damigo was well known to Spencer, Kessler, and the other organizers of Unite the Right. Damigo had gained some notoriety for violence on account of the "Battle of Berkley" a few months earlier, in which video of Damigo punching a woman and knocking her down at that event became, in Spencer's words, something of an "iconic moment" for the Alt-Right. Dkt. 1397 (Nov. 4) 48:18–50:1.

Identity Evropa members were not permitted to engage in activism without Damigo's express permission, or that of Elliott Kline—then in Identity Evropa leadership—who was heavily involved with Kessler in planning Unite the Right. Dkt. 1419 (Nov. 10) 185:6-25. Damigo gave Identity Evropa members permission to attend Unite the Right, and some did. Dkt. 1419 (Nov. 10) 196:7-11. Indeed, Damigo testified that "[a] lot of members" of Identity Evropa were involved with organizing Unite the Right. *Id.* at 195:12-16. Damigo personally approved equipment for Identity Evropa members to wear at Unite the Right—including shields, helmets, and gloves. Dkt. 1419 (Nov. 10) 196:12-22.

In addition, Damigo was the owner and creator of the Identity Evropa server on Discord, which Identity Evropa members often used to communicate about Unite the Right or other topics in the Summer of 2017. Dkt. 1419 (Nov. 10) 167:2-21. Everyone on that Discord server was an Identity Evropa member. *Id.* at 204:13-16. Later, on August 12, 2017, Identity Evropa members took to Discord to trumpet what they saw was akin to a battlefield victory: "Excellent work out there tonight @everyone. This is just the beginning. … but the war goes on." PX 892; *see also* PX 891 ("Today we won and took control of the narrative."); PX 844 ("Honestly, this is a huge victory."); PX 848 ("… this is a great organization." "I am proud to be a part of it. Hail victory."); Dkt. 1419 (Nov. 10) 204:10–208:13. In the wake of Unite the Right, Damigo also

said that he believed that it was a "huge success." Dkt. 1419 (Nov. 10) 203:21-23. Just days after Unite the Right, Damigo exchanged texts with another member of Identity Evropa, in which Damigo directed that the Discord server be shut down, and "reminding" Identity Evropa members "not to talk to the police." Dkt. 1419 (Nov. 10) 209:2-18; PX 1851 (Patrick Casey: "Should we shut down the intel server? Should I issue an announcement reminding our members not to talk to the police?" Nathan Damigo: "Yes, on both counts."). In other words, the jury also had before it some evidence that Damigo sought to conceal Identity Evropa's role in planning of and participation in Unite the Right—the type of behind-the-scenes evidence which often isn't uncovered in a conspiracy.

Damigo's position appears to be that the law required direct evidence of an explicit or formal agreement to conspire. But that's not the law, and Damigo cited no cases supporting such a proposition. Indeed, even in criminal cases, direct proof of an explicit agreement is not required, and circumstantial evidence may be used to establish a conspiracy. *E.g.*, *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc) (explaining that a conspiracy is often "clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement"); *Floyd v. Commonwealth*, 249 S.E.2d 171, 174 (Va. 1978) (explaining that "a conspiracy may be proved by circumstantial evidence," and that "from the very nature of the offense, it often may be established only by indirect and circumstantial evidence"); Dkt. 1461 at ECF 7, 21–22, 40 (jury instructions). Ample evidence supported the jury's conclusion that Damigo conspired with his codefendants. The jury certainly could reasonably find that Damigo was liable for Virginia state law civil conspiracy in Count III. Similarly, such evidence further undermines any argument that Damigo was entitled to a directed verdict on Counts I or II.

Finally, Damigo argues that there was no evidence that any act of violence committed by the co-conspirators would be foreseeable by him. Dkt. 1522 at 3–4. The Court disagrees. Such

violence was certainly foreseeable. Indeed, the communications between the Unite the Right

organizers were replete with candid statements by Damigo and others in Identity Evropa, as well

as the other Unite the Right organizers, demonstrating that they shared expectations of, hoped

for, planned for, and purposefully sought to instigate violence at Unite the Right—including

discussing whether someone could drive a car through a crowd of demonstrators that might be

blocking the street. *See, e.g.*, PX 892 (posting on Identity Evropa Discord server that "the war

goes on"); PX 882 (Damigo posting on Identity Evropa Discord server that "[t]he lines between

politics and violence is blurring. Welcome to 4th generational warfare."); PX 727 (Kline,

subsequent head of Identity Evropa, posting on Discord: "I think we are gonna see some serious

brawls at cville next month too and we'll see some blood on some of these white polos lol"); *see

also* PX 3114 (Spencer texting Kline, "This is going to be a violent summer."); PX 1455

(Kessler texting Spencer: "[W]e're raising an army my liege. For free speech, but the cracking

of skulls if it comes to it"); PX 1119 ("Is it legal to run over protestors blocking roadways?");

PX 1144 (Discord post of image of a tractor, captioned as a "multi-lane protestor digestor"); *id.*

(Discord post of image of buses driving through crowds, writing "This will be us"); PX 2644

(Cantwell, stating: "Blocking traffic is not a peaceful protest, and every person who reminds you

of that without using his car, is giving you more slack than you fucking deserve.").

   For these reasons, the Court will deny Damigo's motion for a directed verdict on

Plaintiffs' conspiracy claims. *See* Dkt. 1522 at 3–4.

   **B.  Identity Evropa**

   Defendant Identity Evropa argues that "there is no evidence from which a jury could

properly find [Identity Evropa] liable for conspiracy." Dkt. 1522 at 4–5. In its view, Plaintiffs'

conspiracy claims "depend entirely on the activities of defendant Elliott Kline." *Id.* at 4. But,

Identity Evropa contends, "the law does not allow for liability if Mr. Kline was acting 'outside

the scope' of what [Identity Evropa] authorized him to do or had his own personal stake in the conspiracy." *Id.* at 4–5. Identity Evropa argues that Kline "was actually working[ ] for his own purposes, with or for defendant Richard Spencer," and not acting in the organization's interests. *Id.* at 5. Identity Evropa also notes that Kline, rather than Identity Evropa or Damigo, was the subject of evidentiary sanctions and an adverse jury instruction. *Id.* Accordingly, Identity Evropa contends, "there is no evidence from which a jury could properly find [it] liable for conspiracy." *Id.* The Court disagrees, the law supports the jury's finding of liability against Identity Evropa for conspiracy, and substantial evidence supported the verdict.

An organization can be held liable for its own tortious conduct. *See Dana v. 313 Freemason*, 587 S.E.2d 548, 553 (Va. 2003) ("Thus, it is axiomatic that when a corporation causes injury as a result of an unlawful action, it is the corporation that is directly liable for any judgment obtained against it by the injured party."). In addition, the actions of Damigo (Identity Evropa's then-leader) and Elliott Kline (Identity Evropa's subsequent leader and in the leadership at the time of Unite the Right), may result in personal tort liability in their own right. *See Borg v. Warren*, 545 F. Supp. 3d 291, 325 (E.D. Va. 2021) (quoting *In re Ellison*, 296 F.3d 266, 271 (4th Cir. 2002) ("And while an officer of a corporation is in no way personally liable for corporate torts solely on account of his corporate position, where the officer actually participates in or otherwise sanctions the tortious acts, personal liability may lie.")). And Damigo's and Kline's conduct may result in liability to the organization for their torts, including intentional torts, under traditional principles of vicarious liability and *respondeat superior*. *See Roughton Pontiac Corp. v. Alston*, 372 S.E.2d 147, 149 (Va. 1988).

With these principles in mind, Identity Evropa's arguments lack force that it can't be held liable for Kline's actions because there was "no evidence that [it] ever authorized Mr. Kline to enter into an unlawful conspiracy," or that Kline was acting "for his own purposes" or on

Spencer's behalf. Dkt. 1522 at 5. Put simply, ample evidence in the record demonstrates that Kline *was* acting on behalf of Identity Evropa and within the scope of its authority in planning Unite the Right. In 2017, Kline was not only a member but a leader of Identity Evropa. Dkt. 1419 (Nov. 10) 184:19-21. During that same "planning period" for Unite the Right, Damigo was "the leader" of Identity Evropa. *Id.* at 185:3-8. And Damigo testified that he *delegated to Kline* authority to "approve activism" for Identity Evropa and for its members, *id.* at 185:15-21; that he explained to Kline what was acceptable and what wasn't in terms of activism, *id.* at 185:22–186:3; that he knew that Kline was not only working with Kessler to organize Unite the Right, but was "very, very involved with Kessler on it," *id.* at 186:4-10; that he relied on Kline for any information involved with making decisions about Identity Evropa participating in Unite the Right, *id.* at 186:11-25; that he told Kessler to talk to Kline and that Kline would fill him (Damigo) in about Unite the Right, *id.* at 190:7-13; and that he worked to get Kline on Identity Evropa's payroll, *id.* at 188:15–189:12. In addition, evidence in the record from the codefendants showed that Kline and Damigo were Identity Evropa's representatives coordinating on its behalf with other organizations in planning Unite the Right. *See* Dkt. 1431 (Nov. 15) 97:21–98:2 (Kessler describing that Kline was Identity Evropa's representative on Discord chat planning Unite the Right). In view of this and other substantial evidence that Kline was acting on behalf of Identity Evropa in the planning of Unite the Right and lacking any contrary evidence,[3] the Court rejects Identity Evropa's unsupported argument that Kline was acting outside the scope of

---

[3] Identity Evropa's suggestion that Kline was acting on behalf of Spencer rather than Identity Evropa is unsupported by the record evidence. *See* Dkt. 1522 at 5 n. 4. The testimony cited in support of the assertion does not establish that Kline *was* acting on behalf of Spencer. Nor does it tend to show that he *was not* acting on behalf of Identity Evropa. In any event, even if there were a conflict of evidence on the point—and there is not—it is not such evidence as would *compel* a conclusion that Kline was acting on his own behalf rather than on behalf of Identity Evropa.

his authority.[4] Moreover, evidence in the record substantiated that Damigo also spoke for the organization and operated with its authority. Damigo himself testified that because he was "the founder of the organization," "pretty much anywhere [he] went … it was generally considered [that he] was representing the organization." Dkt. 1419 (Nov. 10) at 168:3-11.

Substantial evidence in the record further supported the jury's conclusion that Identity Evropa as an organization conspired with the other Defendants and is thus liable under Count III, even aside from Kline and Damigo. For instance, it wasn't just Kline and Damigo, but "[a] lot of members" of Identity Evropa "were involved with the organizing" of Unite the Right. Dkt. 1419 (Nov. 10) 195:12-16.[5] Identity Evropa members planned their participation in Unite the Right on Discord. *See id.* at 167:2-21. A "detachment of fighters" from Identity Evropa showed up at Unite the Right on August 12, 2017. *See* Dkt. 1413 (Nov. 9) 154:15–155:18. (Damigo had personally approved the use of shields, helmets, and gloves for Identity Evropa members at Unite the Right. Dkt. 1419 (Nov. 10) 196:12-22.) After Unite the Right, Identity Evropa members took to Discord to celebrate the "huge victory," PX 844, and for example, cheering "[h]ail Nathan [Damigo]," "[t]his is a great organization," "I am proud to be a part of it. Hail victory," PX 848, but cautioning that "[t]his is just the beginning," and "the war goes on." PX 892; *see also* PX 846 (celebrating their "victory").

---

[4] *Cf. BellSouth Servs.*, 453 S.E.2d at 265 ("It is well settled that, when an agency relationship has been proven, the burden is on the principal to show that the agent was not acting within the scope of his authority when he committed the acts complained of, and, if the evidence leaves the question in doubt, it becomes an issue for determination by a jury.").

[5] In addition, Damigo testified that *Kline* was "very involved" as one of the primary organizers. Dkt. 1419 (Nov. 10) 195:17-20. And Spencer testified that he and *Damigo*, among others, communicated regularly in the summer of 2017 about Unite the Right. *See* Dkt. 1397 (Nov. 4) 100:12–101:5.

In sum, there is substantial evidence in the record to demonstrate that Identity Evropa, as well as its then leader Damigo and its future leader Kline entered into the conspiracy, all supporting the jury's finding Identity Evropa was liable on Count III. The Court rejects Identity Evropa's arguments to the contrary.

### C.  Jason Kessler

Defendant Kessler first challenges the jury's verdict finding him liable for Virginia state law civil conspiracy. Dkt. 1522 at 5–6. Kessler concedes that he was "a major organizer of the Unite the Right event," and he "was physically present at relevant locations" on August 11–12, 2017. Dkt. 1522 at 5. But he argues that his "mere rhetoric is constitutionally protected if it does not amount to unlawful agreement or foreseeability," and contends that "[t]he evidence at trial showed that [he] limited his plans for physical altercation to legitimate self defense." *Id.* In Kessler's telling, "[h]e was careful to include warnings that Antifa must start any fights or there could be no Battle of Charlottesville," and "he was confident Antifa could be relied on to give the Alt Right a legal reason to fight them." *Id.* at 5. Kessler argues that Plaintiffs failed to prove any "unlawful agreement or foreseeability as to any act that damaged any plaintiff," and thus contends that he "is entitled to a directed verdict as to all conspiracy claims." *Id.* at 5–6. Because there was more than substantial evidence supporting the jury's verdict finding Kessler liable for Virginia state law civil conspiracy, and because Kessler is not entitled to a directed verdict on any conspiracy count, the Court rejects Kessler's arguments.

Kessler concedes he was "a major organizer" of Unite the Right Dkt. 1522 at 5. And substantial evidence supported Kessler's central role organizing Unite the Right. Dkt. 1431 (Nov. 15) 50:5-11. Indeed, many of his codefendants testified that Kessler was *the* organizer or a

*lead* organizer of Unite the Right, along with Elliott Kline.[6] During the run-up to the rally and at the rally, Kessler had a prominent and highly visible position. Significantly, on August 11, 2017, Kessler, along with Spencer, Kline, and Cantwell, led hundreds wielding lit tiki torches and chanting "You will not replace us," "Jews will not replace us," "Blood and soil," and "Sieg Heil,"[7] through University of Virginia grounds up to the Rotunda and down to the Thomas Jefferson statue where the marchers surrounded counter-protestors (including Plaintiffs Romero and Willis) where they were prevented from escaping, pepper sprayed, and subjected to racist insults, before they were finally able to flee to safety. *See, e.g.*, PX 2348, 2676; Dkt. 1431 (Nov. 15) 121:4–126:16.

Unite the Right was the culmination of substantial preparations by Kessler and his coordination with various Alt-Right and white supremacist organizations. The online communications platform Discord was a focal point for much of the Unite the Right planning. Kessler served as event coordinator and moderator for the Unite the Right server on Discord; as such, he had the ability to remove members from Discord chats and to ban anyone from posting. Kessler was on the Unite the Right Discord server every day from June 7 to August 11, 2017. *See* Dkt. 1431 (Nov. 15) 61:3–62:3.

For Kessler, violence would be a central feature of Unite the Right. He sought to organize a repeat of the "Battle of Berkeley"—violent clashes that had taken place in Berkeley,

---

[6] *See, e.g.*, Dkt. 1419 (Nov. 10) 221:20-22 (Spencer: "Who, to your knowledge, was the organizer of … Unite the Right …?" Damigo: "That would be Kessler."); Dkt. 1401 (Nov. 10) 179:24 – 180:1 (Spencer: "To your understanding, who was the chief organizer of the Unite the Right rally?" Dr. Michael Hill: "Jason Kessler."); Dkt. 1413 (Nov. 9) 216:6-7 (Spencer: "[W]ho was the organizer of Unite the Right?" Matthew Parrott: "On paper, it was Mr. Kessler."); Dkt. 1428 (Nov. 12) 197:22-24 (Q. "And you considered Mr. Kessler to be one of the organizers of the rally, correct?" Jeff Schoep: "Correct.").

[7] Kessler knew these chants were offensive to Jewish persons. *Id.* at 130:21–131:5.

California several months prior. In May 2017, Kessler wrote on Discord that "**I think we need to have a Battle of Berkeley situation in Charlottesville. Bring in the Alt-Right, Proud Boys, Stickman, Damigo, Spencer and fight this shit out**." PX 552 (emphasis added).[8] Kessler knew Damigo had punched a woman at the "Battle of Berkley," and that another individual, Kyle Chapman, got the nickname "Stickman" because he hit somebody with a leaded stick at Berkeley. Dkt. 1431 (Nov. 15) 53:4–54:5. Kessler wanted a "publicized event" in Charlottesville where Antifa would "bring everything they've got and we do to[o]." PX 552. Kessler acknowledged "[t]he alt-right is a dangerous movement" that "feeds on the chaos energy of our unchecked racism bantz[9] but [in real life] activism you have to be more like a civil rights movement for whites. Its [sic] difficult to say that you can contain that manic energy and maintain the enthusiasm." PX 551. However, Kessler "would go to the ends of the earth to secure a future for my people with or without the funny bantz." Kessler believed: "**This is war**." *Id.* (emphasis added).

In early June 2017, Kessler invited people interested in attending Unite the Right—which he dubbed, "**The Battle of Charlottesville**"—to join the Discord server. PX 3548 (emphasis added). Elsewhere, he called it: "East Coast Berkeley." PX 8652 (Kessler: "Assemble every motherfucker you can."); *see also* Dkt. 1431 (Nov. 15) 62:16–63:23. And so, in the months leading up to Unite the Right, Kessler began contacting codefendants to invite them and their organizations to participate in the rally in Charlottesville. This included: from Traditionalist Worker Party, Matthew Heimbach, Matthew Parrott, and Derrick Davis; from Vanguard

---

[8] Kessler went by several handles (usernames) on Discord, including "MadDimension" and "Zebo," and he posted under the name "Ambien Falcon" on Facebook. Dkt. 1431 (Nov. 15) 55:16-20, 58:17-19.

[9] Kessler testified that "bantz" refers to "banter or joking." Dkt. 1431 (Nov. 15) 56:1-13.

America, Dillon Hopper; from National Socialist Movement ("NSM"), Jeff Schoep; from

League of the South, Dr. Michael Hill; from Identity Evropa, Elliott Kline and Nathan Damigo;

Richard Spencer, sometimes directly and through his designees; Christopher Cantwell; Robert

"Azzmador" Ray; and many others. *See, e.g.*, Dkt. 1431 (Nov. 15) at 64:12-17, 65:17–66:11,

67:8-16, 67:17–68:15, 68:16-20, 69:9-13, 72:1-17, 79:14-19; PX 190. Kessler wanted "all the

groups … as many people as possible to attend" Unite the Right. *Id.* at 69:18-21. Kessler talked

to Cantwell, Heimbach, Hill, Kline and many others numerous times about planning and

preparations for Unite the Right. *See, e.g.*, Dkt. 1431 (Nov. 15) 80:13–82:23; *see also id.* at

82:17, 23 (Kessler: "I talked a lot about it … I talked to them a lot, yeah."). On June 5, 2017,

Kessler wrote to Spencer: "**[W]e're raising an army my liege. For free speech, but the

cracking of skulls if it comes to it**." PX 1455 (emphasis added).

As numerous private social media messages reflect, Kessler undertook several steps

ahead of time to try to spark violence at Unite the Right between the rally-goers and "Antifa."

When someone asked Kessler, "[w]hat's the situation with Antifa", and "are they coming[?]"

Kessler responded: "I don't know yet. I hope so. … It's really up to the Antifa to respond and

not be pussies. I would suggest taunting them a little on social media[.]" PX 1437-B at 2; *see id.*

(another responding, "I'm ready to throw down"). Kessler enlisted others to help when he felt

somewhat constrained in what he could do "as the event organizer." PX 3560 at 2 ("I want to

talk shit but as the event organizer I can only do so much."). His directions were that "[p]eople

need to bullycide [sic] them into 'confronting the alt-right' in Charlottesville. *Id.*; Dkt. 1431

(Nov. 15) 86:24–89:1. In another private social media message,  Kessler wrote that "[w]e need a

new way to tip off Antifa when we want them to show up somewhere," suggesting having

someone "send photos and tips to their members," perhaps through "a fake account." PX 1432-A

at 3;[10] *accord* PX 1444C at 3 (Kessler: "Should we alert Antifa for Thursday's meetup or just the Proud Boys event on Saturday?"). They discussed in considerable detail what information to provide, through what channels and in what manner, in order to spark the desired response. Per Kessler: "We definitely want to play these people into our hands Saturday in Charlottesville." PX 1432-A at 3.

Kessler made sure those attending Unite the Right would be well prepared to fight. In a post to "@everyone" in the Unite the Right Discord server entitled, "regarding self-defense," Kessler advised: "I recommend you bring picket sign posts, shields and other self-defense implements which can be turned from a free speech tool into a self-defense weapon should things turn ugly." PX 1034.[11] However, Kessler wanted to dissuade rallygoers from openly carrying firearms, writing: "We ultimately don't want to scare [Antifa] from laying hands on us if they can't stand our peaceful demonstration." *Id.* This was a consistent theme. For instance, another user wrote on the Unite the Right Discord server: "It's not even about optics, if we want the chance to beat down antifa, showing off guns so that it's just a screaming match isn't the way to do it. If we want something decisive we shouldn't have something deterring them from attacking us." PX 952 at 1. Kessler "100% agree[d]," and wrote: "**If you want the chance to crack some Antifa skulls in self-defense don't open carry**." *Id.* at 7 (emphasis added); PX 1461C at 2 (Kessler: "The main thin[g] is I just don't want a lot of big scary guns out there that

---

[10] Indeed, creating and using fake social media accounts to try to drum up conflict points between the "Alt Right" and "Antifa" was a tactic long known to Defendants. In 2016, Damigo wrote on the Identity Evropa Discord server: "I need a small, fake antifa army," and further, "as many people as possible need to create accounts. Create multiple if possible. Make them as realistic as you can, and then post the link to the account here so other people can follow them making them look more realistic." *See* PX 881.

[11] In a Facebook conversation with Derrick Davis from Traditionalist Worker Party, Kessler asked Davis if he had "a pole or something [he] could wave this Rebel Flag from?" PX 1444D at 3. Davis suggested Kessler get a flagpole that "[c]an be weaponized." *Id.* at 2.

will keep Antifa away. I want them to start something."); *id.* (Kessler: "I don't want to scare Antifa off from throwing the first punch.").

Kessler planned the torch march for months. It would ultimately occur on August 11, 2017, but Kessler kept it secret including from police, who reached out to Kessler about the rally itself planned for August 12. *E.g.*, Dkt. 1431 (Nov. 15) 104:7-23, 112:15-20. Kessler also was less-than-forthcoming to the police about the rally—for instance keeping the total number of anticipated number of attendees from the police. *Id.* at 105:17-21 (Kessler: "If the police ask you how many people we have coming, don't tell them. If they think we have more than 400 they might be able to help the city pull our permit.").

Just as Damigo had the Identity Evropa Discord server deleted after Unite the Right, Kessler similarly directed that the "Charlottesville 2.0" Discord server be deleted two days after Unite the Right. Kessler was alerted by another user on Discord to a concern that the then-Attorney General "was investigating the alt right," and that "**[t]he Cville server needs to be deleted. Its** [sic] **compromised and has people talking about committing violence**. Its [sic] filled its purpose. We are able to coordinate without it." PX 332 (emphases added); Dkt. 1431 (Nov. 15) 151:13 – 152:6. Kessler agreed and directed Kline to delete the server, which he did. *See* Dkt. 1431 (Nov. 15) 158:1–19 (Kessler: "We still need to delete the C'ville server." Kline: "All right, the Discord [server] is handled.").

In other words, Kessler was by his admission a lead organizer of Unite the Right, in which he sought to reprise the violent "Battle of Berkeley" into the "Battle of Charlottesville"; Kessler knowingly invited violent people to Unite the Right, including those like Damigo who gained notoriety for violence in Berkeley; Kessler professed to be "raising an army" for Richard Spencer, for "the cracking of skulls if necessary"; Kessler encouraged attendees to bring signposts, shields and other "self-defense implements" which could transformed from "free

speech tool[s] into [ ] self-defense weapon[s] should things turn ugly"; Kessler believed Antifa wouldn't initiate the fight, and so he schemed to provoke violence with Antifa; and after Unite the Right, Kessler tried to delete the record of their digital communications planning Unite the Right on Discord, though he ultimately failed in that endeavor. And after Unite the Right, Kessler reiterated his support for codefendant James Fields, and expressing numerous times that Heather Heyer—who Fields killed in his car attack on August 12, 2017—was to blame for her own death. *See, e.g.*, Dkt. 1431 (Nov. 15) 153:5-11 (Kessler, calling Heyer "a communist," "[c]ommunists have killed 94 million. Looks like it was payback time."); *id.* at 153:23–154:3 ("To reclarify: I 100 percent believe Heather Heyer was to blame for participating in an armed mob blocking traffic during a state of emergency.").

Kessler argues that his conduct never amounted to anything more than self-defense or preparing for himself and the other participants in Unite the Right rally to be prepared to defend themselves. Dkt. 1522 at 5–6. The jury was instructed about Kessler's (and the other defendants') self-defense theory at considerable length. Dkt. 1461 at ECF 54–56. The jury simply didn't believe it. That's unsurprising. The evidence of Kessler's participation in a civil conspiracy to commit numerous unlawful acts—which resulted in widespread violence during weekend of August 11–12, 2017, including Plaintiffs' injuries—was absolutely overwhelming. There's no error in the jury finding Kessler liable for Virginia state law civil conspiracy in Count III.

Finally, Kessler argues that the jury improperly found him liable for racial, religious, or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1, and therefore seeks a directed verdict on Count IV. Dkt. 1522 at 8–9. Kessler argues that the evidence of his activities at the torch march only show him "engaging in First Amendment protected expressive activity."

*Id.* He asserts that participation in "the torch march itself, without the violence at the rotunda," was "lawful activity," and that he "had nothing to do with the violence at the Rotunda." *Id.* at 9. Kessler also argues that neither Plaintiff Romero or Willis claims to have heard or seen him at the torch march, further supporting his argument for a directed verdict. The Court disagrees. Kessler is not entitled to a directed verdict on Count IV.

The jury could find Kessler liable under § 8.01-42.1 if it found, by a preponderance of the evidence, that he subjected Plaintiffs Romero and Willis to acts of intimidation, harassment, or violence directed at their persons, and that his actions were motivated by racial, religious, or ethnic animosity. *See* Va. Code § 8.01-42.1(A); Dkt. 1461 at ECF 41 (jury instructions). There was such evidence and more in the record. Kessler testified that it was originally his idea to hold the torch march the evening of August 11, 2017. Dkt. 1431 (Nov. 15) 111:14–112:10. Kessler planned and organized the torch march in the preceding months, including notifying potential attendees on the Charlottesville 2.0 Discord server and making sure attending groups would have tiki torches. *Id.* at 113:10–114:23. Then, on the evening of August 11, 2017, Kessler, along with Spencer and Kline, *led* the hundreds carrying lit torches and chanting "You will not replace us," "Jews will not replace us," "Blood and Soil," through University of Virginia grounds, down its historic Lawn, and up the steps of the Rotunda. Dkt. 1431 (Nov. 15 Tr.) 121:4–122:8, 125:22-23; Dkt. 1397 (Nov. 4) 147:24-25 (Spencer: "I was in the lead, I think that's fair"), *id.* at 148:8-14; PX 2348, 2676. Kessler conceded at trial that the chants used during the torch march, including "Jews will not replace us," and "Sieg Heil," were offensive and intimidating to Jewish persons. Dkt. 1431 (Nov. 15) 130:11–131:5.

When Kessler, leading the torch-wielding marchers, approached the top of the Rotunda steps, he saw a small group of counter-protestors surrounding the Thomas Jefferson statue down below. Dkt. 1431 (Nov. 15) 125:1-3. Those included Plaintiffs Romero and Willis, who had

linked arms with others around the statue. Dkt. 1378 (Oct. 29) 23:19–25:2, 170:1-17. Then, Willis described an "ocean of light and flames just starts spilling over both sides of the steps, and it's washing down," and "they basically just rushed the entire area and surrounded all of us in a matter of seconds." *Id.* at 172:7-13. The Unite the Right rallygoers yelled at Romero, Willis, and the other counter-protestors: "go back to where you came from," "stupid bitch," "blood and soil," "Jews will not replace us," "you will not replace us"; and they made "[m]onkey noises" at them. *Id.* at 25:17-23, 172:22–173:12, 176:22-25; *see, e.g.*, PX 3474A; PX 2680, 3011; CCEX0004B. Willis, who is black, testified that he "was really scared because it looked like a lynch mob." Dkt. 1378 (Oct. 29) 176:1-2. Romero testified that the rallygoers threw a torch at her that landed centimeters from her foot and sprayed mace at her and the other counter-protesters. *See id.* at 29:1-14. Willis testified that he was pepper-sprayed, which left him struggling to breathe, and "someone from the direction of the mob threw … mysterious fluid" that appeared to be tiki torch lighter fluid at him. *Id.* at 181:1-19. He feared the mob was trying "to burn [them] alive." *Id.* After the event, Defendant Spencer blithely acknowledged that the crowd they had assembled refused to let the surrounded counter-protestors leave. *See* Dkt. 1397 (Nov. 4) 155:22–156:8 (responding "Fact Checked: True" to tweet that evening: "They surrounded us at the statute. They wouldn't let us out"); PX 2500. As Defendant Spencer testified, their actions pinning the counter-protestors at the statue were meant to be "a sign of dominance." Dkt. 1397 (Nov. 4) 156:9-12.

Kessler argues that his involvement was nothing more than conduct and expression protected by the First Amendment. Dkt. 1522 at 8–9. However, conduct that "authorized" or "directed" tortious activity, or speech "likely to incite lawless action," are not protected. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982). To be sure, Kessler testified that he tried unsuccessfully to turn the crowd descending the steps of the Rotunda from the counter-protesters

by putting up his hands and saying "Stop." Dkt. 1431 (Nov. 15 Tr.) 125:17-20; *see also id.* at

126:11-17 ("I had a torch in my hand and I said, 'Stop.'"). But Kessler said "[t]hat was not

within my power. I tried," and he tried to deflect blame elsewhere. *Id.* 126:19-23 ("There was

another guy named Eli Kline who had a megaphone and was directing them."). The jury was not

required to believe Kessler's testimony on this or any other point. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the

drawing of legitimate inferences from facts are jury functions"). Indeed, that testimony is all the

more incredible given that it runs counter to the substantial evidence that Kessler had labored

ceaselessly for months to create a violent racial flashpoint in Charlottesville that weekend.

Moreover, the jury could have further found Kessler's contention that he tried to stop any

violence less-than-credible given his comments immediately after the torch march, which belied

no such concern. He saw it as "an incredible moment for white people," Dkt. 1431 (Nov. 15. Tr.)

131:14–132:2. And despite Kessler's attempt at trial to throw Kline under the bus, at the time he

praised Kline's "excellent work" on the torch march. *Id.* at 134:10-13. The torch march mob

Kessler devised, assembled and personally led through campus surrounded, intimidated,

harassed and injured counter-protestors including Plaintiffs Romero and Willis. There was more

than ample evidence upon which the jury could find Kessler liable to Plaintiffs Romero and

Willis for intimidation, harassment or violence that was motivated by racial, religious, or ethnic

animosity, in violation of Virginia Code § 8.01-42.1.

### Christopher Cantwell

Plaintiffs introduced more than substantial evidence to support the jury's verdict finding

Christopher Cantwell liable for Virginia state law civil conspiracy (Count III), and committing

religious or ethnic harassment or violence, violating Virginia Code § 8.01-42.1 (Count IV).[12]

Moreover, Cantwell has not shown he is entitled to directed verdicts on either Counts I or II.

Accordingly, Cantwell's post-trial motions will be denied as to their challenges to liability.

### A. Substantial Evidence Supports the Verdict

Cantwell testified that in 2017, his podcast had between 10,000 and 20,000 listeners,

including some "armed extremists." Dkt. 1431 (Nov. 15) 198:10-17. Cantwell advocated for a

white ethnostate and called for violence on his podcast. *Id.* at 198:18-25, 203:23-25. Cantwell

candidly acknowledged that what he said on his podcast could influence people's behavior,

including committing violence. *See id.* at 199:1-3; *see also id.* at 200:10-25; PX 2664. In one

episode of his podcast, for example, a caller said: "Dylann Roof is the kind of guy that had no

future anyways. This is exactly the kind of person who should be committing acts of mass

murder[.]", to which Cantwell responded: "That's a very solid point … Not everyone [is] going

to be to be a professional propagandist, shall we say. **Some of us got to be fucking cannon**

**fodder for the race war**." *Id.* at 205:13–206:11 (emphasis added). Cantwell further posted a

video supporting running over protestors with cars. *See id.* at 207:10-23; PX 2644 (posting video

of protestor standing in middle of street, writing: "Hey, communist, remember this like your life

depends on it, because it does. Blocking traffic is not peaceful protest and every person who

reminds you of that without using his car is giving you more slack than you fucking deserve.").

Cantwell was invited to speak at Unite the Right by Augustus Sol Invictus and Jason

Kessler. Dkt. 1431 (Nov. 15) 220:21–224:25, 280:5-7. Cantwell invited listeners of his podcast

---

[12] As Plaintiffs argue, because Defendant Cantwell did not move for directed verdict on
Count IV, he cannot file a renewed motion for directed verdict on that specific count. Dkt. 1574
at 18. In any event, more than substantial evidence supports the jury's findings of liability on
Count IV, for the reasons that follow.

to join him at Unite the Right, and he promoted the rally on his podcast and website. Dkt. 1431 (Nov. 15) 215:21-23, 225:10-21. On his podcast and elsewhere, Cantwell made many wildly antisemitic statements including that "[t]he Jew is the enemy of the human race," Dkt. 1431 (Nov. 15) 211:1-25; PX 1886A; *see also, e.g.*, Dkt. 1431 (Nov. 15) 210:18-25; *id.* at 1-24; PX 2584, saying that Jewish persons were "responsible for communism," and Cantwell believed "that's a fucking really good reason to fucking genocide a group of people," Dkt. 1431 (Nov. 15) 237:12–238:3, and statements denigrating black persons and other minorities, *see, e.g.*, Dkt. 1431 (Nov. 15) 215:8-20; PX 2710A. Cantwell communicated with Spencer, Kessler, Kline, and others about Unite the Right in the lead-up to the rally. *See, e.g.*, Dkt. 1431 (Nov. 15) 217:6-25, 224:17-25, 226:24–227:12. Cantwell and Kessler discussed Kessler coming onto Cantwell's podcast to promote Unite the Right. *E.g.*, Dkt. 1431 (Nov. 15) 224:1-25; PX 190. Among others, Cantwell had Kessler, Spencer, Heimbach, Robert Ray, and Dillon Hopper as guests on his podcast. Dkt. 1431 (Nov. 15) 220:12-20.

Cantwell told Spencer he was "**willing to risk a lot for our cause, including violence and incarceration**," and **"[m]any in my audience would follow me there, too, but I want to coordinate to make sure its** [sic] **worth it to our cause**." Dkt. 1397 (Nov. 4) 121:13-16 (emphases added); Dkt. 1431 (Nov. 15) 240:7-16; PX 3317.[13] In the weeks before the rally, Cantwell began posting on the Unite the Right Discord server, including suggesting organizing a separate "parallel event somewhere other than Lee Park for women and children"—further

---

[13] Spencer responded: "It's worth it, at least for me." Cantwell continued, in this vein: "You're sure it's worth the risk of violence and imprisonment, but not worth a phone call with a guy who drove eight hours to get here and invite his audience of 10,000 people to follow him?" Dkt. 1431 (Nov. 15) 240:7-23.

evidence demonstrating Cantwell anticipated violence at Unite the Right. Dkt. 1431 (Nov. 15) 244:20–245:4.

Cantwell brought numerous weapons to Charlottesville for Unite the Right. PX 2103A. In addition to firearms, he brought "Kubotans"—metal rods attached to keychains that can be used as weapons—and canisters of pepper spray. Dkt. 1431 (Nov. 15) 241:6–242:15. Cantwell planned to sell them to "better arm our people," while making some "extra bucks." *Id.* at 243:1– 244:14; PX 325A. Cantwell explained to a reporter: "I've got to organize an unknown number of armed extremists I've never met through a hostile environment with death threats and legal intimidation. We all have our crosses to bear." Dkt. 1431 (Nov. 15) 247:4-10.

On the night of August 11, 2017, Cantwell marched with Kessler, Spencer and the hundreds of others with lit tiki torches chanting "Jews will not replace us" and other slogans. As the marchers surrounded Plaintiffs Willis and Romero and the other counter-protesters at the Thomas Jefferson statue, Cantwell began, in his words, "beating the shit out of" somebody and pepper-spraying them. *Id.* at 253:11-16 ("I definitely just pepper-sprayed somebody. I'm not trying to evade that."); *id.* at 253:19–254:5. Cantwell admitted to the language he used against counter-protesters at Unite the Right: "I probably wouldn't have said 'N word,' but I probably said the N word. … I've almost certainly said that and a whole lot worse about the people who were counter-protesting at the Unite the Right rally." Dkt. 1431 (Nov. 15) 227:24–228:2.

After the rally, Cantwell gave Fields a Nazi salute, when he was briefly incarcerated in proximity to Fields. Dkt. 1431 (Nov. 15) 270:8-24. Later, Cantwell "gave [Fields] a hug" and told him, "I'm really sorry this happened to you." *Id.* Cantwell also referred to Heather Heyer's grave as a "urinal." *Id.* at 267:8-10. At bottom, there was more than substantial evidence that underlays the jury's finding that Cantwell was liable for Virginia state law civil conspiracy in

Count III, and religious or ethnic harassment or violence violating Virginia Code § 8.01-42.1 in

Count IV. Nor has Cantwell shown he was entitled to a directed verdict on Counts I or II.

###   B.  Legal Challenges Seeking a New Trial

Cantwell also seeks to raise a number of arguments that he might have, but did not,

timely raise as a motion to dismiss or dispositive motion much earlier in the case. As this Court

previously held, Cantwell was aware of the dispositive motions deadline of August 7, 2020, but

he did not file a dispositive motion on these issues. *See* Dkt. 1344 at 1–2. Having failed to do so,

Cantwell sought to improperly shoehorn these arguments into motions in *limine*. *Id.* at 3; *see*

*also Witness Sys., Inc. v. Nice Sys., Inc.*, 2008 WL 2047633, at *1 (N.D. Ga. May 10, 2008)

("Defendants should have raised [the dispositive issue] in a properly supported motion for

summary judgment rather than in a motion in limine on the eve of trial."). Undeterred, Cantwell

seeks to raise these untimely arguments again in post-trial motions.

Cantwell argues that Plaintiffs' claims "arose *ex turpi causa* and thus are barred *in pari*

*delicto*." Dkt. 1536 at 18. Cantwell contends that the evidence "showed that Plaintiffs either

were or were in the company of the initiators of the violence at issue in this case." *Id.* Thus,

Cantwell seeks to invoke the general rule that "a party who consents to and participates in an

illegal act may not recover from other participants for the consequences of that act." *Lee v.*

*Nationwide Mut. Ins. Co.*, 497 S.E.2d 328, 329 (Va. 1998). The doctrine is based on the view

that "no one should profit from his illegal act." *Williams v. Harrison*, 497 S.E.2d 467, 470 (Va.

1998). The defense "bar[s] recovery if the evidence shows that the plaintiff freely and

voluntarily consented to participation in the illegal act, without duress or coercion." *Lee*, 497

S.E.2d at 329. In *Lee*, for instance, a car thief could not recover from injuries resulting from the

theft of the car and subsequent joyride. The party raising the defense has the burden to establish

it. *Id.* Even if the defense was timely raised, it fails. There was *no* evidence that Plaintiffs came

to Unite the Right to cause violence or "terrorism," as Cantwell contends, much less such evidence as could have satisfied Cantwell's burden to establish the defense. Dkt. 1574 at 24 n. 6. The Court even permitted Cantwell to examine Plaintiffs and other witnesses about whether Plaintiffs had seen or been a party to any violence on August 11 and 12. Despite his consistent efforts to try to find some link with Antifa or any violence, there was absolutely no evidence that the Plaintiffs were anything other than innocent counter-protestors who went to the rally to peacefully voice their opposition to Defendants' messages. Moreover, the verdict reflects that the jury found that Defendants initiated the violence that led to Plaintiffs' injuries, and overwhelming evidence supports that finding.

Cantwell challenges the jury's verdict finding him liable for civil conspiracy in Count III. *See* Dkt. 1488 at 7–8. Cantwell argues that, because the jury did not reach a verdict on either Counts I or II, "the parties are now left to ponder just what law the Defendants were found to have conspired against." *Id*. at 7. Cantwell's argument lacks merit. The Virginia state law civil conspiracy instructions clearly described the elements of the offense. *See* Dkt. 1461 at ECF 38–40 (Instruction 23). And indeed, Cantwell does not contend otherwise. Cantwell's argument in this respect does nothing more than attempt to fabricate an inconsistency or ambiguity in the verdict when there is none. The jury found Cantwell liable for conspiracy. The jury also found Cantwell liable for one of the one of the listed predicate unlawful acts—racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). Dkt. 1478 at 6–7. Put simply, Cantwell identifies no error at all in the Virginia state law civil conspiracy jury instructions, much less any basis to believe that he would have met his burden of showing the jury was not adequately informed based upon the entirety of the jury charge. Nor has Cantwell identified any basis to challenge the jury verdict form or the jury's verdict, which was consistent and not at all vague in its application against any Defendant, much less Cantwell.

Cantwell also argues that given the fact that the jury didn't reach a verdict on Counts I or II, that the jury must have found Defendants "liable for something other than violence, such as speech." Dkt. 1536 at 11. However, the Court contrasted "abstract advocacy of lawlessness, or mere advocacy of the use of force, which is protected speech" under the First Amendment, from whether Defendants committed the specific violations of law that Plaintiffs alleged, including a conspiracy alleged by Plaintiffs, which "are not protected by the First Amendment." Dkt. 1461 at ECF 53 (Instruction 30). The jury found Cantwell and the other Defendants liable for Virginia state law civil conspiracy, racial, religious or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1, and other counts (for Fields). Juries are presumed to follow the court's instructions, *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009), including here that they found Defendants liable on Counts III and IV upon finding the elements of those claims satisfied, and not based upon mere advocacy or advocacy lawlessness or use of force.

### C.  Challenge to Juror

Cantwell raises a cursory challenge to this Court's refusal to strike a juror for cause. *See* Dkt. 1536 at 10. It appears Cantwell is challenging the Court's refusal to strike Juror 220. *See id.*; *see also* Dkt. 1324 (Oct. 26) 41–50. Cantwell argues that this juror expressed "pro-Antifa views on politically motivated violence," which he believed were "disqualifying." Dkt. 1536 at 10.

The Fourth Circuit has stated that "[a] trial judge has very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *Bright v. Coastal Lumber Co.*, 962 F.2d 365, 370 (4th Cir. 1992) (quoting *Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989)). "A juror is presumed impartial and the existence of a preconception is insufficient to rebut this presumption if the juror can 'lay

aside his impression or opinion and render a verdict based on the evidence presented in court." *Poynter*, 874 F.2d at 221 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

While Cantwell has argued that Juror 220's "pro-Antifa views" meant that he had "an extremely favorable view of a group that hunts the defendants like dogs in the street," Dkt. 1324 at 48–49; Dkt. 1536 at 10, the juror expressed no such thing. To the contrary, the juror candidly explained that to the extent he had an "extremely favorable" view of "Antifa," it was based on his understanding of "Antifa as being abbreviated 'anti-fascist,'" and so he explained that: "I would consider myself an anti-fascist, in that sense, just like a GI in World War II is an anti-fascist." Dkt. 1324 at 43. That historically grounded answer, as well as the juror's demeanor in response to questioning proposed by the parties, belied no partiality. In any event, Juror 220 repeatedly and credibly answered that, regardless of his opinion(s) concerning Black Lives Matter and Antifa, he could set aside his personal opinions about those groups and that those personal opinions would not affect his reaching a verdict in the case. *See, e.g.*, *id.* at 45; *id.* at 48 (The Court: "Irrespective of any preconceived opinions you might have about any organization, can you set aside those preconceived opinions and try this case solely according to the law and the evidence you hear in the courtroom?" Juror 220: "I believe I can, yes."). In other words, Cantwell's conclusory arguments provide no sound reason to conclude that Juror 220 had to be struck for cause. Further still, Defendants ultimately used a peremptory strike to remove Juror 220 from the panel, and Cantwell has not even attempted to argue, let alone demonstrated, that "using a peremptory challenge on [Juror 220] prevented them from challenging another undesirable juror." *See Bright*, 962 F.2d at 370. This argument is therefore rejected.

### D. Challenges to Jury Instructions

Cantwell also raises a number of challenges to the Court's jury instructions. In considering a challenge to jury instructions, the Fourth Circuit asks "whether the instructions

construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Baily v. Cnty. of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987)). "The party challenging jury instructions faces a heavy burden." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011).

 ***Negligence Defenses.*** Cantwell challenges this Court's instruction that negligence defenses, including assumption of risk, contributory negligence, and sudden emergency, were not valid defenses to Plaintiffs' claims. Dkt. 1461 at ECF 57 (Instruction 32). Cantwell argues in his post-trial motions that these defenses applied to Count IV. *See* Dkt. 1488 at 15. But it is a "familiar principle that contributory negligence is not a defense to an intentional tort," *Williams*, 497 S.E.2d at 469, and assumption of risk is a defense "from the negligent or reckless conduct of the defendant," not an intentional tort, *see* Restatement (Second) of Torts § 496A (1965). Cantwell cites no authority to the contrary. Count IV was for the commission of an intentional tort, and the jury found, based on overwhelming evidence at trial, that Cantwell and Defendants subjected Plaintiffs to intentional acts of harassment, intimidation, or violence, motivated by racial, religious, or ethnic animosity. The jury was properly instructed that negligence defenses did not apply, and Cantwell identifies no error in this regard.

 ***Adverse Inference Instruction.*** Next, Cantwell challenges the general jury instruction on evidentiary sanctions and adverse inferences, both of which were allowed against certain defendants. *See* Dkt. 1536 at 12. Cantwell argues that the instruction did not sufficiently limit any improper "spillover" effects on those Defendants who were not subject to evidentiary sanctions, including himself. *Id.* at 12–13. The jury instruction was proper. It stated to the jury, in pertinent part and in plain language: "You are cautioned, however, that each party is entitled to have the case decided solely on the evidence that applies to that party. *Sanctions against these*

*parties have no bearing on other parties*." Dkt. 1461 at ECF 51 (Instruction 28) (emphasis added). The jury was elsewhere reminded of this same admonition, especially with respect to other evidence that could not be considered as against Cantwell. *Id.* at ECF 52 (Instruction 29) ("As I instructed you throughout the trial, and I will remind you again that each party is entitled to have the case decided solely on the evidence that applies to that party, and some of the evidence in this case is limited under the rules of evidence to some of the parties and cannot be considered against the others."). Again, juries are presumed to follow the court's instructions. *Hensley*, 556 U.S. at 841. While Cantwell argues that, at one point, Plaintiffs tried to skirt this instruction in their closing arguments, Dkt. 1536 at 12–13, he failed to raise a contemporaneous objection to the issue, Dkt. 1469 (Nov. 19) 6:1-18. In any event, the Court further instructed the jury that closing arguments weren't evidence. Simply put, Cantwell offers no basis to conclude that the jury ignored the Court's repeated and express limiting instructions, such that he suffered any improper spillover from the evidentiary sanction instructions.

  ***Limitations on Use of Depositions***. Cantwell also argues in a conclusory fashion that some of Plaintiffs' deposition designations were inadmissible against him, "and the limiting instruction was insufficient to cure this prejudice." Dkt. 1536 at 11–12. This argument has no merit. Indeed, the Court included a specific instruction entitled "Limited Use of Depositions as Against Defendant Cantwell." Dkt. 1461 at ECF 52 (Instruction 29). It specifically explained that Plaintiffs introduced deposition testimony from a number of specified witnesses, "which may not [be] considered by you in connection with Defendant Christopher Cantwell, because of his inability to be at the deposition and lack of notice thereof. However, it may be considered by you in connection with the other Defendants." *Id.* Moreover, the Court repeatedly gave this

instruction when the relevant deposition testimony was played.[14] Again, juries are presumed to follow the Court's instructions, and Cantwell's cursory argument offers no basis to challenge either the instruction itself or to believe it was insufficient to limit the jury's consideration of evidence as against him.

### E.  Evidentiary Challenges

Cantwell raises a host of challenges to the Court's evidentiary rulings. None have merit.

***Professor Peter Simi***. Cantwell argues that the Court should not have allowed the testimony from Plaintiffs' expert, Dr. Peter Simi. *See* Dkt. 1536 at 14–15. Cantwell writes that an expert generally cannot be "called in to call someone a liar." *Id.* at 14. According to Cantwell, "the purpose of Simi's testimony," and "the thrust of what Simi testified," is that Defendants' statements were "Doublespeak," which effectively was calling them "a racist liar" using other verbiage. *Id.* at 14. Defendants previously raised this issue, the Court thoroughly considered it, and denied Defendants' motion to exclude Dr. Simi on this basis. *See* Dkt. 937, 941. The Court explained that "[e]xpert testimony has long been allowed to explain to a jury the meaning of coded language," and Professor Simi's testimony concerned "strategies [that] are akin to coded language meant to deceive outside groups about the meaning of conversations …." Dkt. 941 at 2. Accordingly, the Court concluded that the testimony was "grounded in numerous specific examples, and it fit[ ] well within the types of specialized knowledge that courts have regularly

---

[14] *See, e.g.*, Dkt. 1443 (Nov. 16) 31:16-23 ("Members of the jury, I'm going to read this instruction I've read several times about depositions taken when Mr. Cantwell did not have notice or attend. I remind you that each party is entitled to have the case decided solely on the evidence that applies to that party. Some of the evidence in this case is limited under the rules of evidence to some of the parties and cannot be considered against others. The plaintiff introduced the deposition of Mr. Griffin … Such deposition testimony may not be considered by you in connection with Defendant Christopher Cantwell, but it … may be considered by you in connection with the other defendants.").

found helpful to a jury." *Id.* Nonetheless, the Court explained that Defendants would be afforded the "traditional and appropriate means" of challenging expert testimony, including the ability to conduct "vigorous" cross examination, to present any contrary evidence, and that the jury would be carefully instructed about expert testimony. *See id.* at 25. Cantwell and the other Defendants were afforded that substantial opportunity to conduct that vigorous cross examination. Dkt. 1422 (Nov. 11) 93–208. Cantwell's arguments on this point do not provide any basis for the Court to reconsider its prior rulings on this issue.

Cantwell also contends the Court improperly refused to permit him from asking Dr. Simi questions about "critical race theory." Dkt. 1536 at 15–16. Cantwell had substantial opportunity to cross examine Dr. Simi. Dkt. 1422 (Nov. 11) 178–209. Notably, the Court did not forbid Cantwell from asking Dr. Simi about critical race theory. He asked several questions about the topic, which the Court allowed, overruling Plaintiffs' initial objection to the line of questioning. *Id.* at 183:25–185:7. To be sure, the Court did sustain Plaintiffs' following objection that Cantwell's line of questioning was "really getting far afield." *Id.* at 185:11-23. Given the extremely marginal (if any) relevance Cantwell's questioning on this topic had to the legal claims and fact issues before the jury, there was no error in stating that Cantwell should "go on" from this topic. *Id.* at 186:2. Moreover, Cantwell was able to question Dr. Simi at length about his views whether "white supremacy" was categorized by violence, *id.* at 186:3–188:14, undermining any argument that he was precluded from asking Dr. Simi such questions that he believed were material to his defense, *see* Dkt. 1536 at 15–16.

**Dr. Deborah Lipstadt**. Cantwell also argues that the testimony of Plaintiffs' expert Dr. Lipstadt should have been excluded. Dkt. 1536 at 17. Dr. Lipstadt testified without objection as an expert in antisemitism, and its history, rhetoric, language, and symbols. Dkt. 1393 (Nov. 3) 146:12-17. Cantwell argues that her testimony served no "legitimate purpose." Dkt. 1536 at 17.

However, using her expertise, Dr. Lipstadt examined substantial materials concerning the Unite

the Right rally (including emails, podcasts, videos, and written material) to look for evidence of

and expressions of antisemitism and Nazi symbolism. Dkt. 1393 (Nov. 3) 146:22–147:3. And

Dr. Lipstadt concluded that in her opinion, "there was a great deal of overt antisemitism and

adulation of the Third Reich … throughout the evidence that [she] looked at." *Id.* at 147:18-21.

Such evidence was relevant and particularly material to, among other things, the issue of

Defendants' motive. *See* Dkt. 1461 at ECF 26 (Instruction 16 – 42 U.S.C. § 1985(3) – Racial

Animus); *id.* at ECF 41 (Instruction 24, describing elements of violation of Va. Code § 8.01-

42.1, including that "Defendants' actions were motivated by racial, religious, or ethnic

animosity"). Contrary to Cantwell's argument, there was certainly a "legitimate purpose" to the

expert testimony of Dr. Lipstadt.

Cantwell further contends that Dr. Lipstadt's testimony should have been excluded

because it was prejudicial. Dkt. 1536 at 17. The Court concludes that the probative value of the

testimony outweighed any such prejudice. *See* Fed. R. Evid. 403 (providing that "[t]he court may

exclude relevant evidence if its probative value is substantially outweighed by a danger of one or

more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence"). Moreover, the challenged

testimony was not "unfairly prejudicial" to Cantwell or Defendants, such as would cause an

"undue tendency to suggest a decision on an improper basis." Fed. R. Evid. 403 & advisory

committee's note (1972 proposed rules). The "mere fact that the evidence will damage the

defendant's case is not enough—the evidence must be *unfairly* prejudicial, and the unfair

prejudice must *substantially* outweigh the probative value of the evidence." *United States v.

Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) (emphasis in original), *vacated on other

grounds*, 543 U.S. 1097 (2005), *relevant part of prior opinion reinstated*, 405 F.3d 1034 (4th

Cir. 2005); *see also United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998) (explaining

that "[e]vidence that is highly probative invariably will be prejudicial to the defense," but that

Rule 403 only excludes "unfair" prejudice). Upon consideration of Cantwell's arguments and the

relevant testimony, the Court determines there is no basis to conclude that there was any unfair

prejudice, much less any unfair prejudice that would substantially outweigh the probative value

of the evidence.

The Court previously rejected Cantwell's pre-trial motion to exclude Dr. Lipstadt's

testimony. *See* Dkt. 1347 at 2–3. While Cantwell apparently raises those arguments again by

reference, he does not develop any argument challenging that prior decision (much less provide

any valid basis to do so). *See* Dkt. 1536 at 17 (stating, in full, "Cantwell generally reasserts his

pretrial objections to Lipstadt's testimony.").

***Video Evidence***. Cantwell contends that it was error for this Court to exclude video

evidence he sought to introduce, showing a non-party Dwayne Dixon reading from a sheet of

paper. *See* Dkt. 1488 at 21–22. Cantwell contends that the video helps explain why some

Defendants believed that Fields "did nothing wrong." *Id.* at 22. Subject to a pretrial motion, the

Court excluded the video evidence because Cantwell had not authenticated it under Fed. R. Evid.

901(a); it would be inadmissible hearsay; and, even if relevant, there was a high risk of

misleading the jury and wasting time on unrelated issues. *See* Dkt. 1345 at 1–2. However, the

Court denied Cantwell's motion *without prejudice*, and wrote that, "[i]f Cantwell can fix the

evidentiary issues described here, he may be able to introduce the video at trial." *Id.* at 2.

Cantwell does not argue, much less substantiate, how he could have fixed any—much less all—

of these barriers to admissibility. Accordingly, there was no error in the Court's exclusion of the

video evidence. Moreover, the jury heard ample evidence that some Defendants believed Fields

did "nothing wrong" when he plowed his car through the counter-protestors, killing one and seriously injuring dozens of others. *See, e.g.*, PX 2867A, 2867B, 2867C.

*Rally Permit Litigation Evidence*. Cantwell argues that evidence and testimony concerning the litigation relating to the city-issued permit for the Unite the Right rally "should have been allowed for a limited purpose." Dkt. 1488 at 23. Cantwell acknowledges, as he must, that "an injunction on the permit did not confer a right to unlawful conspiracy," but he argues that did not make the matter irrelevant. *Id.* Rather, he argues that it was relevant to Defendants' state of mind, and that his body-camera footage showed that they were celebrating "a legal victory" rather than "plann[ing] racially motivated violence." *Id.* Therefore Cantwell contends that "much of" his body camera footage was rendered "unusable," since it concerned the permit litigation. *Id.* There are a number of reasons why Cantwell's argument lacks force. Evidence of the underlying permit litigation would greatly risk confusing the issues and misleading the jury, which risks substantially outweighed any marginal relevance. *See* Fed. R. Evid. 403 & advisory committee's note (1972 proposed rules). In any event, Cantwell argues that he was prejudiced by not being able to play his body camera footage in greater length because it allowed Plaintiffs to introduce Kline's statement to "bring your fighters," without necessary context. Dkt. 1488 at 24 (¶¶ 64–65); Dkt. 1574 at 34 (point 3). Cantwell did not object at trial to Plaintiffs playing that specific clip from his body camera footage. Dkt. 1443 (Nov. 16) 159:11-15. And, after Plaintiffs introduced that video, Cantwell was able to testify to the very context he states he needed to provide—i.e., "that plan went out the window" when, "[a]fter that clip," they learned that "[their] permit was intact." *Id.* at 161–62; CCEX153G. In other words, the very prejudice

Cantwell says he experienced did not materialize, from Plaintiffs' introduction of a piece of evidence Cantwell agreed could be admitted.[15]

### F.  Challenge to "Unfairness" of Trial

Finally, the Court rejects Cantwell's argument that his trial was "unfair" because he was incarcerated from January 2020 until trial, and afterward. *See, e.g.*, Dkt. 1536 at 2–6. Cantwell alleges that during the period when he was incarcerated, Plaintiffs sent him materials where he was held when Plaintiffs "had discovery demands" of him, but when "Plaintiffs benefitted from Cantwell's silence," they did not send those communications to his jail. *Id.* at 3. Cantwell argues that when this "misconduct was discovered," Plaintiffs sent him a "2 terabyte encrypted hard drive to the jail where Cantwell was being held." *Id.* Cantwell complains that subsequently he was "stripped … of his property" by the U.S. Marshals and transported to another prison in Mississippi, and then about a month later, transported to USP Marion in Illinois. *Id.* And, he contends that while he "arranged to have the hard drive sent to him at USP Marion, [ ] in September [2021], [he] moved for a continuance. *Id.* at 3–4. Cantwell asserts that "[w]hen [he] was transported, he was not allowed to take any papers or the hard drive with him," and that his subsequent move to Central Virginia Regional Jail "further obstructed his trial preparations." *Id.* at 4.

Cantwell cannot avoid the consequences of one indelible fact—that he was offered the choice to sever his trial from that of his co-Defendants and thus a continuance, to afford him the opportunity to remedy any difficulties he'd experienced preparing for trial (real or perceived) on account of his incarceration. On the eve of trial, Plaintiffs filed a letter motion requesting that the

---

[15] Cantwell provides no sound reason why this Court can, let alone must, engage with his argument that a retrial on Counts I and II should be conditioned on a retrial of all counts—which is a hypothetical and speculative argument. *See* Dkt. 1488 at 17; Dkt. 1574 at 28.

Court sever Cantwell's case from that of the other Defendants pursuant to Fed. R. Civ. P. 21. *See* Dkt. 1305. Plaintiffs took the position that, given Cantwell's "repeated complaints … about his lack of access to documents and pleadings in this case as a result of his incarceration," Plaintiffs saw "the best way to resolve the tension between the need to proceed to trial and Mr. Cantwell's due-process arguments would be for the Court to sever Plaintiffs' claims against Mr. Cantwell from their claims against the other Defendants …." *Id.* at 1. The Traditionalist Worker Party Defendants, Damigo, Kessler and Identity Evropa filed letters opposing the request. *See* Dkts. 1307, 1309.

On the morning of the first day of trial, before jury selection started, the Court heard argument on Plaintiffs' motion to sever and afforded Cantwell numerous chances to have his case severed and thus have his trial continued. Dkt. 1317 (Oct. 25) 6:10–7:13. Cantwell began by explaining that he believed he had "ample grounds for appeal" if he was found liable by the jury and so he "move[d] this Court to sanction the plaintiffs." *Id.* at 8:1-11. The Court explained "there's one issue before the Court right now. Nothing else. Do you want this case severed or not?" Cantwell responded, "I do not." *Id.* at 8:12-15. The Court next heard from Plaintiffs who asserted that, given their interests in proceeding to trial but also seeking to ensure Cantwell is afforded "documents in real time or in as real time as possible as he can to prepare" for trial, they were "trying to come up with the best possible solution under the circumstances." *Id.* at 9:14–10:12. However, Plaintiffs warned that they believed that if "Mr. Cantwell is now saying he does not want severance, we believe that he has then thereby waived any due process arguments for appeal."

The Court then engaged in the following colloquy with Cantwell:

The Court: Mr. Cantwell, the Court is willing to sever the case and allow you the time you want for your case. I will not continue any other case. We're going forward with this case today as set. I am willing to sever this case as to you. Now,

to make it perfectly clear: You're asking the Court not to sever you. You prefer to stay in this case as it is?

Mr. Cantwell: Given the choice between those two things, I'll stay in the case as it is. I don't prefer either of those things, but given that binary choice, we'll go forward.

The Court: Okay. I will deny the motion.

*Id.* at 10:15–11:2.

The Court concludes that Cantwell knowingly and voluntarily opted to proceed to trial at that time and under any constraints of access to evidence he'd experienced and argued against his severance and his trial's continuance. As such, Cantwell *waived* any due process arguments that he was prejudiced on account of his inability and delays in access to evidence prior to and at trial, and he cannot now seek to re-raise them following that waiver. *See, e.g.*, *In re Varat Enters., Inc.*, 81 F.3d 1310, 1317 (4th Cir. 1996) ("traditional waiver principles come into play when a party voluntarily or intentionally relinquishes a known claim right"). Moreover, and separately from waiver, Cantwell is estopped from reraising any due process arguments following his decision to proceed to trial and oppose severance and continuance.[16] The Court

---

[16] Plaintiffs argue that "judicial estoppel" is the precise doctrine that prevents Cantwell's continued attempt to raise due process arguments in this posture. Dkt. 1574 at 29. And their invocation of judicial estoppel is understandable, which holds that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). And under those principles, the Court agrees that Cantwell cannot "play[ ] fast and loose" with the Court and this case, by being allowed to take "inconsistent positions during the course of litigation" as to severance and the continuance—which this Court expressed it would have allowed for Cantwell, absent his objection. *See Fed. Dep. Ins. Corp. v. Jones*, 846 F.2d 211, 234 (4th Cir. 1988) (cleaned up). However, the Court is mindful that courts generally invoke *judicial* estoppel only when "the position sought to be estopped" is "one of fact rather than law or legal theory." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). Accordingly, equitable estoppel principles more closely capture the nature of Cantwell's attempted change-of-position. *See Jones*, 846 F.2d at 234 (defining equitable estoppel as "[t]he vital principle" that "he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such

further notes that, in another respect, much of the difficulty Cantwell asserts in terms of his access to files in the weeks leading up to the trial, Dkt. 1536 at 4–5 (¶¶ 14–20), were again occasioned by his own decision to request that he be transported from USP Marion in Illinois to Charlottesville to attend the trial in person. Dkt. 1015. The Court *granted* Cantwell's request, directing the U.S. Marshal's Service to transport Cantwell to Charlottesville for trial and further to transport Cantwell at no expense to himself with costs to be borne by the United States as he was then held in federal custody. Dkts. 1031, 1032, 1104, 1105. The Court further specifically directed that "[t]o the extent practicable and consistent with applicable security considerations, Cantwell shall be able to retain any case-related materials and papers he may possess while being transported to Charlottesville." Dkt. 1105 at 4.

The Court finds that Cantwell was able to fully prepare for and participate in the trial notwithstanding his incarcerated status. The Court granted his request to be transported to trial and he was therefore able to attend, in person, for this multi-week trial at no expense to himself. Dkts. 1031, 1032, 1104, 1105. Given Cantwell's incarcerated status and recognizing delays inherent in mail to prisons, in advance of trial, the Court took the extraordinary step of allowing Cantwell to file any submission with the Clerk's Office through electronic means, including by fax or email. Dkt. 1401. Cantwell took full advantage of the opportunity and access to the Court in advance of trial, even though he was incarcerated, filing a multitude of pre-trial motions—

---

person to loss or injury by disappointing the expectations upon which he acted"). Plaintiffs sought severance of Cantwell's case and a continuance to permit him the time that he said he needed to adequately prepare for trial. Cantwell objected to Plaintiffs' request and opted to proceed with trial, thus leading Plaintiffs to proceed with what they otherwise would not have done. Allowing Cantwell to backtrack from his prior position would prejudice Plaintiffs. In any event, considered under either legal framework, Cantwell is estopped from the about-face he seeks to make, claiming now that his trial is unfair due to logistical problems on account of his incarceration when he voluntary decided to go to trial under those very same circumstances.

many more than any other Defendant, or the combined other Defendants—all of which this Court or the Magistrate Judge (if a motion was directed to him) fully considered and resolved. *See, e.g.*, Dkt. 1056, 1062, 1063, 1066, 1077, 1084, 1085, 1088, 1090, 1096, 1098, 1099, 1102, 1157, 1158, 1159, 1160.  Plaintiffs provided him with all exhibits in advance of trial.  The Court provided Cantwell access to a computer throughout trial, including time before and after trial every day so that he could prepare any exhibits.

By this Court's own observation, Cantwell was prepared and engaged in his defense of Plaintiffs' claims against him throughout the entirety of this multi-week trial, using exhibits, his computer, and court technology, and was sufficiently prepared to present his own defense and evidence as well as cross examine and challenge Plaintiffs' evidence. Cantwell was certainly afforded a full and fair opportunity to present his case and challenge Plaintiffs' case—and in practice, Cantwell was afforded more than what the Due Process Clause requires.

Accordingly, there was no unfairness in his trial, and Cantwell's arguments are rejected in this regard as well. *See* Dkt. 1536 at 2–6.

### Richard Spencer

Richard Spencer also challenged the jury's verdict finding him liable for Virginia state law civil conspiracy (Count III) and for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). *See* Dkt. 1550 at 1–4, 6–11; Dkt. 1595. The Court rejects Spencer's arguments as the jury's verdicts against him were lawful and supported by more than substantial evidence.

First, Spencer seeks to overturn the jury verdict that he committed Virginia state law civil conspiracy because, he contends, there was no proof that he was engaged in a conspiracy to do anything "malign or unlawful." *Id.* at 2. Rather, Spencer argues that he had only "agree[d] to participate in a political rally," but "[t]here is no tort in engaging in or witnessing bold talk, [or]

even the advocacy of violence, so long as that discussion does not involve the directing or

inciting or producing imminent lawless actions." *Id.* Spencer also contends that he had not

communicated with certain members of the Nationalist Front (The League of the South,

Traditionalist Workers Party, and National Socialist Movement) "in the days leading up to

[Unite the Right] or during the event itself." *Id.* at 3. Moreover, Spencer cites a statement from

Plaintiffs' expert witness Dr. Peter Simi, where Dr. Simi stated that he did not believe Spencer

was involved in the Unite the Right Discord server. *Id.*

Spencer's challenge to the jury's verdict finding him liable on Count III lacks merit. To

be sure, Virginia state law civil conspiracy "generally requires proof that the underlying tort was

committed." *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007). But Spencer's argument that the

Court can't discern what tortious conduct or illegality the jury concluded that he had conspired

to commit makes little sense. Here, the Court need look no further than the jury's additional

finding that he (Spencer) and his co-conspirators Kessler, Kline, Ray, and Cantwell engaged in

racial, religious, or ethnic harassment or violence, violating Virginia Code § 8.01-42.1

(Count IV). Dkt. 1478 at 3, 6 (jury verdict). That's a "criminal or unlawful purpose" of the

conspiracy. *See Bellsouth Servs.*, 453 S.E.2d at 267; Va. Code § 8.01-42.1 ("An action for

injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts  (i)

intimidation or harassment, (ii) violence directed against his person, …where such acts are

motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic

animosity.").

There's more. The jury also found that Fields, Spencer, and the other Defendants were

coconspirators; that Fields intentionally drove his car into the crowd on August 12, 2017,

injuring numerous Plaintiffs; and that Fields (as well as Spencer, et al.) were liable for racial

religious or ethnic harassment or violence under Va. Code § 8.01.42.1, and that Fields was liable

for assault and battery. Dkt. 1478 at 6–9. That's another criminal or unlawful purpose of the

conspiracy. The jury found that Spencer and Fields were both members of the conspiracy, and

the jury was instructed that members of a conspiracy were liable for the foreseeable acts of their

co-conspirators done in furtherance of the conspiracy. Dkt. 1461 at ECF 22, 38–40 (jury

instructions); *La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC*, 805 S.E.2d 399, 406

(Va. 2017) (explaining that "civil conspiracy is a mechanism for spreading liability amongst

coconspirators for damages sustained as a result of an underlying act that is itself wrongful or

tortious") (cleaned up). At bottom, the jury's finding that there were numerous criminal or

unlawful purposes of the conspiracy is manifest on the face of the verdict sheet. Spencer's claim

that they can't be discerned lacks merit.

      To the extent Spencer argues that the evidence did not support the jury's conclusion

finding him liable for Virginia state law civil conspiracy (Count III), the Court disagrees. There

was more than substantial evidence in the record to support such a finding. Communications

between Spencer and the other Defendants and planners and organizers of Unite the Right

preceding the event evidenced an intent to spark violence at Unite the Right. For example,

Spencer wrote to Elliott Kline two months before Unite the Right that "[t]his is going to be a

violent summer." PX 3114. In the lead-up to Unite the Right, Christopher Cantwell texted

Spencer that he (Cantwell) was "**willing to risk a lot for our cause**, **including violence and

incarceration**. **Many in my audience would follow me there too, but I want to coordinate

and make sure it's worth it to our cause**." Dkt. 1397 (Nov. 4) 121:13-16 (emphasis added);

PX 3149-B-D. Spencer responded: "**It's worth it, at least for me.**" *Id.* at 121:17-18 (emphasis

added). There were various other communications between Spencer and co-Defendants to

similar effect. *See* Dkt. 1574 at 32–36 (Plaintiffs' post-trial merits briefs) (citing

communications). Indeed, Spencer testified that "one of the goals of the white nationalist rallies

in 2017" was "triggering" other people, *i.e.*, "sending a message that provokes an angry

response." Dkt. 1397 (Nov. 4) 48:10-18. And substantial evidence showed that Spencer's

codefendants, including Kessler, shared similar motives and sought various methods to spark

violence at which point Unite the Right rallygoers would be prepared to respond with

overwhelming force and violence. *See, e.g.*, PX 1461 (Kessler, asking in a Facebook post

whether rallygoers could "conceal carry," because he didn't "want to scare Antifa off from

throwing the first punch," and he didn't want to "keep Antifa away," because he "want[ed] them

to start something"); PX 1432-A (Kessler, writing "[w]e need a new way to tip off Antifa when

we want them to show up somewhere," and asking whether someone could "with a fake account

or some apolotical normie" could "send photos and tips to their members," because "[w]e

definitely want to play these people into our hands Saturday in Charlottesville.").

Evidence showed that these were not mere one-off communications between Spencer and

the Unite the Right organizers. Ample evidence showed Kessler and the other Unite the Right

organizers considered Spencer a key organizer or a "VIP" of the event. *See, e.g.*, Dkt. 1397

(Nov. 4) 134:15–136:9 (text message chain including Spencer also included Kessler, Cantwell,

Damigo, Michael Hill, and others whom Spencer identified were leaders of Unite the Right); *id.*

at 136:3-9 (Kline writing Spencer on August 11, that they were "canceling the afterparty to the

general public, but still having one for leadership and VIP"); PX 3115, 3146. Spencer testified

that he regularly held calls with Damigo, Kline, Greg Conte, and others in the summer of 2017,

regarding Unite the Right. Dkt. 1397 (Nov. 4) 100:14–101:5; *see also* Dkt. 1550 at 2 (Spencer

acknowledging he "[s]poke occasionally with Mr. Kessler and other Defendants about [Unite the

Right] between [June 2017] and August 11-12").[17] And even when Spencer did not go to certain "leadership meetings" in preparation for Unite the Right, Spencer was invited, and he sent representatives such as Conte to attend in his stead and report back to him. *See, e.g.*, Dkt. 1397 (Nov. 4) 137:18–138:10 (Spencer testifying that Conte attended the "leadership meeting" the night of the torch march on August 11, 2017; and reported back to him the marchers were meeting at Nameless Field). And even if Spencer personally was not active on Discord, as he argues, Dkt. 1522 at 4, the jury heard other evidence that he participated in the Discord #leadership channel through several "designees," Dkt. 1431 (Nov. 15) 69:9-12.

At the torch march on August 11, and at the Unite the Right rally on August 12, evidence showed Spencer to be a central figure. Spencer—along with Kessler and Kline—*led* the hundreds carrying lit torches and chanting "You will not replace us," "Jews will not replace us," "Blood and Soil," through University of Virginia grounds, down its historic Lawn, and up the steps of the Rotunda. Dkt. 1431 (Nov. 15) 121:4–122:8, 125:22-23; Dkt. 1397 (Nov. 4) 147:24-25 (Spencer: "I was in the lead, I think that's fair, at the front of the torch march."), *id.* at 148:8-14; PX 2348, 2676.[18] Spencer testified that the Unite the Right crowd quickly surrounded counter-protestors at the base of the Thomas Jefferson statue (which included Plaintiffs Romero and Willis), and that their pinning the counter-protestors at the statue was meant to be "a sign of dominance." Dkt. 1397 (Nov. 4) 156:9-12. And again, Spencer flippantly acknowledged that the crowd they had assembled refused to let the surrounded counter-protestors leave. *See* Dkt. 1397

---

[17] On August 13, 2017, the day after Unite the Right, Spencer texted Kessler in an apparent attempt to distance himself from Kessler, saying: "You're not listening to leadership." PX 3502. This would be further evidence that Spencer considered himself among "leadership" with respect to the Unite the Right rally.

[18] At 10:15 p.m. that evening, Kessler texted Spencer to "Come out front" of the torch march. Dkt. 1397 (Nov. 4) 147:11-14; PX 3107.

(Nov. 4) 155:22–156:8 (responding "Fact Check: True" to tweet that evening: "They surrounded us at the statute[.] They wouldn't let us out"); PX 2500. After the counter-protesters had been driven off, Spencer stood at the base of the Thomas Jefferson statue and shouted: "Alt Right! We own these streets! We occupy this ground! We won!" The mob chanted "Hail Spencer!", "Hail Victory!" and "You will not replace us!" Dkt. 1397 (Nov. 4) 160:9-22; PX 2117 at 0:05–0:35. Spencer retweeted Kessler's post that the torch march was an "[i]ncredible moment for white people who've had it up to here & aren't going to take it anymore." PX 2500.

On the night of August 12, 2017, after Unite the Right—after police called an unlawful assembly, crowds were dispersed and after Fields drove his car into a crowd of peaceful protestors including numerous Plaintiffs—Spencer was a in a room with codefendants, including Nathan Damigo, Jason Kessler, Elliott Kline, and other white nationalists, when Spencer went on a racist tirade which was recorded:

> We're coming back here like a fucking hundred times. I am so mad. I am so fucking mad at these people. They don't do this to fucking me. We are going to fucking ritualistically humiliate them. I am coming back here every fucking weekend if I have to. Like this is never over. I win! They fucking lose! That's how the world fucking works. Little fucking kikes. Little fucking octoroons … my ancestors fucking enslaved those pieces of fucking shit. I rule the fucking world. Those pieces of shit get ruled by people like me. They look up and they see a face like mine looking down at them. That's how the fucking world works. We are going to destroy this fucking town.

PX 2489. Spencer's racist invectives made behind closed doors to the Unite the Right organizers in its immediate aftermath, his stated intent to "ritualistically humiliate" those in Charlottesville who had opposed him including Jewish and African American persons (to whom he referred by racial epithets), and to "com[e] back here every fucking weekend" and "destroy this fucking town," *i.e.*, Charlottesville, all provided strong evidence to the jury that Spencer and his codefendants had been co-conspirators engaged in a Virginia state law civil conspiracy to commit various unlawful acts, including racial, religious, or ethnic violence and intimidation in

violation of Va. Code § 8.01-42.1. Indeed, such behind-the-scenes statements are often notoriously hard to uncover in conspiracy cases, increasing its potential salience and force here. *Cf. Burgos*, 94 F.3d at 857 ("By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement."). And to be sure, while Spencer attempted on the stand to explain away the tirade—as "captur[ing] [his] most childish, embarrassing sentiments, the animal brain," for which he was "ashamed," but had merely said things that were "obviously absurd," Dkt. 1397 (Nov. 4) 46:21–47:4—the jury was not required to accept the credibility of his testimony on this, or indeed any other, point.

Plaintiffs also testified and presented substantial evidence showing that they suffered physical injuries, emotional and other damages, on account of Spencer's acts in furtherance of the conspiracy, and those of his coconspirators. *See, e.g.*, Dkt. 1378 (Oct. 29) 176:1-2, 177:5-11, 180:10-14, 181:1-24 (Plaintiff Willis describing how during the torch march he could not leave the Jefferson statue because he "was surrounded on all sides by tiki torches," "tiki torches, still on fire, were being thrown in our direction," he was pepper-sprayed, and liquid that "appeared to be a tiki torch canister" was thrown at his feet and splashed his shoes, which caused Willis to fear "their strategy was going to be to burn us alive," and then finally when he was able to "crawl[ ] off the statue" surrounded by his friends, he watched them "take punches and kicks to their backs," and "take pepper-sprays at point-blank range directly into their eyes"); *see also id.* at 176:1-2 (Plaintiff Romero testifying that the rallygoers threw a torch at her that landed centimeters from her foot and sprayed mace at her and the other counter-protesters).

Spencer also challenges the jury's verdict on Count IV, finding him liable for acts of intimidation, harassment, or violence directed at Plaintiffs Romero and Willis, and that his actions were motivated by racial, religious, or ethnic animosity. *See* Va. Code § 8.01-42.1(A); *see also* Dkt. 1550 at 6–8 (Spencer's brief). Spencer argues that he should not be held liable on

this count because Plaintiffs Romero and Willis were "vague and noncommittal" about seeing Spencer on the night of the torch march. Dkt. 1550 at 7–8; *see also* Dkt. 1595 at 2–3 (similar). Spencer asserts that, to be liable on Count IV, he had to "directly harm[ ] the Plaintiffs, or expressly order[ ] someone to harm them." Dkt. 1550 at 8. Spencer writes that there was no evidence to support either of those possibilities. *Id.* In Spencer's telling, unlike the evidence of Cantwell "pushing, shoving, pepper-spraying, and manhandling counter-protestors," he (*i.e.*, Spencer), "was not involved in any of those altercations," and accordingly should not be held liable on Count IV. *Id.*

The fact that Plaintiffs Romero and Willis themselves could not personally identify Spencer and any tortious conduct he committed on the night of the torch march is unsurprising, considering their testimony (and photographic and video evidence) that they and the other counter-protestors were surrounded by what they perceived to be "a lynch mob" of hundreds waving lit tiki torches in their faces, throwing lit torches at them, shouting at them and calling them racial epithets, and spraying them with pepper spray. *See* Dkt. 1378 (Oct. 29) 29:1-19, 176:1-2, 180:11–81:3. Willis testified he was "trying to keep [his] head down" to protect himself against "pepper spray and things that were being thrown," and to avoid becoming a victim of "doxing." *Id.* at 176:10–177:9; *see also* PX 2680 (counter protestors surrounded), PX 2695 (counter protestors' heads down). Romero testified that they "covered [them]selves and tried to run out," while the Unite the Right crowd "were literally spraying, throwing stuff," "violently swinging" torches. Dkt. 1378 (Oct. 29) 30:8-11. In any event, there is no evidentiary requirement that Plaintiffs Romero and Willis specifically had to testify that they saw Spencer commit acts prohibited by Va. Code § 8.01-42.1(A), rather than other evidence in the record support liability.

Again, ample testimonial, video and other evidence demonstrated that Spencer (as well as codefendants Kessler and Kline) led the mob at the torch march to the Rotunda and down to

the Jefferson statue as they chanted "You will not replace us," "Jews will not replace us," and "Blood and Soil"; surrounded the counter-protestors including Plaintiffs Willis and Romero and pinned them to the statue preventing them from leaving as a sign of dominance; shouted at Romero, Willis, and the other counter-protestors: "go back to where you came from," "stupid bitch," other chants, and they made "[m]onkey noises" at them; thrust lit tiki torches at them and pepper sprayed them; and when Romero, Willis and the other counter-protestors were driven off following a barrage of punches, kicks and pepper-spray, Spencer gave a speech touting their victory ("We own these streets! We occupy this ground! We won!"), to which the mob chanted "Hail Spencer!", "Hail Victory!" That constitutes more than substantial evidence that Spencer personally committed intimidation, harassment, or violence directed at Plaintiffs Romero and Willis, and that his actions were motivated by racial, religious, or ethnic animosity. In addition, Spencer's argument that he was merely engaged in "constitutionally protected speech" even if many around him were more directly engaged in violence—like Cantwell, who he agreed was "pushing, shoving, pepper-spraying, and manhandling counter-protestors, Dkt. 1550 at 6, 8— ignores that an individual may be liable for the unlawful conduct of others by "authoriz[ing] [or] directing" the unlawful conduct, or engaging in speech that was "likely to incite lawless action." *Claiborne Hardware*, 458 U.S. at 927.

Spencer's motion for a directed verdict or a new trial on Counts III or IV will be denied. Dkt. 1550.

### The League of the South, Michael Hill, Michael Tubbs

The jury found the League of the South, Dr. Michael Hill and Michael Tubbs liable for Virginia state law civil conspiracy in Count III. However, the jury did not reach a verdict on Counts I and II. Dkt. 1478 at 1–3 (jury verdict). In their post-trial motions, the League of the South, Michael Hill, and Michael Tubbs (the "League of the South Defendants") have moved for

directed verdicts on Counts I, II, and III. Dkt. 1549. For the following reasons, the Court

concludes that the League of the South Defendants are not entitled to a directed verdict on any

count, and that substantial evidence supported the jury's finding that they were liable on

Count III.

Hill is the founder and President of League of the South. Dkt. 1401 (Nov. 5) 66:18-23.

Hill expressed his beliefs on the League of the South website in "My Pledge of Allegiance," in

which he stated: "I pledge to be a white supremacist, a racist, an anti-Semite, a homophobe, a

xenophobe, an Islamophobe, and any other sort of 'phobe that benefits my people, so help me

God!" Dkt. 1401 (Nov. 5) 68:17-21; PX 1566-A. The League of the South seeks to "create a

white homeland," and to that end, Hill has advocated for "[s]ome degree of segregation –

perhaps total – and the restoration of white dominance through various Jim Crow-type laws."

Dkt. 1401 (Nov. 5) 69:15-21, 70:16–71:8. The League billed itself as "the heart and soul of the

hard right, an uncompromising movement of real blood and soil Southern/white nationalists who

will not compromise our vision of a Southern homeland for whites." Dkt. 1401 (Nov. 5) 74:12-

21. Because, to them, "Dixie is and should be white man's land," they wrote: "We are firm on

the Negro question and the Jew question." *Id.*

In the months preceding Unite the Right, League of the South began working as part of

the "Nationalist Front"—an umbrella organization comprised of individual white supremacist

organizations including codefendants Traditionalist Worker Party, National Socialist Movement,

and Vanguard America. *Id.* at 89:9–91:9. In May 2017, Hill announced on the League of the

South website that "[t]he League is now working with several other nationalist groups on the

right," and that they "have the same common enemy." PX 1918. That month, Hill issued "an

official call for resistance" to League of the South members, saying "I have spoken with many of

you at length, face to face, about the nature of such resistance. You know what it means," and

cautioning that he "want[ed] no discussion here or elsewhere online of resistance strategies, tactics, logistics, plans, operations, or after action reports," which "all will be handled through secure channels." PX 1537. Indeed, in July 2017—one month before Unite the Right—Hill wrote an address which Ike Baker delivered at the Nationalist Front meeting in Tennessee, in which Hill stated

> As it is said: 'We must secure the existence of our people and a future for white children.'
>
> But we are compassed around with enemies who seek our destruction. From above, in the form of the international Jew and his white gentile traitor allies, to below, in the dark shape of the negro, Mestizo, and Muslim street thug, we are beset by those who despise us and all we hold dear.
>
> The time has come when white men of the West must put aside their petty differences and unite for our very survival and well-being.

PX 1554. The League of the South and its Nationalist Front allies would have a key role in instigating widespread fighting on the streets of Charlottesville on August 12, 2017.

Jason Kessler invited Hill to speak at Unite the Right, and Hill not only accepted but offered League of the South's participation at the rally. Dkt. 1401 (Nov. 5) 80:3-7. A flyer for Unite the Right advertised Hill (as well as codefendants Richard Spencer, Jason Kessler, Christopher Cantwell, and Matthew Heimbach) as speakers at Unite the Right. *Id.* at 81:10–82:17; PX 198. Hill deputized others in League of the South to assist in its preparations for Unite the Right. These included Tubbs (his "chief of staff") to support the League's operations that day, Brad Griffin to handle public relations, and Ike Baker to monitor the Discord server regarding Unite the Right planning and report back. Dkt. 1401 (Nov. 5) 82:22–84:6.

The League of the South Defendants first argue that Plaintiffs failed to introduce evidence that Hill, Tubbs, or the League of the South attended Unite the Right as part of a conspiracy to commit racially motivated violence and failed to prove the "content" of any of

their communications supporting the existence of such a conspiracy. Dkt. 1549 at 2. In their

view, allowing a jury to draw the inference that their communications included an agreement to

commit racially motivated violence would be "speculative and unreasonable," and "have a

chilling effect on actions and speech that are protected by the First Amendment." *Id.* League of

the South Defendants also appear to argue that they didn't commit any act in support of the

conspiracy. *See* Dkt. 1549 at 2 (arguing that "Plaintiffs' evidence has shown that Hill was part of

a group of protestors who pushed through a human barricade which blocked a public roadway,"

which is "insufficient evidence" of a "conspiracy to commit racially motivated violence"). These

arguments fail because substantial evidence established that the League of the South Defendants

conspired with their codefendants to commit racial violence and to commit unlawful acts, and

they undertook numerous acts in support of that conspiracy.

In public and private statements, Hill and League of the South emphasized the racial

motivation for participating at Unite the Right, encouraging participation to "defend" "Western

civilization" and "white men" against perceived "enemies"—specifically, Jewish persons, Black

persons, and their "white gentile traitor allies." *See, e.g.*, PX 2101 (Hill, tweeting "**If you want

to defend the South and Western civilization from the Jew and his dark-skinned allies, be

at Charlottesville on 12 August**.") (emphasis added); Dkt. 1401 (Nov. 5) 116:7–117:18.

Moreover, the jury heard other substantial evidence supporting a finding that League of

the South Defendants anticipated, hoped for, prepared for, and plotted to spark violence at Unite

the Right. For instance, in announcing the League's participation at Unite the Right, Hill wrote

that he "want[ed] an excellent turnout of Southern nationalists for this event. Antifa, BLM, et al

will be there to greet us! Don't miss out on the fun! – Michael Hill." PX 2858. Indeed, League of

the South Defendants acknowledged using similar tactics as their codefendants to "bait" Antifa,

Black Lives Matter, or other groups to "come out as public opposition." PX 1560. Behind the

scenes, Tubbs wrote that "I think we all assumed there would be," "and maybe even hoped for," "violence." PX 1553. They "wanted a public confrontation in Charlottesville for the world to see," and they "got it." PX 1560. Hill testified that he wanted League of the South men to wear the same uniform to present "strength and discipline," and a "unified appearance." Dkt. 1401 (Nov. 5) 114:8-14; PX 1553. They brought flagpoles to the rally, which could be used as weapons. Dkt. 1401 (Nov. 5) 114:4-7; PX 3239A (video showing Tubbs leading League of the South and Nationalist Front allies carrying flagpoles into brawl with stationary counter-protesters). And after Unite the Right, League of the South Defendants reveled in engaging in violence that day. *See, e.g.*, PX 3801 (Hill, posting on social media, "Yes, Mr. Tubbs was everywhere the chaos was," and writing "Tubbs will be the first to say that he fought beside many brave warriors that day"). Days after Unite the Right, when someone wrote Hill to express appreciation for Tubbs' "leading the troops into battle and coordinating attack," and the League's "impressive and inspiring" presence at the rally, Hill agreed that "Mr. Tubbs indeed was very much the warrior, as were all of our men who joined us in Charlottesville. I could not have been prouder of them." PX 1562.

   To the extent League of the South Defendants argue that "Plaintiffs have failed to prove that the content of Hill's communication with some of his codefendants constituted an agreement to commit racially motivated violence," Dkt. 1549 at 2, that argument fails as well. Again, proof of an explicit agreement to conspire is not required, and circumstantial evidence may be used to establish a conspiracy. *E.g.*, *Burgos*, 94 F.3d at 857; *Floyd*, 249 S.E.2d at 174. League of the South's communications—both in public and in private—more than substantiate that they agreed with their codefendants to commit racially motivated violence and conspired to commit numerous unlawful acts at Unite the Right.

Next, League of the South Defendants argue that there was not sufficient evidence that

they were "part of any conspiracy to commit racially motivated violence *at the Torch March*" on

August 11, 2017. Dkt. 1549 at 4 (emphasis added). For instance, they argue that "Hill did not

attend the Torch March and had no role in its planning or execution," and that there was "no

evidence that Tubbs had advance notice of the Torch March." *Id.* at 4–5. Thus, League of the

South Defendants argue that they are entitled to judgment as a matter of law on Plaintiffs'

§ 1985(3) conspiracy claim and § 1986 claim (for failure to prevent a conspiracy). *Id.* These

arguments fail. As previously described, it is not necessary that every defendant have notice of

every act in furtherance of the conspiracy. Rather, "the law holds conspirators liable for all the

reasonably foreseeable acts of their co-conspirators." Dkt. 1461 at ECF 29–30 (Instruction 19);

*United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) ("[U]nder conspiracy law," a

defendant "is liable for the conduct of all co-conspirators that was in furtherance of the

conspiracy and reasonably foreseeable to him."). League of the South Defendants were aware of

the Torch March beforehand. Indeed, Hill concedes that he sent two League of the South

"observers" to the march. Dkt. 1549 at 4; Dkt. 1401 (Nov. 5) 122:13-15. Brad Griffin, a League

member in charge of their "public relations," was at the Torch March as one of those

"observers." *Id.* at 122:21–123:9; *id.* at 83:4-6; PX 2857 (photo of Griffin); *see also* Def. Ex. 10

(Hill email about Torch March). Others from the League were at the Torch March as well. *See,*

*e.g.*, PX 2883A ("Still getting chills from this, Fla League was there that night before the rally").

Because the Torch March was certainly reasonably foreseeable (and indeed, League of the South

Defendants knew about it beforehand and Hill sent observers), this argument fails.

　　　To the extent that League of the South Defendants argue they didn't commit any acts in

support of a conspiracy to commit racial violence and unlawful acts, that argument fares no

better. Indeed, few organizations or individuals (besides Fields) were as prominent in the

violence of August 12, 2017, as League of the South, Tubbs and Hill. The League of the South

as well as the other members of the Nationalist Front gathered at a predetermined meeting point

outside Charlottesville to organize and arrange for coordinated transport to the rally. Dkt. 1401

(Nov. 5) 128:25–192:13; 130:17 (Hill: "[Ike] Baker was coordinating the logistics."). There,

Baker told those assembled that the "convoy" would travel to Market Street parking garage in

downtown Charlottesville, and further exclaimed: "We're going to assemble there. We're going

to march as a mass. This is the greatest assemblage of white identitiarians I've personally ever

seen. We're going to take that park!" PX 1409 (0:00–1:07). When League of the South

Defendants and their Nationalist Front allies (National Socialist Movement, Traditionalist

Worker Party, and Vanguard America) convened on Market Street, they formed as a column in

their respective uniforms and began marching. Tubbs led their column as they charged into a line

of stationary counter-protesters, which included Plaintiff Natalie Romero. *See* PX 1888A,

3239A. After initiating that first widespread brawl, Tubbs helped Nationalist Front members

regroup and prepare for another charge out of Emancipation Park, whereupon Tubbs bellowed

"Follow me!" and led the second column charging into a crowd assembled outside the park,

prompting another melee. PX 2001A. Indeed, "Tubbs was everywhere the chaos was." PX 3801.

Moreover, video establishes and Hill's own testimony at trial conceded that "there were some

League members that engaged in some violence *that they initiated*." Dkt. 1401 (Nov. 5) 149:16-

19 (emphasis added). Hill also conceded at trial that when a League member pepper sprayed a

female counter-protester, it was not done in self-defense. *Id.* at 154:5-10; PX 1888A (0:55 –

1:00).[19] At bottom, Plaintiffs' evidence established numerous acts committed by League of the

---

[19] Plaintiffs also rely on a separate later incident, in which League members beat a black man, DeAndre Harris, in the Market Street parking garage following the declaration of a state of emergency. *See* Dkt. 1574 at 43.

South Defendants, both before and during the Unite the Right rally, taken in furtherance of a conspiracy to commit racial violence and other unlawful conduct at Unite the Right.

League of the South Defendants also contend that Fields' car attack was not connected to any conspiracy. They argue that there was insufficient evidence "to establish that the Fields car attack was an overt act in furtherance of a conspiracy to commit racial violence," or that "the Fields car attack was a reasonably foreseeable result of any conspiracy" they could have been a part of, or that Fields "conspired with any [other] defendant to commit racially motivated violence." Dkt. 1549 at 3–4. These arguments lack merit. There was more than substantial evidence in the record to establish these points. League of the South and Vanguard America were both members of the Nationalist Front. Dkt. 1401 (Nov. 5) 90:11–91:2. They were, in Hill's words, "nationalist allies," working against "the same common enemy," which included Jewish persons. *Id.* at 91:6 – 92:20; PX 1918. At Unite the Right, Fields marched and chanted with Vanguard America, as well as other members of the Nationalist Front (including League of the South). PX 2389, 2390, 2864. Fields wore a Vanguard America polo and carried one of its shields. *See id.*; *see also* PX 3862 at 9. As described above, League of the South Defendants stated that they anticipated and even hoped for violence. *See, e.g.*, PX 1560 (Hill: "we wanted a public confrontation in Charlottesville for the world to see, and we got it."). And further still, running over protestors was a constant theme on the Unite the Right Discord channel and elsewhere. *See, e.g.*, PX 1119 ("Is it legal to run over protestors blocking roadways?"); PX 1144 (Discord post of image of a tractor, captioned as a "multi-lane protestor digestor"); *id.* (Discord post of image of buses driving through crowds, writing "This will be us"); PX 2644 (Cantwell, posting: "Blocking traffic is not a peaceful protest, and every person who reminds you of that without using his car, is giving you more slack than you fucking deserve."); PX 3573 (Fields posted on Instagram a picture of a car driving into a crowd of protestors, with the hashtags

"#HitlerWasRight and #ShutItDown); PX 3606 (Fields posted on August 12, 2017, "Shut it

down", tagging Richard Spencer and League of the South member Brad Griffin).

In addition, League of the South Defendants further ratified the violence after Unite the

Right, including Fields' car attack. *See Claiborne Hardware*, 458 U.S. at 927 ("[A] finding that

[a defendant] authorized, directed, or ratified specific tortious activity would justify holding him

responsible for the consequences of that activity."). Hill, head of the League of the South,

declared after Unite the Right that he "couldn't be happier" with the outcome, that he "would not

go back and change a thing" about it, and that the "League of the South had a good day in

Charlottesville, Virginia. Our warriors acquitted themselves as men." PX 1379B, 1904, 2063.

Tubbs repeatedly tweeted after Unite the Right that Fields "did nothing wrong." *See, e.g.*, PX

2867A, 2867B, 2867C.

Lastly, League of the South argues that there was no evidence that Plaintiffs Sines,

Willis, Muñiz, and Wispelwey's injuries were caused by overt acts in furtherance of a

conspiracy to commit racially motivated violence. As explained below in considerable detail

below, Plaintiffs sustained significant physical and emotional (as well as financial) injuries on

account of the actions of Defendants, including League of the South Defendants, on August 11

and 12, 2017. *See, e.g.*, Dkt. 1419 (Nov. 11 Tr.) 12:11-23 (Martin); Dkt. 1407 (Nov. 8 Tr.)

70:18–71:2 (Blair); Dkt. 1401 (Nov. 5 Tr.) 208:11–209:7, 213:9–214:6 (Baker); Dkt. 1378 (Oct.

29 Tr.) 49:20–51:7 (Romero); Dkt. 1413 (Nov. 9 Tr.) 17:23–18:6 (Alvarado); Dkt. 1428 (Nov.

12 Tr.) 75:19-21 (Sines); Dkt. 1378 (Oct. 29) 181:1-19 (Willis); *id.* at 29:1-14 (Romero); Dkt.

1422 (Nov. 11) 223:8–234:14, 225:12–229:25, 230:1–234:4 (Muñiz).[20]

---

[20] Unlike the other Plaintiffs, the jury awarded Plaintiff Wispelwey no damages in its
verdict.

League of South Defendants' motions for a directed verdict or a new trial are without merit and will be denied. Dkt. 1549.[21]

*　　　*　　　*

For these reasons, no Defendant has shown that they were entitled to a directed verdict or a new trial on any count. The verdict as to liability will stand against each of the Defendants as it was returned by the jury.

— DAMAGES —

**<u>Virginia Cap on Punitive Damages</u>**

The parties dispute the effect that Virginia's statutory cap on punitive damages, Va. Code § 8.01-38.1, has on the jury's damages award.

On Count III, for Virginia state law civil conspiracy, the jury awarded punitive damages of $500,000 against each individual defendant, and $1,000,000 against each organizational defendant, totaling $11,000,000. Dkt. 1478 at 5. On Count IV, for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1, the jury awarded $200,000 in punitive damages each against Kessler, Spencer, Kline, Ray and Cantwell. Dkt. 1478 at 6. On

---

[21] League of the South Defendants challenge the jury's finding of liability against them for Virginia state law civil conspiracy on Count III, for the same reasons as those advanced in support of a directed verdict on Counts I and II. *See* Dkt. 1549 at 6. No separate argument is made in the slightest. The Court concludes that, for the reasons set forth above, and based on the same evidence noted and otherwise advanced at trial, more than substantial evidence supported the jury's verdict finding League of the South Defendants liable for Virginia state law civil conspiracy. The jury was properly instructed on the latter claim and the jury could properly find that these defendants conspired to engage in numerous unlawful acts, including intimidation or harassment, or directing violence, motivated by racial, religious or ethnic animosity (in violation of Virginia Code § 8.01-42.1), as well as assault, battery, and false imprisonment. League of the South Defendants have failed to raise any meritorious argument for why they were entitled to a directed verdict on this, or any other claim, or that they would be entitled to a new trial on Count III.

Count V, for assault and battery, the jury awarded punitive damages of $6,000,000 against Fields

*Id.* at 8. And on Count VI, for intentional infliction of emotional distress, the jury rendered an

award of another $6,000,000 in punitive damages against Fields. *Id.* at 9. Thus, the jury awarded

a total of $24,000,000 in punitive damages in its verdict.

Defendants contend that Virginia law caps punitive damages in any action to no more

than $350,000, even if, as here, there are multiple plaintiffs in the same action. Plaintiffs raise

two counterarguments. First, they argue that Virginia's punitive damages cap does not apply in a

case involving a conspiracy to commit racial violence. Second, Plaintiffs assert that even if the

statutory cap applies, it applies only on a "per-plaintiff" basis, meaning that a total of $2,800,000

in punitive damages should be awarded, i.e., $350,000 for each of the eight plaintiffs seeking

punitive damages.

Virginia's cap on punitive damages in civil lawsuits reads as follows:

> In any action accruing on or after July 1, 1988, including an action for medical
> malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for
> punitive damages against all defendants found to be liable shall be determined by
> the trier of fact. *In no event shall the total amount awarded for punitive damages
> exceed $350,000.* The jury shall not be advised of the limitation prescribed by this
> section. However, if a jury returns a verdict for punitive damages in excess of the
> maximum amount specified in this section, the judge shall reduce the award and
> enter judgment for such damages in the maximum amount provided by this section.

Va. Code § 8.01-38.1 (emphasis added).

When the language of a statute is unambiguous, the statutory text is given its plain

meaning. *Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 159 (Va. 1998). That

means the court will "take the words as written," without "resort[ing] to the history of a

particular enactment, extrinsic facts, or to general rules of construction of enactments that have a

doubtful meaning." *Bray v. Brown*, 521 S.E.2d 526, 528 (Va. 1999). Accordingly, in interpreting

a statute, a court applies the plain meaning "unless the terms are ambiguous or applying the plain

meaning would lead to an absurd result." *JSR Mech., Inc. v. Aireco Supply, Inc.*, 786 S.E.2d 144,

146 (Va. 2016) (quoting *Baker v. Commonwealth*, 733 S.E.2d 642, 644 (Va. 2012)). However,

"[i]f a statute is subject to more than one interpretation, this Court must 'apply the interpretation

that will carry out the legislative intent behind the statute.'" *JSR Mech., Inc.*, 786 S.E.2d at 146

(citation omitted).

### A.  Whether Virginia Cap Applies to Claims Covering Defendants' Conduct

Plaintiffs argue that the Court should not apply Virginia's statutory cap on punitive

damages "to Defendants' egregious misconduct." Dkt. 1572 at 14. Plaintiffs assert that

Virginia's General Assembly "could not have contemplated, let alone intended, for this punitive-

damages cap to apply in a case like this"—where the jury found Defendants conspired to

commit and committed "heinous acts of racial and religious violence over the course of two

days, in violation of Virginia's hate-crime statute." *Id.* In Plaintiffs' view, § 8.01-38.1's

language shows that Virginia's General Assembly "intended to cover run-of-the-mill tort actions

that resemble medical malpractice claims." *Id.* at 15. Plaintiffs further assert that the statute's

legislative history shows that it was "designed to enable insurance companies to more readily

estimate the dollar amount of claims they might need to pay for personal-injury lawsuits," but

not to "curtail damages for civil rights plaintiffs …." *Id.*

The Fourth Circuit has rejected a similar contention that Virginia's cap on punitive

damages "should apply only in unintentional tort cases." *Wackenhut Applied Techs. Ctr., Inc. v.

Sygnetron Protection Sys., Inc.*, 979 F.2d 980, 984 (4th Cir. 1992) (concluding that the same

argument had "no merit"). As the Fourth Circuit explained, the drafters of § 8.01-38.1 "chose

the phrase 'any action' to define the class of cases to which the statute would apply"—a phrase

that "was unequivocal," and there was "no definitional language indicating that the term 'any

action' is limited to unintentional tort actions." *Id.* Like Plaintiffs here, the defendant in

*Wackenhut* argued that the legislative history of the statute evidenced the legislature's concern "with the liability insurance crisis and the need for tort reform." *Id.*; *see also* Dkt. 1572 at 8. But the Fourth Circuit found clear the "plain meaning of the statute" that "the punitive damages cap be applied 'in any action,'" and not just ones for unintentional torts. *Wackenhut*, 979 F.2d at 984–85.

The Court concludes that the plain language of § 8.01-38.1 applies "[i]n any action," and does not draw any distinction like that proposed by Plaintiffs, such that it would only "cover run-of-the-mill tort actions that resemble medical malpractice claims." Dkt. 1572 at 14–15. The statutory language plainly applies "[i]n any action," which would cover this suit. The fact that the statute further specifically clarifies, "*including* an action for medical malpractice …," simply provides an example of an action to which the statutory cap applies. *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (an "including" clause introduces "illustrative application[s] of a general principle"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 15, at 132 (2012) ("The verb to include introduces examples."). The including clause cannot reasonably be read to greatly cabin the scope of the broader phrase, "in any action."

But, Plaintiffs argue, it is "well established that words are known by the company they keep," the principle of statutory interpretation known as *noscitur a sociis*. Dkt. 1572 at 7. And that is true, as far as it goes. It is a general principle that "an *ambiguous* term may be given more precise content by the neighboring words with which it is associated." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quotation marks omitted) (emphasis added); *Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003) (articulating the canon of construction for interpreting "the meaning of doubtful words in a statute"). However, the Fourth Circuit concluded that the phrase "any action" is *unambiguous*. *Wackenhut*, 979 F.2d at 984. Plaintiffs' proposed construction, if not

unworkable, at a minimum also risks introducing confusion into the statutory scheme concerning

what actions would qualify as "run-of-the-mill tort actions" like medical malpractice claims, and

which wouldn't qualify—all without a textual basis for the distinction.[22] As the Fourth Circuit

rejected a similar attempt to limit § 8.01-38.1's application only to unintentional torts, this Court

also concludes that Plaintiffs' proposed limitation must be rejected. Section 8.01-38.1 applies

"[i]n any action." That includes this one.

### B.  Whether Virginia Cap Applies on a Per-Plaintiff Basis

Plaintiffs argue that, even if Virginia's statutory cap applies, it applies "on a per-plaintiff

basis." Dkt. 1572 at 8. In Plaintiffs' view, "*each* of the eight Plaintiffs seeking punitive damages

would be entitled to a punitive-damages award in the maximum amount of $350,000," resulting

in a total punitive damages award of $2,800,000 for all Defendants. *Id.* at 6, 9, 20. Plaintiffs note

that the Fourth Circuit left open the question whether Virginia's punitive damages cap applies on

a per-plaintiff basis in *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 237 (4th Cir.

2000). However, they argue that "the answer … is clear based on the statutory text and context;

principles of judicial efficiency, fairness, and predictability; and legal authority from other

jurisdictions." *Id.* Defendants counter that since punitive damages awards "are capped at

---

[22] Plaintiffs also argue that since the Virginia hate-crime statute "includes a relatively rare provision for the prevailing party to recover attorneys' fees," it would "seem highly illogical and anomalous for the statute to have such a fee-shifting provision, intended by the legislature to act as a deterrent, and then to simultaneously cap punitive damages for the same violent misconduct." Dkt. 1572 at 7 n. 4. To the contrary, that would be no more anomalous than, for instance, Congress providing that in Title VII intentional discrimination cases the prevailing party may recover attorneys' fees but also capping punitive damages based on the size of the company. *See* 42 U.S.C. § 1981a(b)(3) (limitations on punitive damages based on number of defendant's employees); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) ("Congress provided for additional remedies, including punitive damages, for certain classes of Title VII and ADA violations"); *Fairfax v. CBS Corp.*, 2 F.4th 286, 297 (4th Cir. 2021) ("a prevailing Title VII plaintiff is presumptively entitled to recover attorney's fees").

$350,000 by statute," "[t]he jury awards for all Defendants for all counts may not exceed

$350,000," and therefore, the Court must "reduce the total punitive damages awards to

Virginia's statutory cap." Dkt. 1551-1 at 6.

 While the Fourth Circuit may have left the issue open, this Court is not writing on a

blank slate. To begin, the statutory text states, in part, that "[i]n *any action* … the total amount

awarded for punitive damages against all defendants found to be liable shall be determined by

the trier of fact. In no event shall the total amount awarded for punitive damages exceed

$350,000. …." Va. Code § 8.01-38.1 (emphasis added). Plaintiffs assert that the "central

interpretative question is whether the statutory term 'action' refers to the proceeding as a whole,

or, instead, to each plaintiff's right of action." Dkt. 1572 at 9. Plaintiffs' phrasing of the question

would appear to suggest the answer. The statutory cap only says that it applies "in *any action*,"

not "*a plaintiff's* action," or "*each plaintiff's* right of action," suggesting the legislature did not

mean the former to mean the latter, *see Barr v. Town & Country Properties, Inc.*, 396 S.E.2d

672, 674 (Va. 1990) ("[w]e must … assume … the legislature chose, with care, the words it used

when it enacted the relevant statute"). *See generally* Va. Code § 8.01-2(1) ("'Action' and 'suit'

may be used interchangeably and shall include *all civil proceedings* whether upon claims at law,

in equity, or statutory in nature and whether in circuit courts or district courts.") (emphasis

added); *id.* § 8.01-272 ("In *any civil action*, a *party* may plead as many matters, whether of law

or fact, as he shall think necessary. … The court, in its discretion, may order a separate trial for

*any claim*.") (emphasis added); Fed. R. Civ. P. 3 ("A civil *action* is commenced by filing a

complaint with the court.") (emphasis added).

 The Fourth Circuit has already resolved the related issue whether Virginia's punitive

damages cap applies to the action as a whole, or as against each defendant. In *Al-Abood*, the

Fourth Circuit "predict[ed] what the Supreme Court of Virginia would decide were the issue

presented to it," and, "find[ing] no ambiguity" in the text of § 8.01-38.1, "conclude[d] that its plain meaning dictates that the cap on punitive damages awards applies *to the action as a whole, and not to each defendant." Al-Abood*, 217 F.3d at 237 (emphasis added). While part of the statutory analysis relied on the "against all defendants" language, the Fourth Circuit also explained that, "even without the 'against all defendants' phrase, the statute refers to the 'total amount awarded' '[i]n any action.'" *Id.* Accordingly, the Fourth Circuit held that, "[g]iving this language its plain meaning," "the statute mandates that *the entirety of the punitive damages* awarded in the action amount to no more than $350,000." *Id.* (emphasis added). To be sure, the Fourth Circuit in *Al-Abood* "express[ed] no opinion on how the cap would be applied in a case involving multiple plaintiffs." *Id.* at 237 n. 10. However, the reasoning in *Al-Abood* as well as its conclusion that the punitive damages cap "applies to the action as a whole," both strongly indicate that Virginia's cap "applies to the action as a whole," and not, as Plaintiffs argue, as to each plaintiff.

Plaintiffs also rely on *Bulala v. Boyd*, 389 S.E.2d 670 (Va. 1990), a case in which the Supreme Court of Virginia considered whether another damages cap (the medical malpractice cap)[23] applied to damages awarded to each eligible plaintiff or to the action overall. That case was brought by a child born with birth defects and its parents against the mother's obstetrician and gynecologist. One issue on appeal certified by the Fourth Circuit was, "[w]here there are two or more plaintiffs entitled to recover damages arising from the same act or acts of medical malpractice, does § 8.01-581.51 apply individually to each plaintiff or overall to two or more

---

[23] The medical malpractice cap contained the following language:

"In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred … the total amount recoverable for any injury to, or death of, *a patient*, shall not exceed seven hundred fifty thousand dollars." *Bulala*, 389 S.E.2d at 674 (citation omitted) (emphasis added); *accord* Va. Code § 8.01-272.

such plaintiffs?" *Id.* at 672. In answering the question, the Supreme Court of Virginia construed

that damages cap "to mean that in a medical malpractice action, the total damages recoverable

for injury to a '*patient*' are limited to the statutory amount, regardless of the number of legal

theories upon which the claims are based." *Id.* at 675 (emphasis added). A further key issue in

the court's "determination on the existence of a single cap" was the definition of the meaning of

the word "patient" in the statute. *Id.* The Supreme Court of Virginia held that, because "the

mother had a physician-patient relationship" with the obstetrician, "she was a 'patient' within

the meaning of the Act and entitled to the benefit of one statutory cap for her compensatory

damage claim." *Id.* Because the court also found that "the infant is the obstetrician's 'patient'"

as well, it further concluded that "a separate statutory cap for compensatory damages applies to

the child's case." *Id.* at 676. So the Supreme Court of Virginia in *Bulala* held that the mother

and the child had "separate statutory cap[s]." *Id.* But that holding was based upon the specific

language of that statute—which capped "the total amount recoverable for any injury to, or death

of, *a patient*"—and the court's ruling that the mother and the child each was the defendant's

patient. Section 8.01-38.1, by contrast, caps punitive damages "[i]n any action," and does not

include comparable language linking capped punitive damages to the claims of any given

plaintiff or number of plaintiffs. If anything, *Bulala* thus provides further support for interpreting

§ 8.01-38.1 as applying to an entire action, not on a per-plaintiff basis.[24]

Plaintiffs also invoke the principle that statutes should be construed to avoid "significant

constitutional questions." Dkt. 1572 at 12. In their view, "a per-plaintiff reading of the statutory

---

[24] The Court notes that Plaintiffs have not advanced a "per-claim" construction of the
statute. Any such construction would appear to be foreclosed by *Bulala*, which held that "in a
medical malpractice action, the total damages recoverable for injury to a 'patient' are limited to
the statutory amount, *regardless of the number of legal theories upon which the claims are
based*." 389 S.E.2d at 675 (emphasis added).

cap" is necessary to avoid "separat[ing] plaintiffs into higher and lower damages classes based solely on whether they brought their suits individually or jointly—a baseless distinction that arguably violates equal protection and due-process principles under the federal and state constitutions." *Id.* They argue that, rather than "inject[ing] that constitutional defect into the statute," the Court "should apply the punitive damages cap on a per-plaintiff basis." *Id.*

This argument isn't persuasive for two reasons. First, "[t]he canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). But where, as here, ordinary textual analysis based on binding precedent supplies but "one plausible construction, the canon [of constitutional avoidance] simply has no application." *Id.* at 842 (internal quotation marks omitted). Second, although Plaintiffs invoke the specter of "significant constitutional questions" raised by reading § 8.01-38.1 to cap punitive damages allowed in an entire action rather than on a per-plaintiff basis, they do not develop any argument why that reading would present serious constitutional questions. Nor do they cite any authority that would support such an argument. Nor is any such constitutional concern readily apparent for that matter, especially considering that "courts have routinely rejected substantive due process challenges to statutory damages caps, and, consequently, affirmed that these statutes serve proper governmental purposes." *Wackenhut*, 979 F.2d at 985.

Plaintiffs also argue that "a per-plaintiff construction of Virginia's statutory cap on punitive damages is necessary to promote the efficient, just, and predictable resolution of civil disputes in state and federal courts." Dkt. 1572 at 12–13. They contend that "[i]f Virginia's cap did not apply on a per-plaintiff basis, then multiple plaintiffs asserting a right to relief and seeking punitive damages for the same occurrence would have no incentive to join their claims."

*Id.* at 13. Plaintiffs have cited cases from Georgia and North Carolina, arguing that these states' highest courts have construed their punitive damages caps to apply on a per-plaintiff basis. *See Bagley v. Shortt*, 410 S.E.2d 738, 739 (Ga. 1991); *Rhyne v. K-Mart Corp.*, 594 S.E.2d 1, 19–21 (N.C. 2004).[25] And those two state courts concluded that similar policy concerns against encouraging a "proliferation" of lawsuits supported the per-plaintiff interpretations of those statutes. *See Rhyne*, 594 S.E.2d at 21 (citing *Bagley*, 410 S.E.2d at 739). Plaintiffs' efficiency argument is not without force, as a matter of policy. Future plaintiffs would have less incentive to join their claims arising out of a single occurrence if the Virginia statute capped punitive damages for an entire action, as opposed to on a per-plaintiff basis. However, similar efficiency concerns were raised to the Fourth Circuit in *Al-Abood* in favor of a per-defendant cap on punitive damages rather than a cap on the entire action. *See* Ans. Br. of Cross-Appellee at 50, *Al-Abood v. El-Shamari*, 217 F.3d 225 (4th Cir. 2000) (Nos. 99-1939, 99-1940), 2000 WL 34012231, at *50 ("What is clear is that a rule applying the punitive damages cap as the El-Shamaris propose would encourage plaintiffs to bring *separate actions* against each defendant, thereby multiplying litigation."). Nonetheless, the Fourth Circuit held that there was "no ambiguity" in the statute and "its plain meaning dictate[d] that the cap on punitive damage awards applies to the action as a whole, and not to each defendant." *Al-Abood*, 217 F.3d at 237. Such policy or efficiency arguments did not support a contrary conclusion. *See id.* So too here.

---

[25] Alabama and Massachusetts cases to which Plaintiffs cited are inapposite, containing materially different statutory language that compelled those courts' conclusions that statutory damages limits applied on a per-plaintiff basis. *See Carson v. City of Prichard*, 709 So.2d 1199, 1203–05 (Ala. 1998); *Irwin v. Town of Ware*, 467 N.E.2d 1294, 1307 (Mass. 1984).

Efficiency or other policy considerations cannot supplant the plain meaning of the statute guided by Fourth Circuit published precedent and are more suited to other fora besides this Court.[26]

There is authority from some Virginia circuit courts and federal district courts that have considered Virginia's $350,000 statutory cap as applying to an action regardless whether there are one or more plaintiffs.[27] And, notably, Plaintiffs have not pointed the Court to any example of a Virginia case in which multiple plaintiffs were each awarded a separate $350,000 statutory cap on punitive damages.[28] Were Plaintiffs to have advanced a construction of Virginia's statutory cap commonly accepted by Virginia courts rather than a novel interpretation of the statute, one would have expected examples of punitive damages awards capped on a per-plaintiff basis to be quite commonplace.

---

[26] *See, e.g.*, *NAPCO, Inc. v. Landmark Technology A, LLC*, 555 F. Supp. 3d 189, 203 (M.D.N.C. 2021) ("In predicting how the highest court of a state would address an issue, this court 'should not create or expand a [s]tate's public policy.'") (quoting *Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007)).

[27] *See, e.g.*, *Foster v. Wintergreen Real Estate Co.*, No. CL09000086, 2010 WL 8696177, at *11–12 (Va. Cir. Ct. Nelson Cnty., Nov. 16, 2010) (holding that the punitive damages cap "applies to the entire lawsuit rather than to each individual defendant," and thus $350,000 was the statutory cap in case with multiple plaintiffs, but issue wasn't raised whether the cap could have applied separately for each plaintiff); *see also Transition, Inc. v. Austin*, No. 3:01-cv-103, 2002 WL 1050240, at *2 (E.D. Va. Mar. 15, 2002) (Dohnal, M.J.) (explaining in *dicta* that, "although the Fourth Circuit has specifically reserved ruling on the issue of the impact of the statutory cap as applied to multiple plaintiffs as opposed to multiple defendants, it is difficult to discern a difference … given the explicit language of § 8.01-38.1 …").

[28] Dicta in at least one case could be interpreted as lending support to Plaintiffs' position. *See Fidelity Nat. Title Ins. Co. v. Wash. Settlement Grp., LLC*, No. CL-2012-4793, 2013 WL 9541969, at *15 (Va. Cir. Ct. Fairfax Cnty. Sept. 4, 2013) ("while Virginia Code § 8.01-38.1 places a $350,000 statutory cap on punitive damages, by the clear language of the statute, the cap pertains to the amount of punitive damages that may be recovered *by a successful party*, not the amount that may be sought in the complaint and to which a jury may find a defendant liable") (emphasis added).

At bottom, considering the language of Virginia's statutory cap, the Fourth Circuit's precedent in *Al-Abood*, and lacking subsequent precedent from the Supreme Court of Virginia or the Fourth Circuit clarifying the application of the statutory cap in multiple-plaintiff cases,[29] the Court concludes that Virginia's $350,000 statutory cap on punitive damages applies to the action as a whole, and not on a per-plaintiff basis. Accordingly, the jury's punitive damages award will be reduced to $350,000 against all Defendants found liable on Counts III, IV, V and VI.

### C.  Whether Punitive Damages Award Exceeds Constitutional Grounds

Defendants also argue that the punitive damages award violates their right to due process under the Fourteenth Amendment. The jury's punitive damages award capped pursuant to Va. Code § 8.01-38.1 at $350,00 violates no defendant's due process rights.

Compensatory and punitive damages, although typically awarded at the same time by the same decisionmaker, serve different purposes. While compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," "punitive damages serve a broader function"—specifically, "they are aimed at deterrence and retribution." *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citations omitted). Punitive damages may be imposed to punish unlawful conduct and deter its repetition. *BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 568 (1996). It is "[o]nly when a punitive

---

[29] Virginia's statute governing certifications of questions of law provides that the Supreme Court of Virginia may answer a certified question "if a question of Virginia law is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of [the Supreme Court of Virginia] or the Court of Appeals of Virginia." Va. Sup. Ct. R. 5:40(a). Application of Virginia's punitive damages cap in cases of multiple plaintiffs is a significant question on which it appears there is no controlling Virginia precedent on point. But given the challenges to the merits of the jury verdict and other federal and state law challenges to the damages award, this Court must conclude the question is not at this juncture "determinative" in the pending proceeding. *See United States v. White*, 987 F.3d 340, 342 (4th Cir. 2021) ("We observe that under Supreme Court of Virginia Rule 5:40, the question we certify must be determinative of the proceeding.").

damages award can fairly be categorized as 'grossly excessive' in relation to these [legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.*

The Court must consider three "guideposts" in assessing the constitutionality of a punitive damages award: "(1) the degree of reprehensibility of the defendant's conduct; (2) any disparity between the actual or potential harm suffered by the plaintiff and the amount of the punitive award; and (3) any difference between the award and civil penalties that are authorized or imposed in comparable cases." *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 376 (4th Cir. 2008) (citing *Campbell*, 538 U.S. at 418). Here, Virginia's statutory cap on punitive damages has reduced the punitive damages award to $350,000 against all Defendants, which is a factor that operates to insulate the award against constitutional challenge. *Wackenhut*, 979 F.2d at 985 (explaining, "we have indicated that a statutory cap is one factor that might be considered in insulating a punitive damages award against constitutional attack based on unbridled jury discretion and infringement of substantive due process rights"); *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) ("a punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated"). So too here, the "statutory cap of [$350,000] provided [Defendants] with fair notice" of the range of punitive damages liability they faced on Plaintiffs' Virginia state law claims. *See Fed. Express*, 513 F.3d at 378 (citing *Romano*, 233 F.3d at 673). Upon consideration of these guideposts, the Court concludes that the capped punitive damages award is not grossly excessive or was any individual punitive damages award. Rather, the Court has little difficulty concluding the capped award passes constitutional muster.

1.  Degree of Reprehensibility

The first guidepost whether a punitive damages award is unreasonably excessive is "the degree of reprehensibility of the defendant's misconduct." *Campbell*, 538 U.S. at 418. That is because punitive damages "should reflect the enormity of the offense." *Gore*, 517 U.S. at 575 (cleaned up). To that end, the Supreme Court has explained that "[p]erhaps the *most important* indicum of the reasonableness of a punitive damages award is the *degree of reprehensibility* of the defendant's conduct." *Id.* (emphases added). Because "some wrongs are more blameworthy than others" in this analysis, those "marked by violence or the threat of violence" are more reprehensible than nonviolent wrongs, and those involving "trickery and deceit" are more reprehensible than negligence. *See id.* (citations omitted). In weighing the reprehensibility of a defendant's conduct, courts must ask whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419.

Some Defendants (Fields, Traditionalist Worker Party, Parrott and Heimbach) offer little to challenge the reprehensibility of their conduct. *See, e.g.*, Dkt. 1551-1 (Fields); Dkt. 1556 at 4–6 (Traditionalist Worker Party, Parrott and Heimbach). Others argue that their conduct was not reprehensible largely because *they* did not cause any injury to Plaintiffs or put their health or safety at risk, or that they only engaged in "speech and action that is largely protected by the First Amendment." *See, e.g.*, Dkt. 1542 at 3 (Schoep); Dkt. 1548 at 5 (League of South Defendants).

Defendants' arguments fail. Because significant evidence in the record supports the presence of four of the factors, a jury could reasonably find Defendants' conduct reprehensible

and warranting a substantial punitive damages award.[30] That would be clear in any event—and especially so considering the trial evidence is viewed in the light most favorable to Plaintiffs as the prevailing parties. *See Fed. Express*, 513 F.3d at 377. First, the harm caused to Plaintiffs was clearly physical. Plaintiffs suffered grievous injuries – the product of callous violence. On August 12, 2017, Defendant Fields drove his car into a group of counter-protestors, killing one and injuring many others, including Plaintiffs Marcus Martin, Marissa Blair, Thomas Baker, Natalie Romero and Chelsea Alvarado. Dkt. 1419 (Nov. 11 Tr.) 12:11-23 (Martin); Dkt. 1407 (Nov. 8 Tr.) 70:18–71:2 (Blair); Dkt. 1401 (Nov. 5 Tr.) 208:11–209:7, 213:9–214:6 (Baker); Dkt. 1378 (Oct. 29 Tr.) 49:20–51:7 (Romero); Dkt. 1413 (Nov. 9 Tr.) 17:23–18:6 (Alvarado). Marcus Martin's left leg was shattered, his ankle fractured, he had ligament damage in his foot, scrapes on his right leg, and he was diagnosed with traumatic brain injury and PTSD. Dkt. 1419 (Nov. 11 Tr.) 19:11-19, 24:15-25. Martin threw his then-fiancée Marissa Blair from Fields' car's path. She suffered a hematoma on her leg, scrapes and cuts, and injured ribs. Dkt. 1407 (Nov. 8 Tr.) 75:24–77:9. Thomas Baker suffered a concussion, lacerations and bruising all over his body, a torn ligament in his left wrist and a right hip labral tear. Dkt. 1401 (Nov. 5 Tr.) 216:18–22. Natalie Romero suffered a fractured skull, a severe concussion, a shattered tooth root, lip laceration, and cuts and bruises all over her legs. Dkt. 1378 (Oct. 29 Tr.) 57:23–58:2. Chelsea Alvarado suffered a concussion, contusions on her upper thighs, a hematoma on her left knee, and cuts and scrapes on her hands and arms. Dkt. 1413 (Nov. 9 Tr.) 23:12-17, 24:14-22. Following her narrow escape from the path of Fields' car and witness to the carnage that

---

[30] Plaintiffs do not argue that the fifth factor identified in *Campbell*, concerning financial vulnerability, is implicated. *See* Dkt. 1572 at 16–17.

followed, Elizabeth Sines was diagnosed with PTSD and major depressive disorder related to her PTSD. Dkt. 1428 (Nov. 12 Tr.) 75:19-21.

The prior evening of August 11, at the torch march, Plaintiffs Romero and Willis were surrounded at the base of the Thomas Jefferson statue by a mob organized and led by Jason Kessler, Richard Spencer, Elliott Kline, and others. Romero and Willis were encircled, spat on, cursed at, called racially discriminatory names, and were otherwise battered by the crowd those Defendants and others had instigated. Richard Spencer called it a victorious day afterward.

Those Defendants arguing that they did not *personally* injure any of these Plaintiffs nonetheless committed tortious conduct evidencing "indifference to or a reckless disregard of the health or safety of others." *Campbell*, 538 U.S. at 419. The jury found that those Defendants entered into a conspiracy with Defendant Fields and others. *See* Dkt. 1478 at 4 (jury verdict). Some Defendants acknowledged that their liability for conspiracy supported to some extent a reprehensibility finding for purposes of assessing punitive damages. *See* Dkt. 1542 at 3 (Schoep); Dkt. 1542 at 3 (NSM).

Moreover, the tortious conduct at issue in this case was no "isolated" or passing incident. *Campbell*, 538 U.S. at 419. Rather, evidence showed that Defendants' conduct sparked days of violence and multiple violent encounters. On August 11, Defendants Kessler, Spencer, Kline and Cantwell organized and led the tiki torch-wielding mob which culminated in attacking, pepper spraying, racial and ethnic slurs, harassment and intimidation of Plaintiffs Romeo and Willis; on August 12, columns of Nationalist Front groups led by Defendants Tubbs, Hill, Heimbach, and League of the South, marching in battle formation, charged into a line of stationary counter-protestors and used flagpoles and shields as weapons and pepper spray in the melee that followed, injuring among others, Plaintiff Romero. Later that day, Defendant Fields plowed his car into a peaceful crowd of counter-protestors, injuring the Plaintiffs. More than substantial

evidence showed that this violence was the product of intentional malice, rather than "mere accident." *Campbell*, 538 U.S. at 419. Plaintiffs introduced substantial evidence that Defendants sought violence, planned for violence, sparked violence, engaged in violence, and afterwards, glorified the violence.

In other words, on both days, the conduct was violent and physical (as opposed to economic); demonstrated deliberate indifference to a great risk of harm; stretched over a substantial period on August 11 (and again on August 12); and was deliberate and intentional and the product of malice (as opposed to merely negligent). The evidence of Defendants' conduct far exceeds the standard of conduct deemed reprehensible in the courts. *See, e.g.*, *Saunders v. Branch Banking & Trust Co of Va.*, 526 F.3d 142, 153 (4th Cir. 2008). Accordingly, under the evidence, the jury was entitled to conclude that Defendants acted reprehensibly such as to support a sizable award of punitive damages.

### 2.   Punitive Damages Ratio

The second guidepost "is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 418. The Supreme Court has declined to "impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 425. To be sure, the Supreme Court has explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages" will satisfy due process. *Id.* The Fourth Circuit and other circuits have applied those principles and explained that "when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter.'" *Saunders*, 526 F.3d at 154 (quoting *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364–65 (11th Cir. 2004)).

Defendants argue that the jury awarded punitive damages in a ratio to compensatory

damages awarded that was unconstitutionally excessive, violating their due process rights. *See,*

*e.g.*, Dkt. 1542 at 1–4 (Schoep); Dkt. 1555 at 1–2 (Damigo, Identity Evropa, Kessler); Dkt. 1556

at 4–5 (Traditionalist Worker Party, Parrott and Heimbach). Defendants' arguments on this issue

are predicated upon challenging the ratio between *the jury's* punitive and compensatory damages

awards, rather than the ratio between the statutorily capped $350,000 in punitive damages and

the jury's compensatory damages awards. *See id.* Defendants also generally advocate for a

claim-by-claim analysis of the ratio between punitive and compensatory damages. *See, e.g.*,

Dkt. 1542 at 1–4 (arguing that 500,000-to-1 ratio for Count III is unconstitutionally excessive);

Dkt. 1550 at 4 (same). Plaintiffs, for their part, argue that the Court should not compare the ratio

of punitive damages to compensatory damages on a "claim-by-claim basis." Dkt. 1572 at 18.

Rather, they contend that, "[b]ecause the jury found Defendants liable on multiple claims, the

Court should calculate the ratio by comparing the aggregate compensatory damages for which

each Defendant is liable (across all claims) against the aggregate punitive damages award against

that Defendant (across all claims)." *Id.*

Plaintiffs' aggregate approach to calculating the punitive to compensatory damages ratio

is appropriate, well supported, and accords with the posture of this case. *See* Dkt. 1572 at 18–21.

At the outset this approach is especially appropriate considering that the jury found Defendants

liable for a civil conspiracy. Under Virginia law, the jury's finding of liability on the civil

conspiracy claim "meant that [Defendants] were held jointly and severally liable for the damages

award." *See Tire Eng'g & Dist., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 312

n. 10 (4th Cir. 2012); *see also Worrie v. Boze*, 95 S.E.2d 192, 198 (Va. 1956) ("The conspirators

are jointly and severally liable for all damage resulting from the conspiracy."), *abrogated in part*

*on other grounds*, *Station #2, LLC v. Lynch*, 695 S.E.2d 537, 541 (Va. 2010). "The object of a

civil conspiracy claim is to spread liability to persons other than the primary tortfeasor." *Gelber v. Glock*, 800 S.E.2d 800, 820 (Va. 2017); *see also La Bella Dona Skin Care, Inc.*, 805 S.E.2d at 406 (explaining that "civil conspiracy is a mechanism for spreading liability amongst coconspirators for damages sustained as a result of an underlying act that is itself wrongful or tortious"). While Defendants Damigo and Identity Evropa argue that Plaintiffs' "argument regarding joint and several liability [ ] misses the mark," Dkt. 1593 at 4, they present no contrary law to dispute Plaintiffs' authorities that under Virginia law, Defendants, as coconspirators, are liable for all damages resulting from the conspiracy. In addition, Plaintiffs' aggregate approach makes particular sense where, as here, the jury did not award compensatory damages on all counts for which it found Defendants liable, and thus, the total damages award reflects the jury's assessment of the full measure of damages, and that the jury reasonably sought to avoid awarding any double recovery. *See Cutaia v. Radius Eng'g Int'l*, No. 5:11-cv-77, 2014 WL 3359368, at *3 (W.D. Va. July 9, 2014); Dkt. 1461 at ECF 61 (Instruction 34 – instructing that jury "must be careful not to award double or duplicate damages"). The Court is persuaded that, under "*State Farm*, *BMW*, and *TXO* … a court can aggregate compensatory damages from multiple related causes of action when comparing compensatory damages to punitive damages." *Fastenal Co. v. Crawford*, 609 F. Supp. 3d 650, 661 (E.D. Ky. 2009) (citing *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993)).

The jury awarded Plaintiffs compensatory damages in the amount of $1,303,284 on Counts III, IV and V—the counts for which all Defendants are jointly and severally liable. *See* Dkt. 1478 at 4–8.[31] The jury awarded Plaintiffs compensatory damages in the amount of

---

[31] These counts include Count III (Virginia state law civil conspiracy), as well as Count IV (violation of Virginia's hate crime statute) and Count V (assault and battery)—both of which the Court instructed the jury would constitute predicate unlawful acts of the conspiracy. *See* Dkt.

$701,459 on Count VI (intentional infliction of emotional distress)—a sum for which Fields is

solely liable. *Id.* at 9. Accordingly, the total compensatory damages liability for all non-Fields

Defendants is $1,303,284, and the total compensatory damages liability for Fields is $2,004,743.

*See id.* at 4–9.

As discussed above, applying Virginia's statutory punitive damages cap, the total

punitive damages liability for Defendants is $350,000. No party argues that the Court should

apply anything other than the pro-rata portion of each Defendant's responsibility of the total

punitive damages awarded for purposes of calculating the applicable ratio. No ratio comes

anywhere close to raising due process concerns of an excessive punitive damages award. Here,

Fields has the highest ratio of punitive to compensatory damages—the jury held him responsible

for 52 percent of total punitive damages (i.e., $182,000)—and it still is well below a 1-1 ratio:

0.091 of punitive to compensatory damages. That does not present any constitutional issue of an

excessive punitive damages award—far from it. *See, e.g.*, *Morris v. Bland*, 666 F. App'x 233,

241 (4th Cir. 2016) ("single digit ratios generally do not present a constitutional issue"). The

others' ratios are even less consequential. Far from their protestations of an unconstitutionally

excessive 500,000-to-1 ratio, Kessler, Spencer, and Cantwell, for their part, would owe a pro rata

portion of punitive damages amounting to $10,208, resulting in a 0.0078 ratio of punitive to

compensatory damages. Hill, Tubbs, Schoep and Damigo would owe a pro rata portion of

punitive damages of $7,292, resulting in a smaller-still ratio of 0.0056 ratio of punitive to

compensatory damages. League of the South, National Socialist Movement and Traditionalist

Worker Party would each owe $14,583.33 in punitive damages, resulting in a 0.011 ratio of

---

1478 at 4–8; Dkt. 1461 at ECF 38–39; *accord La Bella Dona Skin Care, Inc.*, 805 S.E.2d at 406
(explaining that "civil conspiracy is a mechanism for spreading liability amongst coconspirators
for damages sustained as a result of an underlying act that is itself wrongful or tortious").

Filed 04/09/23

Doc 83

punitive to compensatory damages. Each of these falls well below even a 1:1 ratio of punitive to compensatory damages, which only further serves to support a conclusion that their imposition comports with due process. *See Campbell*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process").

While the Court has concluded that Plaintiffs' aggregate approach is the most instructive to the Court's consideration of the constitutionality of the punitive damages award—especially given the Defendants' joint and several liability—even under Defendants' preferred "claim-by-claim" approach, the punitive to compensatory damages ratios readily pass muster.

Under a "claim-by-claim" approach for Count IV, the jury found Defendants Kessler, Spencer, Kline, Ray, and Cantwell, each responsible for $100,000 in compensatory damages, and each responsible for $200,000 in punitive damages. *See* Dkt. 1478 at 6 (jury verdict). As a percentage of the total capped $350,000 punitive damages award, each of the five Defendants would be responsible for about $2,916 in punitive damages on this count, resulting in a 0.029 ratio of punitive to compensatory damages for this count. For Count V, the jury found Defendant Fields responsible for $803,277 in compensatory damages, and as a capped percentage of the total punitive damages award, $87,500 in punitive damages, resulting in a 0.11 ratio of punitive to compensatory damages. *See id.* at 8. And for Count VI, the jury found Defendant Fields responsible for $701,459 in compensatory damages, and, as a capped percentage of the total punitive damages award, $87,500 in punitive damages, resulting in a 0.12 ratio of punitive to compensatory damages. *See id.* at 9. Again, each falls well below even a 1:1 ratio, further showing their imposition comports with due process.

Defendants' arguments fare no better with respect to Count III. First, a number of Defendants whom the jury had found liable for Virginia state law civil conspiracy in Count III—but no other counts—have challenged punitive damages imposed upon them as excessive. These

include individual Defendants Nathan Damigo, Matthew Heimbach, Matthew Parrott, Michael

Hill, Michael Tubbs, and Jeff Schoep, as well as the organizational Defendants Vanguard

America, League of the South, Identity Evropa, Traditionalist Worker Party, and Nationalist

Socialist Movement. Dkt. 1478 at 3–5 (jury verdict). On this count, the jury awarded nominal

damages to seven Plaintiffs, awarded $500,000 in punitive damages against each of the

abovementioned individual Defendants, and awarded $1,000,000 in punitive damages against

each of the organizational Defendants. *Id.* Numerous moving Defendants have argued that this

results in an impermissible 500,000-to-1 ratio for the individual Defendants, and 1,000,000-to-1

ratio for the organizations. *See, e.g.*, Dkt. 1542 at 1 (Schoep); Dkt. 1543 at 1 (NSM); Dkt. 1548

at 5–6 (League of the South Defendants). However, again, Virginia law capped the punitive

damages award in this action at $350,000 against all Defendants found liable. Therefore, even

applying Defendants' proposed claim-by-claim approach for purposes of this analysis, as a pro

rata portion of the total punitive damages awarded in the action, Defendants Nathan Damigo,

Matthew Heimbach, Matthew Parrott, Michael Hill, Michael Tubbs, and Jeff Schoep would each

be responsible for about $7,292 in punitive damages. Defendants Vanguard America, League of

the South, Identity Evropa, Traditionalist Worker Party, and Nationalist Socialist Movement,

would each be responsible for $14,583—resulting in a 7,292:1 ratio for individual defendants,

and 14,583:1 ratio for the organizational defendants. Also, under a "claim-by-claim" approach

for Count III, Kessler, Spencer, and Cantwell, would each be responsible for $7,292 in punitive

damages—resulting in a 7,292:1 ratio.

     The Court concludes that these ratios—while significantly exceeding more standard

single- or double-digit ratios—are not excessive using Defendants' proposed claim-by-claim

approach, considering that the jury awarded only nominal damages on the civil conspiracy count.

The Fourth Circuit's admonition is readily applicable here, that "when a jury only awards

nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter.'" *Saunders*, 526 F.3d at 154 (citation omitted). Single, double, or even triple-digit ratios in this claim-by-claim approach would "utterly fail" to "punish and deter" these Defendants and others from engaging in similar conduct. To be sure, it might be argued that between $7,000 and $15,000 in punitive damages is also insufficient to achieve that the purposes of punishment and deterrence, especially when the jury would have imposed awards of punitive damages many orders of magnitude greater ($500,000 and $1,000,000). However, again, that outward limit on punitive damages available is the product of Virginia's statutory cap which limited the *entirety of the punitive damages* awarded in the action amount to no more than $350,000. Accordingly, the Court has concluded these ratios do not give rise to constitutional concerns even utilizing Defendants' preferred "claim-by-claim" approach.

The Court further notes that even if it applied a claim-by-claim approach as to the punitive damages awards for Kessler, Spencer, and Cantwell,[32] as to Count III, the Court would still conclude that because nominal damages were awarded, an award of $7,292 in punitive damages as against each does not raise concerns about excessive punitive damages. Especially as to those Defendants who included many of the primary organizers and architects of Unite the Right's violence, the Court finds that even triple-digit ratios would utterly fail to punish and deter them (and others) from engaging in similar conduct in the future.

---

[32] The analysis applies to Kline and Ray as well, however, the Court does not separately address them as they have been absent from court proceedings and have not affirmatively raised these (or any other) arguments at trial or in post-trial motions.

"[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell*, 538 U.S. at 426. The ratios of capped punitive damages to compensatory damages on any or all of Counts III, IV, V and VI do not give rise to concerns of excessiveness. The Court similarly concludes that the measure of punishment is both reasonable and proportionate to the harms inflicted upon Plaintiffs. Moreover, an award of punitive damages within the Virginia statutory cap further offers some measure of protection from constitutional attack. *See Wackenhut*, 979 F.2d at 985.

3. Civil or criminal penalties

Lastly, the Court considers "any difference between the award and civil penalties that are authorized or imposed in comparable cases." *Fed. Express*, 513 F.3d at 376 (citing *Campbell*, 538 U.S. at 418); *see also Gore*, 517 U.S. at 583 ("Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."). The parties offer comparatively little argument concerning this last "guidepost" in the Court's analysis assessing the constitutionality of the punitive damages award. Indeed, they have not identified any appropriately analogous civil or criminal statutes or described the statutory penalties authorized or imposed in such cases.

Plaintiffs identify punitive damages awards in several other cases and argue that if those awards were upheld under the facts of those cases, Defendants' reprehensible conduct in this case deserves at least $350,000 in punitive damages. Dkt. 1572 at 29–30. For instance, Plaintiffs cite a case in which two of the same Defendants as in this case (Andrew Anglin and Moonbase Holdings) were found liable for intentional infliction of emotional distress and ordered to pay $100,000 in compensatory and $500,000 in punitive damages, after they directed their followers to harass the plaintiff—the first female, African American student government president at

American University. *See Dumpson v. Ade*, No. 18-cv-1011, 2019 WL 3767171, at *1 (D.D.C. Aug. 9, 2019). For their part, Defendants' arguments primarily focus on the second "guidepost," the ratio between punitive and compensatory damages, and they offer little if any argument as to this factor. *See* Dkt. 1551-1 at 2–5 (Fields). The Court concludes that the argument concerning punitive damages awards imposed in other cases is not helpful in this case, given, at a minimum, significant factual differences between the underlying conduct at issue.[33] More significant is the fact that the Virginia legislature determined that punitive damages in a civil case may be awarded in the amount of $350,000 (the cap), and that the Court has reduced the punitive damages to that cap. *See Fed. Express*, 513 F.3d at 378 (explaining that the fact that the damages award was within the statutory cap "provides additional support for the reasonableness and constitutionality of the punitive damages award"); *Gore*, 517 U.S. at 583 ("substantial deference" afforded to "legislative judgments concerning appropriate sanctions for the conduct at issue"). This offers further support to the constitutionality of the punitive damages award, although the Court concludes that the other two guideposts offer more useful analyses here. *See also Wackenhut*, 979 F.2d at 985.

The Court concludes that no Defendant has any meritorious due process challenge to the constitutionality of the punitive damages awards. Defendants' conduct is reprehensible and satisfies four of the relevant factors in making that determination. Any ratios of punitive damages to compensatory damages are well within the realm of reasonableness, supported by

---

[33] The Court also notes that some authority has held that other punitive damages awards are simply not relevant to this third guidepost, which concerns "civil or criminal *penalties*," and therefore meant to discern *legislative intent* on appropriate punishments, instead of any punitive damages awards in other cases. *See, e.g.*, *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 367 n. 2 (6th Cir. 2005) (unpublished).

precedent, and necessary to achieve the goals of punishment and deterrence. And the Court has capped punitive damages at $350,000 as set forth by Virginia statute.

### D. Whether Punitive Damages Award Is Permissible Under Virginia Law

Defendants also argue that Virginia law does not permit any punitive damages award as against them, or that, if it does, the Court should reduce the punitive damages award as excessive under Virginia law. Dkt. 1542 at 4–6 (Schoep); Dkt. 1543 at 4–6 (NSM); Dkt. 1548 at 2–4 (LOS, Hill, Tubbs); Dkt. 1551 at  5–6 (Fields); Dkt. 1556 at 1–2 (Parrott, Heimbach, TWP). The Court disagrees. The award of punitive damages reduced to the Virginia statutory cap is not excessive under Virginia law.

Under Virginia law, the purpose of punitive damages is "to provide protection to the public," "punishment to [the] defendant," and to serve as "a warning and example to deter him and others from committing like offenses." *Coalson v. Canchola*, 754 S.E.2d 525, 528 (Va. 2014). "The general rule is that there is no fixed standard for the measure of exemplary or punitive damages and the amount of the award is largely a matter within the discretion of the jury." *Baldwin v. McConnell*, 643 S.E.2d 703, 707 (Va. 2007) (quoting *Worrie*, 95 S.E.2d at 201). Courts that review a punitive damages award under Virginia law must consider various factors, including: (1) the "reasonableness between the damages sustained and the amount of the award," (2) "the measurement of punishment required," (3) whether "the award will amount to a double recovery," (4) "the proportionality between the compensatory and punitive damages," and (5) "the ability of the defendant to pay." *Baldwin*, 643 S.E.2d at 707. A court considering a request under Virginia law for remittitur of a punitive damages award must view the evidence in the light most favorable to the party who received the jury verdict. *Caldwell v. Seaboard Sys. R.R., Inc.*, 380 S.E.2d 910, 914–15 (Va. 1989). The Supreme Court of Virginia "ha[s] repeatedly held that a jury's award of damages may not be set aside … as excessive," unless the damages

"are so excessive … as to shock the conscience and to create the impression that the jury has

been influenced by passion or prejudice or has in some way misconceived or misinterpreted the

facts or the law which should guide them to a just conclusion." *Downer v. CSX Transp., Inc.*,

507 S.E.2d 612, 614 (Va. 1998).

    Several Defendants argue that under Virginia law, punitive damages can be awarded only

where the jury has awarded "actual or compensatory damages," not "nominal damages." *See,*

*e.g.*, Dkt. 1548 at 2–3 (League of the South Defendants); Dkt. 1556 at 1–2 (Parrott, Heimbach,

Traditionalist Worker Party). However, notwithstanding the distinctions under Virginia law

between compensatory and nominal damages, *Kerns v. Wells Fargo Bank, N.A.*, 818 S.E.2d 779,

785 (Va. 2018), Virginia precedent is clear that punitive damages can be awarded if the jury has

awarded either compensatory *or* nominal damages, *Valley Acceptance Corp. v. Glasby*, 337

S.E.2d 291, 297 (Va. 1985) ("Here, neither compensatory damages nor nominal damages were

awarded against Valley. Consequently, punitive damages could not be awarded."); *Gibson v.*

*Boy Scouts of Am.*, 163 F. App'x 206, 211 (4th Cir. 2006) (unpublished, per curiam) (citing

*Glasby* for the proposition that "under Virginia law, punitive damages are not proper absent an

award of compensatory or nominal damages."); *Syed v. ZH Techs., Inc.*, 694 S.E.2d 625, 634

(Va. 2010) (quoting *Zedd v. Jenkins*, 74 S.E.2d 791, 793 (Va. 1953)) (explaining a punitive

damages award was "illegal" without a "finding that plaintiff was entitled to any compensatory,

or even nominal, damages").[34] Because Plaintiffs are not seeking recovery of punitive damages

---

[34] Defendants' reliance on precedent setting aside a punitive damages award in the
absence of compensatory damages—and where *no* nominal damages were awarded—does not
support a contrary conclusion. *See Gay v. Am. Motorists Ins. Co.*, 714 F.2d 13, 16 (4th Cir.
1983). In any event, later Virginia precedent confirmed that nominal damages can support an
award of punitive damages. *E.g.*, *Glasby*, 337 S.E.2d at 297; *Syed*, 694 S.E.2d at 634; *Doddy*
*v. Zedd Auctioneers, Ltd.*, No. CL07-4965, 77 Va. Cir. 272, 2008 WL 8201371, at *2 (Va. Cir.

for Plaintiff Wispelwey, to whom the jury did not award any compensatory or nominal damages, Dkt. 1478 at 3–9 (jury verdict), this Virginia state law limitation did not bar an award of punitive damages in favor of any of the other Plaintiffs.

Regardless, some Defendants argue that even if nominal damages are sufficient to award punitive damages, the punitive damages award is excessive as to those Defendants against whom the jury awarded *only* nominal (no compensatory) damages. For example, League of the South Defendants argue that "Virginia law requires a reasonable ratio between compensatory damages and punitive damages." Dkt. 1548 at 3–4. They argue that the punitive damages award as against them on Count III, even capped by Va. Code § 8.01-38.1, was disproportionate to the nominal damages award. *See id.* This argument is unpersuasive. Viewed in the light most favorable to Plaintiffs as the prevailing parties, ample evidence supported the conclusion that substantial punitive damages were required against these Defendants to "provide protection to the public," "punishment" to Defendants, and to serve as a "warning and example to deter [them] and others from committing like offenses." *See Coalson*, 754 S.E.2d at 528. To a large extent, whether the punitive damages award is excessive tracks the Court's analysis above. And, in any event, the sums awarded, especially reduced to fall within the statutory cap, certainly are not "so excessive … as to shock the conscience." *Downer*, 507 S.E.2d at 614.

Moreover, this is not a case in which any of the Plaintiffs who were awarded nominal damages on some counts were awarded nominal damages only because they "failed to demonstrate actionable harm." *People Helpers Found., Inc. v. City of Richmond, Va.*, 12 F.3d 1321, 1327 (4th Cir. 1993). While on the Virginia state law civil conspiracy count (Count III),

---

Ct. Norfolk City) (2008) ("an award of nominal damages will support an award of punitive damages").

the jury awarded Plaintiffs Romero, Muñiz, Baker, Blair, Martin, Alvarado, and Willis nominal

damages in the amount of $1.00, Dkt. 1478 at 4, the jury also awarded each of those Plaintiffs

substantial compensatory damages for the underlying predicate violent and tortious acts, namely

religious, or ethnic harassment or violence, violating Virginia Code § 8.01-42.1 (Count IV),

assault and battery (Count V), and intentional infliction of emotional distress (Count VI),

Dkt. 1478 at 5–9.

Some Defendants also argued that the punitive damages awards should be further

reduced because of their purported inability to pay. *See, e.g.*, Dkt. 1556 at 5 – 6 (Traditionalist

Worker Party, Parrott and Heimbach). However, these Defendants cite no evidence in the record

to substantiate their argument that they lack the ability to pay, and therefore the Court concludes

that it does not support any further reduced punitive damages award. *See Condominium Servs.,*

*Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.*, 709 S.E.2d 163, 175 (Va.

2011) (holding that a defendant who "contends that it was experiencing financial difficulties,"

but "did not introduce evidence of their financial situation at trial … cannot prevail before this

Court on its claim that the amount of punitive damages would be oppressive"). Defendant

Schoep argues that, "[h]ad Plaintiffs' counsel allowed testimony of the defendant's current work

to be heard, the jury would have been better equipped to 'determine the proper amount of

punitive damage, if any only against Defendant Schoep.'" Dkt. 1542 at 7 (citing Dkt. 1431

(Nov. 15) 17:19-21)). However, Schoep does not identify any evidence that he argued should be

introduced to show his alleged inability to pay punitive damages that was excluded. Having

failed to "introduce evidence of [his] financial situation at trial," he cannot now prevail on his

claim that the amount of punitive damages would be oppressive.[35] *See Condominium Servs.*, 709 S.E.2d at 175. In any event, this argument also fails because no defendant asserting this issue has demonstrated such an inability to pay, based upon the totality of their financial circumstances, especially with respect to the punitive damages award reduced to comply with the Virginia statutory cap. *Cf. Baldwin v. McConnell*, 643 S.E.2d 703, 707–08 (Va. 2007) (considering value of defendant's stocks in determining ability to pay); *Jordan v. Osmun*, No. 1:16-cv-501, 2017 WL 2837143, at *8 (E.D. Va. June 29, 2017) (affirming a $100,000 punitive damages award, and rejecting argument that defendant "do[es] not have that kind of money, because "neither party has presented a clear record of the financial condition of the Defendants," and noting Virginia's "low threshold for ability to repay").

      Because Defendants have not raised any valid reason that the punitive damages award, capped at the statutory threshold, should be further reduced under Virginia law, the Court will deny Defendants' arguments for such relief.

---

[35] Schoep argues that, had Plaintiffs not objected, he would have introduced testimony from a witness Daryl Davis concerning Schoep's "current work," which would have given the jury a basis to determine he was unable to pay punitive damages. *See* Dkt. 1542 at 7–8. But the basis upon which Schoep sought to introduce Davis's testimony was that he "could potentially humanize Defendant Schoep," and that he would testify about "the state of mind of [Schoep] and his propensity, or lack of, for violence." Dkt. 1267 at 2–3. Not inability to pay punitive damages. Indeed, though Defendant Schoep had not raised the issue of relevance to punitive damages, the Court allowed Schoep to introduce evidence regarding his subsequent alleged repudiation of white supremacy and related conduct for the limited purpose of determining the amount of punitive damages. Dkt. 1431 (Nov. 15) at 17:6-21; Dkt. 1428 (Nov. 12) 188:5-13. In other words, Schoep's (suggestion) that he was not permitted to introduce evidence that he was unable to pay fails, both because (1) he did not timely argue that he wanted to introduce such evidence for that purpose, (2) in any event, he was afforded the opportunity to introduce evidence to that effect, and (3) he does not articulate the argument, much less substantiate such argument, as to how his "current work" renders him unable to pay.

## Conclusion

The Court has affirmed the jury verdicts as to liability against all Defendants. The Court has further affirmed the compensatory damage awards as imposed by the jury. The jury's punitive damages award will be reduced to $350,000, Virginia's statutory cap on punitive damages. An appropriate Order will issue.

The Clerk of Court is directed to send this Memorandum Opinion to the parties.

ENTERED this ___30th___ day of December, 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

# Exhibit C

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

October 08, 2024

LAURA A. AUSTIN, CLERK
BY  s/ S. MELVIN
     DEPUTY CLERK

### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
**Charlottesville Division**

ELIZABETH SINES, SETH WISPELWEY,
MARISSA BLAIR, APRIL MUÑIZ, MARCUS
MARTIN, NATALIE ROMERO, CHELSEA
ALVARADO, JOHN DOE, and THOMAS
BAKER,

                              Plaintiffs,

    v.

JASON KESSLER, et al.,

                              Defendants.

<u>AMENDED JUDGMENT</u>

Civil Action No. 3:17-cv-00072-NKM

### AMENDED JUDGMENT

A jury heard this matter from October 25, 2021 to November 23, 2021 and returned a verdict in favor of the Plaintiffs as to liability on Counts III, IV, V and VI. The jury did not reach a verdict on Counts I or II.

The Court entered judgment on January 9, 2023, affirming the jury verdict in part and awarding nominal and compensatory damages as follows:

    i.    On <u>Count III</u>, nominal damages of $1.00 each to Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Marissa Blair, Marcus Martin, Chelsea Alvarado, and Devin Willis;

    ii.    On <u>Count IV</u>, compensatory damages of $250,000 each to Plaintiffs Romero and Willis;

    iii.    On <u>Count V</u>, compensatory damages of $217,715 to Romero; $108,000 to Muñiz; $318,575 to Baker; $2,000 to Blair; and $156,987 to Martin;

    iv.    On <u>Count VI</u>, compensatory damages of $155,715 to Romero; $50,000 to Muñiz; $246,757 to Baker; $50,000 to Sines; $100,000 to Blair; and $98,987 to Martin. <u>See</u> Dkt. 1631.

The Court held all Defendants jointly and severally liable for the nominal and compensatory damages awards on Counts III, IV, and V, which amount is $1,303,284. The Court held Defendant Fields liable for the compensatory damages awarded on Count VI, which amount is $701,459. In a July 1, 2024 decision, the United States Court of Appeals for the Fourth Circuit affirmed these portions of this Court's Judgment, including this Court's imposition of joint-and-several liability on all Defendants for the damages awarded on Counts III, IV, and V. See Dkt. 1683 at 6.

Eight Plaintiffs in this action (Alvarado, Baker, Blair, Martin, Muñiz, Romero, Sines, and Willis) also sought punitive damages. The jury awarded a total of $24 million in punitive damages in its verdict, including $12.5 million against Fields; $1 million against each of Vanguard America, League of the South, Identity Evropa, Traditionalist Worker Party, and National Socialist Movement; $700,000 against each of Kessler, Spencer, Cantwell, Ray, and Kline; and $500,000 against each of Damigo, Heimbach, Parrott, Hill, Tubbs, and Schoep. See Dkt. 1478 at 5-9. Applying Virginia's statutory cap on punitive damages, this Court reduced the jury's punitive damages award to a total of $350,000. See Dkt. 1631 at 3-4. However, the Fourth Circuit vacated this portion of the Court's Judgment and remanded with instructions to apply the $350,000 statutory cap on a per-plaintiff basis. See Dkt. 1683 at 27.

Accordingly, it is hereby **ADJUDGED AND ORDERED** that the Court's Judgment dated January 9, 2023 is amended to **cap the jury's punitive damages award at $2,800,000**, or $350,000 for each of the eight Plaintiffs who sought punitive damages. In addition to their nominal and compensatory damages liability, each Defendant found liable by the jury at trial for punitive damages is also liable for their pro rata portion of the amended punitive damages award of $2,800,000, as follows: $1,458,333.32 for Fields; $116,666.67 for each of Vanguard America,

League of the South, Identity Evropa, Traditionalist Worker Party, and National Socialist

Movement; $81,666.67 for each of Kessler, Spencer, Cantwell, Ray, and Kline; and $58,333.33

for each of Damigo, Heimbach, Parrott, Hill, Tubbs, and Schoep.

In all other respects besides the punitive damages award, as noted above, the Court

affirmed the jury verdict. The Court also determined, in separate Orders following its January 9,

2023 Judgment, that Defendants Kessler, Spencer, Kline, Ray, Cantwell, and Fields were jointly

and severally liable for a total of $3.18 million in reasonable attorney's fees to Plaintiffs Romero,

Muñiz, Wispelwey, Sines, Blair, Martin, and Willis; that all Defendants were jointly and

severally liable for a total of $468,216.15 in costs to all Plaintiffs; and that Defendants Cantwell,

Damigo, Heimbach, Hill, Identity Evropa, Kessler, League of the South, Kline, Nationalist Front,

National Socialist Movement, Parrott, Ray, Schoep, Spencer, Traditionalist Worker Party,

Tubbs, and Vanguard America were jointly and severally liable for a total of $1,266,420.84 in

reimbursable expenses to all Plaintiffs under the terms of the ESI Stipulation & Order. See Dkt.

1660 at 3; Dkt. 1656 at 3; Fed. R. Civ. P. 58(a)(3). No party appealed from either of these

Orders.

It is therefore **ADJUDGED AND ORDERED** that this Amended Judgment is entered in

favor of Plaintiffs on Counts III, IV, V, and VI; Counts I and II remain **DISMISSED**, see Dkt.

1672; and this case is **DISMISSED** from the Court's active docket. Plaintiffs are further entitled

to post-judgment interest under 28 U.S.C. § 1961.

The Clerk of Court is directed to send this Amended Judgment to the parties.

ENTERED this 8th day of October, 2024.

_____
THE HONORABLE NORMAN K. MOON
Senior United States District Judge

Pg. No. 207