In re Nathan Benjamin Damigo
United States Bankruptcy Court, Eastern District of California
Case No. 19-90003-E-7
*Sines, et al. v. Damigo*
Adv. Pro. No. 19-09006

**Index of Exhibits to the Declaration of Robert L. Eisenbach III in Support
of Joint Stipulation of Undisputed Facts**

**Joint Exhibits Volume 2 (JXV-2)**

| Joint Exhibit No. | Document | Page Range |
|---|---|---|
| 6. | Stipulated & Order for the Imaging, Preservation, and Production of Documents, No. 3:17-cv-00072 (W.D. Va.) ("***Charlottesville Action***"), Dkt. No. 383, dated Nov. 19, 2018. | 331–347 |
| 7. | Excerpts of Exhibit V to the Declaration of Yotam Barkai in Support of Plaintiffs' Motion for Attorney Fees, Charlottesville Action, Dkt. No. 1552-23, filed on March 9, 2022. | 348–350 |
| 8. | Final Jury Instructions & Verdict Form, Charlottesville Action, Dkt. No. 1461, filed on Nov. 19, 2021. | 351–428 |
| 9. | Jury Verdict Form, Charlottesville Action, Dkt. No. 1478, filed on Nov. 23, 2021. | 429–439 |
| 10. | Defendants' Post Trial Motions, Charlottesville Action, Dkt. No. 1522, filed January 7, 2022. | 440–450 |
| 11. | Defendants' Reply Brief as to Punitive Damages, Charlottesville Action, Dkt. No. 1593, filed on May 5, 2022. | 451–457 |
| 12. | Memorandum Opinion, Charlottesville Action, Dkt. No. 1622, filed on December 30, 2022. | 458–547 |
| 13. | Report & Recommendation, Charlottesville Action, Dkt. No. 1655, dated Mar. 7, 2023. | 548–594 |
| 14. | Order Granting Plaintiffs' Post-Trial Motion for Attorney's Fees and Costs, Charlottesville Action, Dkt. No. 1656, dated Mar. 7, 2023. | 595–599 |
| 15. | Opinion, Sines v. Hill, No. 23-1119 (4th Cir.) ("***Fourth Circuit Appeal***"), Dkt. No. 141, dated July 1, 2024. | 600–627 |
| 16. | Mandate, Fourth Circuit Appeal, Dkt. No. 143, dated July 23, 2024. | 628–632 |
| 17. | Amended Judgment, Charlottesville Action, Dkt. No. 1691, dated Oct. 8, 2024. | 633–636 |

# JOINT EXHIBIT 6

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
11/19/2018
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

|  |  |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE,<br><br>        Plaintiffs,<br><br> v.<br><br>JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSELY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,<br><br>        Defendants. | **Civil Action No.** 3:17-cv-00072-NKM<br><br><br><br>**JURY TRIAL DEMANDED** |

## STIPULATION AND ORDER FOR THE
## IMAGING, PRESERVATION, AND PRODUCTION OF DOCUMENTS

1

WHEREAS the Plaintiffs having engaged a discovery vendor to image, preserve, and produce information relevant to the Action in a manner consistent with the Federal Rules of Civil Procedure; and

WHEREAS certain Defendants have expressed an inability to image, preserve, and produce Electronically Stored Information ("ESI") in a manner consistent with the Federal Rules of Civil Procedure; and

WHEREAS the Plaintiffs and Defendants Christopher Cantwell, Nathan Damigo, Matthew Heimbach, Michael Hill, Identity Evropa, Jason Kessler, League of the South, Eli Mosley, Nationalist Front, National Socialist Movement, Matthew Parrott, Robert Ray, Jeff Schoep, Richard Spencer, Traditionalist Worker Party, Michael Tubbs, and Vanguard America (collectively, the "Defendants," and with Plaintiffs, the "Parties") having stipulated and agreed to the terms set forth herein;

IT IS hereby ORDERED as follows:

I.    **GENERAL PROVISIONS AND DEFINITIONS**

1.    Scope of Order:  This Stipulation and Order governs the Parties' agreement to permit the Third Party Discovery Vendor to collect and preserve evidence from Defendants' Electronic Devices that is potentially relevant to this litigation and/or responsive to Plaintiffs' Discovery Requests.  Plaintiffs have already conducted a collection from Plaintiffs' Electronic Devices and Social Media Accounts of ESI that is potentially relevant to this litigation and/or responsive to Defendants' requests for production, consistent with the terms of this Stipulation and Order.  The purpose of this Stipulation and Order is to ensure that Defendants conduct a collection and production commensurate with their obligations under the Federal Rules of Civil Procedure and Plaintiffs' collection and production.  The Parties understand that their obligation to preserve, collect, and produce Documents relevant to this litigation is mutual and ongoing.

2.    <u>Definitions</u>:  As used herein:

    i.    "Action" refers to the above-captioned litigation, *Sines, et al. v. Kessler, et al.*, No. 3:17-cv-00072 (W.D. Va.).

    ii.    "Discovery Requests" refers to Plaintiffs' [Corrected] First Set of Documents Requests, dated January 25, 2018; Plaintiffs First Set of Interrogatories, dated January 25, 2018; and any other discovery requests served by Plaintiffs in this Action.

    iii.    "Document" shall be construed broadly to include any original, reproduction or copy of written or documentary material, ESI (as defined below), howsoever stored, or drafts thereof, including, but not limited to, correspondence, memoranda, and other communications.  The term "Document" shall also encompass the use of the term "Documents" as contemplated by Fed. R. Civ. P. 34(a) including, without limitation, Documents maintained in paper form.  The term "Document" as used in this Stipulation and Order is synonymous with "file."

    iv.    "Electronic Device" shall be construed to include computer networks, mainframe computers, desktop computers, laptop computers, smartphones, tablet computers, gaming devices, hard drives and/or electronic storage systems and/or devices (whether accessed via a network or locally).  For purposes of clarification, storage devices include external hard drives, portable jump or thumb drives, CDs, DVDs, and any other electronic data storage device.

v.    "Electronically Stored Information" or "ESI" shall be construed to mean all digital or analog electronic files, including 'deleted' files and file fragments, stored in machine-readable format on magnetic, optical or other storage media, including phones, tablets, laptops, desktop computers, and any hard drives or backup media used by the Parties (e.g., other external hard drives, backup drives or tapes, flash drives, or any other storage media used for storing backups) or otherwise, whether such files have been reduced to paper printouts or not.  This includes all e-mails, both sent and received; all word-processed files, including drafts and revisions; all spreadsheets, including drafts and revisions; all databases; all CAD (computer aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts, and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and Personal Information Management (PIM) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of smartphones or any other mobile smart device including Personal Data Assistants ("PDA's"); all data created with the use of document management software; all data created with the use of paper and electronic mail logging and routing software; all internet and web-browser-generated  history files, caches and "cookies" files; and any and all other files generated through the use of computers, video, audio recording, image, instant messages, posts to social media, text messages,

4

gaming and collaboration web services or information and/or

telecommunications, including but not limited to voice mail and cloud

storage. ESI shall not include any file created by a machine or any files

necessary for the normal operation of a computer system. The term "ESI"

as used in this Stipulation and Order shall also encompass the meaning of

"electronically stored information" as used in Fed. R. Civ. P. 34(a).

vi.  The act of creating an "image" or "imaging" as used herein refers to

creating an electronic copy that captures all ESI related to that device or

account without the alteration of metadata associated with that account.

vii. "Metadata" refers to the fields set forth below to the extent that such fields

are available in the source Document.

| Field | Comments |
|---|---|
| BegBates | Beginning Bates number |
| EndBates | Ending Bates number |
| BegAttach | Bates number of the first page of a family range |
| EndAttach | Bates number of the last page of a family range |
| PageCount | Number of pages in a Document. |
| FileExtension | Original file extension as the Document was maintained in the ordinary course |
| FileSize | File size in bytes |
| DocTitle | Document title as stored in file metadata |
| Custodian | Full name of all applicable custodians |
| Author | Document author information for non-email |
| From | Email FROM |
| To | Email TO |
| Cc | Email CC |
| BCC | Email BCC |
| Subject | Email Subject |
| Attachments | Name of attached file(s) as maintained in the ordinary course of business |
| DateCreated | File date created MM/DD/YYYY |
| DateModified | File date modified MM/DD/YYYY |

| DateSent | Date sent MM/DD/YYYY |
|---|---|
| TimeSent | Time sent HH:MM:SS AM/PM |
| DateReceived | Date received MM/DD/YYYY |
| TimeReceived | Time received HH:MM:SS AM/PM |
| DateStarted | Date started MM/DD/YYYY |
| DateEnded | Date ended MM/DD/YYYY |
| FileName | Name of the file as maintained in the ordinary course of business with extension |
| MD5Hash | The Computer-generated MD5 Hash value for each Document |
| NativePath | The path to the native-format file corresponding to each Document on the delivery media, including the file name (if a native-format file is provided) |
| TextPath | The path to the corresponding text file for each Document on the delivery media, including filename |

viii. "Producing Party" refers to the Party producing Documents.

ix. "Protective Order" refers to the "Order for the Production of Documents and Exchange of Confidential Information," ECF No. 167.

x. "Social Media Account" shall mean an account on any forum, website, application, or other platform on which persons can create, transmit, share, communicate concerning, or comment upon any information, ideas, or opinions, or otherwise engage in social networking. Without limiting the foregoing in any manner, and by way of example only, the following are social media platforms: email, comment sections of websites, Facebook, Discord, Reddit, Imgur, SnapChat, Instagram, Google+, 4chan, 8chan, Twitter, Tumblr, Youtube, and instant messaging services such as Signal, WhatsApp, Messenger, Hangouts, or Skype. Without limiting the foregoing in any manner, and by way of example only, the following are methods of using social media platforms: uploading, posting, commenting, reacting (e.g., "liking" a post), and sharing.

          xi.    "Third Party Discovery Vendor" shall mean a company capable of undertaking the obligations set forth herein that is in the business of conducting forensic examinations of Electronic Devices for the purposes of collecting and preserving ESI, as well as determining whether any ESI has been deleted or lost.[1]

## II.    <u>COLLECTION AND IMAGING OF DOCUMENTS</u>[2]

    3.    <u>Engagement of a Third Party Discovery Vendor for Plaintiffs</u>:  Within 21 days of the entry of this Stipulation and Order, to the extent they have not already done so, Plaintiffs shall engage, at their own expense, a Third Party Discovery Vendor to conduct the collection and production of ESI from Plaintiffs' Electronic Devices and Social Media Accounts required by this Stipulation and Order.

    4.    <u>Engagement of a Third Party Discovery Vendor for Defendants</u>:  Within 21 days of the entry of this Stipulation and Order, the Parties shall engage, at Plaintiffs' expense, a Third Party Discovery Vendor to conduct the collection and production of ESI from Defendants' Electronic Devices and Social Media Accounts required by this Stipulation and Order.  Pursuant to the Court's November 13, 2018 Order, ECF No. 379, such engagement shall be without prejudice to Plaintiffs' ability to seek to recover from Defendants expenses arising from this engagement at a later date.  This Stipulation and Order does not obligate Defendants to pay any fees or costs incurred by the Third Party Discovery Vendor at this time, and does not prejudice

---

[1] Examples of such companies include, but are not limited to:  Epiq Systems, Inc.; RVM Enterprises, Inc.; KLDiscovery; kCura; and FTI Consulting.
[2] Due to his current incarceration, the deadlines in Section II shall not apply to Defendant Fields.  Plaintiffs and Defendant Fields will enter into a separate stipulation and proposed order as to the timing to be applied to Defendant Fields.

7

Defendants' rights to oppose any request made by Plaintiffs to recover those expenses, any such obligation to be determined at a later date.

5.  <u>Identification of Sources of Documents</u>:  Within 14 days of the entry of this Stipulation and Order, the Parties shall complete the Certification attached as Exhibit A (the "Certification") and provide such Certification to opposing counsel.

6.  <u>Defendants' ESI</u>:  Within 7 days of receipt of the Defendants' Exhibit A's, Plaintiffs shall identify those Electronic Devices and Social Media Accounts that the Third Party Discovery Vendor shall image and collect.  Within 28 days of the entry of this Stipulation and Order, Defendants shall make available to the Third Party Discovery Vendor for imaging and collection any Electronic Device or Social Media Account identified on Exhibit A and selected by Plaintiffs pursuant to this paragraph.

7.  <u>Plaintiffs' ESI</u>:  Plaintiffs have already collected and preserved ESI with the assistance of a Third Party Discovery Vendor and will indicate on the Certification which Electronic Devices and Social Media Accounts identified on the Certification were imaged and collected.  Should a particular Electronic Device or Social Media Account identified on the Certification not have been collected and/or imaged by Plaintiffs, Defendants may, within 7 days of receipt of the Plaintiffs' Exhibit A's, identify those additional Electronic Devices and Social Media Accounts that the Third Party Discovery Vendor shall image and collect.  Within 28 days of the entry of this Stipulation and Order, Plaintiffs shall make available to the Third Party Discovery Vendor for imaging and collection any Electronic Device or Social Media Account identified on Exhibit A and selected by Defendants pursuant to this paragraph.

8.  <u>Identification of Responsive Documents by Defendants</u>:  Following the imaging and collection of the Documents contained on Electronic Devices and Social Media Accounts

identified on Exhibit A and selected by Plaintiffs, Defendants shall review the results of the collection and produce to Plaintiffs those non-privileged Documents that are responsive to the Discovery Requests in the manner set forth in Paragraphs 10-18 below. Prior to conducting the review of the results of the collection, Defendants shall disclose to Plaintiffs any search terms or date ranges used to limit the review population. Should Plaintiffs have an objection to the search terms or date ranges applied by Defendants, Plaintiffs shall note such objection by email and the Parties shall confer within one week to attempt to resolve any dispute. In the event that a dispute between the Parties remains following the meet and confer, the Parties shall submit to the Court a joint email setting forth the nature of the dispute for the Court's resolution.

9.    <u>Identification of Responsive Documents by Plaintiffs</u>:  Following the imaging and collection of the Documents contained on Electronic Devices and Social Media Accounts identified on Exhibit A and selected by Defendants pursuant to Paragraph 7, Plaintiffs shall review the results of the collection and produce to Defendants any non-privileged Documents that are responsive to Defendants' discovery requests in the manner set forth in Paragraphs 10-18 below. Prior to conducting the review of the results of the collection, Plaintiffs shall disclose to Defendants search terms or date ranges used to limit the review population. Should Defendants have an objection to the search terms or date ranges applied by Plaintiffs, Defendants shall note such objection by email and the Parties shall confer within one week to attempt to resolve any dispute. In the event that a dispute between the Parties remains following the meet and confer, the Parties shall submit to the Court a joint email setting forth the nature of the dispute for the Court's resolution.

## III.    FORMAT OF PRODUCTION OF DOCUMENTS

10.    When producing Documents responsive to Parties' discovery requests, Producing Parties shall produce such Documents in the following manner:

9

11. <u>Production Format</u>:

    i. For word processing files (e.g., Microsoft Word): Comments, "tracked changes," and any similar in-line editing or hidden content will be produced. Such files must be produced in native format with the only alteration being the addition of Bates numbers, unless the file can be produced as a pdf or TIFF file in a manner that preserves the metadata of the original word processing file.

    ii. For presentation files (e.g., Microsoft PowerPoint): Speaker notes, comments, and all other hidden content will be produced. Such files must be produced in native format with the only alteration being the addition of Bates numbers, unless the file can be produced as a pdf or TIFF file in a manner that preserves the metadata of the original presentation file.

    iii. For spreadsheet files (e.g., Microsoft Excel): Hidden columns, rows, and sheets, comments, "tracked changes," and any similar in-line editing or hidden content will be produced. Such files must be produced in native format with the only alteration being the addition of a Bates number to the file name.

    iv. Text messages, instant messages, e-mails, and social media postings (e.g., Facebook activity): Such files will be produced as pdf or TIFF files with optical character recognition ("OCR"). The Bates number will be affixed at the lower right-hand corner of the PDF or TIFF files.

    v.   Media files, including audio, videos and photographs: Such files may be produced in native format with the only alteration being the addition of a Bates number to the file name.

    vi.   For PDFs: Such files will be produced as PDF or TIFF files with optical character recognition ("OCR") and Bates numbers.

    vii.   For hard-copy Documents:  Such files will be produced as PDF or TIFF files with OCR and Bates numbers.

    viii.   For any and all ESI, Documents shall be produced with all metadata intact to the maximum extent possible.  Where necessary to preserve metadata that cannot be produced as a result of the production formats listed above, or that cannot be produced with the Document for any other reason, the Producing Party will affix as the final page of the Document a description of the metadata.

12.    <u>Segregation of Documents</u>:  Documents to be produced that are segregated or separated from other Documents, whether because the Documents were located in binders, separate files, segregated by dividers, tabs, or clips or otherwise segregated or separated, will be produced in a manner that reflects these divisions.  Without limiting the foregoing, the Parties specifically agree that:

    i.   In scanning paper Documents, distinct Documents should not be merged into a single Document, and single Documents should not be split into multiple Documents (i.e., paper Documents should be logically unitized as found in the source Document).  The Parties will make their best efforts to

unitize Documents correctly and agree promptly to address situations where there are improperly unitized Documents.

ii. Parent-child relationships (the association between an attachment and its parent Document) should be preserved and appropriately reflected in the metadata if identified in the source Document. Bates numbering of a parent Document and any attachments shall be sequential such that a parent Document has the lowest value Bates number when compared to its attachment(s).

iii. If any portion of a Document is responsive, the entire Document should be produced.

13. <u>Bates Numbering</u>: Documents shall be produced Bates-stamped. Bates numbers shall be unique IDs with a prefix that can be readily attributed to the Producing Party. Bates numbering should be sequential. The Parties agree to use placeholders (e.g., "intentionally left blank" pages), rather than skipping Bates numbers in production. Bates numbers shall be provided on the lower right-hand of each page.

14. <u>Treatment of Attachments</u>: Where attachments to Documents are produced, they shall be attached in the same manner as found in the original Document. Where Documents are produced and all attachments thereto are not included, the Producing Party shall identify the missing attachments by means of a one-page "place holder" document for each missing Document and assign a Bates number to that page, consistent with the Bates number protocol in this Stipulation and Order. For each missing attachment, the Producing Party shall provide a description of the attachment, type of document, title, number of pages, and explain the reason for its non-production, with information sufficient to allow the Party requesting the production of

the Document to understand the basis for the non-production and to challenge it in Court, if appropriate.

## IV.    <u>REDACTION OF DOCUMENTS</u>

15.    Producing Parties may only redact the content of Documents to the extent the content is: (a) subject to the attorney-client privilege, work-product doctrine, or any other privilege; (b) information that is not responsive to any discovery request.

16.    To the extent that a Document is produced in redacted form, any redactions shall be clearly indicated on the face of the Document and each page of the Document from which information is redacted shall bear a designation that it has been redacted and the reason for the redaction.  As an example, "Redacted for Privilege," "Highly Confidential – Redacted" when producing Documents to Pro Se Parties, or "Redacted as Non-Responsive."  Where a responsive Document contains both redacted and non-redacted content, the Producing Party shall produce the remainder of the non-redacted portions of the Document.  Only where redactable content is predominant in a Document and no potentially relevant unredacted material responsive to a discovery request for production remains in the Document shall a Party be exempted from producing the Document in redacted form (i.e., the Party can withhold the Document in its entirety).

17.    Documents that are to be produced in a native format but require redactions may be produced with the relevant text replaced with "[REDACTED]" or black overlay concealing those portions of the Document.

18.    The production of a Document in redacted form does not affect the Producing Party's obligation to properly document and substantiate the assertion of privilege over the content on a privilege log.  Any Party that produces Documents containing redactions for privilege or withholds Documents on the basis of privilege shall create a privilege log that

13

complies with the requirements of Federal Rule of Civil Procedure 26.  All redactions must be logged by the Producing Party on the privilege log.

## V.    **MISCELLANEOUS**

19.    Except as specifically set forth herein, this Stipulation and Order does not alter or affect the applicability of the Federal Rules of Civil Procedure or Local Rules for the Western District of Virginia to this matter.  Nor does this Stipulation and Order address, limit, affect, determine, or have any bearing on the relevance, discoverability, or admissibility as evidence of any Document, regardless of whether the Document is to be preserved, is preserved, or is produced pursuant to the terms of this Stipulation and Order.

20.    This Stipulation and Order is without prejudice to any Party's properly made objections to requests for production on any ground permitted by the Federal Rules of Civil Procedure.

21.    All obligations in this Stipulation and Order are continuing obligations.  As such, for every new email address, mobile phone device, computer, external storage, social media account, or other communication platform created or obtained during this Action, the relevant obligations in this Stipulation and Order apply and require an updated Certification from each Party confirming that they have completed their obligations under this Stipulation and Order.

22.    This Stipulation and Order does not alter any obligations or rights that may be contained in the Protective Order.

23.    Nothing in this Stipulation and Order shall be deemed a waiver of any Party's right to object to the production of any Document on the basis of relevance, materiality, privilege, overbreadth, burden, proportionality, or any other recognized objection to discovery.

24.    Nothing in this Stipulation and Order shall be deemed to either diminish or eliminate the general obligation to identify and preserve potentially relevant information, nor as a

14

waiver of any Party's right to seek any appropriate relief for spoliation or any failure to preserve or to otherwise seek appropriate relief from this Court.

25.    Any Party may seek a modification to this Stipulation and Order from the Court for good cause shown.

26.    Any obligation to preserve Documents or ESI contained in this Stipulation and Order shall continue throughout the pendency of this litigation, including during the pendency of any appeals or time in which a Party may appeal.

So Ordered:


_____          _____
Magistrate Judge Hoppe                                              Date

11/19/18

15

**EXHIBIT A TO STIPULATION AND ORDER FOR THE
IMAGING, PRESERVATION, AND PRODUCTION OF DOCUMENTS**

Consistent with the obligations under the "Stipulation and Order for the Imaging,

Preservation, and Production of Documents," I certify that:

1.      The following are all the Social Media Accounts, as defined in ¶ 2(xi) of the

Stipulation and Order, that contain potentially relevant Documents:

| Username | Provider/Platform | Nature of Responsive Documents on Account |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

2.      The following are all the Electronic Devices, as defined in ¶ 2(vi) of the

Stipulation and Order, that I have possessed since January 1, 2017 that may contain any

potentially relevant Documents or ESI:

| Device Type (e.g., iPhone 7) | Size (e.g., 32 GB) | Nature of Responsive Documents on Device |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on _____.


_____
                                              Party

# JOINT EXHIBIT 7

# EXHIBIT V



**iDiscovery Solutions**

Invoice # 16669
Date: 03/31/19
Terms: Upon receipt
Matter: SINKS-02678|Sines v. Kessler

| To | From |
|---|---|
| Christopher Greene<br>Kaplan Hecker & Fink LLP<br>350 Fifth Avenue<br>Suite 7110<br>New York, NY 10118 | Intelligent Discovery Solutions, Inc.<br>3000 K Street NW, Suite 330<br>Washington, DC 20007 |

| Type | User | Date | Task | Description/Notes | Rate | Hours | Total |
|---|---|---|---|---|---|---|---|
| Hourly | | | | | | | |
| | Fila, Caitlin | | | | | | |
| | | 03/01/19 | Project Communications\Meetings (B) | Confer with J. Kessler re collection logistics; send followup emails to Defendants' counsel; provide confirmation of timing for collection to B. Jones; confer with C. Cantwell and B. Williams re additional credentials needed for collection; prepare for call with M. Parrott; coordinate transfer of Facebook archive with J. Kolenich; draft and send update email to J. Kolenich. | | 1.1 | |
| | | 03/01/19 | Project Management (B) | Review collection tracker to identify follow-ups needed; determine next steps based on collection status; coordinate with team on J. Kessler collection. | | 1 | |
| | | 03/04/19 | Project Management (B) | Coordinate intake of evidence from J. Kessler; review status of R. Spencer's data and provide update to counsel; email to J. DiNucci re followup questions; review and update Status Report in preparation of sending update to counsel; email B. Jones re results of processing M. Hilfs emails and application of search terms; follow up with counsel on remote collection option; email new Defendants to coordinate collections; coordinate with counsel re dropping off devices at DC office for collection. | | 4.5 | |
| | | 03/05/19 | Project Management (B) | Coordinate with the team on return of J. Kessler devices; email J. Kessler re update on collection; review proposed search terms and | | 0.7 | |

# JOINT EXHIBIT 8

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

ELIZABETH SINES, *et al.*,

                     *Plaintiffs,*

        v.

JASON KESSLER, *et al.*,

                 *Defendants.*

CASE NO. 3:17-cv-00072

NOTICE

JUDGE NORMAN K. MOON

## FINAL JURY INSTRUCTIONS & VERDICT FORM

### Final Jury Instruction # 1

### General Instructions

Members of the jury:

Now that you have heard all of the evidence in the case, it becomes my duty to instruct you on the rules of law that you must follow and apply in arriving at your decision. You will follow and apply these rules of law after you have heard the final arguments of the lawyers for the parties.

It is your duty as jurors to follow the law as stated in my instructions and to apply the rules of law, so given, to the facts as you find them from the evidence in this case, and solely the evidence presented to you.

Counsel may quite properly refer to some of the governing rules of law in their arguments. If, however, any difference appears to you between the law as stated by me in these instructions, you are governed by the instructions I am about to give you. You must follow all of the rules as I explain them to you. You may not follow some and ignore others.

You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to

2

be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in the instructions; just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the evidence in the case. You must not base your verdict on prejudice, sympathy, guesswork or speculation, but on the evidence and on the rules of law I have given you.

Justice through trial by jury must always depend on the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors and to arrive at a verdict by applying the same rules of law, as given in the instructions of the Court.

## Final Jury Instruction # 2
### Role of the Jury & Evidence

As stated earlier, it is your duty to determine the facts, and in so doing you must consider only the evidence I have admitted in the case. The evidence in the case includes the sworn testimony of the witnesses, regardless of who may have called them; all exhibits received in evidence, regardless of who may have produced them; all depositions read or played into the record, regardless of who may have introduced them; and all facts which may have been admitted or stipulated.

Remember that statements, objections, or arguments made by the lawyers are not evidence in the case, and you may not consider any question which contained any statement of fact as evidence of that fact, unless it was agreed to by the witness. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you.

4

Also, during the course of the trial, I occasionally made comments to the lawyers, or asked questions of a witness, or admonished a witness concerning the manner in which he or she should have responded to the questions of counsel. Do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case. Except for my instructions on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

**Final Jury Instruction # 3**

**Jury as Judges of the Facts, Credibility, and Weight of Evidence**

You are the judges of the facts, the credibility of the witnesses, and the weight of the evidence.  You may consider the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and for having observed the things about which they testified, their interest in the outcome of the case, their bias, and, if any have been shown, their prior inconsistent statements, or whether they have knowingly testified untruthfully as to any material fact in the case.

You may not arbitrarily disregard believable testimony of a witness. However, after you have considered all the evidence in the case, then you may accept or discard all or part of the testimony of a witness as you think proper.

You are entitled to use your common sense in judging any testimony.  From these things and all the other circumstances of the case, you may determine which witnesses are more believable and weigh their testimony accordingly.

6

## Final Jury Instruction # 4

### Direct & Circumstantial Evidence

While you should consider only the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you may feel are justified in light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

You should not be concerned about whether the evidence is direct or circumstantial. "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of events and circumstances indicating that something is or is not a fact.

The law makes no distinction between the weight you may give to either direct or circumstantial evidence. It only requires that you weigh all of the evidence in reaching your verdict.

7

## Final Jury Instruction # 5

### Credibility

It is your job to decide if a party with the burden of proof on an issue has proven that issue by a preponderance of the evidence. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all the evidence as true or accurate. You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case. You should decide whether you believe all or any part of what each person had to say, and how important that testimony was.

In making that decision you should consider:

- Did the witness impress you as honest?

- Did the witness have any particular reason not to tell the truth?

- Did the witness have a personal interest in the outcome of the case?

- Did the witness have any relationship with either the plaintiff or the defense?

- Did the witness seem to have a good memory?

- Did the witness clearly see or hear the things about which the witness testified?

8

- Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?

- Did the witness's testimony differ from the testimony of other witnesses or other evidence in the case?

These are a few of the considerations that will help you determine the accuracy of what each witness said.

Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say. In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than the other. Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point.

9

## Final Jury Instruction # 6

## Impeachment

The testimony of a witness may be discredited or "impeached" by showing that the witness testified falsely, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.

10

### Final Jury Instruction # 6-A

### Testimony of Government Officials

.

During this trial you have heard the testimony of a number of witnesses, some of whom are employees of the state, law enforcement officers, and ordinary civilians. The testimony of a government employee, or a law enforcement officer, is not necessarily deserving of more or less consideration, or greater or lesser weight, than that of an ordinary civilian witness.

11

JXV-2_Page 362

## Final Jury Instruction # 7

### Burden of Proof

As I explained to you at the beginning of the trial, unless otherwise instructed, Plaintiffs bear the burden of proving their claims against each Defendant by what is called a "preponderance of the evidence." This burden applies to all of Plaintiffs' claims except their claims for intentional infliction of emotional distress, which will be discussed later. In the same vein, each Defendant has the burden to prove any affirmative defenses that they may advance by a preponderance of the evidence.

The term "preponderance of the evidence" means evidence which, as a whole, shows that the fact sought to be proven is more probable than not. In other words, a preponderance of the evidence means such evidence that persuades you that a fact is more likely true than not true. In your mind, you may think of this as 51%—more likely than not.

You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard that is applicable in criminal cases. It does not apply in civil cases such as this. You should, therefore, put it out of your minds.

In determining whether any fact in issue has been proven by a preponderance of the evidence, you may—unless otherwise instructed—consider the testimony of all witnesses, regardless of who may have called them, all exhibits

12

received in evidence, regardless of who may have produced them, and all depositions read into the record, regardless of who may have introduced them.

If you conclude that a party who has the burden of proof on an issue establishes his or her position by a preponderance of the evidence, you must decide that issue for the party.

JXV-2_Page 364

## **Final Jury Instruction # 8**

### **Expert Opinions**

The rules of evidence provide that if scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, expertise, training, or education, may testify and state his or her opinion concerning such matters. During the trial, you heard from four expert witnesses, including Dr. Deborah Lipstadt, who was qualified as an expert on antisemitism, including the history, rhetoric, language, and symbols of antisemitism; Dr. Peter Simi, who was qualified as an expert in the white supremacist movement and the culture of the white supremacist movement; Ms. Sharon Reavis, who was qualified as an expert in the fields of rehabilitation counseling and life care planning; and Dr. Nadia Webb, who was qualified as an expert in the fields of neuropsychology and medical psychology.

You should consider each expert opinion received in this case and give it such weighs as you might think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound,

14

or that the opinion is outweighed by other evidence, then you may disregard the opinion.

15

**Final Jury Instruction # 9**

**Matters Stricken by the Court**

You must not consider any matter that was stricken by the Court. It is not evidence and should be disregarded.

16

**Final Jury Instruction # 10**

**Deposition Testimony**

A deposition is a witness's sworn testimony that is taken before the trial. During a deposition, the witness is under oath and swears to tell the truth, and the lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

During trial, you heard the deposition testimony of various witnesses. Deposition testimony is entitled to the same consideration as live testimony, and you must judge it the same way as if the witness was testifying in court.

Some of the deposition testimony that you heard was a video recording of the deposition. Other deposition testimony that you heard may have been read out loud by an attorney. If the deposition testimony was read out loud, you should not place any significance on the behavior or tone of voice of any person reading the questions or answers.

## Final Jury Instruction # 11

## Invocation of Fifth Amendment Privilege by Non-Party Witness

As I just noted, under the Fifth Amendment of the United States Constitution, a person has the right to refuse to answer questions that may tend to incriminate him in criminal activity. During this case, you heard deposition testimony from certain non-party witnesses, including Benjamin Daley and Vasillios Pistolis, who refused to testify or answer questions by exercising their Fifth Amendment privilege against self-incrimination.

With respect to each witness's refusal to testify, you may, but are not required to, infer that their testimony would have been unfavorable to a Defendant associated with that witness if you find that the witness is sufficiently associated with that Defendant so as to justify the adverse inference. Where the witness is sufficiently associated with a party to justify an adverse inference depends upon all the circumstances of the case. For example, a witness who is a past or present employee, officer or agent of a party may be, but is not necessarily, sufficiently associated with that party to justify an adverse inference. Likewise, a coconspirator may be sufficiently associated with a party to permit the drawing of an adverse inference to the party if the coconspirator refuses to testify.

19

If, however, you find that the witness is not sufficiently associated with the party, you are instructed that you are not to attach any significance to that witness's refusal to testify. In other words, you should not make any assumption or speculate why the witness chose to exercise his constitutional privilege. In addition, if the witness is not sufficiently associated with either of the parties, you are not to infer anything adverse or unfavorable to either party in the case because the witness refused to testify.

20

## Final Jury Instruction # 12

## Conspiracy to Commit Racially Motivated Violence – 42 U.S.C. § 1985(3)

Plaintiffs claim that Defendants conspired to commit racially motivated violence in violation of 42 U.S.C. § 1985(3). All Plaintiffs except Chelsea Alvarado bring this claim against all Defendants. Plaintiff Alvarado brings this same claim against all Defendants except James Fields.

To prove this claim, Plaintiffs must prove:

*First*: The existence of a conspiracy of two or more persons;

*Second*: The persons involved in the conspiracy were motivated, in whole or part, by animus against Black or Jewish individuals, or motivated, in whole or part, because Plaintiffs were advocates of supporters of Black and Jewish individuals;

*Third*: A purpose of the conspiracy was to deprive Plaintiffs of their right to be free from racially motivated violence;

*Fourth*: At least one person involved in the conspiracy took an overt act in furtherance of the conspiracy; and

*Fifth*: As a result of the conspiracy, Plaintiffs were injured.

I will take these elements in turn.

2

Case 3:17-cv-00072-NKM-JCH Document 1461-90 Filed

## Final Jury Instruction # 13

### 42 U.S.C. § 1985(3) - Existence of a Conspiracy

The **first** element is the existence of a conspiracy. A conspiracy is an

agreement between two or more persons to join together to accomplish some

unlawful purpose. It is a kind of unlawful partnership in which each member

becomes the agent of every other member. While the Plaintiffs must prove that the

conspiracy had an unlawful objective, Plaintiffs need not prove that the conspiracy

had only an unlawful purpose. Co-conspirators may have legal as well as unlawful

objectives. A conspiracy may have several objectives, but if any one of them, even

if it is only a secondary objective, is to violate the law, then the conspiracy is

unlawful.

Plaintiffs do not need to prove that the alleged conspirators entered into any

formal agreement or that they directly stated between themselves all of the details

of the scheme. Plaintiffs are not required to produce a written contract or even

produce evidence of an express oral agreement spelling out all the details of the

understanding. An informal agreement may be sufficient. All Plaintiffs must

show is an agreement to cause racially motivated violence.

Plaintiffs are also not required to show that all the Defendants they alleged

as members of the conspiracy were, in fact, parties to the alleged agreement, or that

3

all of the members of the alleged conspiracy were named or alleged in this lawsuit, or that all of the people whom the evidence shows were actually members of the conspiracy agreed to all of the means or methods set out in the complaint.

By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little evidence of such an agreement. Therefore, Plaintiffs may prove a conspiracy by circumstantial evidence. Circumstantial evidence tending to prove a conspiracy may include evidence of a Defendant's relationship with other members of the alleged conspiracy, the length of any such association, the Defendant's attitude and conduct, and the nature of the alleged conspiracy.

Simply put, to find that an agreement existed between conspirators, you must be convinced, by a preponderance of the evidence, that there was a mutual understanding, either spoken or unspoken, between the conspirators to commit at least one unlawful act. A conspiracy can be made up of persons from allegedly rival groups, and that does not disprove the conspiracy's existence. The law holds co-conspirators liable for all the reasonably foreseeable acts of their co-conspirators done in furtherance of the conspiracy.

4

**Final Jury Instruction # 14**

**Membership in a Conspiracy**

Because there are multiple defendants in this case, you will also need to consider which, if any, of the Defendants was a member of the alleged conspiracy. One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all of the other alleged conspirators. If a person understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to prove him as being a member of the conspiracy even though the person had not participated before and even though he played only a minor part.

The extent of a Defendant's participation, if any, has no bearing on the issue of a Defendant's membership, if any. A conspirator's membership is not measured by the extent or duration of his participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw a defendant within the ambit of the conspiracy.

Moreover, once a conspiracy is established, even a slight connection between the defendant and the conspiracy could be sufficient to include him in the

plan. To be clear, that does not mean that Plaintiffs' burden of proof is "slight." Before the jury may find that a defendant, or any other person, became a member of the conspiracy, the evidence in the case must show by a preponderance of the evidence that the defendant knew the purpose or goal of the agreement or understanding of that conspiracy and then deliberately entered into the agreement, intending in some way to accomplish the goal or purpose by this common plan or joint action.

In attempting to prove a Defendant's membership in the alleged conspiracy, Plaintiffs may rely on all direct and circumstantial evidence, including the nature of the alleged conspiracy, the Defendant's association to other members of the alleged conspiracy, if any, the Defendant's conduct before, during, and after the relevant events, and the Defendant's presence at the scene of events, if applicable.

6

**Final Jury Instruction # 15**

**Withdrawal from Conspiracy**


To find that a Defendant has withdrawn from or abandoned a conspiracy, the Defendant must prove that he:

(1)    Undertook affirmative steps, inconsistent with the object of the conspiracy, to disavow or defeat the goal or purposes of the conspiracy; and

(2)    Either acted in a manner reasonably calculated to notify co-conspirators that he was no longer participating in the conspiracy, or disclosed the conspiracy to law enforcement authorities.


Mere inactivity is not proof of withdrawal. Furthermore, even if a Defendant tells others of his intention to withdraw, he has not withdrawn if he continues to act in furtherance of the object of the conspiracy.

If you have concluded that a Defendant was a member of a conspiracy, that Defendant bears the burden of proving, by a preponderance of the evidence, that he withdrew from the conspiracy; there must be evidence of some affirmative act of withdrawal.

## Final Jury Instruction # 16

## 42 U.S.C. § 1985(3) – Racial Animus

The **second** element is that Plaintiffs must prove that the Defendants were motivated by some discriminatory animus. In this case, that means that Plaintiffs must prove that Defendants were motivated either by dislike or hate for Black or Jewish people, or by hatred or dislike towards persons because of their advocacy or support for Black or Jewish people.

This discriminatory reason does not have to be the sole basis for the Defendant's asserted dislike or hate of the Plaintiffs. As long as the dislike or hatred is not wholly personal to a specific individual, that is, as long as there is some intent to discriminate against Black people, Jewish people, or their supporters, as a class, you may find that the Defendants acted with sufficient discriminatory animus.

If you find that the Defendants acted, at least in part, with at least one of these types of discriminatory animus, you must find for the Plaintiffs on this element even if Defendants also possessed some other motive, such as a desire to join together for mutual protection. That is because, as mentioned above, co-conspirators may have legal as well as unlawful objectives.

8

## Final Jury Instruction # 17

## 42 U.S.C. § 1985(3) – Purpose of the Conspiracy

The purpose of 42 U.S.C. § 1985(3) is to deter two or more people from conspiring to deprive persons of their rights because they are members of a racial group or supporters of the rights of racial minorities. In this case, Plaintiffs allege that the Defendants interfered with their Thirteenth Amendment right to be free from racially motivated violence. If you find that Plaintiffs have shown by a preponderance of the evidence that this right has been violated, you must find for the Plaintiffs on the third element of their claim, which requires that they prove that a purpose of the conspiracy was to deprive them of their right to be free from racially motivated violence.

9

## Final Jury Instruction # 18

## 42 U.S.C. § 1985(3) – Overt Act

The **fourth** element is that at least one of the Defendants took an overt act in furtherance of the alleged conspiracy. An "overt act" means some type of outward objective action performed by one of the members of the conspiracy which evidences that agreement. An overt act may be an act which is entirely innocent when considered alone, but which is knowingly done in furtherance of some object or purpose of the conspiracy. All Plaintiffs must prove is a single overt act by just one of the alleged conspirators.

10

## Final Jury Instruction # 19

## 42 U.S.C. § 1985(3) – Injuries Sustained

The **fifth** element is that the Plaintiffs show that they suffered injuries as a consequence of the alleged conspiracy. Injuries in this context include physical injuries, pain and suffering, and demonstrable emotional harms, and any economic losses resulting therefrom.

Plaintiffs may satisfy this element by showing that a member of the conspiracy did, or caused to be done, the acts which injured Plaintiffs. To make this showing, Plaintiffs need not identify a particular person who caused their injuries. Instead, it is sufficient if Plaintiffs offer specific evidence which shows that their injuries were proximately caused by the Defendants' overt and unlawful actions. An act is a proximate cause of an injury if it was a substantial factor in bringing about that injury, and if the injury was a reasonably foreseeable consequence of the defendant's act. Moreover, a defendant need not have foreseen the precise nature of an injury in order to be held liable for it; the Defendant can be liable so long as the injury was "of the same general nature as foreseeable risk created by" his conduct.

In making this showing, each Plaintiff need not be able to point to an injury caused by each member of the conspiracy. Instead, the law holds conspirators

11

liable for all the reasonably foreseeable acts of their co-conspirators. In other words, a Defendant may be held liable even if he did not personally participate in the acts or plans of his co-conspirators or even if the defendant did not have actual knowledge of those acts or plans, so long as those acts or plans were reasonably foreseeable to the Defendant. The reason for this is simply that a co-conspirator is deemed to be the agent of all other members of the conspiracy. Therefore, all of the co-conspirators bear responsibility for acts or plans that are undertaken to further the goals of the conspiracy.

Recall also that Plaintiffs are not required to show that all of the members of the alleged conspiracy were named or alleged in this lawsuit. Regardless whether a person was named in this lawsuit, if you find by a preponderance of the evidence that he was a member of the conspiracy, then any acts done or statements made in furtherance of the conspiracy by that person may also be considered against the Defendants.

12

## Final Jury Instruction # 20

### Organizational Defendants -- Unincorporated Associations

Some of the Defendants that Plaintiffs seek to hold liable may be organizations called "unincorporated associations." An "unincorporated association" is a voluntary group of persons joined together by mutual consent for the purpose of promoting some stated object. Generally, unincorporated associations have the ability to prescribe the conditions or qualifications of their membership or their duties, to enlarge or reduce their membership, to enlarge or decrease the scope of their activities, and to dissolve the association. Thus, to find that one of theses Defendants was an unincorporated association, you must find that it was an organized group made up of persons who became members of it voluntarily, and who were subject to certain rules or bylaws.

Any Defendant who you find qualifies as an unincorporated association may be held liable for the actions of any of its leaders or members who took part in and joined in the conspiracy, if that person acted with the authorization of the association and to promote the association's purpose. But an unincorporated association cannot be held liable for the acts of a member which it did not control or authorize, unless the association subsequently ratified the member's actions. An intention to ratify may be inferred by words, conduct or silence on the part of the

13

association, through its officers or members, which reasonably indicates the association's desire to affirm the unauthorized actions.  Ratification can only occur if the ratifier has full knowledge of the material facts surrounding the act in question.

In addition, if you find an organizational Defendant liable, a Defendant who is a member of that organization may also be held liable if the Defendant personally participated in the unlawful acts or if the Defendant set proceedings in motion or agreed to a course of action which culminated in the wrongful conduct. Mere membership in an unincorporated association is insufficient, however. Rather, Plaintiffs must show that the association possessed unlawful goals and that the Defendant held a specific intent to further those unlawful aims.

14

**Final Jury Instruction # 21**

**Organizational Defendants – Incorporated Entities**

Some of the Defendants that Plaintiffs seek to hold liable may be corporations.

Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

An "agent" is a person who performs services for a corporation under an express or implied agreement and who is subject to the corporation's control or right to control the manner and means of performing the services. A corporation may be liable for the acts of its agents even if the agent does not receive compensation for his services.

For you to find a corporate Defendant liable, Plaintiffs must prove three elements by a preponderance of the evidence:

> ***First***: That the unlawful conduct was committed by an employee or agent of the corporation;
>
> ***Second***: That, in committing the unlawful conduct, the employee or agent was acting within the scope of his employment or within his apparent authority; and

15

> **Third**:  That, in committing the unlawful conduct, the employee or agent was acting on behalf of or for the benefit of the corporation.

The term "scope of employment" is defined to include all those acts falling within the employee's or agent's general line of work, when they are motivated, at least in part, by an intent to benefit the corporation. An agent may act for his own benefit while also acting for the benefit of the corporation.

While the act of an employee or agent is within the scope of his employment or within the scope of his apparent authority, the corporation is held legally responsible for it. This is true even though the actions of the employee or agent may be unlawful, and contrary to the corporation's actual instruction. A corporation may be responsible for the action of its agents done or made within the scope of their authority, even though the conduct of the agents may be contrary to the corporation's actual instruction, or contrary to the corporation's stated position.

In addition, a corporation that ratifies the acts of someone who was purporting to act as the corporation's agent will be liable for the acts of that purported agent, provided that the principal made a conscious and affirmative decision to approve the relevant acts of the purported agent while in possession of full and complete knowledge of all relevant events.

16

## Final Jury Instruction # 21-A

### Further Instruction on Organizations and Conspiracy

It is possible for an organization to conspire with its agent, officer, or employee, if that person had an independent, personal stake in the conspiracy. However, the organization must have acted through a different agent, officer, or employee than the one with an independent, personal stake in the conspiracy in order to so conspire.

It is also possible for the agent, officer, or employee who has an independent, personal stake in the conspiracy to conspire with other persons besides his own organization.

17

**Final Jury Instruction # 22**

**Failure to Stop Conspiracy -- 42 U.S.C. § 1986**

All Plaintiffs except Chelsea Alvarado bring a claim under 42 U.S.C. § 1986 against all Defendants.  Plaintiff Alvarado brings this same claim against all Defendants except James Fields.

A Defendant may be liable under Section 1986 for failing to prevent a conspiracy to commit racially motivated violence even if he was not involved in that conspiracy.  Defendants charged under Section 1986 with neglecting to intervene in a Section 1985(3) conspiracy do not have to personally share the same discriminatory animus.

To prevail on their Section 1986 claim against any given Defendant, a Plaintiff must prove the existence of a Section 1985(3) conspiracy, and prove each of the following three elements by a preponderance of the evidence:

*First*:   That the Defendant knew about the wrongs conspired to be done in the Section 1985(3) conspiracy, even if he was not involved with the conspiracy;

*Second*:   That the Defendant had the power to prevent or aid in preventing the wrongs committed as part of such conspiracy; and

*Third*:   That the Defendant either neglected or refused to prevent such wrongs.

18

In other words, this claim does not require Plaintiffs to prove that a Defendant actually was involved in the conspiracy. It only requires Plaintiffs to prove that a Defendant *knew* of the conspiracy, had the power to prevent the wrongs to be done, and either neglected or refused to prevent those wrongs.

19

## Final Jury Instruction # 23

## Civil Conspiracy – Under Virginia Law

In addition to Plaintiffs' claim that Defendants conspired to commit racially motivated violence in violation of Section 1985(3), which is a claim under federal law, Plaintiffs also bring a claim that Defendants violated Virginia state law by conspiring to commit a variety of unlawful and tortious actions against them. All Plaintiffs except Chelsea Alvarado bring this claim against all defendants. Plaintiff Alvarado brings this same claim against all Defendants except James Fields.

Under Virginia law, persons who conspired together to commit one or more unlawful acts may be held liable for the injuries that result from that conspiracy. Plaintiffs allege that the Defendants conspired with one or more persons to commit one or more of the following unlawful acts:

- Subjecting persons to actions of intimidation or harassment, motivated by racial, religious, or ethnic animosity in violation of Virginia Code § 8.01-42.1 (often referred to as Virginia's hate crimes statute);

- Directing violence at another person, motivated by racial, religious, or ethnic animosity in violation of Virginia Code § 8.01-42.1;

- Committing an unwanted touching that was neither consented to, excused, or justified (battery);

20

- Engaging in an overt act intended to inflict bodily harm, or intended to place the victim in fear or apprehension of bodily harm (assault); and

- Causing a reasonable apprehension that force will be used unless a person willingly submits and causing him to submit to the extent that he is denied freedom of action (false imprisonment).

Each of these alleged unlawful or tortious acts has its own specific elements that Plaintiffs must prove. For example, false imprisonment is an intentional restriction of a person's freedom of movement without legal right. A false imprisonment results from the intentional use of force, words, or acts which the person restrained is afraid to ignore or to which he reasonably believes he must submit. It is not a legal defense to a claim of false imprisonment that one had an honest or a reasonable belief that he was acting lawfully in restricting another's freedom. Any intentional restriction of a person's freedom that is without legal right is a false imprisonment.

Importantly, Plaintiffs need only prove that Defendants conspired to commit *one* of these underlying acts to impose liability. And, unlike Plaintiffs' § 1985(3) claim, Plaintiffs' Virginia law conspiracy claim only requires Plaintiffs to prove that Defendants harbored discriminatory animus if that is an element of the underlying unlawful or tortious act. For example, discriminatory animus is not

21

required to prove assault or battery and is thus not required to prove a conspiracy to commit assault and battery.

Soon, I will instruct you on the elements that Plaintiffs must prove for the other unlawful or tortious acts alleged by Plaintiffs, which include assault and battery, and violations of the Virginia hate crimes statute.

Plaintiffs must prove by a preponderance of the evidence that an agreement to commit any one of these objects of the alleged conspiracy existed. It would be sufficient if Plaintiffs prove by a preponderance of the evidence that the alleged conspiracy existed to commit one of those offenses. I previously instructed you as to the law governing the existence of a conspiracy and membership therein including in Instructions 13-15, and those principles are applicable here.

22

**Final Jury Instruction # 24**

**Violation of Virginia Code § 8.01-42.1**


As previously mentioned, Plaintiffs allege that Defendants engaged in a civil conspiracy to violate Virginia Code § 8.01-42.1 (often referred to as Virginia's hate crimes statute).  Plaintiffs Romero and Willis also bring a standalone claim against Defendants Kline, Spencer, Kessler, Ray, and Cantwell under Virginia Code § 8.01-42.1 for racial, religious or ethnic harassment, or violence. Additionally, Plaintiffs Romero, Muniz, Wispelwey, Sines, Blair, Martin, and Willis, bring a standalone claim against Defendant Fields under Virginia Code § 8.01-42.1.

To prove this claim, Plaintiffs must prove, by a preponderance of the evidence, that:

1. Defendants subjected them to acts of intimidation and/or harassment, or violence directed at their persons.  Only one of these acts (intimidation or harassment) need be shown.

2. Defendants' actions were motivated by racial, religious, or ethnic animosity.

23

Acts of intimidation need not involve violence in order to satisfy the first element of the statute. For example, an act of intimidation or harassment can include the use of slurs, threats, or other intimidation tactics.

The term "violence" has its ordinary meaning, and can also include (but is not limited to), an assault and/or a battery by Defendants against Plaintiffs as will be defined in one minute.

24

Filed 05/08/18   Doc 100

**Final Jury Instruction # 25**

**Assault and Battery – Under Virginia Law**

As previously mentioned, Plaintiffs claim that Defendants engaged in a civil conspiracy to commit assault and battery.  Plaintiffs Muñiz, Sines, Blair, Martin, Baker, and Romero also bring a standalone claim for assault and battery under Virginia state law against Defendant Fields.

"Battery" means an intentional and unwanted touching of another without justification, excuse, or the consent of the other.

"Assault" means any threatening act that is intended to put another person in reasonable fear of imminent physical injury.  Words alone are never assault.  To succeed on their claim of assault and battery, Plaintiffs Muñiz, Sines, Blair, Martin, Baker, and Romero, must prove by a preponderance of the evidence that:

1. A defendant engaged in an act intended to inflict bodily harm on Plaintiffs;

2. As a result of the defendant's actions, Plaintiffs experienced apprehension of harmful and/of offensive bodily contact or experienced such contact; and

3. If Plaintiffs did, in fact, experience bodily contact, it was not consented to, justified, or excused.

25

Under Virginia law, it is not necessary for Plaintiffs to prove that the unwanted touching resulted in injury to their bodily persons. For the purposes of assault and battery, it is sufficient to establish that the bodily contact harmed their mind or feelings.

### Final Jury Instruction # 26

### Intentional Infliction of Emotional Distress – Under Virginia Law

Plaintiffs Muñiz, Sines, Blair, Martin, Baker, and Romero also bring a claim for intentional infliction of emotional distress against Defendant Fields.

As I mentioned earlier, to prove this claim, Plaintiffs must meet a different standard of proof than the "preponderance of the evidence" standard, which applies to all of Plaintiffs' other claims. Plaintiffs must prove this claim by "clear and convincing evidence." Clear and convincing evidence is the measure of proof that will produce in the mind of a juror a firm belief or conviction that he has proved the issue. It is an intermediate standard, requiring more than a preponderance of the evidence, but not requiring the extent of such certainty as is required beyond a reasonable doubt in criminal cases. It does not mean clear and unequivocal; it simply means that you are convinced that it is highly probable that it is true.

Thus, to prove a claim for intentional infliction of emotional distress, Plaintiffs must show by clear and convincing evidence each of the following four things:

1. That the defendant had the specific purpose of inflicting emotional distress upon the plaintiff; intended specific conduct and knew, or should have known, that his conduct would likely result in emotional distress;

27

2. The defendant's conduct was outrageous or intolerable in that it offenders generally accepted standards of decency and morality;

3. That the plaintiff suffered severe emotional distress.  Severe emotional distress is emotional distress so severe that no reasonable person could be expected to endure it; and

4. That the plaintiff's emotional distress was proximately caused by the defendant's conduct.

No physical injury is needed to establish a claim for emotional distress. Again, this standard of proof applies only to this claim.  In proving emotional injuries resulting from any other claim in this case, Plaintiffs need only prove those injuries by a preponderance of the evidence.

28

## Final Jury Instruction # 27

### Evidentiary Sanctions against Defendants Elliott Kline and Robert Ray

### – Facts Deemed Found

In a federal civil action like this case, parties are entitled to the disclosure of all relevant, non-privileged evidence the other side possesses or controls, including relevant documents and electronically stored information. This pre-trial process is known as "discovery." During the discovery process in this case, the Court has found that Defendants Elliott Kline and Robert "Azzmador" Ray failed to comply with their discovery obligations.

On account of Defendant Elliott Kline's failure to comply with his discovery obligations in this case, I have imposed as a sanction that the following facts are to be deemed established as true against Defendant Elliott Kline for purposes of this case:

1. Defendant Kline was one of the leaders of Identity Evropa from April 2017 through at least August 2017.

2. Defendant Kline entered into an agreement with one or more coconspirators to engage in racially motivated violence in Charlottesville, Virginia on August 11 and 12, 2017. Whether such coconspirator or

coconspirators are, or are not, a Defendant or Defendants, is a question for the jury.

3. Defendant Kline was motivated by animus against racial minorities, Jewish people, and their supporters when conspiring to engage in acts of intimidation and violence on August 11 and 12, 2017, in Charlottesville, Virginia.

4. It was reasonably foreseeable to Defendant Kline and intended by him that coconspirators would commit acts of racially-motivated violence and intimidation at the events in Charlottesville on August 11 and 12, 2017. Whether such coconspirator or coconspirators are, or are not, a Defendant or Defendants, is a question for the jury.

5. After the Unite the Right event in Charlottesville, Virginia on August 11 and 12, 2017, Defendant Kline ratified the racially-motivated violence at the event.

On account of Defendant Robert Azzmador Ray's failure to comply with his discovery obligations in this case, I have imposed as a sanction that the following facts are to be deemed established as true against Defendant Robert Ray for purposes of this case:

1. Defendant Ray was a writer for *The Daily Stormer* from at least July 2016 through at least March 2020.

30

2. Defendant Ray entered into an agreement with one or more coconspirators to commit racially motivated violence in Charlottesville, Virginia on August 11 and 12, 2017. Whether such coconspirator or coconspirators are, or are not, a Defendant or Defendants, is a question for the jury.

3. Defendant Ray was motivated by animus against racial minorities, Jewish people, and their supporters when conspiring to engage in acts of intimidation and violence on August 11 and 12, 2017, in Charlottesville, Virginia.

4. It was reasonably foreseeable to Defendant Ray and intended by him that the coconspirators would commit acts of racially motivated violence and intimidation at the events in Charlottesville, Virginia on August 11 and 12, 2017. Whether such coconspirator or coconspirators are, or are not, a Defendant or Defendants, is a question for the jury.

5. After the Unite the Right event in Charlottesville, Virginia on August 11 and 12, 2017, Defendant Ray ratified the racially motivated violence that occurred at Unite the Right.

You are cautioned, however, that each party is entitled to have the case decided solely on the evidence that applies to that party. The facts deemed established, which I just listed, are admitted only as to Defendants Elliott Kline and

31

Robert "Azzmador" Ray, respectively. Thus, taking those facts as true for this case

against Elliott Kline and Robert "Azzmador" Ray does not relieve Plaintiffs of

their burden to prove by a preponderance of the evidence the conduct committed

by the other Defendants in the case.  Nor does taking those facts as true as against

Elliott Kline, specifically, have any bearing on Plaintiffs' burden of proof as

against Defendant Identity Evropa.

32

## Final Jury Instruction # 28

**Evidentiary Sanctions against Defendants Elliott Kline, Robert Ray, Matthew Heimbach, Vanguard America, and Nationalist Socialist Movement – Permissive Adverse Inference**

During the discovery process in this case, the Court found that Defendants Elliott Kline, Robert "Azzmador" Ray, Matthew Heimbach, Vanguard America, and Nationalist Socialist Movement, failed to comply with their discovery obligations, specifically in that they intentionally withheld or destroyed documents and electronically stored information they were required to produce to Plaintiffs.

On account of Defendant Elliott Kline, Robert "Azzmador" Ray, Matthew Heimbach, Vanguard America, and Nationalist Socialist Movement's failures to abide by their discovery obligations in this case, I have imposed as a sanction that you are permitted, but not required, to infer that they intentionally withheld or destroyed documents and electronically stored information because they were aware that such documents and electronically stored information contained evidence that they each conspired to plan racially-motivated violence at Unite the Right.

You are cautioned, however, that each party is entitled to have the case decided solely on the evidence that applies to that party. Sanctions against these parties have no bearing on other parties.

33

# Final Jury Instruction # 29

## Limited Use of Depositions as Against Defendant Cantwell

As I instructed you throughout the trial, and I will remind you again that each party is entitled to have the case decided solely on the evidence that applies to that party, and some of the evidence in this case is limited under the rules of evidence to some of the parties and cannot be considered against the others. Plaintiffs introduced deposition testimony from Robert Isaacs a/k/a Ike Baker, Samantha Froelich, Bradley Griffin, Dillon Hopper, Vasillios Pistolis, and Thomas Rousseau, which may not considered by you in connection with Defendant Christopher Cantwell, because of his inability to be at the deposition and lack of notice thereof. However, it may be considered by you in connection with the other Defendants.

34

## Final Jury Instruction # 30

### First Amendment

Certain Defendants make the claim that their activities constituted free speech and assembly protected by the First Amendment to the United States Constitution.

The abstract advocacy of lawlessness, or mere advocacy of the use of force, is protected speech. However, if you find that the Defendants have engaged in the violations of law I have instructed you on, including a conspiracy as alleged by Plaintiffs, you may not find that the Defendants' actions were protected by the First Amendment. The violations of law I have instructed you on are not protected by the First Amendment.

The fact that an agreement to engage in illegal conduct necessarily takes the form of words also does not confer upon it, or upon the underlying conduct, protection under the First Amendment.

35

## Final Jury Instruction # 31

### Self-Defense

Certain Defendants have claimed that much of their conduct, including preparations they made in advance of, and actions they took during, the events in Charlottesville, Virginia on August 11 and 12, 2017, were motivated by considerations of self-defense.

As I mentioned earlier, if Plaintiffs prove that the alleged conspiracy was motivated, at least in part, by discriminatory racial animus, then it is no defense that Defendants also possessed some other motive, such as a desire to join together for mutual protection. Thus, if you find that Plaintiffs proved by a preponderance of the evidence each element of their claim under 42 U.S.C. § 1985(3), considerations of self-defense will not defeat that claim. But in deciding whether Plaintiffs have proved their Section 1985(3) claim, you may consider Defendants' assertions, along with any supporting evidence from any party, that they were motivated solely by self-defense, rather than by racial animus or a desire to commit racially motivated violence. You must consider all relevant evidence as stated in other instructions.

Principles of self-defense may be a relevant consideration in determining whether Defendants should be liable for Plaintiffs' claims under Virginia state law

36

for civil conspiracy; racial, religious or ethnic harassment or violence; and assault and battery.

The following law governs Defendants' claim of self-defense.

Self-defense is an affirmative defense which a Defendant bears the burden to prove by the preponderance of the evidence. The law recognizes that a person who suffers, or is threatened with, an assault or battery that he did not provoke has a right to use as much force in self-defense as is reasonably necessary to protect himself. A person who is being assaulted, however, may not react with reasonable force unless he has reason to believe, and does believe, that it is necessary to avoid threatened bodily injury. A person who is being subjected to a battery may use such reasonable force as is necessary to repel the threat of bodily injury

Force is "reasonable" only if it was no more or no greater force or means than the person in fact believed reasonably necessary, and no more or no greater force or means than that which would appear to a reasonable person, under like circumstances, to be necessary, in order to prevent bodily injury to himself. Additionally, self-defense is not available if the Defendant provoked or initiated the conflict. In other words, a Defendant can only claim self-defense for his actions if they were in response to an unprovoked attack.

Thus, to prove self-defense, a Defendant bears the burden of proving by a preponderance of the evidence that:

37

(1)     A person, unprovoked, threatened the Defendant with assault or battery such that the Defendant reasonably believed that the Plaintiff was going to inflict bodily injury on him;

(2)     The Defendant, in order to avoid bodily injury, used force;

(3)     The amount of force the Defendant used was no greater than the amount he believed was necessary to prevent bodily injury; and

(4)     The amount of force the Defendant used was no greater than the amount or means a reasonable person would have used in like circumstances in order to prevent bodily injury.

A Defendant may only use the amount of force reasonably necessary to avoid the harm he believes will be inflicted upon himself. If a Defendant reasonably believes that nondeadly force will be used against him, a Defendant may only use nondeadly force against that person in self-defense. Deadly force is only allowable as a defense when a Defendant reasonably believes deadly force will be used upon himself.

38

## Final Jury Instruction # 32

### Negligence Defenses Do Not Apply

Negligence defenses, including assumption of risk, contributory negligence, and sudden emergency, are not valid defenses to any of the claims that Plaintiffs bring against Defendants.  I instruct you to disregard these defenses when assessing Defendants' liability.

39

## Final Jury Instruction # 33

### Damages Generally

     If Plaintiffs have proven one or more of their claims, then you must determine the damages to which Plaintiffs are entitled.  However, you should not infer that Plaintiffs are entitled to damages merely because I am giving you these instructions.  I give you these instructions on damages merely because I am required to charge you on all phases of the case that you might have to consider.

     Under the law, the purposes of damages is to award, as far as possible, just and fair compensation for the losses which resulted from Defendants unlawful conduct.  If you find the Defendants are liable on the claims as I have explained them, you must award Plaintiffs sufficient damages to compensate them for all injuries proximately caused by Defendants' conduct.  These damages are known as "compensatory damages."  Compensatory damages seek to make a Plaintiff whole—that is, to compensate the Plaintiff for damages he or she suffered.  In determining the compensatory damages to which Plaintiffs are entitled, you shall consider any of the following injuries that you believe Plaintiffs have proven by a preponderance of the evidence were caused by the Defendants' unlawful actions:

(1)    Any bodily injuries they sustained and their effect on Plaintiffs' health according to their degree and probable duration;

40

(2)     Any physical pain and suffering, mental anguish, or emotional distress
        they suffered in the past and any they are reasonably certain to
        experience in the future;

(3)     The reasonable value of any medical expenses incurred in the past and
        any that may be reasonably expected to occur in the future;

(4)     Any disfigurement or deformity and any associated humiliation or
        embarrassment;

(5)     Any inconvenience caused in the past and any that probably will be
        caused in the future;

(6)     Any earnings that Plaintiffs lost because they were unable to work at
        their callings;

(7)     Any loss of earnings and lessening of earning capacity, or either, that
        Plaintiffs may reasonably be expected to sustain in the future; or

(8)     Any property damage Plaintiffs sustained.


Your verdict shall be for a sum that fully and fairly compensates Plaintiffs
for the damages sustained as a result of Defendants' unlawful actions.

Plaintiffs are not required to prove the exact amount of their damages, but
they must show sufficient facts and circumstances to permit you to make a
reasonable estimate of each item.  If Plaintiffs fail to do so, then they cannot
recover for that item.

During the trial, some of the lawyers may have argued that the Plaintiffs
should be awarded a specific figure of damages.  As I have instructed you before,

41

the arguments of counsel, including any statements about the appropriate damages award, are not evidence. You as the jury must determine the appropriate measure of damages based solely on the evidence before you.

42

**Final Jury Instruction # 34**

**Duplicate Damages**

If you find that Plaintiffs are entitled to damages, you must be careful not to award double or duplicate damages. Double or duplicate damages means more than one award of money for the same loss, injury, violation, wrong or damage. In this case, Plaintiffs are seeking damages from Defendants under a number of claims. Where the same acts cause the same injury or loss to Plaintiffs under more than one claim, the Plaintiffs may recover only once for that injury or loss. To recover damages under more than one of the claims, Plaintiffs must prove Defendants' liability for each of those claims and must present evidence of distinct, separate injuries or losses under those claims.

With respect to punitive damages, however, you may make separate wards on each claim that is established.

43

## Final Jury Instruction # 35

### Collateral Source Rule

If you find for Plaintiffs on liability, in determining the damages to which
Plaintiffs are entitled, you shall not reduce a Plaintiff's damages award based on
any evidence tending to show that he or she has received insurance benefits,
employment or government benefits, or gratuities to help offset the losses he or she
incurred as a result of Defendants' unlawful conduct.

## Final Jury Instruction # 36

### Punitive Damages

Punitive damages are awarded, in the discretion of the jury, to punish a defendant for extreme or outrageous conduct, and to deter or prevent a defendant and others like him from committing such conduct in the future.

You may award Plaintiffs punitive damages if you find that the acts or omissions of a Defendant were done maliciously or wantonly. An act or failure to act is maliciously done if it is prompted by ill will or spite towards the injured person. An act or failure to act is wanton if done with a reckless or callous disregard for the rights of the injured person. Plaintiffs have the burden of proving, by a preponderance of the evidence, that a Defendant acted maliciously or wantonly with regard to the Plaintiffs' rights.

If you find by a preponderance of the evidence that a Defendant acted with malicious intent to violate the Plaintiffs' federal rights or unlawfully injure him, or if you find that a Defendant acted with a callous or reckless disregard of the Plaintiffs' rights, then you may award punitive damages. An award of punitive damages, however, is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them.

45

In making this decision, you should consider the underlying purpose of punitive damages. Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future. Thus, in deciding whether to award punitive damages, you should consider whether a Defendant may be adequately punished by an award of actual damages only, or whether the conduct is so extreme and outrageous that actual damages are inadequate to punish the wrongful conduct. You should also consider whether actual damages, standing alone, are likely to deter or prevent this defendant from similar wrongful conduct in the future, if it was in fact wrongful, or whether punitive damages are necessary to provide deterrence. Finally, you should consider whether punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those the Defendant may have committed.

If you decide to award punitive damages, the same purposes should be kept in mind as you determine the appropriate sum of money to be awarded as punitive damages. That is, in fixing the sum to be awarded, you should consider the degree to which the Defendant should be punished for his wrongful conduct, and the degree to which an award of one sum or another will deter defendant or persons like him from committing wrongful acts in the future.

46

Filed 05/08/25   Doc 100

### Final Jury Instruction # 37

### James Fields's Trial Testimony

You may have noticed that Defendant James Fields, unlike other Defendants, did not testify at trial in his own defense.  That is not because he chose not to testify.  Defendant Fields refused to testify at a properly noticed deposition during the discovery process in this case.  To level the evidentiary playing field that may have been skewed as a result of Defendant Fields's misconduct, the Court issued the appropriate sanction against him and prohibited him from testifying in his defense at trial.

47

**Final Jury Instruction # 38**

**Foreperson and Verdict Form**

When you go to the jury room, you should first select one of your members to act as your foreperson. The foreperson will preside over your discussions and speak for you here in court. It is your duty, as jurors, to discuss this case with one another in the jury and try to reach agreement. Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of the other jurors. Do not be afraid to change your opinions if the discussion persuades you that you should. But do not make a decision simply because other jurors think it is right, or simply to reach a verdict. Remember at all times that you are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

If you need to communicate with me during your deliberations, you may send a note to me through the marshal, signed by one or more jurors. I will respond as soon as possible either in writing or orally in open court. Remember that you should not tell anyone—including me—how your votes stand numerically. Your verdict must be based solely on the evidence and on the law that I have given to you in my instructions. The verdict must be unanimous. Nothing I have said or

done is intended to suggest what your verdict should be—that is entirely for you to decide.

Finally, a form of verdict has been prepared for your convenience. The verdict form is simply the written notice of the decision that you reach in this case. You will take this form to the jury room, and when each of you has agreed on the verdicts, your foreperson will fill in the form, sign and date it, and advise the marshal or bailiff that you are ready to return to the courtroom.

The form reads: [[**READ VERDICT FORM**]].

49

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

ELIZABETH SINES, *et al.*,

                                        Plaintiffs,

              v.                                              Civil Action No. 3:17-cv-72

JASON KESSLER, *et al.*,

                                        Defendants.

**VERDICT FORM**

## **FIRST CLAIM: 42 U.S.C. § 1985(3)**

1. Did Plaintiffs prove by a preponderance of the evidence their claim that one or more Defendants engaged in a conspiracy to commit racially motivated violence in violation of 42 U.S.C. § 1985(3)?

    _____ YES   _____ NO

    If you answered "YES" to the first part of this question, please indicate (by marking each appropriate line with a check mark), any and all Defendants against whom you find that Plaintiffs proved their 42 U.S.C. § 1985(3) claim:

    _____ ALL DEFENDANTS

    If not all Defendants, specify which ones:

    _____ Jason Kessler
    _____ Richard Spencer
    _____ Christopher Cantwell
    _____ James Alex Fields, Jr.
    _____ Robert "Azzmador" Ray
    _____ Nathan Damigo
    _____ Elliott Kline
    _____ Matthew Heimbach
    _____ Matthew Parrott
    _____ Michael Hill
    _____ Michael Tubbs
    _____ Jeff Schoep
    _____ League of the South
    _____ Vanguard America
    _____ Nationalist Socialist Movement
    _____ Identity Evropa
    _____ Traditionalist Worker Party

1

## SECOND CLAIM: 42 U.S.C. § 1986

2. Did Plaintiffs prove by a preponderance of the evidence their claim that one or more Defendants had knowledge of the conspiracy found in Claim 1 and failed to prevent that conspiracy from taking place in violation of 42 U.S.C. § 1986?

_____ YES _____ NO

If you answered "YES" to the first part of this question, please indicate (by marking each appropriate line with a check mark), any and all Defendants against whom you find that Plaintiffs proved their 42 U.S.C. § 1986 claim:

_____ ALL DEFENDANTS

If not all Defendants, specify which ones:

_____ Jason Kessler
_____ Richard Spencer
_____ Christopher Cantwell
_____ James Alex Fields, Jr.
_____ Robert "Azzmador" Ray
_____ Nathan Damigo
_____ Elliott Kline
_____ Matthew Heimbach
_____ Matthew Parrott
_____ Michael Hill
_____ Michael Tubbs
_____ Jeff Schoep
_____ League of the South
_____ Vanguard America
_____ Nationalist Socialist Movement
_____ Identity Evropa
_____ Traditionalist Worker Party

## THIRD CLAIM: CIVIL CONSPIRACY

3. Did Plaintiffs prove by a preponderance of the evidence each element of their Virginia state law civil conspiracy claim?

_____ YES   _____ NO

If you answered "YES" to the first part of this question, please indicate (by marking each appropriate line with a check mark) which of the following Defendants you find, by a preponderance of the evidence, were members of that conspiracy.

_____ ALL DEFENDANTS

If not all Defendants, specify which ones:

_____ Jason Kessler
_____ Richard Spencer
_____ Christopher Cantwell
_____ James Alex Fields, Jr.
_____ Robert "Azzmador" Ray
_____ Nathan Damigo
_____ Elliott Kline
_____ Matthew Heimbach
_____ Matthew Parrott
_____ Michael Hill
_____ Michael Tubbs
_____ Jeff Schoep
_____ League of the South
_____ Vanguard America
_____ Nationalist Socialist Movement
_____ Identity Evropa
_____ Traditionalist Worker Party

3

## POTENTIAL DAMAGES FOR FIRST THREE CLAIMS

You must now consider what damages, if any, to impose with respect to the three conspiracy claims—Claims 1, 2, and 3—listed above.

If you answered "NO" to all of Questions 1, 2, and 3, you must skip Questions 4 and 5.

If you listed "YES" to any of Questions 1, 2, or 3, you may impose damages on Defendants for those claims. You may only impose damages on those Defendants you found liable for at least one of the three conspiracy claims.

4. For each Plaintiff who you found for on Claims 1, 2, or 3, please state the total compensatory damages that will fully and fairly compensate the Plaintiff for the injuries sustained as a result of the conspiracy. All Plaintiffs except Chelsea Alvarado have brought these three claims against all Defendants. Plaintiff Alvarado has brought these three claims against all Defendants except James Alex Fields, Jr.; her damages should be assessed accordingly.

Natalie Romero:       $_____
April Muñiz:          $_____
Thomas Baker:         $_____
Elizabeth Sines:      $_____
Marissa Blair:        $_____
Marcus Martin:        $_____
Chelsea Alvarado:     $_____
Seth Wispelwey:       $_____
Devin Willis:         $_____

Filed 05/09/22     Doc 100

5.  If you found for Plaintiffs as to Claims 1, 2, or 3, do you find that punitive damages should be awarded against at least one Defendant?

   _____ YES   _____ NO

If you answered "YES" to the first part of this question, please state on the following lines the total punitive damages, if any, you are assessing against each Defendant.

| | |
|---|---|
| Jason Kessler: | $_____ |
| Richard Spencer: | $_____ |
| Christopher Cantwell: | $_____ |
| James Alex Fields, Jr.: | $_____ |
| Robert "Azzmador" Ray: | $_____ |
| Nathan Damigo: | $_____ |
| Elliott Kline: | $_____ |
| Matthew Heimbach: | $_____ |
| Matthew Parrott: | $_____ |
| Michael Hill: | $_____ |
| Michael Tubbs: | $_____ |
| Jeff Schoep: | $_____ |
| Vanguard America: | $_____ |
| League of the South: | $_____ |
| Identity Evropa: | $_____ |
| Traditionalist Worker Party: | $_____ |
| Nationalist Socialist Movement: | $_____ |

5

## FOURTH CLAIM: RACIAL, RELIGIOUS, OR ETHNIC HARRASSMENT OR VIOLENCE

6.  Plaintiffs Natalie Romero and Devin Willis bring a claim under Virginia Code § 8.01-42.1 (Virginia's racial, religious, or ethnic harassment or violence statute). Please indicate (by marking each appropriate line with a check mark) any and all Defendants against whom you find that Plaintiffs proved their Virginia Code § 8.01-42.1 claim.

    _____ Jason Kessler
    _____ Richard Spencer
    _____ Elliott Kline
    _____ Robert "Azzmador" Ray
    _____ Christopher Cantwell

    For each Plaintiff who you found for as to Claim 4, please state the total compensatory damages that will fully and fairly compensate that Plaintiff for the resulting injuries.

    Natalie Romero:     $_____
    Devin Willis:       $_____

7.  If you found for at least one Plaintiff as to Claim 4, do you find that punitive damages should be awarded against at least one Defendant?

    _____ YES     _____ NO

    If you answered "YES" to the first part of this question, please state on the following lines the total punitive damages you are assessing against any such Defendant:

    Jason Kessler:              $_____
    Richard Spencer:            $_____
    Elliott Kline:              $_____
    Robert "Azzmador" Ray:      $_____
    Christopher Cantwell:       $_____

6

8. Plaintiffs Natalie Romero, April Muñiz, Seth Wispelwey, Elizabeth Sines, Marissa Blair, Marcus Martin, and Devin Willis also bring a claim under Virginia Code § 8.01-42.1, against Defendant James Alex Fields, Jr. Please indicate (by marking the appropriate line with a check mark) whether you find that Plaintiffs proved their Virginia Code § 8.01-42.1 claim against James Alex Fields, Jr.

_____ YES _____ NO

If you found liability against James Alex Fields, Jr. as to Claim 4, please state the total compensatory damages that will fully and fairly compensate that Plaintiff for the resulting injuries.

Natalie Romero:     $_____
April Muñiz:     $_____
Seth Wispelwey:     $_____
Elizabeth Sines:     $_____
Marissa Blair:     $_____
Marcus Martin:     $_____
Devin Willis:     $_____

9. If you found for at least one Plaintiff in Question 8, do you find that punitive damages should be awarded?

_____ YES _____ NO

If you answered "YES," to the first part of this question, please state on the following line the total punitive damages you are assessing against James Alex Fields, Jr.:

James Alex Fields, Jr: $_____

7

## FIFTH CLAIM: ASSAULT OR BATTERY

10. Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Elizabeth Sines, Marissa Blair, and Marcus Martin bring a claim for assault or battery against Defendant James Alex Fields, Jr. Did those Plaintiffs prove by a preponderance of the evidence each element of their claim for assault or battery?

_____ YES _____ NO

**If you answered "NO" to Question 10, please skip to Question 13. If you answered, "YES" proceed to Questions 11–12.**

11. For any Plaintiff who you found for as to Claim 5, please state the total compensatory damages that will fully and fairly compensate that Plaintiff for the resulting injuries.

| | |
|---|---|
| Natalie Romero: | $_____ |
| April Muñiz: | $_____ |
| Thomas Baker: | $_____ |
| Elizabeth Sines: | $_____ |
| Marissa Blair: | $_____ |
| Marcus Martin: | $_____ |

12. If you found for at least one Plaintiff as to Claim 5, do you find that punitive damages should be awarded?

_____ YES _____ NO

If you answered "YES" to the first part of this question, please state on the following line the total punitive damages you are assessing against Defendant James Alex Fields Jr. for these claims:

$_____

8

## SIXTH CLAIM: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

13. Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Elizabeth Sines, Marissa Blair, and Marcus Martin bring a claim for intentional infliction of emotional distress against Defendant James Alex Fields, Jr.  Did Plaintiffs prove by clear and convincing evidence each element of their claim for intentional infliction of emotional distress?

_____ YES  _____ NO

**If you answered "NO" to Question 13, please proceed to the END. If you answered "YES" to Question 13, please proceed to Questions 14–15.**

14. For each Plaintiff who you found for as to Claim 6, please state the total compensatory damages that will fully and fairly compensate that Plaintiff for the resulting injuries.

| Natalie Romero: | $_____ |
|---|---|
| April Muñiz: | $_____ |
| Thomas Baker: | $_____ |
| Elizabeth Sines: | $_____ |
| Marissa Blair: | $_____ |
| Marcus Martin: | $_____ |

15. If you found for at least one Plaintiff as to Claim 6, do you find that punitive damages should be awarded?

_____ YES  _____ NO

If you answered "YES" to the first part of this question, please state on the following line the total punitive damages you are assessing against Defendant James Alex Fields, Jr. for these claims:

$_____

### END – STOP HERE

_____          _____
Foreperson                                          Date

9

# JOINT EXHIBIT 9

FILED IN OPEN COURT

DATE: 11/23/2021

H. Wheeler

DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

ELIZABETH SINES, *et al*.,

             Plaintiffs,

    v.

JASON KESSLER, *et al*.,

             Defendants.

**Civil Action No. 3:17-cv-72**

**VERDICT FORM**

## FIRST CLAIM: 42 U.S.C. § 1985(3)

1. Did Plaintiffs prove by a preponderance of the evidence their claim that one or more Defendants engaged in a conspiracy to commit racially motivated violence in violation of 42 U.S.C. § 1985(3)?

    _____ YES   _____ NO

    If you answered "YES" to the first part of this question, please indicate (by marking each appropriate line with a check mark), any and all Defendants against whom you find that Plaintiffs proved their 42 U.S.C. § 1985(3) claim:

    _____ ALL DEFENDANTS

    If not all Defendants, specify which ones:

    _____ Jason Kessler
    _____ Richard Spencer
    _____ Christopher Cantwell
    _____ James Alex Fields, Jr.
    _____ Robert "Azzmador" Ray
    _____ Nathan Damigo
    _____ Elliott Kline
    _____ Matthew Heimbach
    _____ Matthew Parrott
    _____ Michael Hill
    _____ Michael Tubbs
    _____ Jeff Schoep
    _____ League of the South
    _____ Vanguard America
    _____ Nationalist Socialist Movement
    _____ Identity Evropa
    _____ Traditionalist Worker Party

1

## SECOND CLAIM: 42 U.S.C. § 1986

2. Did Plaintiffs prove by a preponderance of the evidence their claim that one or more Defendants had knowledge of the conspiracy found in Claim 1 and failed to prevent that conspiracy from taking place in violation of 42 U.S.C. § 1986?

\_\_\_\_\_ YES   \_\_\_\_\_ NO

If you answered "YES" to the first part of this question, please indicate (by marking each appropriate line with a check mark), any and all Defendants against whom you find that Plaintiffs proved their 42 U.S.C. § 1986 claim:

\_\_\_\_\_ ALL DEFENDANTS

If not all Defendants, specify which ones:

\_\_\_\_\_ Jason Kessler
\_\_\_\_\_ Richard Spencer
\_\_\_\_\_ Christopher Cantwell
\_\_\_\_\_ James Alex Fields, Jr.
\_\_\_\_\_ Robert "Azzmador" Ray
\_\_\_\_\_ Nathan Damigo
\_\_\_\_\_ Elliott Kline
\_\_\_\_\_ Matthew Heimbach
\_\_\_\_\_ Matthew Parrott
\_\_\_\_\_ Michael Hill
\_\_\_\_\_ Michael Tubbs
\_\_\_\_\_ Jeff Schoep
\_\_\_\_\_ League of the South
\_\_\_\_\_ Vanguard America
\_\_\_\_\_ Nationalist Socialist Movement
\_\_\_\_\_ Identity Evropa
\_\_\_\_\_ Traditionalist Worker Party

## THIRD CLAIM: CIVIL CONSPIRACY

3. Did Plaintiffs prove by a preponderance of the evidence each element of their Virginia state law civil conspiracy claim?

____✓ YES   ____ NO

If you answered "YES" to the first part of this question, please indicate (by marking each appropriate line with a check mark) which of the following Defendants you find, by a preponderance of the evidence, were members of that conspiracy.

____ ALL DEFENDANTS

If not all Defendants, specify which ones:

____✓ Jason Kessler
____✓ Richard Spencer
____✓ Christopher Cantwell
____✓ James Alex Fields, Jr.
____✓ Robert "Azzmador" Ray
____✓ Nathan Damigo
____✓ Elliott Kline
____✓ Matthew Heimbach
____✓ Matthew Parrott
____✓ Michael Hill
____✓ Michael Tubbs
____✓ Jeff Schoep
____✓ League of the South
____✓ Vanguard America
____✓ Nationalist Socialist Movement
____✓ Identity Evropa
____✓ Traditionalist Worker Party

3

## POTENTIAL DAMAGES FOR FIRST THREE CLAIMS

You must now consider what damages, if any, to impose with respect to the three conspiracy claims—Claims 1, 2, and 3—listed above.

If you answered "NO" to all of Questions 1, 2, and 3, you must skip Questions 4 and 5.

If you listed "YES" to any of Questions 1, 2, or 3, you may impose damages on Defendants for those claims. You may only impose damages on those Defendants you found liable for at least one of the three conspiracy claims.

4. For each Plaintiff who you found for on Claims 1, 2, or 3, please state the total compensatory damages that will fully and fairly compensate the Plaintiff for the injuries sustained as a result of the conspiracy. All Plaintiffs except Chelsea Alvarado have brought these three claims against all Defendants. Plaintiff Alvarado has brought these three claims against all Defendants except James Alex Fields, Jr.; her damages should be assessed accordingly.

| Plaintiff | Amount |
|---|---|
| Natalie Romero: | $ 1.00 |
| April Muñiz: | $ 1.00 |
| Thomas Baker: | $ 1.00 |
| Elizabeth Sines: | $ 0 |
| Marissa Blair: | $ 1.00 |
| Marcus Martin: | $ 1.00 |
| Chelsea Alvarado: | $ 1.00 |
| Seth Wispelwey: | $ 0 |
| Devin Willis: | $ 1.00 |

4

5. If you found for Plaintiffs as to Claims 1, 2, or 3, do you find that punitive damages should be awarded against at least one Defendant?

    __✓__ YES    _____ NO

If you answered "YES" to the first part of this question, please state on the following lines the total punitive damages, if any, you are assessing against each Defendant.

| Defendant | Amount |
|---|---|
| Jason Kessler: | $ 500,000.00 |
| Richard Spencer: | $ 500,000.00 |
| Christopher Cantwell: | $ 500,000.00 |
| James Alex Fields, Jr.: | $ 500,000.00 |
| Robert "Azzmador" Ray: | $ 500,000.00 |
| Nathan Damigo: | $ 500,000.00 |
| Elliott Kline: | $ 500,000.00 |
| Matthew Heimbach: | $ 500,000.00 |
| Matthew Parrott: | $ 500,000.00 |
| Michael Hill: | $ 500,000.00 |
| Michael Tubbs: | $ 500,000.00 |
| Jeff Schoep: | $ 500,000.00 |
| Vanguard America: | $ 1,000,000.00 |
| League of the South: | $ 1,000,000.00 |
| Identity Evropa: | $ 1,000,000.00 |
| Traditionalist Worker Party: | $ 1,000,000.00 |
| Nationalist Socialist Movement: | $ 1,000,000.00 |

5

## FOURTH CLAIM: RACIAL, RELIGIOUS, OR ETHNIC HARRASSMENT OR VIOLENCE

6. Plaintiffs Natalie Romero and Devin Willis bring a claim under Virginia Code § 8.01-42.1 (Virginia's racial, religious, or ethnic harassment or violence statute). Please indicate (by marking each appropriate line with a check mark) any and all Defendants against whom you find that Plaintiffs proved their Virginia Code § 8.01-42.1 claim.

    ___✓___ Jason Kessler
    ___✓___ Richard Spencer
    ___✓___ Elliott Kline
    ___✓___ Robert "Azzmador" Ray
    ___✓___ Christopher Cantwell

    For each Plaintiff who you found for as to Claim 4, please state the total compensatory damages that will fully and fairly compensate that Plaintiff for the resulting injuries.

    Natalie Romero:     $  250,000.00
    Devin Willis:       $  250,000.00

7. If you found for at least one Plaintiff as to Claim 4, do you find that punitive damages should be awarded against at least one Defendant?

    ___✓___ YES     _____ NO

    If you answered "YES" to the first part of this question, please state on the following lines the total punitive damages you are assessing against any such Defendant:

    Jason Kessler:              $  200,000.00
    Richard Spencer:            $  200,000.00
    Elliott Kline:              $  200,000.00
    Robert "Azzmador" Ray:      $  200,000.00
    Christopher Cantwell:       $  200,000.00

8. Plaintiffs Natalie Romero, April Muñiz, Seth Wispelwey, Elizabeth Sines, Marissa Blair, Marcus Martin, and Devin Willis also bring a claim under Virginia Code § 8.01-42.1, against Defendant James Alex Fields, Jr. Please indicate (by marking the appropriate line with a check mark) whether you find that Plaintiffs proved their Virginia Code § 8.01-42.1 claim against James Alex Fields, Jr.

____X____ YES   _____ NO

If you found liability against James Alex Fields, Jr. as to Claim 4, please state the total compensatory damages that will fully and fairly compensate that Plaintiff for the resulting injuries.

| | |
|---|---|
| Natalie Romero: | $_____0_____ |
| April Muñiz: | $_____0_____ |
| Seth Wispelwey: | $_____0_____ |
| Elizabeth Sines: | $_____0_____ |
| Marissa Blair: | $_____0_____ |
| Marcus Martin: | $_____0_____ |
| Devin Willis: | $_____0_____ |

9. If you found for at least one Plaintiff in Question 8, do you find that punitive damages should be awarded?

_____ YES   __X__ NO

If you answered "YES," to the first part of this question, please state on the following line the total punitive damages you are assessing against James Alex Fields, Jr.:

James Alex Fields, Jr:   $____—_____

7

## FIFTH CLAIM: ASSAULT OR BATTERY

10. Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Elizabeth Sines, Marissa Blair, and Marcus Martin bring a claim for assault or battery against Defendant James Alex Fields, Jr. Did those Plaintiffs prove by a preponderance of the evidence each element of their claim for assault or battery?

   **X** YES  _____ NO

**If you answered "NO" to Question 10, please skip to Question 13. If you answered, "YES" proceed to Questions 11–12.**

11. For any Plaintiff who you found for as to Claim 5, please state the total compensatory damages that will fully and fairly compensate that Plaintiff for the resulting injuries.

   | | |
   |---|---|
   | Natalie Romero: | $ 217,715.00 |
   | April Muñiz: | $ 108,000.00 |
   | Thomas Baker: | $ 318,575.00 |
   | Elizabeth Sines: | $ 0 |
   | Marissa Blair: | $ 2000.00 |
   | Marcus Martin: | $ 156,987.00 |

12. If you found for at least one Plaintiff as to Claim 5, do you find that punitive damages should be awarded?

   **✓** YES  _____ NO

   If you answered "YES" to the first part of this question, please state on the following line the total punitive damages you are assessing against Defendant James Alex Fields Jr. for these claims:

   $ 6,000,000.00

8

**SIXTH CLAIM: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

13. Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Elizabeth Sines, Marissa Blair, and Marcus Martin bring a claim for intentional infliction of emotional distress against Defendant James Alex Fields, Jr.  Did Plaintiffs prove by clear and convincing evidence each element of their claim for intentional infliction of emotional distress?

     __X__ YES  _____ NO

**If you answered "NO" to Question 13, please proceed to the END. If you answered "YES" to Question 13, please proceed to Questions 14–15.**

14. For each Plaintiff who you found for as to Claim 6, please state the total compensatory damages that will fully and fairly compensate that Plaintiff for the resulting injuries.

| | |
|---|---|
| Natalie Romero: | $ 155,715.00 |
| April Muñiz: | $ 50,000.00 |
| Thomas Baker: | $ 246757.00 |
| Elizabeth Sines: | $ 50,000.00 |
| Marissa Blair: | $ 100,000.00 |
| Marcus Martin: | $ 98,987.00 |

15. If you found for at least one Plaintiff as to Claim 6, do you find that punitive damages should be awarded?

     __✓__ YES  _____ NO

If you answered "YES" to the first part of this question, please state on the following line the total punitive damages you are assessing against Defendant James Alex Fields, Jr. for these claims:

$ 6,000,000.00

**END – STOP HERE**

| #275 | 11/23/21 |
|---|---|
| Foreperson | Date |

9

# JOINT EXHIBIT 10

## IN THE UNITED STAES DISTRICT COURT
### WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **ELIZABETH SINES ET AL.** | : | Case No.  3:17-CV-00072 |
| | : | |
| Plaintiffs, | : | (Judge MOON) |
| | : | (Magistrate Judge HOPPE) |
| v. | : | |
| | : | |
| **JASON KESSLER ET AL.** | : | **DEFENDANTS' POST TRIAL** |
| | : | **MOTIONS** |
| Defendants. | : | |
| | : | |
| | : | |

Defendants Jason Kessler, Nathan Damigo, and Identity Evropa ("moving Defendants")
file the following post-trial motions pursuant to Civil Rules 50(B), 54, and 59, and the
Scheduling Order at docket entry 1496.

## I. **Conspiracy Claims**

In order to succeed on their federal conspiracy claims plaintiffs were required to prove
a defendant "entered into an agreement with a specific co-conspirator to engage in racially
motivated violence at the August 11th and 12th events." Sines v. Kessler, 324 F. Supp 3d 765,
783. Further, the plaintiffs were required to prove specifically what persons agreed to the
alleged conspiracy, the specific communications amongst the conspirators, and the manner in
which any such communications were made. Id. at 784 citing A Soc'y Without a Name, for
People without a Home, Millennium Future-Present v. Virginia, 655 F.3d 342, 347. (4th Cir.
2011).

As to plaintiffs' state law civil conspiracy claim, Virginia law holds that "there can be
no conspiracy to do an act that the law allows….. actions for …..civil conspiracy [will] lie

JXV-2_Page 441

only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious."

Dunlap v. Cottman Transmission Sys., LLC, 287 Va. 207, 215 (2014.)

Both state and federal conspiracies require that the damages sustained have been

legally "foreseeable" to the defendant. "The proximate cause of an event is that act or

omission, in the natural and continuous sequence, unbroken by an efficient intervening cause,

produces the event, and without which that event could not have occurred," Brin v. A Home

Come True, Inc., 79 Va. Cir. 33, 35 (2009). "A different case would arise if the substantive

offense committed by one of the conspirators was not in fact done in furtherance of the

conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the

ramifications of the plan which could not be reasonably foreseen as a necessary or natural

consequence of the unlawful agreement." Sines v. Kessler, 324 F. Supp. 3d 765, 795 (W.D.

Va. 2018). See also Docket entry 1461 at p.29, Final Jury Instruction 19.

An organization is not legally responsible for the actions of its agents,

officers, or employees if those persons were acting outside the course and scope of the

permissions to act the organization had given them. Colgate v. Disthene Group, Inc., 86 Va.

Cir. 218, 223 (2013). A corporate officer is "outside the scope" where he has an independent

or personal stake in the conspiracy. Buffalo Wings Factory, Inc. v. Mohd, 622 F. Supp. 2d

325, 335 (2007); See also Docket entry 1461 at p. 35 Final Jury Instruction 21-A.

Additionally, the Court has already found several activities the moving defendants

may have engaged in to be lawful. "[A]bstract advocacy of lawlessness is protected speech

under the First Amendment."); "[M]ere advocacy of the use of force or violence does not

remove speech from the protection of the First Amendment." Sines v. Kessler, 324 F. Supp.

3d 765, 802 (W.D. Va. 2018). [T]he constitutional guarantees of free speech and free press do

not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Id. at 803.

Indeed, the Court has already observed that it was the combination of the August 11th torchlight march *combined with* the violence around the statue that took the torchlight march outside the protection of the First Amendment. Sines, 324 F. Supp. at 801. Therefore, the torchlight march itself was lawful and non-actionable.

The plaintiffs' were required to "present specific facts that would allow a jury to reach a verdict that is based on more than mere speculation." Mettle v. CSX Transp. Inc., 2006 U.S. Dist. LEXIS 95611(Maryland District Court May 18, 2006).

Pursuant to Fed. R. Civ. P. 50(b), a district court may grant judgment notwithstanding the verdict if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party. Cline v. Wal-Mart Stores, 144 F.3d 294, 298 (4th Cir. 1998).

Plaintiffs' have failed to prove a conspiracy

*Nathan Damigo*

Plaintiffs evidence, as to unlawfully conspiring, against Nathan Damigo appears to consist of the following:

1. That he was friends with Richard Spencer and Spencer's friends and associates.[1]

2. That Mr. Damigo had weekly calls with Richard Spencer's friends and associates.[2]

3. That Mr. Damigo was present at Alt Right parties where planning for Unite the Right was discussed. [3]

---

[1] Trial Transcript Day 4 p.100.
[2] Trial Transcript Day 9 p.100.
[3] Trial Transcript Day 9 p.109.

3

4.   That Mr. Damigo asked for fake Antifa accounts to be set up. (Day 13 PX 0880.)

5.   That Mr. Damigo admitted that he and/or Identity Evropa were "working with other Alt
     Right groups as to August 11th and 12[th]. (Trial day 13 at p.176.)

6.   Videotape depositions, primarily those of Elliot Kline and Samantha Froelich.

7.   Other substantially similar evidence.

The above does not provide evidence that would allow the jury to find either
unlawful agreement or foreseeability of any acts that injured any plaintiff. First, there
is no evidence of what the contents of any communications Mr. Damigo was proven to
have was. Where evidence of contents was proven, it was innocuous such as "working
with other Alt Right groups." Second, the video depositions and other exhibits do not
implicate Damigo in anything more than having what the law considers "racial
animus" as well as being acquainted with other Alt Right personalities.

Indeed, witness Samantha Froelich admitted, during the portion of her video
deposition played on Trial day 17, that she never heard any plans calling for IE
members to engage in any unlawful violence at Unite the Right. Her previous video
testimony had established she was in a position, due to her relationships with Elliott
Kline and Richard Spencer, to have been aware of those plans if they existed.

Accordingly, Mr. Damigo is entitled to a directed verdict in his favor as to all
conspiracy claims.

_Identity Evropa_

Plaintiffs' claims of conspiracy against Identity Evropa ("IE")appear to depend
entirely on the activities of defendant Elliott Kline. Yet, the law does not allow for

liability if Mr. Kline was acting "outside the scope" of what IE authorized him to do or had his own personal stake in the conspiracy.

The plaintiffs' provided no evidence that IE ever authorized Mr. Kline to enter into an unlawful conspiracy. Moreover, Mr. Kline, but not IE or Mr. Damigo, was the subject of evidentiary sanctions and an adverse inference jury instruction. Lastly, unrefuted evidence in the case establishes that Mr. Kline was actually working, for his own purposes, with or for defendant Richard Spencer and not acting in the interests of IE. [4]

Accordingly, there is no evidence from which a jury could properly find IE liable for conspiracy.

*Jason Kessler*

Jason Kessler was, admittedly, a major organizer of the Unite the Right event and was physically present at relevant locations on August 11th and 12th 2017. Plaintiffs' case against Mr. Kessler appears to be centered on a series of exhibits Mr. Kessler was shown during his testimony. Specifically Mr. Kessler was shown exhibits regarding such rhetoric as "cracking skulls" and "Battle of Charlottesville."

But mere rhetoric is constitutionally protected if it does not amount to unlawful agreement or foreseeability. The evidence at trial showed that Mr. Kessler limited his plans for physical altercation to legitimate self defense. He was careful to include warnings that Antifa must start any fights or there could be no Battle of Charlottesville though he was confident Antifa could be relied on to give the Alt Right a legal reason to fight them. [5]

---

[4] See Trial day 9 pgs. 193-206 wherein defendant Spencer admits that E. Kline did in fact work for Spencer at least as a bodyguard; and trial day 17, p. 95 where Spencer admits that Kline "kissed my butt" and talked to Spencer "all the time". See also trial day 13 at p. 192-193.
[5] Trial Day 16 at pgs. 54, 86-87.

The plaintiffs' reliance on over the top Alt Right rhetoric falls short of proving an unlawful agreement or foreseeability as to any act that damaged any plaintiff. Accordingly, Mr. Kessler is entitled to a directed verdict as to all conspiracy claims.

## II. <u>Punitive Damages</u>

"If a punitive damages award is unconstitutionally excessive, it is [the court's] obligation to order a remittitur or award a new trial." *EEOC v. Fed. Express Corp.*<u>, 513 F.3d 360, 376 (4th Cir. 2008)</u>. Defendant must have "fair notice" of the possible amount of punitves. Butler v. Windsor 143 F. Supp. 3d 332. Punitives in an amount more than 4 times the compensatory damages is near the line of violating the Constitution, though there is no bright line rule mathematical rule as to punitives. State Farm Mutual v. Campbell 538 U.S. 408, 425.

Virginia law holds that "Because punitive damages are in the nature of a penalty, they should be awarded only in cases of the most egregious conduct. Willful and wanton negligence is the basis for the plaintiffs' claim for punitive damages against all three defendants. We recently defined willful and wanton negligence as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Griffin* v. *Shively*, 227 Va. 317, 321-22, 315 S.E.2d 210, 213 (1984).

We have decided a limited number of cases involving "willful and wanton" negligence. In *Griffin*, we found the evidence sufficient to create a jury issue of willful and wanton negligence where the defendant fired a gun in close proximity to a number of people in a relatively small room. 227 Va. at 322, 315 S.E.2d at 213. In *Friedman* v. *Jordan*, 166 Va.

JXV-2_Page 446

65, 68, 184 S.E. 186, 187 (1936), we said chasing a bicyclist with a car and running over him involved "willful or wanton" negligence. We indicated that driving a vehicle on the wrong side of a street in the face of approaching traffic might constitute wanton negligence in *Thomas* v. *Snow*, 162 Va. 654, 664, 174 S.E. 837, 839 (1934).

On the other hand, we have held no jury issue of willful or wanton negligence was created merely because an employer failed to ascertain that a prospective employee lacked the proper chauffeur's license to operate a non-owned truck. *Wallen* v. *Allen*, 231 Va. 289, 297, 343 S.E.2d 73, 78 (1986). No such issue was raised because of a rear-end collision caused by a defendant's failure to keep a proper lookout, [***58] even though that failure may have been caused in part by her consumption of alcohol. *Baker* v. *Marcus*, 201 Va. 905, 910, 114 S.E.2d 617, 621 (1960). Looking away from the road and down at the gearshift while driving a heavy truck at a speed of 35 to 40 miles an hour while approaching a curve did not present a jury question of willful or wanton negligence in *Boward* v. *Leftwich*, 197 Va. 227, 231, 89 S.E.2d 32, 35 (1955). We pointed out in *Morris* v. *Dame*, 161 Va. 545, 569-70, 171 S.E. 662, 670-71 (1933), that a violation of the reckless driving statute did not, of itself, establish willful or wanton negligence. We sustained a trial court in striking a claim of punitive damages arising out of an automobile manufacturer's negligent design of a parking gear and negligent failure to correct the defect or warn others of it in *Ford Motor Co.* v. *Bartholomew*, 224 Va. 421, 436-37, 297 S.E.2d 675, 683-84 (1982)."

Philip Morris, Inc. v. Emerson, 235 Va. 380, 407-08, 368 S.E.2d 268, 283 (1988).

Punitive damages must bear some reasonable relationship to the compensatory amount awarded. Id.

Virginia code 8.01-38.1 limits punitive damages to $350,000. Moreover, it appears

that the Supreme Court has not, since *State Farm,* approved an award of punitive damages greater than 526 to 1. See TXO v. Alliance Resources 509 U.S. 443 (1993.) Defendants were unable to locate a Virginia case approving punitive damages in a greater ratio than 53 to 1.

Defendants did locate a 9th Circuit employment law case that approved a ratio of 125,000 to 1 however that was in an employment law case.

Moreover, Virginia law requires more than zero compensatory (that is at least nominal damages) to even award any punitive damages. Zedd v. Jenkins, 194 Va. 704 Supreme Court March 9, 1953. However, the same Virginia case seems to mandate a new trial if the punitive award must be reduced below the statutory maximum.

As such, the Court must reduce the punitives awarded to plaintiffs Wispelwey and Sines to zero and order a new trial. The Court should further reduce the awards to all other plaintiffs to no more than 526 to 1.

### III. Fourth Claim, August 11th Torch March

The plaintiffs' fourth claim was a stand alone, non-conspiracy claim in favor of plaintiffs Willis and Romero only regarding injuries sustained at the torch march. The jury found in their favor and against, *inter alia*, moving Defendant Jason Kessler. The jury could not properly have done so as to Kessler however, as the only evidence of Mr. Kessler's activities on at the torch march established him engaging in First Amendment protected expressive activity.

Specifically, neither Willis or Romero claims to have seen or heard Mr. Kessler at the torch march. In addition, though defendant Cantwell showed video of the incident multiple times to both plaintiffs Willis and Romero, Mr. Kessler does not appear anywhere in those

JXV-2_Page 448

videos. There is no evidence Mr. Kessler ever referred to torches or lighter fluid as "self defense weapons".

Thus, as the Court has already found the torch march itself, without the violence at the rotunda, to be lawful activity, and since Mr. Kessler had nothing to do with the violence at the Rotunda, and since this fourth claim is not a conspiracy claim, then there is no evidence at all that would allow the jury to find against Mr. Kessler as to the torch march claim.

Accordingly, Mr. Kessler is entitled to a directed verdict as to the plaintiffs' fourth claim regarding the torch march injuries to plaintiffs Willis and Romero.

**IV. No Ratification by Kessler**

The plaintiffs claim that Mr. Kessler's tweet regarding the death of Heather Heyer constitutes ratification of that act. However, there is no evidence that Mr. Kessler belonged to any group whose actions Mr. Kessler could ratify. As such, it is legally impossible for the jury to find against Mr. Kessler on the basis of ratification. NAACP v. Claiborne Hardware 458 US 886, 887 (1982).

In conclusion, moving defendants are entitled to a directed verdict and/or a remittitur of punitive damages and/or a new trial as stated above.

Respectfully Submitted,

s/James E. Kolenich
James E. Kolenich
KOLENICH LAW OFFICE
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
(513) 444-2150
JEK318@gmail.com

s/Elmer Woodard
Elmer Woodard

5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

*Trial Attorneys for Jason*
*Kessler,Nathan Damigo, and*
*Identity Evropa*

## CERTIFICATE OF SERVICE

I certify the above was served on JANUARY 7, 2021 on all ECF participants and that partiesrequiring service by other means were served as follows:

Robert Ray
*azzmador@gmail.com*
Vanguard America c/o Dillon Hopper
*dillon_hopper@protonmail.com*
Elliott Kline *eli.f.mosley@gmail.com*
*deplorabletruth@gmail.com*Matthew Heimbach
*matthew.w.heimbach@gmail.com*
Richardspencer@gmail.com
 Christopher Cantwell
*#00991-509*
*USP Marion*
*4500 Prison*
*Rd.*
*PO Box 2000*
*Marion IL 62959*

Respectfully Submitted,


s/    James E. Kolenich

JXV-2_Page 450

# JOINT EXHIBIT 11

IN THE UNITED STAES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

**ELIZABETH SINES ET AL.**
:
Case No. 3:17-CV-00072
:
Plaintiffs,
:
(Judge MOON)
:
(Magistrate Judge HOPPE)
v.
:
:
**JASON KESSLER ET AL.**
:
:
<u>DEFENDANTS' REPLY BRIEF AS</u>
<u>TO PUNITIVE DAMAGES</u>
Defendants.
:
:
:
:

Defendants Jason Kessler, Nathan Damigo, and Identity Evropa ("moving Defendants"), through counsel, file the following reply to plaintiffs' *Opposition to Defendants' Motions Challenging the Punitive Damages award* ECF 1572.

---

Plaintiffs have submitted an academic treatise masquerading as a legal brief in support of their punitive damage argument. The issue is, however, not nearly as complex as plaintiffs make it out to be and their arguments must ultimately fail in the face of existing case law.

*First,* the plaintiffs have utterly ignored the well-known distinction between compensatory and punitive damages. "[F]or a plaintiff's losses is the function of compensatory ..... damages." *Doe v. Isaacs, 265 Va. 531, 539(2003).* It is well settled that "punitive damages are something in addition to full compensation, and something *not given as plaintiff's due*." *id. at 539.* "Exemplary damages are something in addition to full compensation, and something *not given as plaintiff's due*, but for the protection of the public...." *Zedd v. Jenkins 194 Va. 704, 707 (1953).* Accordingly, the plaintiffs' argument regarding "rights that are separate and distinct

1

under the governing law"[1] fails as the governing law of Virginia holds that punitive damages are "not the plaintiff's due."

    *Second,* it is notable that plaintiffs' have cited not one single case from Virginia or the 4th Circuit that holds they are each entitled to their own individual punitive damages cap. The available case law is contrary to plaintiffs' position. The 4th Circuit held, in interpreting Virginia's punitive damages cap:

> "We find no ambiguity in the instant statute and conclude that its plain meaning dictates that the cap on punitive damage awards *applies to the action as a whole, and not to each defendant.* <u>See Bray v. Brown, 258 Va. 618, 521 S.E.2d 526, 527-28 (Va. 1999)</u> (stating that courts in Virginia apply the plain meaning of an unambiguous statute). Because the first sentence in the statute refers to "the total amount awarded for punitive damages against all defendants," the reference in the second sentence to "the total amount awarded for punitive damages," absent any further clarification, must refer to the "total amount" discussed in the previous sentence. Further, even without the "against all defendants" phrase, the statute refers to the "total amount awarded" "in any action." Giving this language its plain meaning, the statute mandates that the entirety of the punitive damages awarded in the action amount to no more than $ 350,000. <u>*Al-Abood v. Elshamari, 217 F.3d 225, 237 (4th Cir. 2000)*</u>

The <u>*Al-Abood*</u> Court did not misread Virginia law on the subject:

" After reviewing [the punitive damages cap]statute, the court concludes that *it applies to the entire lawsuit rather than to each individual defendant.* The first sentence describes "all defendants found to be liable," and the second sentence speaks to the "total amount awarded for punitive damages." Had the General Assembly intended for the punitive damage cap to apply to each defendant, it would have added or substituted the words

---

[1] ECF 1572 at p.17

"each defendant" in the two sentences." *Foster v. Wintergreen Real Estate Co., 81 Va. Cir. 353, 364 (Cir. Ct. 2010).*

While it is true that *Al-Abood* was not dealing with a multiple plaintiff case, *Foster* was. see *Foster 81 Va. Cir. 353 at Summary and passim* describing the Foster "plaintiffs" in the plural, yet ordering punitives to be reduced to $350,000 for the whole case if the jury exceeded that amount. *Foster at 364.* In any event, the above law regarding punitive damages not being "plaintiff's due" combined with the holding in state and federal courts that the Virginia punitive damages cap applies to the case "as a whole", and not per defendant, makes the conclusion urged by defendants unavoidably obvious.

*Third,* the plaintiffs' argument that the punitive cap should not apply to them because their case is special has been tried before in a similar fashion and failed in a Virginia Circuit court:

> "The provisions of § 8.01-38.1 of the Code of Virginia are clear and are explicit and have been repeatedly upheld by the Federal Courts and inferentially by the Supreme Court of Virginia. See, Wackenhut Applied Technologies v. Sygnetron, 979 F.2d 980 (4th Cir. 1992);   see also Etheridge v. Medical Ctr. Hosps., 237 Va. 87, 376 S.E.2d 525 (1989).
>
> The Plaintiff's response to this motion is a broadside attack against the constitutionality of the Virginia statutory cap on punitive damages. It ranges from an allegation that the punitive damage cap violates the United States Constitution to the fact that the punitive damage cap violates the separation of powers doctrine, the equal protection clause of the United States and Virginia Constitutions, and the fact that the punitive damage cap should not be applied in this case because the Defendants allegedly used a fraudulent corporation in an unsuccessful attempt to shield themselves from liability.
>
> Although the Plaintiff makes every argument that could be made to challenge the cap and cites a

3

number of non-Virginia authorities in support of his position, it is the position of this Court that the punitive damages cap set forth in § 8.01-38.1 is constitutional and valid, and it requires the Court to reduce the amount of total punitive damages awarded in this case to $ 350,000.00. Therefore, the punitive damage award will be so reduced." *Huffman v. Beverly Cal. Corp., 42 Va. Cir. 205, 211-12 (Cir. Ct. 1997*)

*Fourth,* the plaintiffs' argument regarding joint and several liability also misses the mark. Virginia law requires at least a nominal compensatory damage award as a prerequisite to any award of punitive damages. *Zedd v. Jenkins 194 Va. 704, 708 (1953).* No moving defendant was sued under Count V and therefore not even nominal damages were awarded against them as to Count V. Only Jason Kessler was sued under Count IV and therefore not even nominal damages were awarded against IE or Damigo on Count IV.

To be explicit, the plaintiffs' operative complaint specifically identifies which defendants are sued in each cause of action. The defendants have spent over four years litigating this case only as to the claims they were actually sued under. The plaintiffs themselves made the tactical decision to show no faith in their conspiracy claims and bring stand-alone non conspiracy claims as well. Plaintiffs cannot now be permitted to move the goal posts and have any damages awarded based in any part on claims a defendant was not even sued for.

The punitive to compensatory ratio calculation must therefore be made based only on claims where a defendant was actually found liable for compensatory damages.

In conclusion, the Court must reduce the punitive damage award to no more than $350,000 for the whole case and should reduce it lower than that based on the law and argument above and in defendants' previous briefs.

JXV-2_Page 455

Respectfully Submitted,

s/James E. Kolenich
James E. Kolenich
KOLENICH LAW OFFICE
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
(513) 444-2150
JEK318@gmail.com

s/Elmer Woodard
Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

*Trial Attorneys for Jason Kessler,Nathan Damigo, and Identity Evropa*

## CERTIFICATE OF SERVICE

I certify the above was served on MAY 5, 2022 on all ECF participants and that parties requiring service by other means were served as follows:

Robert Ray
*azzmador@gmail.com*

Vanguard America c/o Dillon Hopper
*dillon_hopper@protonmail.com*

Elliott Kline *eli.f.mosley@gmail.com*
*deplorabletruth@gmail.com*

Christopher Cantwell
*#00991-509*

*USP Marion*
*4500 Prison*
*Rd.*
*PO Box 2000*
*Marion IL 62959*

Respectfully Submitted,

s/    James E. Kolenich

# JOINT EXHIBIT 12

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
12/30/2022
LAURA A. AUSTIN, CLERK
BY: s/ C. Amos
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

ELIZABETH SINES, CHELSEA
ALVARADO, THOMAS BAKER,
MARISSA BLAIR, MARCUS MARTIN,
APRIL MUÑIZ, NATALIE ROMERO, and
SETH WISPELWEY,

*Plaintiffs*,

v.

JASON KESSLER, RICHARD SPENCER,
CHRISTOPHER CANTWELL, JAMES
ALEX FIELDS, JR., VANGUARD
AMERICA, ANDREW ANGLIN,
MOONBASE HOLDINGS, LLC, ROBERT
AZZMADOR RAY, NATHAN DAMIGO,
ELLIOTT KLINE (a/k/a ELI MOSELY),
MATTHEW HEIMBACH, MATTHEW
PARROTT (a/k/a DAVID MATTHEW
PARROTT), TRADITIONALIST
WORKER PARTY, MICHAEL HILL,
MICHAEL TUBBS, LEAGUE OF THE
SOUTH, JEFF SCHOEP, NATIONAL
SOCIALIST MOVEMENT,
NATIONALIST FRONT, AUGUSTUS
SOL INVICTUS, FRATERNAL ORDER
OF THE ALT-KNIGHTS, LOYAL WHITE
KNIGHTS OF THE KU KLUX KLAN, and
EAST COAST KNIGHTS OF THE KU
KLUX KLAN (a/k/a EAST COAST
KNIGHTS OF THE TRUE INVISIBLE
EMPIRE),

*Defendants.*

CASE NO. 3:17-cv-00072

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This matter is before the Court on numerous post-trial motions arising out of Plaintiffs'

injuries suffered during the Unite the Right rally in Charlottesville on August 11 and 12, 2017.

JXV-2_Page 459

The jury found Defendants liable for their conduct planning and participating in Unite the Right, including finding all Defendants liable for Virginia state law civil conspiracy; finding Jason Kessler, Richard Spencer, Elliott Kline, Robert "Azzmador" Ray, Christopher Cantwell, and James Alex Fields, Jr., liable for racial, religious, or ethnic harassment or violence; and finding Fields liable for assault and battery and intentional infliction of emotional distress.

The Court affirms the jury verdict finding all Defendants liable, reduces the punitive damages award as compelled by the Virginia statutory cap on punitive damages, and otherwise affirms the jury verdict.

### **Standard of Review**

Rule 50(b) of the Federal Rules of Civil Procedure permits a party to bring a renewed motion for judgment as matter of law after the jury has returned its verdict. Fed. R. Civ. P. 50(b). "When a jury's verdict has been returned, judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 610 (4th Cir. 2021) (quoting *Int'l Ground Transp. v. Mayor & City Council of Ocean City, Md.*, 475 F.3d 214, 218–19 (4th Cir. 2007)). The court "may not make credibility determinations or weigh the evidence," as those "are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citation omitted).

Rule 59 permits a party aggrieved by a jury verdict to request a new trial. "A district court may grant a new trial only if the verdict: (1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." *E.E.O.C. v. Consol.*

JXV-2_Page 460

*Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017) (citing *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)). A district court's decision on a Rule 59 motion is a discretionary one. *See Consol. Energy*, 860 F.3d at 145.

## Trial

The jury trial in this case lasted more than four weeks—comprising twenty-two trial days. The nine Plaintiffs proceeding to trial were represented by numerous firms and dozens of lawyers, seeking to try their claims against twenty-three Defendants, of which thirteen appeared at trial and presented an active defense. Separate defense counsel represented five different groups of Defendants. Two defendants (Christopher Cantwell and Richard Spencer), represented themselves *pro se*. Two defendants (Cantwell and James Alex Fields, Jr.) were incarcerated at the time of trial—Cantwell appeared in person in court with Marshals present, while Fields was represented in person by counsel.

Nearly 50 motions in *limine* or other pretrial motions were filed and resolved by this Court and the Magistrate Judge, in addition to dozens more filings relating to the trial. The parties admitted 917 exhibits during trial, and 35 witnesses were called to testify, or depositions played to the jury, and some counsel examined witnesses remotely by videoconference. In addition, as this trial was being conducted in the midst of the COVID-19 pandemic, the Court issued a number of directives related to preventing the risk of spread of the virus. These included providing proof of vaccination or negative tests and limiting the persons in the Courthouse and Courtroom—measures that appear to have been successful. Given the many challenges inherent in conducting a trial of this scope and magnitude at that unique point in time, the Court considers that the collegiality of counsel and their efforts to present their cases in a constructive and

efficient manner were indispensable to completing this trial. After three days of deliberations, the jury returned its verdict.

## Jury Verdict

The jury returned a verdict finding that Plaintiffs had proven each element of their Virginia state law civil conspiracy claim against all Defendants, including that each Defendant was a member of that conspiracy, and therefore finding all Defendants liable for Virginia state law civil conspiracy (Count III). Dkt. 1478 at 3. The jury did not reach a verdict on Plaintiffs' claim that Defendants conspired to commit racially motivated violence in violation of 42 U.S.C. § 1985(3) (Count I), or Plaintiffs' claim that Defendants had knowledge of a conspiracy under § 1985(3) and failed to prevent it, in violation of 42 U.S.C. § 1986 (Count II). Dkt. 1478 at 1–2. On Count III, the jury awarded nominal damages to Plaintiffs (except Elisabeth Sines and Seth Wispelwey) and awarded punitive damages of $500,000 against each individual Defendant and $1,000,000 against each organizational Defendant. *Id.* at 5.

The jury also returned a verdict in favor of Plaintiffs Natalie Romero and Devin Willis, finding Defendants Jason Kessler, Richard Spencer, Elliott Kline, Robert "Azzmador" Ray, and Christopher Cantwell liable for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). Dkt. 1478 at 6–7. On Count IV, the jury awarded Plaintiffs Romero and Willis each $250,000 in compensatory damages, and awarded $200,000 in punitive damages each against Kessler, Spencer, Kline, Ray and Cantwell. *Id.* at 6. On Count IV, the jury also found Defendant James Alex Fields, Jr., liable for violating § 8.01-42.1, but did not assess any compensatory or punitive damages against him on that Count specifically. *Id.* at 7.

The jury returned a verdict in favor of Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Marissa Blair and Marcus Martin, finding Defendant Fields liable for assault and battery

JXV-2_Page 462

(Count V), and determined total compensatory damages to be $803,277. Dkt. 1478 at 8.[1] On

Count V, the jury further assessed $6,000,000 in punitive damages against Fields. *Id.*

Finally, the jury returned a verdict in favor of Plaintiffs Romero, Muñiz, Baker, Sines,

Blair, and Martin, finding Defendant Fields liable for intentional infliction of emotional distress

(Count VI), and calculating total compensatory damages in the amount of $701,459. Dkt. 1478

at 9.[2] On Count VI, the jury further assessed $6,000,000 in punitive damages against Fields.

## — LIABILITY —

### Jason Kessler, Nathan Damigo, and Identity Evropa

Defendants Jason Kessler, Nathan Damigo, and Identity Evropa argue in their post-trial

motions that they are entitled to a directed verdict on Plaintiffs' conspiracy claims. Dkt. 1522

at 1–6. They argue that Plaintiffs failed to prove their participation in any unlawful conspiracy.

*Id.* Defendant Kessler separately contends that he is entitled to a directed verdict on Count IV. In

his view, Plaintiffs' evidence of his activities at the torch march on August 11, 2017, established

nothing more than his "engaging in First Amendment protected expressive activity," and he says

he "had nothing to do with the violence at the Rotunda" on that date. *Id.* at 8–9.

The jury heard not only substantial but overwhelming evidence that Kessler, Damigo,

Identity Evropa, and their codefendants planned for months to provoke Antifa and its followers

into a violent battle at Unite the Right—which they called the "Battle of Charlottesville." And

---

[1] The jury found Defendant Fields liable for the following compensatory damages on
Count V: Romero ($217,715), Muñiz ($108,000), Baker ($318,575), Blair ($2,000), and Martin
($156,987). The jury did not award Sines any compensatory damages specifically on this count.
Dkt. 1478 at 8.

[2] The jury found Defendant Fields liable for the following compensatory damages on
Count VI: Romero ($155,715), Muñiz ($50,000), Baker ($246,757), Sines ($50,000), Blair
($100,000), and Martin ($98,987). Dkt. 1478 at 9.

Filed 05/08/23
Doc 100

they strategized how any punch thrown by an Antifa supporter would give them the chance to respond with brutal and overwhelming violence, as the Unite the Right supporters would be prepared to do battle in helmets, shields, and body armor, and armed with weapons. Upon its review of the evidence and the parties' arguments, the Court concludes that substantial evidence and a legally sufficient evidentiary basis supported the jury's verdict on Count III finding Kessler, Damigo, and Identity Evropa liable for Virginia state law civil conspiracy, and further that they are not entitled to a directed verdict on Counts I or II. The Court also concludes that substantial evidence and a legally sufficient evidentiary basis supported the jury's verdict finding Kessler liable for racial, religious, or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1 on Count IV.

### A.  Nathan Damigo

Defendant Nathan Damigo argues that Plaintiffs have failed to prove his participation in an unlawful conspiracy, and so he is entitled to a directed verdict as to all the conspiracy claims. Dkt. 1522 at 3–4. The Court disagrees. There is more than substantial evidence to support the jury's verdict finding Damigo liable for Virginia state law civil conspiracy, and Damigo is not entitled to a directed verdict on any of the conspiracy counts.

In Virginia, common law civil conspiracy "consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *CBS v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995); *The Country Vintner,  Inc. v. Louis Latour, Inc.*, 634 S.E.2d 745, 751 (Va. 2006) (same); Dkt. 1461 at ECF 38–40 (jury instructions). At the outset, the Court notes that Damigo has conceded that he (1) "was friends with Richard Spencer and Spencer's friends and associates," (2) "had weekly calls with Richard Spencer's friends and associates," (3) "was present at Alt Right parties where planning for Unite the Right was discussed," (4) "asked for

fake Antifa accounts to be set up," and (5) "admitted that he and/or Identity Evropa were working with other Alt Right groups as to August 11th and 12th." *Id.* at 3–4 (grammatical marks omitted). However, Damigo contends that this and other "substantially similar evidence" is not evidence that "would allow the jury to find either unlawful agreement or foreseeability of any acts that injured any plaintiff." *Id.* at 4. He argues that the content of his communications was either not proven or was "innocuous[,] such as 'working with other Alt Right groups.'" *Id.* He also cites testimony from Samantha Froelich that "she never heard any plans calling for [Identity Evropa] members to engage in any violence at Unite the Right." *Id.*

The facts that Damigo concedes are far from innocuous and do much work toward establishing the requisite factual basis for the conspiracy finding. And, significantly, Damigo overlooks other substantial evidence in the record from which the jury could find both his participation in an unlawful conspiracy and foreseeability of the acts that injured Plaintiffs. Damigo was the founder and the leader of Identity Evropa in the Summer of 2017—the period when Unite the Right was being planned. Dkt. 1419 (Nov. 10) 166:3-4, 185:6-8, 211:22-24; Dkt. 1397 (Nov. 4) 35:24-25. Damigo testified that he considered himself to be a white supremacist and that in 2017 he was advocating for "a white ethnostate." Dkt. 1419 (Nov. 10) 158:2-9. In fact, Damigo founded Identity Evropa to promote a white ethnostate. Dkt. 1419 (Nov. 10) 166:3-7. Only "white people of European heritage" were allowed to join Identity Evropa—Black and Jewish persons would be excluded. *Id.* at 166:14-23. Damigo also testified that he believed violence might be necessary to secure that white ethnostate. Dkt. 1419 (Nov. 10) 158:20–159:16.

Damigo communicated regularly with the lead figures in the "Alt-Right" and white supremacist groups involved in planning Unite the Right. For instance, Damigo and Richard Spencer communicated regularly in the Summer of 2017, including about Unite the Right.

Filed 05/08/23

Doc 100

Dkt. 1397 (Nov. 4) 100:12–101:5. Jason Kessler invited Damigo to Unite the Right, and by July 2017, Damigo agreed to attend and further agreed to promote Unite the Right to Identity Evropa members. *Id.* at 101:16-18; Dkt. 1419 (Nov. 10) 181:23–182:5, 184;10-18. Damigo was well known to Spencer, Kessler, and the other organizers of Unite the Right. Damigo had gained some notoriety for violence on account of the "Battle of Berkley" a few months earlier, in which video of Damigo punching a woman and knocking her down at that event became, in Spencer's words, something of an "iconic moment" for the Alt-Right. Dkt. 1397 (Nov. 4) 48:18–50:1.

Identity Evropa members were not permitted to engage in activism without Damigo's express permission, or that of Elliott Kline—then in Identity Evropa leadership—who was heavily involved with Kessler in planning Unite the Right. Dkt. 1419 (Nov. 10) 185:6-25. Damigo gave Identity Evropa members permission to attend Unite the Right, and some did. Dkt. 1419 (Nov. 10) 196:7-11. Indeed, Damigo testified that "[a] lot of members" of Identity Evropa were involved with organizing Unite the Right. *Id.* at 195:12-16. Damigo personally approved equipment for Identity Evropa members to wear at Unite the Right—including shields, helmets, and gloves. Dkt. 1419 (Nov. 10) 196:12-22.

In addition, Damigo was the owner and creator of the Identity Evropa server on Discord, which Identity Evropa members often used to communicate about Unite the Right or other topics in the Summer of 2017. Dkt. 1419 (Nov. 10) 167:2-21. Everyone on that Discord server was an Identity Evropa member. *Id.* at 204:13-16. Later, on August 12, 2017, Identity Evropa members took to Discord to trumpet what they saw was akin to a battlefield victory: "Excellent work out there tonight @everyone. This is just the beginning. … but the war goes on." PX 892; *see also* PX 891 ("Today we won and took control of the narrative."); PX 844 ("Honestly, this is a huge victory."); PX 848 ("… this is a great organization." "I am proud to be a part of it. Hail victory."); Dkt. 1419 (Nov. 10) 204:10–208:13. In the wake of Unite the Right, Damigo also

said that he believed that it was a "huge success." Dkt. 1419 (Nov. 10) 203:21-23. Just days after Unite the Right, Damigo exchanged texts with another member of Identity Evropa, in which Damigo directed that the Discord server be shut down, and "reminding" Identity Evropa members "not to talk to the police." Dkt. 1419 (Nov. 10) 209:2-18; PX 1851 (Patrick Casey: "Should we shut down the intel server? Should I issue an announcement reminding our members not to talk to the police?" Nathan Damigo: "Yes, on both counts."). In other words, the jury also had before it some evidence that Damigo sought to conceal Identity Evropa's role in planning of and participation in Unite the Right—the type of behind-the-scenes evidence which often isn't uncovered in a conspiracy.

Damigo's position appears to be that the law required direct evidence of an explicit or formal agreement to conspire. But that's not the law, and Damigo cited no cases supporting such a proposition. Indeed, even in criminal cases, direct proof of an explicit agreement is not required, and circumstantial evidence may be used to establish a conspiracy. *E.g.*, *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc) (explaining that a conspiracy is often "clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement"); *Floyd v. Commonwealth*, 249 S.E.2d 171, 174 (Va. 1978) (explaining that "a conspiracy may be proved by circumstantial evidence," and that "from the very nature of the offense, it often may be established only by indirect and circumstantial evidence"); Dkt. 1461 at ECF 7, 21–22, 40 (jury instructions). Ample evidence supported the jury's conclusion that Damigo conspired with his codefendants. The jury certainly could reasonably find that Damigo was liable for Virginia state law civil conspiracy in Count III. Similarly, such evidence further undermines any argument that Damigo was entitled to a directed verdict on Counts I or II.

Finally, Damigo argues that there was no evidence that any act of violence committed by the co-conspirators would be foreseeable by him. Dkt. 1522 at 3–4. The Court disagrees. Such

violence was certainly foreseeable. Indeed, the communications between the Unite the Right organizers were replete with candid statements by Damigo and others in Identity Evropa, as well as the other Unite the Right organizers, demonstrating that they shared expectations of, hoped for, planned for, and purposefully sought to instigate violence at Unite the Right—including discussing whether someone could drive a car through a crowd of demonstrators that might be blocking the street. *See, e.g.*, PX 892 (posting on Identity Evropa Discord server that "the war goes on"); PX 882 (Damigo posting on Identity Evropa Discord server that "[t]he lines between politics and violence is blurring. Welcome to 4th generational warfare."); PX 727 (Kline, subsequent head of Identity Evropa, posting on Discord: "I think we are gonna see some serious brawls at cville next month too and we'll see some blood on some of these white polos lol"); *see also* PX 3114 (Spencer texting Kline, "This is going to be a violent summer."); PX 1455 (Kessler texting Spencer: "[W]e're raising an army my liege. For free speech, but the cracking of skulls if it comes to it"); PX 1119 ("Is it legal to run over protestors blocking roadways?"); PX 1144 (Discord post of image of a tractor, captioned as a "multi-lane protestor digestor"); *id.* (Discord post of image of buses driving through crowds, writing "This will be us"); PX 2644 (Cantwell, stating: "Blocking traffic is not a peaceful protest, and every person who reminds you of that without using his car, is giving you more slack than you fucking deserve.").

For these reasons, the Court will deny Damigo's motion for a directed verdict on Plaintiffs' conspiracy claims. *See* Dkt. 1522 at 3–4.

### B. Identity Evropa

Defendant Identity Evropa argues that "there is no evidence from which a jury could properly find [Identity Evropa] liable for conspiracy." Dkt. 1522 at 4–5. In its view, Plaintiffs' conspiracy claims "depend entirely on the activities of defendant Elliott Kline." *Id.* at 4. But, Identity Evropa contends, "the law does not allow for liability if Mr. Kline was acting 'outside

the scope' of what [Identity Evropa] authorized him to do or had his own personal stake in the conspiracy." *Id.* at 4–5. Identity Evropa argues that Kline "was actually working[ ] for his own purposes, with or for defendant Richard Spencer," and not acting in the organization's interests. *Id.* at 5. Identity Evropa also notes that Kline, rather than Identity Evropa or Damigo, was the subject of evidentiary sanctions and an adverse jury instruction. *Id.* Accordingly, Identity Evropa contends, "there is no evidence from which a jury could properly find [it] liable for conspiracy." *Id.* The Court disagrees, the law supports the jury's finding of liability against Identity Evropa for conspiracy, and substantial evidence supported the verdict.

An organization can be held liable for its own tortious conduct. *See Dana v. 313 Freemason*, 587 S.E.2d 548, 553 (Va. 2003) ("Thus, it is axiomatic that when a corporation causes injury as a result of an unlawful action, it is the corporation that is directly liable for any judgment obtained against it by the injured party."). In addition, the actions of Damigo (Identity Evropa's then-leader) and Elliott Kline (Identity Evropa's subsequent leader and in the leadership at the time of Unite the Right), may result in personal tort liability in their own right. *See Borg v. Warren*, 545 F. Supp. 3d 291, 325 (E.D. Va. 2021) (quoting *In re Ellison*, 296 F.3d 266, 271 (4th Cir. 2002) ("And while an officer of a corporation is in no way personally liable for corporate torts solely on account of his corporate position, where the officer actually participates in or otherwise sanctions the tortious acts, personal liability may lie.")). And Damigo's and Kline's conduct may result in liability to the organization for their torts, including intentional torts, under traditional principles of vicarious liability and *respondeat superior*. *See Roughton Pontiac Corp. v. Alston*, 372 S.E.2d 147, 149 (Va. 1988).

With these principles in mind, Identity Evropa's arguments lack force that it can't be held liable for Kline's actions because there was "no evidence that [it] ever authorized Mr. Kline to enter into an unlawful conspiracy," or that Kline was acting "for his own purposes" or on

11

Spencer's behalf. Dkt. 1522 at 5. Put simply, ample evidence in the record demonstrates that Kline *was* acting on behalf of Identity Evropa and within the scope of its authority in planning Unite the Right. In 2017, Kline was not only a member but a leader of Identity Evropa. Dkt. 1419 (Nov. 10) 184:19-21. During that same "planning period" for Unite the Right, Damigo was "the leader" of Identity Evropa. *Id.* at 185:3-8. And Damigo testified that he *delegated to Kline* authority to "approve activism" for Identity Evropa and for its members, *id.* at 185:15-21; that he explained to Kline what was acceptable and what wasn't in terms of activism, *id.* at 185:22–186:3; that he knew that Kline was not only working with Kessler to organize Unite the Right, but was "very, very involved with Kessler on it," *id.* at 186:4-10; that he relied on Kline for any information involved with making decisions about Identity Evropa participating in Unite the Right, *id.* at 186:11-25; that he told Kessler to talk to Kline and that Kline would fill him (Damigo) in about Unite the Right, *id.* at 190:7-13; and that he worked to get Kline on Identity Evropa's payroll, *id.* at 188:15–189:12. In addition, evidence in the record from the codefendants showed that Kline and Damigo were Identity Evropa's representatives coordinating on its behalf with other organizations in planning Unite the Right. *See* Dkt. 1431 (Nov. 15) 97:21–98:2 (Kessler describing that Kline was Identity Evropa's representative on Discord chat planning Unite the Right). In view of this and other substantial evidence that Kline was acting on behalf of Identity Evropa in the planning of Unite the Right and lacking any contrary evidence,[3] the Court rejects Identity Evropa's unsupported argument that Kline was acting outside the scope of

---

[3] Identity Evropa's suggestion that Kline was acting on behalf of Spencer rather than Identity Evropa is unsupported by the record evidence. *See* Dkt. 1522 at 5 n. 4. The testimony cited in support of the assertion does not establish that Kline *was* acting on behalf of Spencer. Nor does it tend to show that he *was not* acting on behalf of Identity Evropa. In any event, even if there were a conflict of evidence on the point—and there is not—it is not such evidence as would *compel* a conclusion that Kline was acting on his own behalf rather than on behalf of Identity Evropa.

his authority.[4] Moreover, evidence in the record substantiated that Damigo also spoke for the organization and operated with its authority. Damigo himself testified that because he was "the founder of the organization," "pretty much anywhere [he ] went … it was generally considered [that he] was representing the organization." Dkt. 1419 (Nov. 10) at 168:3-11.

Substantial evidence in the record further supported the jury's conclusion that Identity Evropa as an organization conspired with the other Defendants and is thus liable under Count III, even aside from Kline and Damigo. For instance, it wasn't just Kline and Damigo, but "[a] lot of members" of Identity Evropa "were involved with the organizing" of Unite the Right. Dkt. 1419 (Nov. 10) 195:12-16.[5] Identity Evropa members planned their participation in Unite the Right on Discord. *See id.* at 167:2-21. A "detachment of fighters" from Identity Evropa showed up at Unite the Right on August 12, 2017. *See* Dkt. 1413 (Nov. 9) 154:15–155:18. (Damigo had personally approved the use of shields, helmets, and gloves for Identity Evropa members at Unite the Right. Dkt. 1419 (Nov. 10) 196:12-22.) After Unite the Right, Identity Evropa members took to Discord to celebrate the "huge victory," PX 844, and for example, cheering "[h]ail Nathan [Damigo]," "[t]his is a great organization," "I am proud to be a part of it. Hail victory," PX 848, but cautioning that "[t]his is just the beginning," and "the war goes on." PX 892; *see also* PX 846 (celebrating their "victory").

---

[4] *Cf. BellSouth Servs.*, 453 S.E.2d at 265 ("It is well settled that, when an agency relationship has been proven, the burden is on the principal to show that the agent was not acting within the scope of his authority when he committed the acts complained of, and, if the evidence leaves the question in doubt, it becomes an issue for determination by a jury.").

[5] In addition, Damigo testified that *Kline* was "very involved" as one of the primary organizers. Dkt. 1419 (Nov. 10) 195:17-20. And Spencer testified that he and *Damigo*, among others, communicated regularly in the summer of 2017 about Unite the Right. *See* Dkt. 1397 (Nov. 4) 100:12–101:5.

JXV-2_Page 471

In sum, there is substantial evidence in the record to demonstrate that Identity Evropa, as well as its then leader Damigo and its future leader Kline entered into the conspiracy, all supporting the jury's finding Identity Evropa was liable on Count III. The Court rejects Identity Evropa's arguments to the contrary.

### C.  Jason Kessler

Defendant Kessler first challenges the jury's verdict finding him liable for Virginia state law civil conspiracy. Dkt. 1522 at 5–6. Kessler concedes that he was "a major organizer of the Unite the Right event," and he "was physically present at relevant locations" on August 11–12, 2017. Dkt. 1522 at 5. But he argues that his "mere rhetoric is constitutionally protected if it does not amount to unlawful agreement or foreseeability," and contends that "[t]he evidence at trial showed that [he] limited his plans for physical altercation to legitimate self defense." *Id.* In Kessler's telling, "[h]e was careful to include warnings that Antifa must start any fights or there could be no Battle of Charlottesville," and "he was confident Antifa could be relied on to give the Alt Right a legal reason to fight them." *Id.* at 5. Kessler argues that Plaintiffs failed to prove any "unlawful agreement or foreseeability as to any act that damaged any plaintiff," and thus contends that he "is entitled to a directed verdict as to all conspiracy claims." *Id.* at 5–6. Because there was more than substantial evidence supporting the jury's verdict finding Kessler liable for Virginia state law civil conspiracy, and because Kessler is not entitled to a directed verdict on any conspiracy count, the Court rejects Kessler's arguments.

Kessler concedes he was "a major organizer" of Unite the Right Dkt. 1522 at 5. And substantial evidence supported Kessler's central role organizing Unite the Right. Dkt. 1431 (Nov. 15) 50:5-11. Indeed, many of his codefendants testified that Kessler was *the* organizer or a

14

Filed 05/08/23   Document 1929000   Case 1929000   Doc 100

*lead* organizer of Unite the Right, along with Elliott Kline.[6] During the run-up to the rally and at the rally, Kessler had a prominent and highly visible position. Significantly, on August 11, 2017, Kessler, along with Spencer, Kline, and Cantwell, led hundreds wielding lit tiki torches and chanting "You will not replace us," "Jews will not replace us," "Blood and soil," and "Sieg Heil,"[7] through University of Virginia grounds up to the Rotunda and down to the Thomas Jefferson statue where the marchers surrounded counter-protestors (including Plaintiffs Romero and Willis) where they were prevented from escaping, pepper sprayed, and subjected to racist insults, before they were finally able to flee to safety. *See, e.g.*, PX 2348, 2676; Dkt. 1431 (Nov. 15) 121:4–126:16.

Unite the Right was the culmination of substantial preparations by Kessler and his coordination with various Alt-Right and white supremacist organizations. The online communications platform Discord was a focal point for much of the Unite the Right planning. Kessler served as event coordinator and moderator for the Unite the Right server on Discord; as such, he had the ability to remove members from Discord chats and to ban anyone from posting. Kessler was on the Unite the Right Discord server every day from June 7 to August 11, 2017. *See* Dkt. 1431 (Nov. 15) 61:3–62:3.

For Kessler, violence would be a central feature of Unite the Right. He sought to organize a repeat of the "Battle of Berkeley"—violent clashes that had taken place in Berkeley,

---

[6] *See, e.g.*, Dkt. 1419 (Nov. 10) 221:20-22 (Spencer: "Who, to your knowledge, was the organizer of … Unite the Right …?" Damigo: "That would be Kessler."); Dkt. 1401 (Nov. 10) 179:24 – 180:1 (Spencer: "To your understanding, who was the chief organizer of the Unite the Right rally?" Dr. Michael Hill: "Jason Kessler."); Dkt. 1413 (Nov. 9) 216:6-7 (Spencer: "[W]ho was the organizer of Unite the Right?" Matthew Parrott: "On paper, it was Mr. Kessler."); Dkt. 1428 (Nov. 12) 197:22-24 (Q. "And you considered Mr. Kessler to be one of the organizers of the rally, correct?" Jeff Schoep: "Correct.").

[7] Kessler knew these chants were offensive to Jewish persons. *Id.* at 130:21–131:5.

15

Filed 05/06/23   Doc 1442-905a   Doc 100

California several months prior. In May 2017, Kessler wrote on Discord that "**I think we need to have a Battle of Berkeley situation in Charlottesville. Bring in the Alt-Right, Proud Boys, Stickman, Damigo, Spencer and fight this shit out**." PX 552 (emphasis added).[8] Kessler knew Damigo had punched a woman at the "Battle of Berkley," and that another individual, Kyle Chapman, got the nickname "Stickman" because he hit somebody with a leaded stick at Berkeley. Dkt. 1431 (Nov. 15) 53:4–54:5. Kessler wanted a "publicized event" in Charlottesville where Antifa would "bring everything they've got and we do to[o]." PX 552. Kessler acknowledged "[t]he alt-right is a dangerous movement" that "feeds on the chaos energy of our unchecked racism bantz[9] but [in real life] activism you have to be more like a civil rights movement for whites. Its [sic] difficult to say that you can contain that manic energy and maintain the enthusiasm." PX 551. However, Kessler "would go to the ends of the earth to secure a future for my people with or without the funny bantz." Kessler believed: "**This is war**." *Id.* (emphasis added).

In early June 2017, Kessler invited people interested in attending Unite the Right—which he dubbed, "**The Battle of Charlottesville**"—to join the Discord server. PX 3548 (emphasis added). Elsewhere, he called it: "East Coast Berkeley." PX 8652 (Kessler: "Assemble every motherfucker you can."); *see also* Dkt. 1431 (Nov. 15) 62:16–63:23. And so, in the months leading up to Unite the Right, Kessler began contacting codefendants to invite them and their organizations to participate in the rally in Charlottesville. This included: from Traditionalist Worker Party, Matthew Heimbach, Matthew Parrott, and Derrick Davis; from Vanguard

---

[8] Kessler went by several handles (usernames) on Discord, including "MadDimension" and "Zebo," and he posted under the name "Ambien Falcon" on Facebook. Dkt. 1431 (Nov. 15) 55:16-20, 58:17-19.

[9] Kessler testified that "bantz" refers to "banter or joking." Dkt. 1431 (Nov. 15) 56:1-13.

16

America, Dillon Hopper; from National Socialist Movement ("NSM"), Jeff Schoep; from

League of the South, Dr. Michael Hill; from Identity Evropa, Elliott Kline and Nathan Damigo;

Richard Spencer, sometimes directly and through his designees; Christopher Cantwell; Robert

"Azzmador" Ray; and many others. *See, e.g.*, Dkt. 1431 (Nov. 15) at 64:12-17, 65:17–66:11,

67:8-16, 67:17–68:15, 68:16-20, 69:9-13, 72:1-17, 79:14-19; PX 190. Kessler wanted "all the

groups … as many people as possible to attend" Unite the Right. *Id.* at 69:18-21. Kessler talked

to Cantwell, Heimbach, Hill, Kline and many others numerous times about planning and

preparations for Unite the Right. *See, e.g.*, Dkt. 1431 (Nov. 15) 80:13–82:23; *see also id.* at

82:17, 23 (Kessler: "I talked a lot about it … I talked to them a lot, yeah."). On June 5, 2017,

Kessler wrote to Spencer: "**[W]e're raising an army my liege. For free speech, but the**

**cracking of skulls if it comes to it**." PX 1455 (emphasis added).

    As numerous private social media messages reflect, Kessler undertook several steps

ahead of time to try to spark violence at Unite the Right between the rally-goers and "Antifa."

When someone asked Kessler, "[w]hat's the situation with Antifa", and "are they coming[?]"

Kessler responded: "I don't know yet. I hope so. … It's really up to the Antifa to respond and

not be pussies. I would suggest taunting them a little on social media[.]" PX 1437-B at 2; *see id.*

(another responding, "I'm ready to throw down"). Kessler enlisted others to help when he felt

somewhat constrained in what he could do "as the event organizer." PX 3560 at 2 ("I want to

talk shit but as the event organizer I can only do so much."). His directions were that "[p]eople

need to bullycide [sic] them into 'confronting the alt-right' in Charlottesville. *Id.*; Dkt. 1431

(Nov. 15) 86:24–89:1. In another private social media message,  Kessler wrote that "[w]e need a

new way to tip off Antifa when we want them to show up somewhere," suggesting having

someone "send photos and tips to their members," perhaps through "a fake account." PX 1432-A

at 3;[10] *accord* PX 1444C at 3 (Kessler: "Should we alert Antifa for Thursday's meetup or just the Proud Boys event on Saturday?"). They discussed in considerable detail what information to provide, through what channels and in what manner, in order to spark the desired response. Per Kessler: "We definitely want to play these people into our hands Saturday in Charlottesville." PX 1432-A at 3.

Kessler made sure those attending Unite the Right would be well prepared to fight. In a post to "@everyone" in the Unite the Right Discord server entitled, "regarding self-defense," Kessler advised: "I recommend you bring picket sign posts, shields and other self-defense implements which can be turned from a free speech tool into a self-defense weapon should things turn ugly." PX 1034.[11] However, Kessler wanted to dissuade rallygoers from openly carrying firearms, writing: "We ultimately don't want to scare [Antifa] from laying hands on us if they can't stand our peaceful demonstration." *Id.* This was a consistent theme. For instance, another user wrote on the Unite the Right Discord server: "It's not even about optics, if we want the chance to beat down antifa, showing off guns so that it's just a screaming match isn't the way to do it. If we want something decisive we shouldn't have something deterring them from attacking us." PX 952 at 1. Kessler "100% agree[d]," and wrote: "**If you want the chance to crack some Antifa skulls in self-defense don't open carry.**" *Id.* at 7 (emphasis added); PX 1461C at 2 (Kessler: "The main thin[g] is I just don't want a lot of big scary guns out there that

---

[10] Indeed, creating and using fake social media accounts to try to drum up conflict points between the "Alt Right" and "Antifa" was a tactic long known to Defendants. In 2016, Damigo wrote on the Identity Evropa Discord server: "I need a small, fake antifa army," and further, "as many people as possible need to create accounts. Create multiple if possible. Make them as realistic as you can, and then post the link to the account here so other people can follow them making them look more realistic." *See* PX 881.

[11] In a Facebook conversation with Derrick Davis from Traditionalist Worker Party, Kessler asked Davis if he had "a pole or something [he] could wave this Rebel Flag from?" PX 1444D at 3. Davis suggested Kessler get a flagpole that "[c]an be weaponized." *Id.* at 2.

JXV-2_Page 476

Filed 05/06/23

Doc 100

will keep Antifa away. I want them to start something."); *id.* (Kessler: "I don't want to scare Antifa off from throwing the first punch.").

Kessler planned the torch march for months. It would ultimately occur on August 11, 2017, but Kessler kept it secret including from police, who reached out to Kessler about the rally itself planned for August 12. *E.g.*, Dkt. 1431 (Nov. 15) 104:7-23, 112:15-20. Kessler also was less-than-forthcoming to the police about the rally—for instance keeping the total number of anticipated number of attendees from the police. *Id.* at 105:17-21 (Kessler: "If the police ask you how many people we have coming, don't tell them. If they think we have more than 400 they might be able to help the city pull our permit.").

Just as Damigo had the Identity Evropa Discord server deleted after Unite the Right, Kessler similarly directed that the "Charlottesville 2.0" Discord server be deleted two days after Unite the Right. Kessler was alerted by another user on Discord to a concern that the then-Attorney General "was investigating the alt right," and that this "**[t]he Cville server needs to be deleted. Its** [sic] **compromised and has people talking about committing violence**. Its [sic] filled its purpose. We are able to coordinate without it." PX 332 (emphases added); Dkt. 1431 (Nov. 15) 151:13 – 152:6. Kessler agreed and directed Kline to delete the server, which he did. *See* Dkt. 1431 (Nov. 15) 158:1–19 (Kessler: "We still need to delete the C'ville server." Kline: "All right, the Discord [server] is handled.").

In other words, Kessler was by his admission a lead organizer of Unite the Right, in which he sought to reprise the violent "Battle of Berkeley" into the "Battle of Charlottesville"; Kessler knowingly invited violent people to Unite the Right, including those like Damigo who gained notoriety for violence in Berkeley; Kessler professed to be "raising an army" for Richard Spencer, for "the cracking of skulls if necessary"; Kessler encouraged attendees to bring signposts, shields and other "self-defense implements" which could transformed from "free

speech tool[s] into [ ] self-defense weapon[s] should things turn ugly"; Kessler believed Antifa wouldn't initiate the fight, and so he schemed to provoke violence with Antifa; and after Unite the Right, Kessler tried to delete the record of their digital communications planning Unite the Right on Discord, though he ultimately failed in that endeavor. And after Unite the Right, Kessler reiterated his support for codefendant James Fields, and expressing numerous times that Heather Heyer—who Fields killed in his car attack on August 12, 2017—was to blame for her own death. *See, e.g.*, Dkt. 1431 (Nov. 15) 153:5-11 (Kessler, calling Heyer "a communist," "[c]ommunists have killed 94 million. Looks like it was payback time."); *id.* at 153:23–154:3 ("To reclarify: I 100 percent believe Heather Heyer was to blame for participating in an armed mob blocking traffic during a state of emergency.").

Kessler argues that his conduct never amounted to anything more than self-defense or preparing for himself and the other participants in Unite the Right rally to be prepared to defend themselves. Dkt. 1522 at 5–6. The jury was instructed about Kessler's (and the other defendants') self-defense theory at considerable length. Dkt. 1461 at ECF 54–56. The jury simply didn't believe it. That's unsurprising. The evidence of Kessler's participation in a civil conspiracy to commit numerous unlawful acts—which resulted in widespread violence during weekend of August 11–12, 2017, including Plaintiffs' injuries—was absolutely overwhelming. There's no error in the jury finding Kessler liable for Virginia state law civil conspiracy in Count III.

Finally, Kessler argues that the jury improperly found him liable for racial, religious, or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1, and therefore seeks a directed verdict on Count IV. Dkt. 1522 at 8–9. Kessler argues that the evidence of his activities at the torch march only show him "engaging in First Amendment protected expressive activity."

*Id.* He asserts that participation in "the torch march itself, without the violence at the rotunda," was "lawful activity," and that he "had nothing to do with the violence at the Rotunda." *Id.* at 9. Kessler also argues that neither Plaintiff Romero or Willis claims to have heard or seen him at the torch march, further supporting his argument for a directed verdict. The Court disagrees. Kessler is not entitled to a directed verdict on Count IV.

The jury could find Kessler liable under § 8.01-42.1 if it found, by a preponderance of the evidence, that he subjected Plaintiffs Romero and Willis to acts of intimidation, harassment, or violence directed at their persons, and that his actions were motivated by racial, religious, or ethnic animosity. *See* Va. Code § 8.01-42.1(A); Dkt. 1461 at ECF 41 (jury instructions). There was such evidence and more in the record. Kessler testified that it was originally his idea to hold the torch march the evening of August 11, 2017. Dkt. 1431 (Nov. 15) 111:14–112:10. Kessler planned and organized the torch march in the preceding months, including notifying potential attendees on the Charlottesville 2.0 Discord server and making sure attending groups would have tiki torches. *Id.* at 113:10–114:23. Then, on the evening of August 11, 2017, Kessler, along with Spencer and Kline, *led* the hundreds carrying lit torches and chanting "You will not replace us," "Jews will not replace us," "Blood and Soil," through University of Virginia grounds, down its historic Lawn, and up the steps of the Rotunda. Dkt. 1431 (Nov. 15 Tr.) 121:4–122:8, 125:22-23; Dkt. 1397 (Nov. 4) 147:24-25 (Spencer: "I was in the lead, I think that's fair"), *id.* at 148:8-14; PX 2348, 2676. Kessler conceded at trial that the chants used during the torch march, including "Jews will not replace us," and "Sieg Heil," were offensive and intimidating to Jewish persons. Dkt. 1431 (Nov. 15) 130:11–131:5.

When Kessler, leading the torch-wielding marchers, approached the top of the Rotunda steps, he saw a small group of counter-protestors surrounding the Thomas Jefferson statue down below. Dkt. 1431 (Nov. 15) 125:1-3. Those included Plaintiffs Romero and Willis, who had

linked arms with others around the statue. Dkt. 1378 (Oct. 29) 23:19–25:2, 170:1-17. Then, Willis described an "ocean of light and flames just starts spilling over both sides of the steps, and it's washing down," and "they basically just rushed the entire area and surrounded all of us in a matter of seconds." *Id.* at 172:7-13. The Unite the Right rallygoers yelled at Romero, Willis, and the other counter-protestors: "go back to where you came from," "stupid bitch," "blood and soil," "Jews will not replace us," "you will not replace us"; and they made "[m]onkey noises" at them. *Id.* at 25:17-23, 172:22–173:12, 176:22-25; *see, e.g.*, PX 3474A; PX 2680, 3011; CCEX0004B. Willis, who is black, testified that he "was really scared because it looked like a lynch mob." Dkt. 1378 (Oct. 29) 176:1-2. Romero testified that the rallygoers threw a torch at her that landed centimeters from her foot and sprayed mace at her and the other counter-protesters. *See id.* at 29:1-14. Willis testified that he was pepper-sprayed, which left him struggling to breathe, and "someone from the direction of the mob threw … mysterious fluid" that appeared to be tiki torch lighter fluid at him. *Id.* at 181:1-19. He feared the mob was trying "to burn [them] alive." *Id.* After the event, Defendant Spencer blithely acknowledged that the crowd they had assembled refused to let the surrounded counter-protestors leave. *See* Dkt. 1397 (Nov. 4) 155:22–156:8 (responding "Fact Checked: True" to tweet that evening: "They surrounded us at the statue. They wouldn't let us out"); PX 2500. As Defendant Spencer testified, their actions pinning the counter-protestors at the statue were meant to be "a sign of dominance." Dkt. 1397 (Nov. 4) 156:9-12.

Kessler argues that his involvement was nothing more than conduct and expression protected by the First Amendment. Dkt. 1522 at 8–9. However, conduct that "authorized" or "directed" tortious activity, or speech "likely to incite lawless action," are not protected. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982). To be sure, Kessler testified that he tried unsuccessfully to turn the crowd descending the steps of the Rotunda from the counter-protesters

Filed 05/06/25   Doc 100

by putting up his hands and saying "Stop." Dkt. 1431 (Nov. 15 Tr.) 125:17-20; *see also id.* at

126:11-17 ("I had a torch in my hand and I said, 'Stop.'"). But Kessler said "[t]hat was not

within my power. I tried," and he tried to deflect blame elsewhere. *Id.* 126:19-23 ("There was

another guy named Eli Kline who had a megaphone and was directing them."). The jury was not

required to believe Kessler's testimony on this or any other point. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the

drawing of legitimate inferences from facts are jury functions"). Indeed, that testimony is all the

more incredible given that it runs counter to the substantial evidence that Kessler had labored

ceaselessly for months to create a violent racial flashpoint in Charlottesville that weekend.

Moreover, the jury could have further found Kessler's contention that he tried to stop any

violence less-than-credible given his comments immediately after the torch march, which belied

no such concern. He saw it as "an incredible moment for white people," Dkt. 1431 (Nov. 15. Tr.)

131:14–132:2. And despite Kessler's attempt at trial to throw Kline under the bus, at the time he

praised Kline's "excellent work" on the torch march. *Id.* at 134:10-13. The torch march mob

Kessler devised, assembled and personally led through campus surrounded, intimidated,

harassed and injured counter-protestors including Plaintiffs Romero and Willis. There was more

than ample evidence upon which the jury could find Kessler liable to Plaintiffs Romero and

Willis for intimidation, harassment or violence that was motivated by racial, religious, or ethnic

animosity, in violation of Virginia Code § 8.01-42.1.

### Christopher Cantwell

Plaintiffs introduced more than substantial evidence to support the jury's verdict finding

Christopher Cantwell liable for Virginia state law civil conspiracy (Count III), and committing

religious or ethnic harassment or violence, violating Virginia Code § 8.01-42.1 (Count IV).[12]

Moreover, Cantwell has not shown he is entitled to directed verdicts on either Counts I or II.

Accordingly, Cantwell's post-trial motions will be denied as to their challenges to liability.

### A.  Substantial Evidence Supports the Verdict

Cantwell testified that in 2017, his podcast had between 10,000 and 20,000 listeners,

including some "armed extremists." Dkt. 1431 (Nov. 15) 198:10-17. Cantwell advocated for a

white ethnostate and called for violence on his podcast. *Id.* at 198:18-25, 203:23-25. Cantwell

candidly acknowledged that what he said on his podcast could influence people's behavior,

including committing violence. *See id.* at 199:1-3; *see also id.* at 200:10-25; PX 2664. In one

episode of his podcast, for example, a caller said: "Dylann Roof is the kind of guy that had no

future anyways. This is exactly the kind of person who should be committing acts of mass

murder[.]", to which Cantwell responded: "That's a very solid point … Not everyone [is] going

to be to be a professional propagandist, shall we say. **Some of us got to be fucking cannon**

**fodder for the race war**." *Id.* at 205:13–206:11 (emphasis added). Cantwell further posted a

video supporting running over protestors with cars. *See id.* at 207:10-23; PX 2644 (posting video

of protestor standing in middle of street, writing: "Hey, communist, remember this like your life

depends on it, because it does. Blocking traffic is not peaceful protest and every person who

reminds you of that without using his car is giving you more slack than you fucking deserve.").

Cantwell was invited to speak at Unite the Right by Augustus Sol Invictus and Jason

Kessler. Dkt. 1431 (Nov. 15) 220:21–224:25, 280:5-7. Cantwell invited listeners of his podcast

---

[12] As Plaintiffs argue, because Defendant Cantwell did not move for directed verdict on Count IV, he cannot file a renewed motion for directed verdict on that specific count. Dkt. 1574 at 18. In any event, more than substantial evidence supports the jury's findings of liability on Count IV, for the reasons that follow.

to join him at Unite the Right, and he promoted the rally on his podcast and website. Dkt. 1431
(Nov. 15) 215:21-23, 225:10-21. On his podcast and elsewhere, Cantwell made many wildly
antisemitic statements including that "[t]he Jew is the enemy of the human race," Dkt. 1431
(Nov. 15) 211:1-25; PX 1886A; *see also, e.g.*, Dkt. 1431 (Nov. 15) 210:18-25; *id.* at 1-24;
PX 2584, saying that Jewish persons were "responsible for communism," and Cantwell believed
"that's a fucking really good reason to fucking genocide a group of people," Dkt. 1431 (Nov. 15)
237:12–238:3, and statements denigrating black persons and other minorities, *see, e.g.*,
Dkt. 1431 (Nov. 15) 215:8-20; PX 2710A. Cantwell communicated with Spencer, Kessler,
Kline, and others about Unite the Right in the lead-up to the rally. *See, e.g.*, Dkt. 1431 (Nov. 15)
217:6-25, 224:17-25, 226:24–227:12. Cantwell and Kessler discussed Kessler coming onto
Cantwell's podcast to promote Unite the Right. *E.g.*, Dkt. 1431 (Nov. 15) 224:1-25; PX 190.
Among others, Cantwell had Kessler, Spencer, Heimbach, Robert Ray, and Dillon Hopper as
guests on his podcast. Dkt. 1431 (Nov. 15) 220:12-20.

Cantwell told Spencer he was "**willing to risk a lot for our cause, including violence
and incarceration**," and **"[m]any in my audience would follow me there, too, but I want to
coordinate to make sure its** [sic] **worth it to our cause**." Dkt. 1397 (Nov. 4) 121:13-16
(emphases added); Dkt. 1431 (Nov. 15) 240:7-16; PX 3317.[13] In the weeks before the rally,
Cantwell began posting on the Unite the Right Discord server, including suggesting organizing a
separate "parallel event somewhere other than Lee Park for women and children"—further

---

[13] Spencer responded: "It's worth it, at least for me." Cantwell continued, in this vein:
"You're sure it's worth the risk of violence and imprisonment, but not worth a phone call with a
guy who drove eight hours to get here and invite his audience of 10,000 people to follow him?"
Dkt. 1431 (Nov. 15) 240:7-23.

Filed 05/06/23 Case 1:22-9000E Doc 100

evidence demonstrating Cantwell anticipated violence at Unite the Right. Dkt. 1431 (Nov. 15) 244:20–245:4.

Cantwell brought numerous weapons to Charlottesville for Unite the Right. PX 2103A. In addition to firearms, he brought "Kubotans"—metal rods attached to keychains that can be used as weapons—and canisters of pepper spray. Dkt. 1431 (Nov. 15) 241:6–242:15. Cantwell planned to sell them to "better arm our people," while making some "extra bucks." *Id.* at 243:1–244:14; PX 325A. Cantwell explained to a reporter: "I've got to organize an unknown number of armed extremists I've never met through a hostile environment with death threats and legal intimidation. We all have our crosses to bear." Dkt. 1431 (Nov. 15) 247:4-10.

On the night of August 11, 2017, Cantwell marched with Kessler, Spencer and the hundreds of others with lit tiki torches chanting "Jews will not replace us" and other slogans. As the marchers surrounded Plaintiffs Willis and Romero and the other counter-protesters at the Thomas Jefferson statue, Cantwell began, in his words, "beating the shit out of" somebody and pepper-spraying them. *Id.* at 253:11-16 ("I definitely just pepper-sprayed somebody. I'm not trying to evade that."); *id.* at 253:19–254:5. Cantwell admitted to the language he used against counter-protesters at Unite the Right: "I probably wouldn't have said 'N word,' but I probably said the N word. … I've almost certainly said that and a whole lot worse about the people who were counter-protesting at the Unite the Right rally." Dkt. 1431 (Nov. 15) 227:24–228:2.

After the rally, Cantwell gave Fields a Nazi salute, when he was briefly incarcerated in proximity to Fields. Dkt. 1431 (Nov. 15) 270:8-24. Later, Cantwell "gave [Fields] a hug" and told him, "I'm really sorry this happened to you." *Id.* Cantwell also referred to Heather Heyer's grave as a "urinal." *Id.* at 267:8-10. At bottom, there was more than substantial evidence that underlays the jury's finding that Cantwell was liable for Virginia state law civil conspiracy in

Count III, and religious or ethnic harassment or violence violating Virginia Code § 8.01-42.1 in Count IV. Nor has Cantwell shown he was entitled to a directed verdict on Counts I or II.

## B.  Legal Challenges Seeking a New Trial

Cantwell also seeks to raise a number of arguments that he might have, but did not, timely raise as a motion to dismiss or dispositive motion much earlier in the case. As this Court previously held, Cantwell was aware of the dispositive motions deadline of August 7, 2020, but he did not file a dispositive motion on these issues. *See* Dkt. 1344 at 1–2. Having failed to do so, Cantwell sought to improperly shoehorn these arguments into motions in *limine*. *Id.* at 3; *see also Witness Sys., Inc. v. Nice Sys., Inc.*, 2008 WL 2047633, at *1 (N.D. Ga. May 10, 2008) ("Defendants should have raised [the dispositive issue] in a properly supported motion for summary judgment rather than in a motion in limine on the eve of trial."). Undeterred, Cantwell seeks to raise these untimely arguments again in post-trial motions.

Cantwell argues that Plaintiffs' claims "arose *ex turpi causa* and thus are barred *in pari delicto*." Dkt. 1536 at 18. Cantwell contends that the evidence "showed that Plaintiffs either were or were in the company of the initiators of the violence at issue in this case." *Id.* Thus, Cantwell seeks to invoke the general rule that "a party who consents to and participates in an illegal act may not recover from other participants for the consequences of that act." *Lee v. Nationwide Mut. Ins. Co.*, 497 S.E.2d 328, 329 (Va. 1998). The doctrine is based on the view that "no one should profit from his illegal act." *Williams v. Harrison*, 497 S.E.2d 467, 470 (Va. 1998). The defense "bar[s] recovery if the evidence shows that the plaintiff freely and voluntarily consented to participation in the illegal act, without duress or coercion." *Lee*, 497 S.E.2d at 329. In *Lee*, for instance, a car thief could not recover from injuries resulting from the theft of the car and subsequent joyride. The party raising the defense has the burden to establish it. *Id.* Even if the defense was timely raised, it fails. There was *no* evidence that Plaintiffs came

Filed 05/06/23 Doc 100

to Unite the Right to cause violence or "terrorism," as Cantwell contends, much less such evidence as could have satisfied Cantwell's burden to establish the defense. Dkt. 1574 at 24 n. 6. The Court even permitted Cantwell to examine Plaintiffs and other witnesses about whether Plaintiffs had seen or been a party to any violence on August 11 and 12. Despite his consistent efforts to try to find some link with Antifa or any violence, there was absolutely no evidence that the Plaintiffs were anything other than innocent counter-protestors who went to the rally to peacefully voice their opposition to Defendants' messages. Moreover, the verdict reflects that the jury found that Defendants initiated the violence that led to Plaintiffs' injuries, and overwhelming evidence supports that finding.

Cantwell challenges the jury's verdict finding him liable for civil conspiracy in Count III. *See* Dkt. 1488 at 7–8. Cantwell argues that, because the jury did not reach a verdict on either Counts I or II, "the parties are now left to ponder just what law the Defendants were found to have conspired against." *Id*. at 7. Cantwell's argument lacks merit. The Virginia state law civil conspiracy instructions clearly described the elements of the offense. *See* Dkt. 1461 at ECF 38–40 (Instruction 23). And indeed, Cantwell does not contend otherwise. Cantwell's argument in this respect does nothing more than attempt to fabricate an inconsistency or ambiguity in the verdict when there is none. The jury found Cantwell liable for conspiracy. The jury also found Cantwell liable for one of the one of the listed predicate unlawful acts—racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). Dkt. 1478 at 6–7. Put simply, Cantwell identifies no error at all in the Virginia state law civil conspiracy jury instructions, much less any basis to believe that he would have met his burden of showing the jury was not adequately informed based upon the entirety of the jury charge. Nor has Cantwell identified any basis to challenge the jury verdict form or the jury's verdict, which was consistent and not at all vague in its application against any Defendant, much less Cantwell.

JXV-2_Page 486

Filed 05/06/23 Doc 100

Cantwell also argues that given the fact that the jury didn't reach a verdict on Counts I or II, that the jury must have found Defendants "liable for something other than violence, such as speech." Dkt. 1536 at 11. However, the Court contrasted "abstract advocacy of lawlessness, or mere advocacy of the use of force, which is protected speech" under the First Amendment, from whether Defendants committed the specific violations of law that Plaintiffs alleged, including a conspiracy alleged by Plaintiffs, which "are not protected by the First Amendment." Dkt. 1461 at ECF 53 (Instruction 30). The jury found Cantwell and the other Defendants liable for Virginia state law civil conspiracy, racial, religious or ethnic harassment or violence in violation of Virginia Code § 8.01-42.1, and other counts (for Fields). Juries are presumed to follow the court's instructions, *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009), including here that they found Defendants liable on Counts III and IV upon finding the elements of those claims satisfied, and not based upon mere advocacy or advocacy lawlessness or use of force.

### C. Challenge to Juror

Cantwell raises a cursory challenge to this Court's refusal to strike a juror for cause. *See* Dkt. 1536 at 10. It appears Cantwell is challenging the Court's refusal to strike Juror 220. *See id.*; *see also* Dkt. 1324 (Oct. 26) 41–50. Cantwell argues that this juror expressed "pro-Antifa views on politically motivated violence," which he believed were "disqualifying." Dkt. 1536 at 10.

The Fourth Circuit has stated that "[a] trial judge has very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *Bright v. Coastal Lumber Co.*, 962 F.2d 365, 370 (4th Cir. 1992) (quoting *Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989)). "A juror is presumed impartial and the existence of a preconception is insufficient to rebut this presumption if the juror can 'lay

aside his impression or opinion and render a verdict based on the evidence presented in court." *Poynter*, 874 F.2d at 221 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

While Cantwell has argued that Juror 220's "pro-Antifa views" meant that he had "an extremely favorable view of a group that hunts the defendants like dogs in the street," Dkt. 1324 at 48–49; Dkt. 1536 at 10, the juror expressed no such thing. To the contrary, the juror candidly explained that to the extent he had an "extremely favorable" view of "Antifa," it was based on his understanding of "Antifa as being abbreviated 'anti-fascist,'" and so he explained that: "I would consider myself an anti-fascist, in that sense, just like a GI in World War II is an anti-fascist." Dkt. 1324 at 43. That historically grounded answer, as well as the juror's demeanor in response to questioning proposed by the parties, belied no partiality. In any event, Juror 220 repeatedly and credibly answered that, regardless of his opinion(s) concerning Black Lives Matter and Antifa, he could set aside his personal opinions about those groups and that those personal opinions would not affect his reaching a verdict in the case. *See, e.g.*, *id.* at 45; *id.* at 48 (The Court: "Irrespective of any preconceived opinions you might have about any organization, can you set aside those preconceived opinions and try this case solely according to the law and the evidence you hear in the courtroom?" Juror 220: "I believe I can, yes."). In other words, Cantwell's conclusory arguments provide no sound reason to conclude that Juror 220 had to be struck for cause. Further still, Defendants ultimately used a peremptory strike to remove Juror 220 from the panel, and Cantwell has not even attempted to argue, let alone demonstrated, that "using a peremptory challenge on [Juror 220] prevented them from challenging another undesirable juror." *See Bright*, 962 F.2d at 370. This argument is therefore rejected.

### D. Challenges to Jury Instructions

Cantwell also raises a number of challenges to the Court's jury instructions. In considering a challenge to jury instructions, the Fourth Circuit asks "whether the instructions

construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Baily v. Cnty. of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987)). "The party challenging jury instructions faces a heavy burden." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011).

*Negligence Defenses*. Cantwell challenges this Court's instruction that negligence defenses, including assumption of risk, contributory negligence, and sudden emergency, were not valid defenses to Plaintiffs' claims. Dkt. 1461 at ECF 57 (Instruction 32). Cantwell argues in his post-trial motions that these defenses applied to Count IV. *See* Dkt. 1488 at 15. But it is a "familiar principle that contributory negligence is not a defense to an intentional tort," *Williams*, 497 S.E.2d at 469, and assumption of risk is a defense "from the negligent or reckless conduct of the defendant," not an intentional tort, *see* Restatement (Second) of Torts § 496A (1965). Cantwell cites no authority to the contrary. Count IV was for the commission of an intentional tort, and the jury found, based on overwhelming evidence at trial, that Cantwell and Defendants subjected Plaintiffs to intentional acts of harassment, intimidation, or violence, motivated by racial, religious, or ethnic animosity. The jury was properly instructed that negligence defenses did not apply, and Cantwell identifies no error in this regard.

*Adverse Inference Instruction*. Next, Cantwell challenges the general jury instruction on evidentiary sanctions and adverse inferences, both of which were allowed against certain defendants. *See* Dkt. 1536 at 12. Cantwell argues that the instruction did not sufficiently limit any improper "spillover" effects on those Defendants who were not subject to evidentiary sanctions, including himself. *Id.* at 12–13. The jury instruction was proper. It stated to the jury, in pertinent part and in plain language: "You are cautioned, however, that each party is entitled to have the case decided solely on the evidence that applies to that party. *Sanctions against these*

*parties have no bearing on other parties*." Dkt. 1461 at ECF 51 (Instruction 28) (emphasis added). The jury was elsewhere reminded of this same admonition, especially with respect to other evidence that could not be considered as against Cantwell. *Id.* at ECF 52 (Instruction 29) ("As I instructed you throughout the trial, and I will remind you again that each party is entitled to have the case decided solely on the evidence that applies to that party, and some of the evidence in this case is limited under the rules of evidence to some of the parties and cannot be considered against the others."). Again, juries are presumed to follow the court's instructions. *Hensley*, 556 U.S. at 841. While Cantwell argues that, at one point, Plaintiffs tried to skirt this instruction in their closing arguments, Dkt. 1536 at 12–13, he failed to raise a contemporaneous objection to the issue, Dkt. 1469 (Nov. 19) 6:1-18. In any event, the Court further instructed the jury that closing arguments weren't evidence. Simply put, Cantwell offers no basis to conclude that the jury ignored the Court's repeated and express limiting instructions, such that he suffered any improper spillover from the evidentiary sanction instructions.

  ***Limitations on Use of Depositions***. Cantwell also argues in a conclusory fashion that some of Plaintiffs' deposition designations were inadmissible against him, "and the limiting instruction was insufficient to cure this prejudice." Dkt. 1536 at 11–12. This argument has no merit. Indeed, the Court included a specific instruction entitled "Limited Use of Depositions as Against Defendant Cantwell." Dkt. 1461 at ECF 52 (Instruction 29). It specifically explained that Plaintiffs introduced deposition testimony from a number of specified witnesses, "which may not [be] considered by you in connection with Defendant Christopher Cantwell, because of his inability to be at the deposition and lack of notice thereof. However, it may be considered by you in connection with the other Defendants." *Id.* Moreover, the Court repeatedly gave this

instruction when the relevant deposition testimony was played.[14] Again, juries are presumed to follow the Court's instructions, and Cantwell's cursory argument offers no basis to challenge either the instruction itself or to believe it was insufficient to limit the jury's consideration of evidence as against him.

### E.  Evidentiary Challenges

Cantwell raises a host of challenges to the Court's evidentiary rulings. None have merit.

***Professor Peter Simi***. Cantwell argues that the Court should not have allowed the testimony from Plaintiffs' expert, Dr. Peter Simi. *See* Dkt. 1536 at 14–15. Cantwell writes that an expert generally cannot be "called in to call someone a liar." *Id.* at 14. According to Cantwell, "the purpose of Simi's testimony," and "the thrust of what Simi testified," is that Defendants' statements were "Doublespeak," which effectively was calling them "a racist liar" using other verbiage. *Id.* at 14. Defendants previously raised this issue, the Court thoroughly considered it, and denied Defendants' motion to exclude Dr. Simi on this basis. *See* Dkt. 937, 941. The Court explained that "[e]xpert testimony has long been allowed to explain to a jury the meaning of coded language," and Professor Simi's testimony concerned "strategies [that] are akin to coded language meant to deceive outside groups about the meaning of conversations …." Dkt. 941 at 2. Accordingly, the Court concluded that the testimony was "grounded in numerous specific examples, and it fit[ ] well within the types of specialized knowledge that courts have regularly

---

[14] *See, e.g.*, Dkt. 1443 (Nov. 16) 31:16-23 ("Members of the jury, I'm going to read this instruction I've read several times about depositions taken when Mr. Cantwell did not have notice or attend. I remind you that each party is entitled to have the case decided solely on the evidence that applies to that party. Some of the evidence in this case is limited under the rules of evidence to some of the parties and cannot be considered against others. The plaintiff introduced the deposition of Mr. Griffin … Such deposition testimony may not be considered by you in connection with Defendant Christopher Cantwell, but it … may be considered by you in connection with the other defendants.").

JXV-2_Page 491

found helpful to a jury." *Id.* Nonetheless, the Court explained that Defendants would be afforded

the "traditional and appropriate means" of challenging expert testimony, including the ability to

conduct "vigorous" cross examination, to present any contrary evidence, and that the jury would

be carefully instructed about expert testimony. *See id.* at 25. Cantwell and the other Defendants

were afforded that substantial opportunity to conduct that vigorous cross examination. Dkt. 1422

(Nov. 11) 93–208. Cantwell's arguments on this point do not provide any basis for the Court to

reconsider its prior rulings on this issue.

Cantwell also contends the Court improperly refused to permit him from asking Dr. Simi

questions about "critical race theory." Dkt. 1536 at 15–16. Cantwell had substantial opportunity

to cross examine Dr. Simi. Dkt. 1422 (Nov. 11) 178–209. Notably, the Court did not forbid

Cantwell from asking Dr. Simi about critical race theory. He asked several questions about the

topic, which the Court allowed, overruling Plaintiffs' initial objection to the line of questioning.

*Id.* at 183:25–185:7. To be sure, the Court did sustain Plaintiffs' following objection that

Cantwell's line of questioning was "really getting far afield." *Id.* at 185:11-23. Given the

extremely marginal (if any) relevance Cantwell's questioning on this topic had to the legal

claims and fact issues before the jury, there was no error in stating that Cantwell should "go on"

from this topic. *Id.* at 186:2. Moreover, Cantwell was able to question Dr. Simi at length about

his views whether "white supremacy" was categorized by violence, *id.* at 186:3–188:14,

undermining any argument that he was precluded from asking Dr. Simi such questions that he

believed were material to his defense, *see* Dkt. 1536 at 15–16.

**Dr. Deborah Lipstadt**. Cantwell also argues that the testimony of Plaintiffs' expert Dr.

Lipstadt should have been excluded. Dkt. 1536 at 17. Dr. Lipstadt testified without objection as

an expert in antisemitism, and its history, rhetoric, language, and symbols. Dkt. 1393 (Nov. 3)

146:12-17. Cantwell argues that her testimony served no "legitimate purpose." Dkt. 1536 at 17.

However, using her expertise, Dr. Lipstadt examined substantial materials concerning the Unite the Right rally (including emails, podcasts, videos, and written material) to look for evidence of and expressions of antisemitism and Nazi symbolism. Dkt. 1393 (Nov. 3) 146:22–147:3. And Dr. Lipstadt concluded that in her opinion, "there was a great deal of overt antisemitism and adulation of the Third Reich … throughout the evidence that [she] looked at." *Id.* at 147:18-21. Such evidence was relevant and particularly material to, among other things, the issue of Defendants' motive. *See* Dkt. 1461 at ECF 26 (Instruction 16 – 42 U.S.C. § 1985(3) – Racial Animus); *id.* at ECF 41 (Instruction 24, describing elements of violation of Va. Code § 8.01-42.1, including that "Defendants' actions were motivated by racial, religious, or ethnic animosity"). Contrary to Cantwell's argument, there was certainly a "legitimate purpose" to the expert testimony of Dr. Lipstadt.

Cantwell further contends that Dr. Lipstadt's testimony should have been excluded because it was prejudicial. Dkt. 1536 at 17. The Court concludes that the probative value of the testimony outweighed any such prejudice. *See* Fed. R. Evid. 403 (providing that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). Moreover, the challenged testimony was not "unfairly prejudicial" to Cantwell or Defendants, such as would cause an "undue tendency to suggest a decision on an improper basis." Fed. R. Evid. 403 & advisory committee's note (1972 proposed rules). The "mere fact that the evidence will damage the defendant's case is not enough—the evidence must be *unfairly* prejudicial, and the unfair prejudice must *substantially* outweigh the probative value of the evidence." *United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) (emphasis in original), *vacated on other grounds*, 543 U.S. 1097 (2005), *relevant part of prior opinion reinstated*, 405 F.3d 1034 (4th

Cir. 2005); *see also United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998) (explaining

that "[e]vidence that is highly probative invariably will be prejudicial to the defense," but that

Rule 403 only excludes "unfair" prejudice). Upon consideration of Cantwell's arguments and the

relevant testimony, the Court determines there is no basis to conclude that there was any unfair

prejudice, much less any unfair prejudice that would substantially outweigh the probative value

of the evidence.

The Court previously rejected Cantwell's pre-trial motion to exclude Dr. Lipstadt's

testimony. *See* Dkt. 1347 at 2–3. While Cantwell apparently raises those arguments again by

reference, he does not develop any argument challenging that prior decision (much less provide

any valid basis to do so). *See* Dkt. 1536 at 17 (stating, in full, "Cantwell generally reasserts his

pretrial objections to Lipstadt's testimony.").

***Video Evidence***. Cantwell contends that it was error for this Court to exclude video

evidence he sought to introduce, showing a non-party Dwayne Dixon reading from a sheet of

paper. *See* Dkt. 1488 at 21–22. Cantwell contends that the video helps explain why some

Defendants believed that Fields "did nothing wrong." *Id.* at 22. Subject to a pretrial motion, the

Court excluded the video evidence because Cantwell had not authenticated it under Fed. R. Evid.

901(a); it would be inadmissible hearsay; and, even if relevant, there was a high risk of

misleading the jury and wasting time on unrelated issues. *See* Dkt. 1345 at 1–2. However, the

Court denied Cantwell's motion *without prejudice*, and wrote that, "[i]f Cantwell can fix the

evidentiary issues described here, he may be able to introduce the video at trial." *Id.* at 2.

Cantwell does not argue, much less substantiate, how he could have fixed any—much less all—

of these barriers to admissibility. Accordingly, there was no error in the Court's exclusion of the

video evidence. Moreover, the jury heard ample evidence that some Defendants believed Fields

did "nothing wrong" when he plowed his car through the counter-protestors, killing one and seriously injuring dozens of others. *See, e.g.*, PX 2867A, 2867B, 2867C.

***Rally Permit Litigation Evidence***. Cantwell argues that evidence and testimony concerning the litigation relating to the city-issued permit for the Unite the Right rally "should have been allowed for a limited purpose." Dkt. 1488 at 23. Cantwell acknowledges, as he must, that "an injunction on the permit did not confer a right to unlawful conspiracy," but he argues that did not make the matter irrelevant. *Id.* Rather, he argues that it was relevant to Defendants' state of mind, and that his body-camera footage showed that they were celebrating "a legal victory" rather than "plann[ing] racially motivated violence." *Id.* Therefore Cantwell contends that "much of" his body camera footage was rendered "unusable," since it concerned the permit litigation. *Id.* There are a number of reasons why Cantwell's argument lacks force. Evidence of the underlying permit litigation would greatly risk confusing the issues and misleading the jury, which risks substantially outweighed any marginal relevance. *See* Fed. R. Evid. 403 & advisory committee's note (1972 proposed rules). In any event, Cantwell argues that he was prejudiced by not being able to play his body camera footage in greater length because it allowed Plaintiffs to introduce Kline's statement to "bring your fighters," without necessary context. Dkt. 1488 at 24 (¶¶ 64–65); Dkt. 1574 at 34 (point 3). Cantwell did not object at trial to Plaintiffs playing that specific clip from his body camera footage. Dkt. 1443 (Nov. 16) 159:11-15. And, after Plaintiffs introduced that video, Cantwell was able to testify to the very context he states he needed to provide—i.e., "that plan went out the window" when, "[a]fter that clip," they learned that "[their] permit was intact." *Id.* at 161–62; CCEX153G. In other words, the very prejudice

Cantwell says he experienced did not materialize, from Plaintiffs' introduction of a piece of evidence Cantwell agreed could be admitted.[15]

### F.   Challenge to "Unfairness" of Trial

Finally, the Court rejects Cantwell's argument that his trial was "unfair" because he was incarcerated from January 2020 until trial, and afterward. *See, e.g.*, Dkt. 1536 at 2–6. Cantwell alleges that during the period when he was incarcerated, Plaintiffs sent him materials where he was held when Plaintiffs "had discovery demands" of him, but when "Plaintiffs benefitted from Cantwell's silence," they did not send those communications to his jail. *Id.* at 3. Cantwell argues that when this "misconduct was discovered," Plaintiffs sent him a "2 terabyte encrypted hard drive to the jail where Cantwell was being held." *Id.* Cantwell complains that subsequently he was "stripped … of his property" by the U.S. Marshals and transported to another prison in Mississippi, and then about a month later, transported to USP Marion in Illinois. *Id.* And, he contends that while he "arranged to have the hard drive sent to him at USP Marion, [ ] in September [2021], [he] moved for a continuance. *Id.* at 3–4. Cantwell asserts that "[w]hen [he] was transported, he was not allowed to take any papers or the hard drive with him," and that his subsequent move to Central Virginia Regional Jail "further obstructed his trial preparations." *Id.* at 4.

Cantwell cannot avoid the consequences of one indelible fact—that he was offered the choice to sever his trial from that of his co-Defendants and thus a continuance, to afford him the opportunity to remedy any difficulties he'd experienced preparing for trial (real or perceived) on account of his incarceration. On the eve of trial, Plaintiffs filed a letter motion requesting that the

---

[15] Cantwell provides no sound reason why this Court can, let alone must, engage with his argument that a retrial on Counts I and II should be conditioned on a retrial of all counts—which is a hypothetical and speculative argument. *See* Dkt. 1488 at 17; Dkt. 1574 at 28.

Court sever Cantwell's case from that of the other Defendants pursuant to Fed. R. Civ. P. 21. *See* Dkt. 1305. Plaintiffs took the position that, given Cantwell's "repeated complaints … about his lack of access to documents and pleadings in this case as a result of his incarceration," Plaintiffs saw "the best way to resolve the tension between the need to proceed to trial and Mr. Cantwell's due-process arguments would be for the Court to sever Plaintiffs' claims against Mr. Cantwell from their claims against the other Defendants …." *Id.* at 1. The Traditionalist Worker Party Defendants, Damigo, Kessler and Identity Evropa filed letters opposing the request. *See* Dkts. 1307, 1309.

On the morning of the first day of trial, before jury selection started, the Court heard argument on Plaintiffs' motion to sever and afforded Cantwell numerous chances to have his case severed and thus have his trial continued. Dkt. 1317 (Oct. 25) 6:10–7:13. Cantwell began by explaining that he believed he had "ample grounds for appeal" if he was found liable by the jury and so he "move[d] this Court to sanction the plaintiffs." *Id.* at 8:1-11. The Court explained "there's one issue before the Court right now. Nothing else. Do you want this case severed or not?" Cantwell responded, "I do not." *Id.* at 8:12-15. The Court next heard from Plaintiffs who asserted that, given their interests in proceeding to trial but also seeking to ensure Cantwell is afforded "documents in real time or in as real time as possible as he can to prepare" for trial, they were "trying to come up with the best possible solution under the circumstances." *Id.* at 9:14–10:12. However, Plaintiffs warned that they believed that if "Mr. Cantwell is now saying he does not want severance, we believe that he has then thereby waived any due process arguments for appeal."

The Court then engaged in the following colloquy with Cantwell:

The Court: Mr. Cantwell, the Court is willing to sever the case and allow you the time you want for your case. I will not continue any other case. We're going forward with this case today as set. I am willing to sever this case as to you. Now,

to make it perfectly clear: You're asking the Court not to sever you. You prefer to stay in this case as it is?

Mr. Cantwell: Given the choice between those two things, I'll stay in the case as it is. I don't prefer either of those things, but given that binary choice, we'll go forward.

The Court: Okay. I will deny the motion.

*Id.* at 10:15–11:2.

The Court concludes that Cantwell knowingly and voluntarily opted to proceed to trial at that time and under any constraints of access to evidence he'd experienced and argued against his severance and his trial's continuance. As such, Cantwell *waived* any due process arguments that he was prejudiced on account of his inability and delays in access to evidence prior to and at trial, and he cannot now seek to re-raise them following that waiver. *See, e.g.*, *In re Varat Enters., Inc.*, 81 F.3d 1310, 1317 (4th Cir. 1996) ("traditional waiver principles come into play when a party voluntarily or intentionally relinquishes a known claim right"). Moreover, and separately from waiver, Cantwell is estopped from reraising any due process arguments following his decision to proceed to trial and oppose severance and continuance.[16] The Court

---

[16] Plaintiffs argue that "judicial estoppel" is the precise doctrine that prevents Cantwell's continued attempt to raise due process arguments in this posture. Dkt. 1574 at 29. And their invocation of judicial estoppel is understandable, which holds that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). And under those principles, the Court agrees that Cantwell cannot "play[ ] fast and loose" with the Court and this case, by being allowed to take "inconsistent positions during the course of litigation" as to severance and the continuance—which this Court expressed it would have allowed for Cantwell, absent his objection. *See Fed. Dep. Ins. Corp. v. Jones*, 846 F.2d 211, 234 (4th Cir. 1988) (cleaned up). However, the Court is mindful that courts generally invoke *judicial* estoppel only when "the position sought to be estopped" is "one of fact rather than law or legal theory." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). Accordingly, equitable estoppel principles more closely capture the nature of Cantwell's attempted change-of-position. *See Jones*, 846 F.2d at 234 (defining equitable estoppel as "[t]he vital principle" that "he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such

JXV-2_Page 498

further notes that, in another respect, much of the difficulty Cantwell asserts in terms of his
access to files in the weeks leading up to the trial, Dkt. 1536 at 4–5 (¶¶ 14–20), were again
occasioned by his own decision to request that he be transported from USP Marion in Illinois to
Charlottesville to attend the trial in person. Dkt. 1015. The Court *granted* Cantwell's request,
directing the U.S. Marshal's Service to transport Cantwell to Charlottesville for trial and further
to transport Cantwell at no expense to himself with costs to be borne by the United States as he
was then held in federal custody. Dkts. 1031, 1032, 1104, 1105. The Court further specifically
directed that "[t]o the extent practicable and consistent with applicable security considerations,
Cantwell shall be able to retain any case-related materials and papers he may possess while
being transported to Charlottesville." Dkt. 1105 at 4.

      The Court finds that Cantwell was able to fully prepare for and participate in the trial
notwithstanding his incarcerated status. The Court granted his request to be transported to trial
and he was therefore able to attend, in person, for this multi-week trial at no expense to himself.
Dkts. 1031, 1032, 1104, 1105. Given Cantwell's incarcerated status and recognizing delays
inherent in mail to prisons, in advance of trial, the Court took the extraordinary step of allowing
Cantwell to file any submission with the Clerk's Office through electronic means, including by
fax or email. Dkt. 1401. Cantwell took full advantage of the opportunity and access to the Court
in advance of trial, even though he was incarcerated, filing a multitude of pre-trial motions—

---

person to loss or injury by disappointing the expectations upon which he acted"). Plaintiffs
sought severance of Cantwell's case and a continuance to permit him the time that he said he
needed to adequately prepare for trial. Cantwell objected to Plaintiffs' request and opted to
proceed with trial, thus leading Plaintiffs to proceed with what they otherwise would not have
done. Allowing Cantwell to backtrack from his prior position would prejudice Plaintiffs. In any
event, considered under either legal framework, Cantwell is estopped from the about-face he
seeks to make, claiming now that his trial is unfair due to logistical problems on account of his
incarceration when he voluntary decided to go to trial under those very same circumstances.

many more than any other Defendant, or the combined other Defendants—all of which this Court or the Magistrate Judge (if a motion was directed to him) fully considered and resolved. *See, e.g.*, Dkt. 1056, 1062, 1063, 1066, 1077, 1084, 1085, 1088, 1090, 1096, 1098, 1099, 1102, 1157, 1158, 1159, 1160.  Plaintiffs provided him with all exhibits in advance of trial.  The Court provided Cantwell access to a computer throughout trial, including time before and after trial every day so that he could prepare any exhibits.

By this Court's own observation, Cantwell was prepared and engaged in his defense of Plaintiffs' claims against him throughout the entirety of this multi-week trial, using exhibits, his computer, and court technology, and was sufficiently prepared to present his own defense and evidence as well as cross examine and challenge Plaintiffs' evidence. Cantwell was certainly afforded a full and fair opportunity to present his case and challenge Plaintiffs' case—and in practice, Cantwell was afforded more than what the Due Process Clause requires.

Accordingly, there was no unfairness in his trial, and Cantwell's arguments are rejected in this regard as well. *See* Dkt. 1536 at 2–6.

### Richard Spencer

Richard Spencer also challenged the jury's verdict finding him liable for Virginia state law civil conspiracy (Count III) and for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1 (Count IV). *See* Dkt. 1550 at 1–4, 6–11; Dkt. 1595. The Court rejects Spencer's arguments as the jury's verdicts against him were lawful and supported by more than substantial evidence.

First, Spencer seeks to overturn the jury verdict that he committed Virginia state law civil conspiracy because, he contends, there was no proof that he was engaged in a conspiracy to do anything "malign or unlawful." *Id.* at 2. Rather, Spencer argues that he had only "agree[d] to participate in a political rally," but "[t]here is no tort in engaging in or witnessing bold talk, [or]

Filed 05/06/23

Doc 100

even the advocacy of violence, so long as that discussion does not involve the directing or inciting or producing imminent lawless actions." *Id.* Spencer also contends that he had not communicated with certain members of the Nationalist Front (The League of the South, Traditionalist Workers Party, and National Socialist Movement) "in the days leading up to [Unite the Right] or during the event itself." *Id.* at 3. Moreover, Spencer cites a statement from Plaintiffs' expert witness Dr. Peter Simi, where Dr. Simi stated that he did not believe Spencer was involved in the Unite the Right Discord server. *Id.*

Spencer's challenge to the jury's verdict finding him liable on Count III lacks merit. To be sure, Virginia state law civil conspiracy "generally requires proof that the underlying tort was committed." *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007). But Spencer's argument that the Court can't discern what tortious conduct or illegality the jury concluded that he had conspired to commit makes little sense. Here, the Court need look no further than the jury's additional finding that he (Spencer) and his co-conspirators Kessler, Kline, Ray, and Cantwell engaged in racial, religious, or ethnic harassment or violence, violating Virginia Code § 8.01-42.1 (Count IV). Dkt. 1478 at 3, 6 (jury verdict). That's a "criminal or unlawful purpose" of the conspiracy. *See Bellsouth Servs.*, 453 S.E.2d at 267; Va. Code § 8.01-42.1 ("An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts (i) intimidation or harassment, (ii) violence directed against his person, …where such acts are motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity.").

There's more. The jury also found that Fields, Spencer, and the other Defendants were coconspirators; that Fields intentionally drove his car into the crowd on August 12, 2017, injuring numerous Plaintiffs; and that Fields (as well as Spencer, et al.) were liable for racial religious or ethnic harassment or violence under Va. Code § 8.01.42.1, and that Fields was liable

for assault and battery. Dkt. 1478 at 6–9. That's another criminal or unlawful purpose of the conspiracy. The jury found that Spencer and Fields were both members of the conspiracy, and the jury was instructed that members of a conspiracy were liable for the foreseeable acts of their co-conspirators done in furtherance of the conspiracy. Dkt. 1461 at ECF 22, 38–40 (jury instructions); *La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC*, 805 S.E.2d 399, 406 (Va. 2017) (explaining that "civil conspiracy is a mechanism for spreading liability amongst coconspirators for damages sustained as a result of an underlying act that is itself wrongful or tortious") (cleaned up). At bottom, the jury's finding that there were numerous criminal or unlawful purposes of the conspiracy is manifest on the face of the verdict sheet. Spencer's claim that they can't be discerned lacks merit.

To the extent Spencer argues that the evidence did not support the jury's conclusion finding him liable for Virginia state law civil conspiracy (Count III), the Court disagrees. There was more than substantial evidence in the record to support such a finding. Communications between Spencer and the other Defendants and planners and organizers of Unite the Right preceding the event evidenced an intent to spark violence at Unite the Right. For example, Spencer wrote to Elliott Kline two months before Unite the Right that "[t]his is going to be a violent summer." PX 3114. In the lead-up to Unite the Right, Christopher Cantwell texted Spencer that he (Cantwell) was "**willing to risk a lot for our cause**, **including violence and incarceration**. **Many in my audience would follow me there too, but I want to coordinate and make sure it's worth it to our cause.**" Dkt. 1397 (Nov. 4) 121:13-16 (emphasis added); PX 3149-B-D. Spencer responded: "**It's worth it, at least for me.**" *Id.* at 121:17-18 (emphasis added). There were various other communications between Spencer and co-Defendants to similar effect. *See* Dkt. 1574 at 32–36 (Plaintiffs' post-trial merits briefs) (citing communications). Indeed, Spencer testified that "one of the goals of the white nationalist rallies

in 2017" was "triggering" other people, *i.e.*, "sending a message that provokes an angry response." Dkt. 1397 (Nov. 4) 48:10-18. And substantial evidence showed that Spencer's codefendants, including Kessler, shared similar motives and sought various methods to spark violence at which point Unite the Right rallygoers would be prepared to respond with overwhelming force and violence. *See, e.g.*, PX 1461 (Kessler, asking in a Facebook post whether rallygoers could "conceal carry," because he didn't "want to scare Antifa off from throwing the first punch," and he didn't want to "keep Antifa away," because he "want[ed] them to start something"); PX 1432-A (Kessler, writing "[w]e need a new way to tip off Antifa when we want them to show up somewhere," and asking whether someone could "with a fake account or some apolotical normie" could "send photos and tips to their members," because "[w]e definitely want to play these people into our hands Saturday in Charlottesville.").

Evidence showed that these were not mere one-off communications between Spencer and the Unite the Right organizers. Ample evidence showed Kessler and the other Unite the Right organizers considered Spencer a key organizer or a "VIP" of the event. *See, e.g.*, Dkt. 1397 (Nov. 4) 134:15–136:9 (text message chain including Spencer also included Kessler, Cantwell, Damigo, Michael Hill, and others whom Spencer identified were leaders of Unite the Right); *id.* at 136:3-9 (Kline writing Spencer on August 11, that they were "canceling the afterparty to the general public, but still having one for leadership and VIP"); PX 3115, 3146. Spencer testified that he regularly held calls with Damigo, Kline, Greg Conte, and others in the summer of 2017, regarding Unite the Right. Dkt. 1397 (Nov. 4) 100:14–101:5; *see also* Dkt. 1550 at 2 (Spencer acknowledging he "[s]poke occasionally with Mr. Kessler and other Defendants about [Unite the

Right] between [June 2017] and August 11-12").[17] And even when Spencer did not go to certain "leadership meetings" in preparation for Unite the Right, Spencer was invited, and he sent representatives such as Conte to attend in his stead and report back to him. *See, e.g.*, Dkt. 1397 (Nov. 4) 137:18–138:10 (Spencer testifying that Conte attended the "leadership meeting" the night of the torch march on August 11, 2017; and reported back to him the marchers were meeting at Nameless Field). And even if Spencer personally was not active on Discord, as he argues, Dkt. 1522 at 4, the jury heard other evidence that he participated in the Discord #leadership channel through several "designees," Dkt. 1431 (Nov. 15) 69:9-12.

At the torch march on August 11, and at the Unite the Right rally on August 12, evidence showed Spencer to be a central figure. Spencer—along with Kessler and Kline—*led* the hundreds carrying lit torches and chanting "You will not replace us," "Jews will not replace us," "Blood and Soil," through University of Virginia grounds, down its historic Lawn, and up the steps of the Rotunda. Dkt. 1431 (Nov. 15) 121:4–122:8, 125:22-23; Dkt. 1397 (Nov. 4) 147:24-25 (Spencer: "I was in the lead, I think that's fair, at the front of the torch march."), *id.* at 148:8-14; PX 2348, 2676.[18] Spencer testified that the Unite the Right crowd quickly surrounded counter-protestors at the base of the Thomas Jefferson statue (which included Plaintiffs Romero and Willis), and that their pinning the counter-protestors at the statue was meant to be "a sign of dominance." Dkt. 1397 (Nov. 4) 156:9-12. And again, Spencer flippantly acknowledged that the crowd they had assembled refused to let the surrounded counter-protestors leave. *See* Dkt. 1397

---

[17] On August 13, 2017, the day after Unite the Right, Spencer texted Kessler in an apparent attempt to distance himself from Kessler, saying: "You're not listening to leadership." PX 3502. This would be further evidence that Spencer considered himself among "leadership" with respect to the Unite the Right rally.

[18] At 10:15 p.m. that evening, Kessler texted Spencer to "Come out front" of the torch march. Dkt. 1397 (Nov. 4) 147:11-14; PX 3107.

(Nov. 4) 155:22–156:8 (responding "Fact Check: True" to tweet that evening: "They surrounded us at the statute[.] They wouldn't let us out"); PX 2500. After the counter-protesters had been driven off, Spencer stood at the base of the Thomas Jefferson statue and shouted: "Alt Right! We own these streets! We occupy this ground! We won!" The mob chanted "Hail Spencer!", "Hail Victory!" and "You will not replace us!" Dkt. 1397 (Nov. 4) 160:9-22; PX 2117 at 0:05–0:35. Spencer retweeted Kessler's post that the torch march was an "[i]ncredible moment for white people who've had it up to here & aren't going to take it anymore." PX 2500.

On the night of August 12, 2017, after Unite the Right—after police called an unlawful assembly, crowds were dispersed and after Fields drove his car into a crowd of peaceful protestors including numerous Plaintiffs—Spencer was a in a room with codefendants, including Nathan Damigo, Jason Kessler, Elliott Kline, and other white nationalists, when Spencer went on a racist tirade which was recorded:

> We're coming back here like a fucking hundred times. I am so mad. I am so fucking mad at these people. They don't do this to fucking me. We are going to fucking ritualistically humiliate them. I am coming back here every fucking weekend if I have to. Like this is never over. I win! They fucking lose! That's how the world fucking works. Little fucking kikes. Little fucking octoroons … my ancestors fucking enslaved those pieces of fucking shit. I rule the fucking world. Those pieces of shit get ruled by people like me. They look up and they see a face like mine looking down at them. That's how the fucking world works. We are going to destroy this fucking town.

PX 2489. Spencer's racist invectives made behind closed doors to the Unite the Right organizers in its immediate aftermath, his stated intent to "ritualistically humiliate" those in Charlottesville who had opposed him including Jewish and African American persons (to whom he referred by racial epithets), and to "com[e] back here every fucking weekend" and "destroy this fucking town," *i.e.*, Charlottesville, all provided strong evidence to the jury that Spencer and his codefendants had been co-conspirators engaged in a Virginia state law civil conspiracy to commit various unlawful acts, including racial, religious, or ethnic violence and intimidation in

JXV-2_Page 505

violation of Va. Code § 8.01-42.1. Indeed, such behind-the-scenes statements are often notoriously hard to uncover in conspiracy cases, increasing its potential salience and force here. *Cf. Burgos*, 94 F.3d at 857 ("By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement."). And to be sure, while Spencer attempted on the stand to explain away the tirade—as "captur[ing] [his] most childish, embarrassing sentiments, the animal brain," for which he was "ashamed," but had merely said things that were "obviously absurd," Dkt. 1397 (Nov. 4) 46:21–47:4—the jury was not required to accept the credibility of his testimony on this, or indeed any other, point.

Plaintiffs also testified and presented substantial evidence showing that they suffered physical injuries, emotional and other damages, on account of Spencer's acts in furtherance of the conspiracy, and those of his coconspirators. *See, e.g.*, Dkt. 1378 (Oct. 29) 176:1-2, 177:5-11, 180:10-14, 181:1-24 (Plaintiff Willis describing how during the torch march he could not leave the Jefferson statue because he "was surrounded on all sides by tiki torches," "tiki torches, still on fire, were being thrown in our direction," he was pepper-sprayed, and liquid that "appeared to be a tiki torch canister" was thrown at his feet and splashed his shoes, which caused Willis to fear "their strategy was going to be to burn us alive," and then finally when he was able to "crawl[ ] off the statue" surrounded by his friends, he watched them "take punches and kicks to their backs," and "take pepper-sprays at point-blank range directly into their eyes"); *see also id.* at 176:1-2 (Plaintiff Romero testifying that the rallygoers threw a torch at her that landed centimeters from her foot and sprayed mace at her and the other counter-protesters).

Spencer also challenges the jury's verdict on Count IV, finding him liable for acts of intimidation, harassment, or violence directed at Plaintiffs Romero and Willis, and that his actions were motivated by racial, religious, or ethnic animosity. *See* Va. Code § 8.01-42.1(A); *see also* Dkt. 1550 at 6–8 (Spencer's brief). Spencer argues that he should not be held liable on

Filed 05/06/23   Case: 23-1721   Doc: 100

this count because Plaintiffs Romero and Willis were "vague and noncommittal" about seeing Spencer on the night of the torch march. Dkt. 1550 at 7–8; *see also* Dkt. 1595 at 2–3 (similar). Spencer asserts that, to be liable on Count IV, he had to "directly harm[ ] the Plaintiffs, or expressly order[ ] someone to harm them." Dkt. 1550 at 8. Spencer writes that there was no evidence to support either of those possibilities. *Id.* In Spencer's telling, unlike the evidence of Cantwell "pushing, shoving, pepper-spraying, and manhandling counter-protestors," he (*i.e.*, Spencer), "was not involved in any of those altercations," and accordingly should not be held liable on Count IV. *Id.*

The fact that Plaintiffs Romero and Willis themselves could not personally identify Spencer and any tortious conduct he committed on the night of the torch march is unsurprising, considering their testimony (and photographic and video evidence) that they and the other counter-protestors were surrounded by what they perceived to be "a lynch mob" of hundreds waving lit tiki torches in their faces, throwing lit torches at them, shouting at them and calling them racial epithets, and spraying them with pepper spray. *See* Dkt. 1378 (Oct. 29) 29:1-19, 176:1-2, 180:11–81:3. Willis testified he was "trying to keep [his] head down" to protect himself against "pepper spray and things that were being thrown," and to avoid becoming a victim of "doxing." *Id.* at 176:10–177:9; *see also* PX 2680 (counter protestors surrounded), PX 2695 (counter protestors' heads down). Romero testified that they "covered [them]selves and tried to run out," while the Unite the Right crowd "were literally spraying, throwing stuff," "violently swinging" torches. Dkt. 1378 (Oct. 29) 30:8-11. In any event, there is no evidentiary requirement that Plaintiffs Romero and Willis specifically had to testify that they saw Spencer commit acts prohibited by Va. Code § 8.01-42.1(A), rather than other evidence in the record support liability.

Again, ample testimonial, video and other evidence demonstrated that Spencer (as well as codefendants Kessler and Kline) led the mob at the torch march to the Rotunda and down to

the Jefferson statue as they chanted "You will not replace us," "Jews will not replace us," and "Blood and Soil"; surrounded the counter-protestors including Plaintiffs Willis and Romero and pinned them to the statue preventing them from leaving as a sign of dominance; shouted at Romero, Willis, and the other counter-protestors: "go back to where you came from," "stupid bitch," other chants, and they made "[m]onkey noises" at them; thrust lit tiki torches at them and pepper sprayed them; and when Romero, Willis and the other counter-protestors were driven off following a barrage of punches, kicks and pepper-spray, Spencer gave a speech touting their victory ("We own these streets! We occupy this ground! We won!"), to which the mob chanted "Hail Spencer!", "Hail Victory!" That constitutes more than substantial evidence that Spencer personally committed intimidation, harassment, or violence directed at Plaintiffs Romero and Willis, and that his actions were motivated by racial, religious, or ethnic animosity. In addition, Spencer's argument that he was merely engaged in "constitutionally protected speech" even if many around him were more directly engaged in violence—like Cantwell, who he agreed was "pushing, shoving, pepper-spraying, and manhandling counter-protestors, Dkt. 1550 at 6, 8— ignores that an individual may be liable for the unlawful conduct of others by "authoriz[ing] [or] directing" the unlawful conduct, or engaging in speech that was "likely to incite lawless action." *Claiborne Hardware*, 458 U.S. at 927.

Spencer's motion for a directed verdict or a new trial on Counts III or IV will be denied. Dkt. 1550.

### The League of the South, Michael Hill, Michael Tubbs

The jury found the League of the South, Dr. Michael Hill and Michael Tubbs liable for Virginia state law civil conspiracy in Count III. However, the jury did not reach a verdict on Counts I and II. Dkt. 1478 at 1–3 (jury verdict). In their post-trial motions, the League of the South, Michael Hill, and Michael Tubbs (the "League of the South Defendants") have moved for

directed verdicts on Counts I, II, and III. Dkt. 1549. For the following reasons, the Court

concludes that the League of the South Defendants are not entitled to a directed verdict on any

count, and that substantial evidence supported the jury's finding that they were liable on

Count III.

Hill is the founder and President of League of the South. Dkt. 1401 (Nov. 5) 66:18-23.

Hill expressed his beliefs on the League of the South website in "My Pledge of Allegiance," in

which he stated: "I pledge to be a white supremacist, a racist, an anti-Semite, a homophobe, a

xenophobe, an Islamophobe, and any other sort of 'phobe that benefits my people, so help me

God!" Dkt. 1401 (Nov. 5) 68:17-21; PX 1566-A. The League of the South seeks to "create a

white homeland," and to that end, Hill has advocated for "[s]ome degree of segregation –

perhaps total – and the restoration of white dominance through various Jim Crow-type laws."

Dkt. 1401 (Nov. 5) 69:15-21, 70:16–71:8. The League billed itself as "the heart and soul of the

hard right, an uncompromising movement of real blood and soil Southern/white nationalists who

will not compromise our vision of a Southern homeland for whites." Dkt. 1401 (Nov. 5) 74:12-

21. Because, to them, "Dixie is and should be white man's land," they wrote: "We are firm on

the Negro question and the Jew question." *Id.*

In the months preceding Unite the Right, League of the South began working as part of

the "Nationalist Front"—an umbrella organization comprised of individual white supremacist

organizations including codefendants Traditionalist Worker Party, National Socialist Movement,

and Vanguard America. *Id.* at 89:9–91:9. In May 2017, Hill announced on the League of the

South website that "[t]he League is now working with several other nationalist groups on the

right," and that they "have the same common enemy." PX 1918. That month, Hill issued "an

official call for resistance" to League of the South members, saying "I have spoken with many of

you at length, face to face, about the nature of such resistance. You know what it means," and

cautioning that he "want[ed] no discussion here or elsewhere online of resistance strategies,

tactics, logistics, plans, operations, or after action reports," which "all will be handled through

secure channels." PX 1537. Indeed, in July 2017—one month before Unite the Right—Hill

wrote an address which Ike Baker delivered at the Nationalist Front meeting in Tennessee, in

which Hill stated

> As it is said: 'We must secure the existence of our people and a future for white children.'
>
> But we are compassed around with enemies who seek our destruction. From above, in the form of the international Jew and his white gentile traitor allies, to below, in the dark shape of the negro, Mestizo, and Muslim street thug, we are beset by those who despise us and all we hold dear.
>
> The time has come when white men of the West must put aside their petty differences and unite for our very survival and well-being.

PX 1554. The League of the South and its Nationalist Front allies would have a key role in

instigating widespread fighting on the streets of Charlottesville on August 12, 2017.

Jason Kessler invited Hill to speak at Unite the Right, and Hill not only accepted but

offered League of the South's participation at the rally. Dkt. 1401 (Nov. 5) 80:3-7. A flyer for

Unite the Right advertised Hill (as well as codefendants Richard Spencer, Jason Kessler,

Christopher Cantwell, and Matthew Heimbach) as speakers at Unite the Right. *Id.* at 81:10–

82:17; PX 198. Hill deputized others in League of the South to assist in its preparations for Unite

the Right. These included Tubbs (his "chief of staff") to support the League's operations that

day, Brad Griffin to handle public relations, and Ike Baker to monitor the Discord server

regarding Unite the Right planning and report back. Dkt. 1401 (Nov. 5) 82:22–84:6.

The League of the South Defendants first argue that Plaintiffs failed to introduce

evidence that Hill, Tubbs, or the League of the South attended Unite the Right as part of a

conspiracy to commit racially motivated violence and failed to prove the "content" of any of

their communications supporting the existence of such a conspiracy. Dkt. 1549 at 2. In their view, allowing a jury to draw the inference that their communications included an agreement to commit racially motivated violence would be "speculative and unreasonable," and "have a chilling effect on actions and speech that are protected by the First Amendment." *Id.* League of the South Defendants also appear to argue that they didn't commit any act in support of the conspiracy. *See* Dkt. 1549 at 2 (arguing that "Plaintiffs' evidence has shown that Hill was part of a group of protestors who pushed through a human barricade which blocked a public roadway," which is "insufficient evidence" of a "conspiracy to commit racially motivated violence"). These arguments fail because substantial evidence established that the League of the South Defendants conspired with their codefendants to commit racial violence and to commit unlawful acts, and they undertook numerous acts in support of that conspiracy.

In public and private statements, Hill and League of the South emphasized the racial motivation for participating at Unite the Right, encouraging participation to "defend" "Western civilization" and "white men" against perceived "enemies"—specifically, Jewish persons, Black persons, and their "white gentile traitor allies." *See, e.g.*, PX 2101 (Hill, tweeting "**If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August**.") (emphasis added); Dkt. 1401 (Nov. 5) 116:7–117:18.

Moreover, the jury heard other substantial evidence supporting a finding that League of the South Defendants anticipated, hoped for, prepared for, and plotted to spark violence at Unite the Right. For instance, in announcing the League's participation at Unite the Right, Hill wrote that he "want[ed] an excellent turnout of Southern nationalists for this event. Antifa, BLM, et al will be there to greet us! Don't miss out on the fun! – Michael Hill." PX 2858. Indeed, League of the South Defendants acknowledged using similar tactics as their codefendants to "bait" Antifa, Black Lives Matter, or other groups to "come out as public opposition." PX 1560. Behind the

scenes, Tubbs wrote that "I think we all assumed there would be," "and maybe even hoped for," "violence." PX 1553. They "wanted a public confrontation in Charlottesville for the world to see," and they "got it." PX 1560. Hill testified that he wanted League of the South men to wear the same uniform to present "strength and discipline," and a "unified appearance." Dkt. 1401 (Nov. 5) 114:8-14; PX 1553. They brought flagpoles to the rally, which could be used as weapons. Dkt. 1401 (Nov. 5) 114:4-7; PX 3239A (video showing Tubbs leading League of the South and Nationalist Front allies carrying flagpoles into brawl with stationary counter-protesters). And after Unite the Right, League of the South Defendants reveled in engaging in violence that day. *See, e.g.*, PX 3801 (Hill, posting on social media, "Yes, Mr. Tubbs was everywhere the chaos was," and writing "Tubbs will be the first to say that he fought beside many brave warriors that day"). Days after Unite the Right, when someone wrote Hill to express appreciation for Tubbs' "leading the troops into battle and coordinating attack," and the League's "impressive and inspiring" presence at the rally, Hill agreed that "Mr. Tubbs indeed was very much the warrior, as were all of our men who joined us in Charlottesville. I could not have been prouder of them." PX 1562.

To the extent League of the South Defendants argue that "Plaintiffs have failed to prove that the content of Hill's communication with some of his codefendants constituted an agreement to commit racially motivated violence," Dkt. 1549 at 2, that argument fails as well. Again, proof of an explicit agreement to conspire is not required, and circumstantial evidence may be used to establish a conspiracy. *E.g.*, *Burgos*, 94 F.3d at 857; *Floyd*, 249 S.E.2d at 174. League of the South's communications—both in public and in private—more than substantiate that they agreed with their codefendants to commit racially motivated violence and conspired to commit numerous unlawful acts at Unite the Right.

Next, League of the South Defendants argue that there was not sufficient evidence that they were "part of any conspiracy to commit racially motivated violence *at the Torch March*" on August 11, 2017. Dkt. 1549 at 4 (emphasis added). For instance, they argue that "Hill did not attend the Torch March and had no role in its planning or execution," and that there was "no evidence that Tubbs had advance notice of the Torch March." *Id.* at 4–5. Thus, League of the South Defendants argue that they are entitled to judgment as a matter of law on Plaintiffs' § 1985(3) conspiracy claim and § 1986 claim (for failure to prevent a conspiracy). *Id.* These arguments fail. As previously described, it is not necessary that every defendant have notice of every act in furtherance of the conspiracy. Rather, "the law holds conspirators liable for all the reasonably foreseeable acts of their co-conspirators." Dkt. 1461 at ECF 29–30 (Instruction 19); *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) ("[U]nder conspiracy law," a defendant "is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him."). League of the South Defendants were aware of the Torch March beforehand. Indeed, Hill concedes that he sent two League of the South "observers" to the march. Dkt. 1549 at 4; Dkt. 1401 (Nov. 5) 122:13-15. Brad Griffin, a League member in charge of their "public relations," was at the Torch March as one of those "observers." *Id.* at 122:21–123:9; *id.* at 83:4-6; PX 2857 (photo of Griffin); *see also* Def. Ex. 10 (Hill email about Torch March). Others from the League were at the Torch March as well. *See, e.g.*, PX 2883A ("Still getting chills from this, Fla League was there that night before the rally"). Because the Torch March was certainly reasonably foreseeable (and indeed, League of the South Defendants knew about it beforehand and Hill sent observers), this argument fails.

To the extent that League of the South Defendants argue they didn't commit any acts in support of a conspiracy to commit racial violence and unlawful acts, that argument fares no better. Indeed, few organizations or individuals (besides Fields) were as prominent in the

JXV-2_Page 513

violence of August 12, 2017, as League of the South, Tubbs and Hill. The League of the South

as well as the other members of the Nationalist Front gathered at a predetermined meeting point

outside Charlottesville to organize and arrange for coordinated transport to the rally. Dkt. 1401

(Nov. 5) 128:25–192:13; 130:17 (Hill: "[Ike] Baker was coordinating the logistics."). There,

Baker told those assembled that the "convoy" would travel to Market Street parking garage in

downtown Charlottesville, and further exclaimed: "We're going to assemble there. We're going

to march as a mass. This is the greatest assemblage of white identitiarians I've personally ever

seen. We're going to take that park!" PX 1409 (0:00–1:07). When League of the South

Defendants and their Nationalist Front allies (National Socialist Movement, Traditionalist

Worker Party, and Vanguard America) convened on Market Street, they formed as a column in

their respective uniforms and began marching. Tubbs led their column as they charged into a line

of stationary counter-protesters, which included Plaintiff Natalie Romero. *See* PX 1888A,

3239A. After initiating that first widespread brawl, Tubbs helped Nationalist Front members

regroup and prepare for another charge out of Emancipation Park, whereupon Tubbs bellowed

"Follow me!" and led the second column charging into a crowd assembled outside the park,

prompting another melee. PX 2001A. Indeed, "Tubbs was everywhere the chaos was." PX 3801.

Moreover, video establishes and Hill's own testimony at trial conceded that "there were some

League members that engaged in some violence *that they initiated*." Dkt. 1401 (Nov. 5) 149:16-

19 (emphasis added). Hill also conceded at trial that when a League member pepper sprayed a

female counter-protester, it was not done in self-defense. *Id.* at 154:5-10; PX 1888A (0:55 –

1:00).[19] At bottom, Plaintiffs' evidence established numerous acts committed by League of the

---

[19] Plaintiffs also rely on a separate later incident, in which League members beat a black man, DeAndre Harris, in the Market Street parking garage following the declaration of a state of emergency. *See* Dkt. 1574 at 43.

South Defendants, both before and during the Unite the Right rally, taken in furtherance of a conspiracy to commit racial violence and other unlawful conduct at Unite the Right.

League of the South Defendants also contend that Fields' car attack was not connected to any conspiracy. They argue that there was insufficient evidence "to establish that the Fields car attack was an overt act in furtherance of a conspiracy to commit racial violence," or that "the Fields car attack was a reasonably foreseeable result of any conspiracy" they could have been a part of, or that Fields "conspired with any [other] defendant to commit racially motivated violence." Dkt. 1549 at 3–4. These arguments lack merit. There was more than substantial evidence in the record to establish these points. League of the South and Vanguard America were both members of the Nationalist Front. Dkt. 1401 (Nov. 5) 90:11–91:2. They were, in Hill's words, "nationalist allies," working against "the same common enemy," which included Jewish persons. *Id.* at 91:6 – 92:20; PX 1918. At Unite the Right, Fields marched and chanted with Vanguard America, as well as other members of the Nationalist Front (including League of the South). PX 2389, 2390, 2864. Fields wore a Vanguard America polo and carried one of its shields. *See id.*; *see also* PX 3862 at 9. As described above, League of the South Defendants stated that they anticipated and even hoped for violence. *See, e.g.*, PX 1560 (Hill: "we wanted a public confrontation in Charlottesville for the world to see, and we got it."). And further still, running over protestors was a constant theme on the Unite the Right Discord channel and elsewhere. *See, e.g.*, PX 1119 ("Is it legal to run over protestors blocking roadways?"); PX 1144 (Discord post of image of a tractor, captioned as a "multi-lane protestor digestor"); *id.* (Discord post of image of buses driving through crowds, writing "This will be us"); PX 2644 (Cantwell, posting: "Blocking traffic is not a peaceful protest, and every person who reminds you of that without using his car, is giving you more slack than you fucking deserve."); PX 3573 (Fields posted on Instagram a picture of a car driving into a crowd of protestors, with the hashtags

Filed 05/08/23   Doc 100

"#HitlerWasRight and #ShutItDown); PX 3606 (Fields posted on August 12, 2017, "Shut it down", tagging Richard Spencer and League of the South member Brad Griffin).

In addition, League of the South Defendants further ratified the violence after Unite the Right, including Fields' car attack. *See Claiborne Hardware*, 458 U.S. at 927 ("[A] finding that [a defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity."). Hill, head of the League of the South, declared after Unite the Right that he "couldn't be happier" with the outcome, that he "would not go back and change a thing" about it, and that the "League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men." PX 1379B, 1904, 2063. Tubbs repeatedly tweeted after Unite the Right that Fields "did nothing wrong." *See, e.g.*, PX 2867A, 2867B, 2867C.

Lastly, League of the South argues that there was no evidence that Plaintiffs Sines, Willis, Muñiz, and Wispelwey's injuries were caused by overt acts in furtherance of a conspiracy to commit racially motivated violence. As explained below in considerable detail below, Plaintiffs sustained significant physical and emotional (as well as financial) injuries on account of the actions of Defendants, including League of the South Defendants, on August 11 and 12, 2017. *See, e.g.*, Dkt. 1419 (Nov. 11 Tr.) 12:11-23 (Martin); Dkt. 1407 (Nov. 8 Tr.) 70:18–71:2 (Blair); Dkt. 1401 (Nov. 5 Tr.) 208:11–209:7, 213:9–214:6 (Baker); Dkt. 1378 (Oct. 29 Tr.) 49:20–51:7 (Romero); Dkt. 1413 (Nov. 9 Tr.) 17:23–18:6 (Alvarado); Dkt. 1428 (Nov. 12 Tr.) 75:19-21 (Sines); Dkt. 1378 (Oct. 29) 181:1-19 (Willis); *id.* at 29:1-14 (Romero); Dkt. 1422 (Nov. 11) 223:8–234:14, 225:12–229:25, 230:1–234:4 (Muñiz).[20]

---

[20] Unlike the other Plaintiffs, the jury awarded Plaintiff Wispelwey no damages in its verdict.

League of South Defendants' motions for a directed verdict or a new trial are without merit and will be denied. Dkt. 1549.[21]

*     *     *

For these reasons, no Defendant has shown that they were entitled to a directed verdict or a new trial on any count. The verdict as to liability will stand against each of the Defendants as it was returned by the jury.

## — DAMAGES —

### <u>Virginia Cap on Punitive Damages</u>

The parties dispute the effect that Virginia's statutory cap on punitive damages, Va. Code § 8.01-38.1, has on the jury's damages award.

On Count III, for Virginia state law civil conspiracy, the jury awarded punitive damages of $500,000 against each individual defendant, and $1,000,000 against each organizational defendant, totaling $11,000,000. Dkt. 1478 at 5. On Count IV, for racial, religious, or ethnic harassment or violence, in violation of Virginia Code § 8.01-42.1, the jury awarded $200,000 in punitive damages each against Kessler, Spencer, Kline, Ray and Cantwell. Dkt. 1478 at 6. On

---

[21] League of the South Defendants challenge the jury's finding of liability against them for Virginia state law civil conspiracy on Count III, for the same reasons as those advanced in support of a directed verdict on Counts I and II. *See* Dkt. 1549 at 6. No separate argument is made in the slightest. The Court concludes that, for the reasons set forth above, and based on the same evidence noted and otherwise advanced at trial, more than substantial evidence supported the jury's verdict finding League of the South Defendants liable for Virginia state law civil conspiracy. The jury was properly instructed on the latter claim and the jury could properly find that these defendants conspired to engage in numerous unlawful acts, including intimidation or harassment, or directing violence, motivated by racial, religious or ethnic animosity (in violation of Virginia Code § 8.01-42.1), as well as assault, battery, and false imprisonment. League of the South Defendants have failed to raise any meritorious argument for why they were entitled to a directed verdict on this, or any other claim, or that they would be entitled to a new trial on Count III.

Count V, for assault and battery, the jury awarded punitive damages of $6,000,000 against Fields

*Id.* at 8. And on Count VI, for intentional infliction of emotional distress, the jury rendered an

award of another $6,000,000 in punitive damages against Fields. *Id.* at 9. Thus, the jury awarded

a total of $24,000,000 in punitive damages in its verdict.

Defendants contend that Virginia law caps punitive damages in any action to no more

than $350,000, even if, as here, there are multiple plaintiffs in the same action. Plaintiffs raise

two counterarguments. First, they argue that Virginia's punitive damages cap does not apply in a

case involving a conspiracy to commit racial violence. Second, Plaintiffs assert that even if the

statutory cap applies, it applies only on a "per-plaintiff" basis, meaning that a total of $2,800,000

in punitive damages should be awarded, i.e., $350,000 for each of the eight plaintiffs seeking

punitive damages.

Virginia's cap on punitive damages in civil lawsuits reads as follows:

> In any action accruing on or after July 1, 1988, including an action for medical malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact. *In no event shall the total amount awarded for punitive damages exceed $350,000.* The jury shall not be advised of the limitation prescribed by this section. However, if a jury returns a verdict for punitive damages in excess of the maximum amount specified in this section, the judge shall reduce the award and enter judgment for such damages in the maximum amount provided by this section.

Va. Code § 8.01-38.1 (emphasis added).

When the language of a statute is unambiguous, the statutory text is given its plain

meaning. *Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 159 (Va. 1998). That

means the court will "take the words as written," without "resort[ing] to the history of a

particular enactment, extrinsic facts, or to general rules of construction of enactments that have a

doubtful meaning." *Bray v. Brown*, 521 S.E.2d 526, 528 (Va. 1999). Accordingly, in interpreting

a statute, a court applies the plain meaning "unless the terms are ambiguous or applying the plain

meaning would lead to an absurd result." *JSR Mech., Inc. v. Aireco Supply, Inc.*, 786 S.E.2d 144,

146 (Va. 2016) (quoting *Baker v. Commonwealth*, 733 S.E.2d 642, 644 (Va. 2012)). However,

"[i]f a statute is subject to more than one interpretation, this Court must 'apply the interpretation

that will carry out the legislative intent behind the statute.'" *JSR Mech., Inc.*, 786 S.E.2d at 146

(citation omitted).

### A. Whether Virginia Cap Applies to Claims Covering Defendants' Conduct

Plaintiffs argue that the Court should not apply Virginia's statutory cap on punitive

damages "to Defendants' egregious misconduct." Dkt. 1572 at 14. Plaintiffs assert that

Virginia's General Assembly "could not have contemplated, let alone intended, for this punitive-

damages cap to apply in a case like this"—where the jury found Defendants conspired to

commit and committed "heinous acts of racial and religious violence over the course of two

days, in violation of Virginia's hate-crime statute." *Id.* In Plaintiffs' view, § 8.01-38.1's

language shows that Virginia's General Assembly "intended to cover run-of-the-mill tort actions

that resemble medical malpractice claims." *Id.* at 15. Plaintiffs further assert that the statute's

legislative history shows that it was "designed to enable insurance companies to more readily

estimate the dollar amount of claims they might need to pay for personal-injury lawsuits," but

not to "curtail damages for civil rights plaintiffs …." *Id.*

The Fourth Circuit has rejected a similar contention that Virginia's cap on punitive

damages "should apply only in unintentional tort cases." *Wackenhut Applied Techs. Ctr., Inc. v.*

*Sygnetron Protection Sys., Inc.*, 979 F.2d 980, 984 (4th Cir. 1992) (concluding that the same

argument had "no merit"). As the Fourth Circuit explained, the drafters of § 8.01-38.1 "chose

the phrase 'any action' to define the class of cases to which the statute would apply"—a phrase

that "was unequivocal," and there was "no definitional language indicating that the term 'any

action' is limited to unintentional tort actions." *Id.* Like Plaintiffs here, the defendant in

*Wackenhut* argued that the legislative history of the statute evidenced the legislature's concern "with the liability insurance crisis and the need for tort reform." *Id.*; *see also* Dkt. 1572 at 8. But the Fourth Circuit found clear the "plain meaning of the statute" that "the punitive damages cap be applied 'in any action,'" and not just ones for unintentional torts. *Wackenhut*, 979 F.2d at 984–85.

The Court concludes that the plain language of § 8.01-38.1 applies "[i]n any action," and does not draw any distinction like that proposed by Plaintiffs, such that it would only "cover run-of-the-mill tort actions that resemble medical malpractice claims." Dkt. 1572 at 14–15. The statutory language plainly applies "[i]n any action," which would cover this suit. The fact that the statute further specifically clarifies, "*including* an action for medical malpractice …," simply provides an example of an action to which the statutory cap applies. *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (an "including" clause introduces "illustrative application[s] of a general principle"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 15, at 132 (2012) ("The verb to include introduces examples."). The including clause cannot reasonably be read to greatly cabin the scope of the broader phrase, "in any action."

But, Plaintiffs argue, it is "well established that words are known by the company they keep," the principle of statutory interpretation known as *noscitur a sociis*. Dkt. 1572 at 7. And that is true, as far as it goes. It is a general principle that "an *ambiguous* term may be given more precise content by the neighboring words with which it is associated." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quotation marks omitted) (emphasis added); *Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003) (articulating the canon of construction for interpreting "the meaning of doubtful words in a statute"). However, the Fourth Circuit concluded that the phrase "any action" is *unambiguous*. *Wackenhut*, 979 F.2d at 984. Plaintiffs' proposed construction, if not

62

unworkable, at a minimum also risks introducing confusion into the statutory scheme concerning what actions would qualify as "run-of-the-mill tort actions" like medical malpractice claims, and which wouldn't qualify—all without a textual basis for the distinction.[22] As the Fourth Circuit rejected a similar attempt to limit § 8.01-38.1's application only to unintentional torts, this Court also concludes that Plaintiffs' proposed limitation must be rejected. Section 8.01-38.1 applies "[i]n any action." That includes this one.

### B. Whether Virginia Cap Applies on a Per-Plaintiff Basis

Plaintiffs argue that, even if Virginia's statutory cap applies, it applies "on a per-plaintiff basis." Dkt. 1572 at 8. In Plaintiffs' view, "*each* of the eight Plaintiffs seeking punitive damages would be entitled to a punitive-damages award in the maximum amount of $350,000," resulting in a total punitive damages award of $2,800,000 for all Defendants. *Id.* at 6, 9, 20. Plaintiffs note that the Fourth Circuit left open the question whether Virginia's punitive damages cap applies on a per-plaintiff basis in *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 237 (4th Cir. 2000). However, they argue that "the answer … is clear based on the statutory text and context; principles of judicial efficiency, fairness, and predictability; and legal authority from other jurisdictions." *Id.* Defendants counter that since punitive damages awards "are capped at

---

[22] Plaintiffs also argue that since the Virginia hate-crime statute "includes a relatively rare provision for the prevailing party to recover attorneys' fees," it would "seem highly illogical and anomalous for the statute to have such a fee-shifting provision, intended by the legislature to act as a deterrent, and then to simultaneously cap punitive damages for the same violent misconduct." Dkt. 1572 at 7 n. 4. To the contrary, that would be no more anomalous than, for instance, Congress providing that in Title VII intentional discrimination cases the prevailing party may recover attorneys' fees but also capping punitive damages based on the size of the company. *See* 42 U.S.C. § 1981a(b)(3) (limitations on punitive damages based on number of defendant's employees); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) ("Congress provided for additional remedies, including punitive damages, for certain classes of Title VII and ADA violations"); *Fairfax v. CBS Corp.*, 2 F.4th 286, 297 (4th Cir. 2021) ("a prevailing Title VII plaintiff is presumptively entitled to recover attorney's fees").

$350,000 by statute," "[t]he jury awards for all Defendants for all counts may not exceed

$350,000," and therefore, the Court must "reduce the total punitive damages awards to

Virginia's statutory cap." Dkt. 1551-1 at 6.

 While the Fourth Circuit may have left the issue open, this Court is not writing on a

blank slate. To begin, the statutory text states, in part, that "[i]n *any action* … the total amount

awarded for punitive damages against all defendants found to be liable shall be determined by

the trier of fact. In no event shall the total amount awarded for punitive damages exceed

$350,000. …." Va. Code § 8.01-38.1 (emphasis added). Plaintiffs assert that the "central

interpretative question is whether the statutory term 'action' refers to the proceeding as a whole,

or, instead, to each plaintiff's right of action." Dkt. 1572 at 9. Plaintiffs' phrasing of the question

would appear to suggest the answer. The statutory cap only says that it applies "in *any action*,"

not "*a plaintiff's* action," or "*each plaintiff's* right of action," suggesting the legislature did not

mean the former to mean the latter, *see Barr v. Town & Country Properties, Inc.*, 396 S.E.2d

672, 674 (Va. 1990) ("[w]e must … assume … the legislature chose, with care, the words it used

when it enacted the relevant statute"). *See generally* Va. Code § 8.01-2(1) ("'Action' and 'suit'

may be used interchangeably and shall include *all civil proceedings* whether upon claims at law,

in equity, or statutory in nature and whether in circuit courts or district courts.") (emphasis

added); *id.* § 8.01-272 ("In *any civil action*, a *party* may plead as many matters, whether of law

or fact, as he shall think necessary. … The court, in its discretion, may order a separate trial for

*any claim*.") (emphasis added); Fed. R. Civ. P. 3 ("A civil *action* is commenced by filing a

complaint with the court.") (emphasis added).

 The Fourth Circuit has already resolved the related issue whether Virginia's punitive

damages cap applies to the action as a whole, or as against each defendant. In *Al-Abood*, the

Fourth Circuit "predict[ed] what the Supreme Court of Virginia would decide were the issue

presented to it," and, "find[ing] no ambiguity" in the text of § 8.01-38.1, "conclude[d] that its

plain meaning dictates that the cap on punitive damages awards applies *to the action as a whole*,

and not to each defendant." *Al-Abood*, 217 F.3d at 237 (emphasis added). While part of the

statutory analysis relied on the "against all defendants" language, the Fourth Circuit also

explained that, "even without the 'against all defendants' phrase, the statute refers to the 'total

amount awarded' '[i]n any action.'" *Id.* Accordingly, the Fourth Circuit held that, "[g]iving this

language its plain meaning," "the statute mandates that *the entirety of the punitive damages*

awarded in the action amount to no more than $350,000." *Id.* (emphasis added). To be sure, the

Fourth Circuit in *Al-Abood* "express[ed] no opinion on how the cap would be applied in a case

involving multiple plaintiffs." *Id.* at 237 n. 10. However, the reasoning in *Al-Abood* as well as its

conclusion that the punitive damages cap "applies to the action as a whole," both strongly

indicate that Virginia's cap "applies to the action as a whole," and not, as Plaintiffs argue, as to

each plaintiff.

Plaintiffs also rely on *Bulala v. Boyd*, 389 S.E.2d 670 (Va. 1990), a case in which the

Supreme Court of Virginia considered whether another damages cap (the medical malpractice

cap)[23] applied to damages awarded to each eligible plaintiff or to the action overall. That case

was brought by a child born with birth defects and its parents against the mother's obstetrician

and gynecologist. One issue on appeal certified by the Fourth Circuit was, "[w]here there are

two or more plaintiffs entitled to recover damages arising from the same act or acts of medical

malpractice, does § 8.01-581.51 apply individually to each plaintiff or overall to two or more

---

[23] The medical malpractice cap contained the following language:

"In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred … the total amount recoverable for any injury to, or death of, *a patient*, shall not exceed seven hundred fifty thousand dollars." *Bulala*, 389 S.E.2d at 674 (citation omitted) (emphasis added); *accord* Va. Code § 8.01-272.

such plaintiffs?" *Id.* at 672. In answering the question, the Supreme Court of Virginia construed that damages cap "to mean that in a medical malpractice action, the total damages recoverable for injury to a '*patient*' are limited to the statutory amount, regardless of the number of legal theories upon which the claims are based." *Id.* at 675 (emphasis added). A further key issue in the court's "determination on the existence of a single cap" was the definition of the meaning of the word "patient" in the statute. *Id.* The Supreme Court of Virginia held that, because "the mother had a physician-patient relationship" with the obstetrician, "she was a 'patient' within the meaning of the Act and entitled to the benefit of one statutory cap for her compensatory damage claim." *Id.* Because the court also found that "the infant is the obstetrician's 'patient'" as well, it further concluded that "a separate statutory cap for compensatory damages applies to the child's case." *Id.* at 676. So the Supreme Court of Virginia in *Bulala* held that the mother and the child had "separate statutory cap[s]." *Id.* But that holding was based upon the specific language of that statute—which capped "the total amount recoverable for any injury to, or death of, *a patient*"—and the court's ruling that the mother and the child each was the defendant's patient. Section 8.01-38.1, by contrast, caps punitive damages "[i]n any action," and does not include comparable language linking capped punitive damages to the claims of any given plaintiff or number of plaintiffs. If anything, *Bulala* thus provides further support for interpreting § 8.01-38.1 as applying to an entire action, not on a per-plaintiff basis.[24]

Plaintiffs also invoke the principle that statutes should be construed to avoid "significant constitutional questions." Dkt. 1572 at 12. In their view, "a per-plaintiff reading of the statutory

---

[24] The Court notes that Plaintiffs have not advanced a "per-claim" construction of the statute. Any such construction would appear to be foreclosed by *Bulala*, which held that "in a medical malpractice action, the total damages recoverable for injury to a 'patient' are limited to the statutory amount, *regardless of the number of legal theories upon which the claims are based*." 389 S.E.2d at 675 (emphasis added).

cap" is necessary to avoid "separat[ing] plaintiffs into higher and lower damages classes based solely on whether they brought their suits individually or jointly—a baseless distinction that arguably violates equal protection and due-process principles under the federal and state constitutions." *Id.* They argue that, rather than "inject[ing] that constitutional defect into the statute," the Court "should apply the punitive damages cap on a per-plaintiff basis." *Id.*

This argument isn't persuasive for two reasons. First, "[t]he canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). But where, as here, ordinary textual analysis based on binding precedent supplies but "one plausible construction, the canon [of constitutional avoidance] simply has no application." *Id.* at 842 (internal quotation marks omitted). Second, although Plaintiffs invoke the specter of "significant constitutional questions" raised by reading § 8.01-38.1 to cap punitive damages allowed in an entire action rather than on a per-plaintiff basis, they do not develop any argument why that reading would present serious constitutional questions. Nor do they cite any authority that would support such an argument. Nor is any such constitutional concern readily apparent for that matter, especially considering that "courts have routinely rejected substantive due process challenges to statutory damages caps, and, consequently, affirmed that these statutes serve proper governmental purposes." *Wackenhut*, 979 F.2d at 985.

Plaintiffs also argue that "a per-plaintiff construction of Virginia's statutory cap on punitive damages is necessary to promote the efficient, just, and predictable resolution of civil disputes in state and federal courts." Dkt. 1572 at 12–13. They contend that "[i]f Virginia's cap did not apply on a per-plaintiff basis, then multiple plaintiffs asserting a right to relief and seeking punitive damages for the same occurrence would have no incentive to join their claims."

Filed 05/08/23

Doc 100

*Id.* at 13. Plaintiffs have cited cases from Georgia and North Carolina, arguing that these states' highest courts have construed their punitive damages caps to apply on a per-plaintiff basis. *See Bagley v. Shortt*, 410 S.E.2d 738, 739 (Ga. 1991); *Rhyne v. K-Mart Corp.*, 594 S.E.2d 1, 19–21 (N.C. 2004).[25] And those two state courts concluded that similar policy concerns against encouraging a "proliferation" of lawsuits supported the per-plaintiff interpretations of those statutes. *See Rhyne*, 594 S.E.2d at 21 (citing *Bagley*, 410 S.E.2d at 739). Plaintiffs' efficiency argument is not without force, as a matter of policy. Future plaintiffs would have less incentive to join their claims arising out of a single occurrence if the Virginia statute capped punitive damages for an entire action, as opposed to on a per-plaintiff basis. However, similar efficiency concerns were raised to the Fourth Circuit in *Al-Abood* in favor of a per-defendant cap on punitive damages rather than a cap on the entire action. *See* Ans. Br. of Cross-Appellee at 50, *Al-Abood v. El-Shamari*, 217 F.3d 225 (4th Cir. 2000) (Nos. 99-1939, 99-1940), 2000 WL 34012231, at *50 ("What is clear is that a rule applying the punitive damages cap as the El-Shamaris propose would encourage plaintiffs to bring *separate actions* against each defendant, thereby multiplying litigation."). Nonetheless, the Fourth Circuit held that there was "no ambiguity" in the statute and "its plain meaning dictate[d] that the cap on punitive damage awards applies to the action as a whole, and not to each defendant." *Al-Abood*, 217 F.3d at 237. Such policy or efficiency arguments did not support a contrary conclusion. *See id.* So too here.

---

[25] Alabama and Massachusetts cases to which Plaintiffs cited are inapposite, containing materially different statutory language that compelled those courts' conclusions that statutory damages limits applied on a per-plaintiff basis. *See Carson v. City of Prichard*, 709 So.2d 1199, 1203–05 (Ala. 1998); *Irwin v. Town of Ware*, 467 N.E.2d 1294, 1307 (Mass. 1984).

Efficiency or other policy considerations cannot supplant the plain meaning of the statute guided by Fourth Circuit published precedent and are more suited to other fora besides this Court.[26]

There is authority from some Virginia circuit courts and federal district courts that have considered Virginia's $350,000 statutory cap as applying to an action regardless whether there are one or more plaintiffs.[27] And, notably, Plaintiffs have not pointed the Court to any example of a Virginia case in which multiple plaintiffs were each awarded a separate $350,000 statutory cap on punitive damages.[28] Were Plaintiffs to have advanced a construction of Virginia's statutory cap commonly accepted by Virginia courts rather than a novel interpretation of the statute, one would have expected examples of punitive damages awards capped on a per-plaintiff basis to be quite commonplace.

---

[26] *See, e.g.*, *NAPCO, Inc. v. Landmark Technology A, LLC*, 555 F. Supp. 3d 189, 203 (M.D.N.C. 2021) ("In predicting how the highest court of a state would address an issue, this court 'should not create or expand a [s]tate's public policy.'") (quoting *Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007)).

[27] *See, e.g.*, *Foster v. Wintergreen Real Estate Co.*, No. CL09000086, 2010 WL 8696177, at *11–12 (Va. Cir. Ct. Nelson Cnty., Nov. 16, 2010) (holding that the punitive damages cap "applies to the entire lawsuit rather than to each individual defendant," and thus $350,000 was the statutory cap in case with multiple plaintiffs, but issue wasn't raised whether the cap could have applied separately for each plaintiff); *see also Transition, Inc. v. Austin*, No. 3:01-cv-103, 2002 WL 1050240, at *2 (E.D. Va. Mar. 15, 2002) (Dohnal, M.J.) (explaining in *dicta* that, "although the Fourth Circuit has specifically reserved ruling on the issue of the impact of the statutory cap as applied to multiple plaintiffs as opposed to multiple defendants, it is difficult to discern a difference … given the explicit language of § 8.01-38.1 …").

[28] Dicta in at least one case could be interpreted as lending support to Plaintiffs' position. *See Fidelity Nat. Title Ins. Co. v. Wash. Settlement Grp., LLC*, No. CL-2012-4793, 2013 WL 9541969, at *15 (Va. Cir. Ct. Fairfax Cnty. Sept. 4, 2013) ("while Virginia Code § 8.01-38.1 places a $350,000 statutory cap on punitive damages, by the clear language of the statute, the cap pertains to the amount of punitive damages that may be recovered *by a successful party*, not the amount that may be sought in the complaint and to which a jury may find a defendant liable") (emphasis added).

JXV-2_Page 527

At bottom, considering the language of Virginia's statutory cap, the Fourth Circuit's precedent in *Al-Abood*, and lacking subsequent precedent from the Supreme Court of Virginia or the Fourth Circuit clarifying the application of the statutory cap in multiple-plaintiff cases,[29] the Court concludes that Virginia's $350,000 statutory cap on punitive damages applies to the action as a whole, and not on a per-plaintiff basis. Accordingly, the jury's punitive damages award will be reduced to $350,000 against all Defendants found liable on Counts III, IV, V and VI.

### C.  Whether Punitive Damages Award Exceeds Constitutional Grounds

Defendants also argue that the punitive damages award violates their right to due process under the Fourteenth Amendment. The jury's punitive damages award capped pursuant to Va. Code § 8.01-38.1 at $350,00 violates no defendant's due process rights.

Compensatory and punitive damages, although typically awarded at the same time by the same decisionmaker, serve different purposes. While compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," "punitive damages serve a broader function"—specifically, "they are aimed at deterrence and retribution." *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citations omitted). Punitive damages may be imposed to punish unlawful conduct and deter its repetition. *BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 568 (1996). It is "[o]nly when a punitive

---

[29] Virginia's statute governing certifications of questions of law provides that the Supreme Court of Virginia may answer a certified question "if a question of Virginia law is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of [the Supreme Court of Virginia] or the Court of Appeals of Virginia." Va. Sup. Ct. R. 5:40(a). Application of Virginia's punitive damages cap in cases of multiple plaintiffs is a significant question on which it appears there is no controlling Virginia precedent on point. But given the challenges to the merits of the jury verdict and other federal and state law challenges to the damages award, this Court must conclude the question is not at this juncture "determinative" in the pending proceeding. *See United States v. White*, 987 F.3d 340, 342 (4th Cir. 2021) ("We observe that under Supreme Court of Virginia Rule 5:40, the question we certify must be determinative of the proceeding.").

damages award can fairly be categorized as 'grossly excessive' in relation to these [legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.*

The Court must consider three "guideposts" in assessing the constitutionality of a punitive damages award: "(1) the degree of reprehensibility of the defendant's conduct; (2) any disparity between the actual or potential harm suffered by the plaintiff and the amount of the punitive award; and (3) any difference between the award and civil penalties that are authorized or imposed in comparable cases." *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 376 (4th Cir. 2008) (citing *Campbell*, 538 U.S. at 418). Here, Virginia's statutory cap on punitive damages has reduced the punitive damages award to $350,000 against all Defendants, which is a factor that operates to insulate the award against constitutional challenge. *Wackenhut*, 979 F.2d at 985 (explaining, "we have indicated that a statutory cap is one factor that might be considered in insulating a punitive damages award against constitutional attack based on unbridled jury discretion and infringement of substantive due process rights"); *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) ("a punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated"). So too here, the "statutory cap of [$350,000] provided [Defendants] with fair notice" of the range of punitive damages liability they faced on Plaintiffs' Virginia state law claims. *See Fed. Express*, 513 F.3d at 378 (citing *Romano*, 233 F.3d at 673). Upon consideration of these guideposts, the Court concludes that the capped punitive damages award is not grossly excessive or was any individual punitive damages award. Rather, the Court has little difficulty concluding the capped award passes constitutional muster.

Filed 05/06/23

Doc 100

1.  Degree of Reprehensibility

The first guidepost whether a punitive damages award is unreasonably excessive is "the degree of reprehensibility of the defendant's misconduct." *Campbell*, 538 U.S. at 418. That is because punitive damages "should reflect the enormity of the offense." *Gore*, 517 U.S. at 575 (cleaned up). To that end, the Supreme Court has explained that "[p]erhaps the *most important* indicum of the reasonableness of a punitive damages award is the *degree of reprehensibility* of the defendant's conduct." *Id.* (emphases added). Because "some wrongs are more blameworthy than others" in this analysis, those "marked by violence or the threat of violence" are more reprehensible than nonviolent wrongs, and those involving "trickery and deceit" are more reprehensible than negligence. *See id.* (citations omitted). In weighing the reprehensibility of a defendant's conduct, courts must ask whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419.

Some Defendants (Fields, Traditionalist Worker Party, Parrott and Heimbach) offer little to challenge the reprehensibility of their conduct. *See, e.g.*, Dkt. 1551-1 (Fields); Dkt. 1556 at 4–6 (Traditionalist Worker Party, Parrott and Heimbach). Others argue that their conduct was not reprehensible largely because *they* did not cause any injury to Plaintiffs or put their health or safety at risk, or that they only engaged in "speech and action that is largely protected by the First Amendment." *See, e.g.*, Dkt. 1542 at 3 (Schoep); Dkt. 1548 at 5 (League of South Defendants).

Defendants' arguments fail. Because significant evidence in the record supports the presence of four of the factors, a jury could reasonably find Defendants' conduct reprehensible

and warranting a substantial punitive damages award.[30] That would be clear in any event—and especially so considering the trial evidence is viewed in the light most favorable to Plaintiffs as the prevailing parties. *See Fed. Express*, 513 F.3d at 377. First, the harm caused to Plaintiffs was clearly physical. Plaintiffs suffered grievous injuries – the product of callous violence. On August 12, 2017, Defendant Fields drove his car into a group of counter-protestors, killing one and injuring many others, including Plaintiffs Marcus Martin, Marissa Blair, Thomas Baker, Natalie Romero and Chelsea Alvarado. Dkt. 1419 (Nov. 11 Tr.) 12:11-23 (Martin); Dkt. 1407 (Nov. 8 Tr.) 70:18–71:2 (Blair); Dkt. 1401 (Nov. 5 Tr.) 208:11–209:7, 213:9–214:6 (Baker); Dkt. 1378 (Oct. 29 Tr.) 49:20–51:7 (Romero); Dkt. 1413 (Nov. 9 Tr.) 17:23–18:6 (Alvarado). Marcus Martin's left leg was shattered, his ankle fractured, he had ligament damage in his foot, scrapes on his right leg, and he was diagnosed with traumatic brain injury and PTSD. Dkt. 1419 (Nov. 11 Tr.) 19:11-19, 24:15-25. Martin threw his then-fiancée Marissa Blair from Fields' car's path. She suffered a hematoma on her leg, scrapes and cuts, and injured ribs. Dkt. 1407 (Nov. 8 Tr.) 75:24–77:9. Thomas Baker suffered a concussion, lacerations and bruising all over his body, a torn ligament in his left wrist and a right hip labral tear. Dkt. 1401 (Nov. 5 Tr.) 216:18–22. Natalie Romero suffered a fractured skull, a severe concussion, a shattered tooth root, lip laceration, and cuts and bruises all over her legs. Dkt. 1378 (Oct. 29 Tr.) 57:23–58:2. Chelsea Alvarado suffered a concussion, contusions on her upper thighs, a hematoma on her left knee, and cuts and scrapes on her hands and arms. Dkt. 1413 (Nov. 9 Tr.) 23:12-17, 24:14-22. Following her narrow escape from the path of Fields' car and witness to the carnage that

---

[30] Plaintiffs do not argue that the fifth factor identified in *Campbell*, concerning financial vulnerability, is implicated. *See* Dkt. 1572 at 16–17.

JXV-2_Page 531

followed, Elizabeth Sines was diagnosed with PTSD and major depressive disorder related to her PTSD. Dkt. 1428 (Nov. 12 Tr.) 75:19-21.

The prior evening of August 11, at the torch march, Plaintiffs Romero and Willis were surrounded at the base of the Thomas Jefferson statue by a mob organized and led by Jason Kessler, Richard Spencer, Elliott Kline, and others. Romero and Willis were encircled, spat on, cursed at, called racially discriminatory names, and were otherwise battered by the crowd those Defendants and others had instigated. Richard Spencer called it a victorious day afterward.

Those Defendants arguing that they did not *personally* injure any of these Plaintiffs nonetheless committed tortious conduct evidencing "indifference to or a reckless disregard of the health or safety of others." *Campbell*, 538 U.S. at 419. The jury found that those Defendants entered into a conspiracy with Defendant Fields and others. *See* Dkt. 1478 at 4 (jury verdict). Some Defendants acknowledged that their liability for conspiracy supported to some extent a reprehensibility finding for purposes of assessing punitive damages. *See* Dkt. 1542 at 3 (Schoep); Dkt. 1542 at 3 (NSM).

Moreover, the tortious conduct at issue in this case was no "isolated" or passing incident. *Campbell*, 538 U.S. at 419. Rather, evidence showed that Defendants' conduct sparked days of violence and multiple violent encounters. On August 11, Defendants Kessler, Spencer, Kline and Cantwell organized and led the tiki torch-wielding mob which culminated in attacking, pepper spraying, racial and ethnic slurs, harassment and intimidation of Plaintiffs Romeo and Willis; on August 12, columns of Nationalist Front groups led by Defendants Tubbs, Hill, Heimbach, and League of the South, marching in battle formation, charged into a line of stationary counter-protestors and used flagpoles and shields as weapons and pepper spray in the melee that followed, injuring among others, Plaintiff Romero. Later that day, Defendant Fields plowed his car into a peaceful crowd of counter-protestors, injuring the Plaintiffs. More than substantial

Filed 05/08/23

Doc 100

evidence showed that this violence was the product of intentional malice, rather than "mere accident." *Campbell*, 538 U.S. at 419. Plaintiffs introduced substantial evidence that Defendants sought violence, planned for violence, sparked violence, engaged in violence, and afterwards, glorified the violence.

In other words, on both days, the conduct was violent and physical (as opposed to economic); demonstrated deliberate indifference to a great risk of harm; stretched over a substantial period on August 11 (and again on August 12); and was deliberate and intentional and the product of malice (as opposed to merely negligent). The evidence of Defendants' conduct far exceeds the standard of conduct deemed reprehensible in the courts. *See, e.g.*, *Saunders v. Branch Banking & Trust Co of Va.*, 526 F.3d 142, 153 (4th Cir. 2008). Accordingly, under the evidence, the jury was entitled to conclude that Defendants acted reprehensibly such as to support a sizable award of punitive damages.

2.   Punitive Damages Ratio

The second guidepost "is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 418. The Supreme Court has declined to "impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 425. To be sure, the Supreme Court has explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages" will satisfy due process. *Id.* The Fourth Circuit and other circuits have applied those principles and explained that "when a jury only awards nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter.'" *Saunders*, 526 F.3d at 154 (quoting *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364–65 (11th Cir. 2004)).

Defendants argue that the jury awarded punitive damages in a ratio to compensatory damages awarded that was unconstitutionally excessive, violating their due process rights. *See, e.g.*, Dkt. 1542 at 1–4 (Schoep); Dkt. 1555 at 1–2 (Damigo, Identity Evropa, Kessler); Dkt. 1556 at 4–5 (Traditionalist Worker Party, Parrott and Heimbach). Defendants' arguments on this issue are predicated upon challenging the ratio between *the jury's* punitive and compensatory damages awards, rather than the ratio between the statutorily capped $350,000 in punitive damages and the jury's compensatory damages awards. *See id.* Defendants also generally advocate for a claim-by-claim analysis of the ratio between punitive and compensatory damages. *See, e.g.*, Dkt. 1542 at 1–4 (arguing that 500,000-to-1 ratio for Count III is unconstitutionally excessive); Dkt. 1550 at 4 (same). Plaintiffs, for their part, argue that the Court should not compare the ratio of punitive damages to compensatory damages on a "claim-by-claim basis." Dkt. 1572 at 18. Rather, they contend that, "[b]ecause the jury found Defendants liable on multiple claims, the Court should calculate the ratio by comparing the aggregate compensatory damages for which each Defendant is liable (across all claims) against the aggregate punitive damages award against that Defendant (across all claims)." *Id.*

Plaintiffs' aggregate approach to calculating the punitive to compensatory damages ratio is appropriate, well supported, and accords with the posture of this case. *See* Dkt. 1572 at 18–21. At the outset this approach is especially appropriate considering that the jury found Defendants liable for a civil conspiracy. Under Virginia law, the jury's finding of liability on the civil conspiracy claim "meant that [Defendants] were held jointly and severally liable for the damages award." *See Tire Eng'g & Dist., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 312 n. 10 (4th Cir. 2012); *see also Worrie v. Boze*, 95 S.E.2d 192, 198 (Va. 1956) ("The conspirators are jointly and severally liable for all damage resulting from the conspiracy."), *abrogated in part on other grounds*, *Station #2, LLC v. Lynch*, 695 S.E.2d 537, 541 (Va. 2010). "The object of a

civil conspiracy claim is to spread liability to persons other than the primary tortfeasor." *Gelber v. Glock*, 800 S.E.2d 800, 820 (Va. 2017); *see also La Bella Dona Skin Care, Inc.*, 805 S.E.2d at 406 (explaining that "civil conspiracy is a mechanism for spreading liability amongst coconspirators for damages sustained as a result of an underlying act that is itself wrongful or tortious"). While Defendants Damigo and Identity Evropa argue that Plaintiffs' "argument regarding joint and several liability [ ] misses the mark," Dkt. 1593 at 4, they present no contrary law to dispute Plaintiffs' authorities that under Virginia law, Defendants, as coconspirators, are liable for all damages resulting from the conspiracy. In addition, Plaintiffs' aggregate approach makes particular sense where, as here, the jury did not award compensatory damages on all counts for which it found Defendants liable, and thus, the total damages award reflects the jury's assessment of the full measure of damages, and that the jury reasonably sought to avoid awarding any double recovery. *See Cutaia v. Radius Eng'g Int'l*, No. 5:11-cv-77, 2014 WL 3359368, at *3 (W.D. Va. July 9, 2014); Dkt. 1461 at ECF 61 (Instruction 34 – instructing that jury "must be careful not to award double or duplicate damages"). The Court is persuaded that, under "*State Farm*, *BMW*, and *TXO* … a court can aggregate compensatory damages from multiple related causes of action when comparing compensatory damages to punitive damages." *Fastenal Co. v. Crawford*, 609 F. Supp. 3d 650, 661 (E.D. Ky. 2009) (citing *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993)).

The jury awarded Plaintiffs compensatory damages in the amount of $1,303,284 on Counts III, IV and V—the counts for which all Defendants are jointly and severally liable. *See* Dkt. 1478 at 4–8.[31] The jury awarded Plaintiffs compensatory damages in the amount of

---

[31] These counts include Count III (Virginia state law civil conspiracy), as well as Count IV (violation of Virginia's hate crime statute) and Count V (assault and battery)—both of which the Court instructed the jury would constitute predicate unlawful acts of the conspiracy. *See* Dkt.

$701,459 on Count VI (intentional infliction of emotional distress)—a sum for which Fields is

solely liable. *Id.* at 9. Accordingly, the total compensatory damages liability for all non-Fields

Defendants is $1,303,284, and the total compensatory damages liability for Fields is $2,004,743.

*See id.* at 4–9.

As discussed above, applying Virginia's statutory punitive damages cap, the total

punitive damages liability for Defendants is $350,000. No party argues that the Court should

apply anything other than the pro-rata portion of each Defendant's responsibility of the total

punitive damages awarded for purposes of calculating the applicable ratio. No ratio comes

anywhere close to raising due process concerns of an excessive punitive damages award. Here,

Fields has the highest ratio of punitive to compensatory damages—the jury held him responsible

for 52 percent of total punitive damages (i.e., $182,000)—and it still is well below a 1-1 ratio:

0.091 of punitive to compensatory damages. That does not present any constitutional issue of an

excessive punitive damages award—far from it. *See, e.g.*, *Morris v. Bland*, 666 F. App'x 233,

241 (4th Cir. 2016) ("single digit ratios generally do not present a constitutional issue"). The

others' ratios are even less consequential. Far from their protestations of an unconstitutionally

excessive 500,000-to-1 ratio, Kessler, Spencer, and Cantwell, for their part, would owe a pro rata

portion of punitive damages amounting to $10,208, resulting in a 0.0078 ratio of punitive to

compensatory damages. Hill, Tubbs, Schoep and Damigo would owe a pro rata portion of

punitive damages of $7,292, resulting in a smaller-still ratio of 0.0056 ratio of punitive to

compensatory damages. League of the South, National Socialist Movement and Traditionalist

Worker Party would each owe $14,583.33 in punitive damages, resulting in a 0.011 ratio of

---

1478 at 4–8; Dkt. 1461 at ECF 38–39; *accord La Bella Dona Skin Care, Inc.*, 805 S.E.2d at 406
(explaining that "civil conspiracy is a mechanism for spreading liability amongst coconspirators
for damages sustained as a result of an underlying act that is itself wrongful or tortious").

punitive to compensatory damages. Each of these falls well below even a 1:1 ratio of punitive to compensatory damages, which only further serves to support a conclusion that their imposition comports with due process. *See Campbell*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process").

While the Court has concluded that Plaintiffs' aggregate approach is the most instructive to the Court's consideration of the constitutionality of the punitive damages award—especially given the Defendants' joint and several liability—even under Defendants' preferred "claim-by-claim" approach, the punitive to compensatory damages ratios readily pass muster.

Under a "claim-by-claim" approach for Count IV, the jury found Defendants Kessler, Spencer, Kline, Ray, and Cantwell, each responsible for $100,000 in compensatory damages, and each responsible for $200,000 in punitive damages. *See* Dkt. 1478 at 6 (jury verdict). As a percentage of the total capped $350,000 punitive damages award, each of the five Defendants would be responsible for about $2,916 in punitive damages on this count, resulting in a 0.029 ratio of punitive to compensatory damages for this count. For Count V, the jury found Defendant Fields responsible for $803,277 in compensatory damages, and as a capped percentage of the total punitive damages award, $87,500 in punitive damages, resulting in a 0.11 ratio of punitive to compensatory damages. *See id.* at 8. And for Count VI, the jury found Defendant Fields responsible for $701,459 in compensatory damages, and, as a capped percentage of the total punitive damages award, $87,500 in punitive damages, resulting in a 0.12 ratio of punitive to compensatory damages. *See id.* at 9. Again, each falls well below even a 1:1 ratio, further showing their imposition comports with due process.

Defendants' arguments fare no better with respect to Count III. First, a number of Defendants whom the jury had found liable for Virginia state law civil conspiracy in Count III—but no other counts—have challenged punitive damages imposed upon them as excessive. These

include individual Defendants Nathan Damigo, Matthew Heimbach, Matthew Parrott, Michael

Hill, Michael Tubbs, and Jeff Schoep, as well as the organizational Defendants Vanguard

America, League of the South, Identity Evropa, Traditionalist Worker Party, and Nationalist

Socialist Movement. Dkt. 1478 at 3–5 (jury verdict). On this count, the jury awarded nominal

damages to seven Plaintiffs, awarded $500,000 in punitive damages against each of the

abovementioned individual Defendants, and awarded $1,000,000 in punitive damages against

each of the organizational Defendants. *Id.* Numerous moving Defendants have argued that this

results in an impermissible 500,000-to-1 ratio for the individual Defendants, and 1,000,000-to-1

ratio for the organizations. *See, e.g.*, Dkt. 1542 at 1 (Schoep); Dkt. 1543 at 1 (NSM); Dkt. 1548

at 5–6 (League of the South Defendants). However, again, Virginia law capped the punitive

damages award in this action at $350,000 against all Defendants found liable. Therefore, even

applying Defendants' proposed claim-by-claim approach for purposes of this analysis, as a pro

rata portion of the total punitive damages awarded in the action, Defendants Nathan Damigo,

Matthew Heimbach, Matthew Parrott, Michael Hill, Michael Tubbs, and Jeff Schoep would each

be responsible for about $7,292 in punitive damages. Defendants Vanguard America, League of

the South, Identity Evropa, Traditionalist Worker Party, and Nationalist Socialist Movement,

would each be responsible for $14,583—resulting in a 7,292:1 ratio for individual defendants,

and 14,583:1 ratio for the organizational defendants. Also, under a "claim-by-claim" approach

for Count III, Kessler, Spencer, and Cantwell, would each be responsible for $7,292 in punitive

damages—resulting in a 7,292:1 ratio.

 The Court concludes that these ratios—while significantly exceeding more standard

single- or double-digit ratios—are not excessive using Defendants' proposed claim-by-claim

approach, considering that the jury awarded only nominal damages on the civil conspiracy count.

The Fourth Circuit's admonition is readily applicable here, that "when a jury only awards

Filed 05/08/23   Doc 100

nominal damages or a small amount of compensatory damages, a punitive damages award may exceed the normal single digit ratio because a smaller amount 'would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter.'" *Saunders*, 526 F.3d at 154 (citation omitted). Single, double, or even triple-digit ratios in this claim-by-claim approach would "utterly fail" to "punish and deter" these Defendants and others from engaging in similar conduct. To be sure, it might be argued that between $7,000 and $15,000 in punitive damages is also insufficient to achieve that the purposes of punishment and deterrence, especially when the jury would have imposed awards of punitive damages many orders of magnitude greater ($500,000 and $1,000,000). However, again, that outward limit on punitive damages available is the product of Virginia's statutory cap which limited the *entirety of the punitive damages* awarded in the action amount to no more than $350,000. Accordingly, the Court has concluded these ratios do not give rise to constitutional concerns even utilizing Defendants' preferred "claim-by-claim" approach.

The Court further notes that even if it applied a claim-by-claim approach as to the punitive damages awards for Kessler, Spencer, and Cantwell,[32] as to Count III, the Court would still conclude that because nominal damages were awarded, an award of $7,292 in punitive damages as against each does not raise concerns about excessive punitive damages. Especially as to those Defendants who included many of the primary organizers and architects of Unite the Right's violence, the Court finds that even triple-digit ratios would utterly fail to punish and deter them (and others) from engaging in similar conduct in the future.

---

[32] The analysis applies to Kline and Ray as well, however, the Court does not separately address them as they have been absent from court proceedings and have not affirmatively raised these (or any other) arguments at trial or in post-trial motions.

JXV-2_Page 539

"[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell*, 538 U.S. at 426. The ratios of capped punitive damages to compensatory damages on any or all of Counts III, IV, V and VI do not give rise to concerns of excessiveness. The Court similarly concludes that the measure of punishment is both reasonable and proportionate to the harms inflicted upon Plaintiffs. Moreover, an award of punitive damages within the Virginia statutory cap further offers some measure of protection from constitutional attack. *See Wackenhut*, 979 F.2d at 985.

### 3.  Civil or criminal penalties

Lastly, the Court considers "any difference between the award and civil penalties that are authorized or imposed in comparable cases." *Fed. Express*, 513 F.3d at 376 (citing *Campbell*, 538 U.S. at 418); *see also Gore*, 517 U.S. at 583 ("Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."). The parties offer comparatively little argument concerning this last "guidepost" in the Court's analysis assessing the constitutionality of the punitive damages award. Indeed, they have not identified any appropriately analogous civil or criminal statutes or described the statutory penalties authorized or imposed in such cases.

Plaintiffs identify punitive damages awards in several other cases and argue that if those awards were upheld under the facts of those cases, Defendants' reprehensible conduct in this case deserves at least $350,000 in punitive damages. Dkt. 1572 at 29–30. For instance, Plaintiffs cite a case in which two of the same Defendants as in this case (Andrew Anglin and Moonbase Holdings) were found liable for intentional infliction of emotional distress and ordered to pay $100,000 in compensatory and $500,000 in punitive damages, after they directed their followers to harass the plaintiff—the first female, African American student government president at

American University. *See Dumpson v. Ade*, No. 18-cv-1011, 2019 WL 3767171, at *1 (D.D.C.

Aug. 9, 2019). For their part, Defendants' arguments primarily focus on the second "guidepost,"

the ratio between punitive and compensatory damages, and they offer little if any argument as to

this factor. *See* Dkt. 1551-1 at 2–5 (Fields). The Court concludes that the argument concerning

punitive damages awards imposed in other cases is not helpful in this case, given, at a minimum,

significant factual differences between the underlying conduct at issue.[33] More significant is the

fact that the Virginia legislature determined that punitive damages in a civil case may be

awarded in the amount of $350,000 (the cap), and that the Court has reduced the punitive

damages to that cap. *See Fed. Express*, 513 F.3d at 378 (explaining that the fact that the damages

award was within the statutory cap "provides additional support for the reasonableness and

constitutionality of the punitive damages award"); *Gore*, 517 U.S. at 583 ("substantial

deference" afforded to "legislative judgments concerning appropriate sanctions for the conduct

at issue"). This offers further support to the constitutionality of the punitive damages award,

although the Court concludes that the other two guideposts offer more useful analyses here. *See

also Wackenhut*, 979 F.2d at 985.

  The Court concludes that no Defendant has any meritorious due process challenge to the

constitutionality of the punitive damages awards. Defendants' conduct is reprehensible and

satisfies four of the relevant factors in making that determination. Any ratios of punitive

damages to compensatory damages are well within the realm of reasonableness, supported by

---

[33] The Court also notes that some authority has held that other punitive damages awards are simply not relevant to this third guidepost, which concerns "civil or criminal *penalties*," and therefore meant to discern *legislative intent* on appropriate punishments, instead of any punitive damages awards in other cases. *See, e.g.*, *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 367 n. 2 (6th Cir. 2005) (unpublished).

Filed 05/06/23   Doc 100

precedent, and necessary to achieve the goals of punishment and deterrence. And the Court has capped punitive damages at $350,000 as set forth by Virginia statute.

### D. Whether Punitive Damages Award Is Permissible Under Virginia Law

Defendants also argue that Virginia law does not permit any punitive damages award as against them, or that, if it does, the Court should reduce the punitive damages award as excessive under Virginia law. Dkt. 1542 at 4–6 (Schoep); Dkt. 1543 at 4–6 (NSM); Dkt. 1548 at 2–4 (LOS, Hill, Tubbs); Dkt. 1551 at  5–6 (Fields); Dkt. 1556 at 1–2 (Parrott, Heimbach, TWP). The Court disagrees. The award of punitive damages reduced to the Virginia statutory cap is not excessive under Virginia law.

Under Virginia law, the purpose of punitive damages is "to provide protection to the public," "punishment to [the] defendant," and to serve as "a warning and example to deter him and others from committing like offenses." *Coalson v. Canchola*, 754 S.E.2d 525, 528 (Va. 2014). "The general rule is that there is no fixed standard for the measure of exemplary or punitive damages and the amount of the award is largely a matter within the discretion of the jury." *Baldwin v. McConnell*, 643 S.E.2d 703, 707 (Va. 2007) (quoting *Worrie*, 95 S.E.2d at 201). Courts that review a punitive damages award under Virginia law must consider various factors, including: (1) the "reasonableness between the damages sustained and the amount of the award," (2) "the measurement of punishment required," (3) whether "the award will amount to a double recovery," (4) "the proportionality between the compensatory and punitive damages," and (5) "the ability of the defendant to pay." *Baldwin*, 643 S.E.2d at 707. A court considering a request under Virginia law for remittitur of a punitive damages award must view the evidence in the light most favorable to the party who received the jury verdict. *Caldwell v. Seaboard Sys. R.R., Inc.*, 380 S.E.2d 910, 914–15 (Va. 1989). The Supreme Court of Virginia "ha[s] repeatedly held that a jury's award of damages may not be set aside … as excessive," unless the damages

"are so excessive … as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion." *Downer v. CSX Transp., Inc.*, 507 S.E.2d 612, 614 (Va. 1998).

Several Defendants argue that under Virginia law, punitive damages can be awarded only where the jury has awarded "actual or compensatory damages," not "nominal damages." *See, e.g.*, Dkt. 1548 at 2–3 (League of the South Defendants); Dkt. 1556 at 1–2 (Parrott, Heimbach, Traditionalist Worker Party). However, notwithstanding the distinctions under Virginia law between compensatory and nominal damages, *Kerns v. Wells Fargo Bank, N.A.*, 818 S.E.2d 779, 785 (Va. 2018), Virginia precedent is clear that punitive damages can be awarded if the jury has awarded either compensatory *or* nominal damages, *Valley Acceptance Corp. v. Glasby*, 337 S.E.2d 291, 297 (Va. 1985) ("Here, neither compensatory damages nor nominal damages were awarded against Valley. Consequently, punitive damages could not be awarded."); *Gibson v. Boy Scouts of Am.*, 163 F. App'x 206, 211 (4th Cir. 2006) (unpublished, per curiam) (citing *Glasby* for the proposition that "under Virginia law, punitive damages are not proper absent an award of compensatory or nominal damages."); *Syed v. ZH Techs., Inc.*, 694 S.E.2d 625, 634 (Va. 2010) (quoting *Zedd v. Jenkins*, 74 S.E.2d 791, 793 (Va. 1953)) (explaining a punitive damages award was "illegal" without a "finding that plaintiff was entitled to any compensatory, or even nominal, damages").[34] Because Plaintiffs are not seeking recovery of punitive damages

---

[34] Defendants' reliance on precedent setting aside a punitive damages award in the absence of compensatory damages—and where *no* nominal damages were awarded—does not support a contrary conclusion. *See Gay v. Am. Motorists Ins. Co.*, 714 F.2d 13, 16 (4th Cir. 1983). In any event, later Virginia precedent confirmed that nominal damages can support an award of punitive damages. *E.g.*, *Glasby*, 337 S.E.2d at 297; *Syed*, 694 S.E.2d at 634; *Doddy v. Zedd Auctioneers, Ltd.*, No. CL07-4965, 77 Va. Cir. 272, 2008 WL 8201371, at *2 (Va. Cir.

for Plaintiff Wispelwey, to whom the jury did not award any compensatory or nominal damages, Dkt. 1478 at 3–9 (jury verdict), this Virginia state law limitation did not bar an award of punitive damages in favor of any of the other Plaintiffs.

Regardless, some Defendants argue that even if nominal damages are sufficient to award punitive damages, the punitive damages award is excessive as to those Defendants against whom the jury awarded *only* nominal (no compensatory) damages. For example, League of the South Defendants argue that "Virginia law requires a reasonable ratio between compensatory damages and punitive damages." Dkt. 1548 at 3–4. They argue that the punitive damages award as against them on Count III, even capped by Va. Code § 8.01-38.1, was disproportionate to the nominal damages award. *See id.* This argument is unpersuasive. Viewed in the light most favorable to Plaintiffs as the prevailing parties, ample evidence supported the conclusion that substantial punitive damages were required against these Defendants to "provide protection to the public," "punishment" to Defendants, and to serve as a "warning and example to deter [them] and others from committing like offenses." *See Coalson*, 754 S.E.2d at 528. To a large extent, whether the punitive damages award is excessive tracks the Court's analysis above. And, in any event, the sums awarded, especially reduced to fall within the statutory cap, certainly are not "so excessive … as to shock the conscience." *Downer*, 507 S.E.2d at 614.

Moreover, this is not a case in which any of the Plaintiffs who were awarded nominal damages on some counts were awarded nominal damages only because they "failed to demonstrate actionable harm." *People Helpers Found., Inc. v. City of Richmond, Va.*, 12 F.3d 1321, 1327 (4th Cir. 1993). While on the Virginia state law civil conspiracy count (Count III),

---

Ct. Norfolk City) (2008) ("an award of nominal damages will support an award of punitive damages").

the jury awarded Plaintiffs Romero, Muñiz, Baker, Blair, Martin, Alvarado, and Willis nominal damages in the amount of $1.00, Dkt. 1478 at 4, the jury also awarded each of those Plaintiffs substantial compensatory damages for the underlying predicate violent and tortious acts, namely religious, or ethnic harassment or violence, violating Virginia Code § 8.01-42.1 (Count IV), assault and battery (Count V), and intentional infliction of emotional distress (Count VI), Dkt. 1478 at 5–9.

Some Defendants also argued that the punitive damages awards should be further reduced because of their purported inability to pay. *See, e.g.*, Dkt. 1556 at 5 – 6 (Traditionalist Worker Party, Parrott and Heimbach). However, these Defendants cite no evidence in the record to substantiate their argument that they lack the ability to pay, and therefore the Court concludes that it does not support any further reduced punitive damages award. *See Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.*, 709 S.E.2d 163, 175 (Va. 2011) (holding that a defendant who "contends that it was experiencing financial difficulties," but "did not introduce evidence of their financial situation at trial … cannot prevail before this Court on its claim that the amount of punitive damages would be oppressive"). Defendant Schoep argues that, "[h]ad Plaintiffs' counsel allowed testimony of the defendant's current work to be heard, the jury would have been better equipped to 'determine the proper amount of punitive damage, if any only against Defendant Schoep.'" Dkt. 1542 at 7 (citing Dkt. 1431 (Nov. 15) 17:19-21)). However, Schoep does not identify any evidence that he argued should be introduced to show his alleged inability to pay punitive damages that was excluded. Having failed to "introduce evidence of [his] financial situation at trial," he cannot now prevail on his

claim that the amount of punitive damages would be oppressive.[35] *See Condominium Servs.*, 709 S.E.2d at 175. In any event, this argument also fails because no defendant asserting this issue has demonstrated such an inability to pay, based upon the totality of their financial circumstances, especially with respect to the punitive damages award reduced to comply with the Virginia statutory cap. *Cf. Baldwin v. McConnell*, 643 S.E.2d 703, 707–08 (Va. 2007) (considering value of defendant's stocks in determining ability to pay); *Jordan v. Osmun*, No. 1:16-cv-501, 2017 WL 2837143, at *8 (E.D. Va. June 29, 2017) (affirming a $100,000 punitive damages award, and rejecting argument that defendant "do[es] not have that kind of money, because "neither party has presented a clear record of the financial condition of the Defendants," and noting Virginia's "low threshold for ability to repay").

Because Defendants have not raised any valid reason that the punitive damages award, capped at the statutory threshold, should be further reduced under Virginia law, the Court will deny Defendants' arguments for such relief.

---

[35] Schoep argues that, had Plaintiffs not objected, he would have introduced testimony from a witness Daryl Davis concerning Schoep's "current work," which would have given the jury a basis to determine he was unable to pay punitive damages. *See* Dkt. 1542 at 7–8. But the basis upon which Schoep sought to introduce Davis's testimony was that he "could potentially humanize Defendant Schoep," and that he would testify about "the state of mind of [Schoep] and his propensity, or lack of, for violence." Dkt. 1267 at 2–3. Not inability to pay punitive damages. Indeed, though Defendant Schoep had not raised the issue of relevance to punitive damages, the Court allowed Schoep to introduce evidence regarding his subsequent alleged repudiation of white supremacy and related conduct for the limited purpose of determining the amount of punitive damages. Dkt. 1431 (Nov. 15) at 17:6-21; Dkt. 1428 (Nov. 12) 188:5-13. In other words, Schoep's (suggestion) that he was not permitted to introduce evidence that he was unable to pay fails, both because (1) he did not timely argue that he wanted to introduce such evidence for that purpose, (2) in any event, he was afforded the opportunity to introduce evidence to that effect, and (3) he does not articulate the argument, much less substantiate such argument, as to how his "current work" renders him unable to pay.

JXV-2_Page 546

## **Conclusion**

The Court has affirmed the jury verdicts as to liability against all Defendants. The Court has further affirmed the compensatory damage awards as imposed by the jury. The jury's punitive damages award will be reduced to $350,000, Virginia's statutory cap on punitive damages. An appropriate Order will issue.

The Clerk of Court is directed to send this Memorandum Opinion to the parties.

ENTERED this __30th__ day of December, 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

# JOINT EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| ELIZABETH SINES et al., | ) | |
| Plaintiffs, | ) | Civil Action No. 3:17-cv-00072 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| JASON KESSLER et al., | ) | By:   Joel C. Hoppe |
| Defendants. | ) | United States Magistrate Judge |

This matter is before the Court on Plaintiffs' post-trial Motion for Attorney's Fees and

Costs ("Pls.' Mot."), ECF No. 1552, and Bill of Costs, ECF No. 1553. *See* Order of Jan. 5, 2023,

ECF No. 1624. Plaintiffs seek **$12,726,103.35** in attorney's fees under Virginia Code § 8.01-

42.1(B), *see* Pls.' Mot. 8, 19, 21, 30; and **$546,018.46** in other costs under Rule 54(d) of the

Federal Rules of Civil Procedure, *see id.* at 20, 30–31.[1, 2] The Motion follows a jury verdict

finding seventeen individual and organizational Defendants liable to nine Plaintiffs for those

Defendants' conduct planning and participating in Unite the Right on August 11–12, 2017, in

Charlottesville, Virginia.[3]

---

[1] Pinpoint citations to documents filed on the electronic docket use the header page numbers generated by CM/ECF and exhibit labels used by the filing party.

[2] Plaintiffs also request $1,266,420.84 in reimbursement for certain discovery expenses specifically under the parties' Stipulation & Order for the Imaging, Preservation, and Production of Documents, *see* Pls.' Mot. 32 (citing ECF No. 383), which I signed and entered in November 2018. I will address that request by separate Order.

[3] The following Plaintiffs went to trial: Natalie Romero, April Muñiz, Thomas Baker, Elizabeth Sines, Marissa Blair, Marcus Martin, Chelsea Alvarado, Seth Wispelwey, and Devin Willis. *See* Jury Verdict ¶¶ 4, 8, 11, 14, ECF No. 1631-1. The jury returned a general verdict, or verdicts, against each of seventeen "non-defaulted" Defendants: Jason Kessler; Richard Spencer; Christopher Cantwell; James Fields Jr.; Robert "Azzmador" Ray; Elliott Kline; Matthew Heimbach; Matthew Parrott; Michael Hill; Michael Tubbs; Jeff Schoep; Vanguard America; League of the South; Identity Evropa; Traditionalist Worker Party; and National Socialist Movement. Jury Verdict ¶¶ 1–13; *see* Pls.' Mot. 8. Plaintiffs do not seek attorney's fees or costs against seven other Defendants who have been found in default under Rule 55(a) of the Federal Rules of Civil Procedure. *See* Pls.' Mot. 10 & n.2; Pls.' Reply 6 n.1, ECF No. 1605.

1

More specifically, the jury found all seventeen Defendants liable to all nine Plaintiffs for Virginia common law civil conspiracy (Count III); found Defendants Jason Kessler, Richard Spencer, Elliott Kline, Robert "Azzmador" Ray, Christopher Cantwell, and James Fields Jr. liable to Plaintiffs Natalie Romero, April Muñiz, Elizabeth Sines, Marissa Blair, Marcus Martin, Seth Wispelwey, and Devin Willis for racially, religiously, or ethnically motivated harassment, intimidation, or violence (Count IV, Va. Code § 8.01-42.1(A)); and found Defendant Fields liable to Plaintiffs Romero, Muñiz, Sines, Blair, Martin, Wispelwey, Chelsea Alvarado, and Thomas Baker for assault or battery (Count V) and for intentional infliction of emotional distress (Count VI) under Virginia law. *See* J. 1–3, ECF No. 1631; Jury Verdict ¶¶ 3–14. The jury did not return a verdict on the merits of Plaintiffs' federal claims that one or more of those seventeen Defendants conspired to commit racially motivated violence (Count I, 42 U.S.C. § 1985(3)), or knew about that alleged conspiracy and failed to stop it (Count II, 42 U.S.C. § 1986). *See* Jury Verdict ¶¶ 1–2.

On Count III, the jury awarded nominal compensatory damages each to Romero, Muñiz, Baker, Blair, Martin, Alvarado, and Willis; no compensatory damages to Sines or Wispelwey; $500,000 punitive damages against each individual Defendant; and $1 million punitive damages against each organizational Defendant. *See* J. 2 (citing Jury Verdict ¶¶ 4–5). On Count IV, the jury awarded $250,000 compensatory damages each to Romero and Willis, and $200,000 punitive damages each against Kessler, Spencer, Kline, Ray, and Cantwell. The jury did not assign any damages to Fields's liability on Count IV. *See id.* (citing Jury Verdict ¶¶ 6–9). On Counts V–VI, the jury awarded at least $50,000 compensatory damages each to Romero, Muñiz, Baker, Blair, Martin, and Sines, plus $12 million punitive damages against Fields. *See id.* at 2–3 (citing Jury Verdict ¶¶ 11–12, 14–15). In December 2022, the presiding District Judge affirmed

2

Filed 05/08/23   Case 1:55 00 00   Doc 100

the jury's verdicts finding all Defendants liable; reduced the jury's total punitive damages awards on Counts III–VI, as required by Virginia's statutory cap on punitive damages, Va. Code § 8.01-38.1, and otherwise affirmed the jury's verdicts awarding nominal and compensatory damages. *See* ECF Nos. 1622, 1623.

*

Plaintiffs filed their Motion and Bill of Costs on March 9, 2022. Defendants Spencer, Kline, Ray, Jeff Schoep, Vanguard America, and National Socialist Movement ("NSM") did not respond to Plaintiffs' requests for fees and costs. *See* Pls.' Reply 6 n.1 (May 27, 2022); Sched. Order ¶ 7, ECF No. 101. Defendants Kessler, Damigo, and Identity Evropa; Defendants League of the South ("LOS"), Michael Hill, and Micheal Tubbs; Defendant Fields; and Defendants Heimbach, Parrott, and Traditionalist Worker Party ("TWP") filed briefs opposing Plaintiffs' requests for attorney's fees under Virginia Code § 8.01-42.1(B), but those briefs did not address Plaintiffs' separate requests for other costs under Rule 54(d). *See* Defs. Kessler, Damigo & Identity Evropa's Br. in Opp'n 1–5, ECF No. 1570; Defs. LOS, Hill & Tubbs's Br. in Opp'n 1–2, ECF No. 1571; Def. Fields's Br. in Opp'n 1–3; Defs. Heimbach, Parrott & TWP's Br. in Opp'n 1–5, ECF No. 1575; *accord* Pls.' Reply 6, 13 n.5. Defendant Cantwell, appearing pro se, filed a letter brief joining the legal argument made in Defendants Kessler, Damigo, and Identity Evropa's brief opposing Plaintiffs' requests for attorney's fees under Virginia Code § 8.01-42.1. Def. Cantwell's Br. in Opp'n ¶ 10, ECF No. 1601. Plaintiffs' Motion is now fully briefed. No party requested oral argument.

### I. The Legal Framework

In the United States, parities are ordinarily required to bear their own costs of litigation, including their attorney's fees. *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health &*

*Human Res.*, 532 U.S. 598, 602 (2001) ("[T]he prevailing party is not entitled to collect from the loser."). "This is the 'American Rule,' and it governs litigation in federal courts 'absent explicit congressional authorization' to the contrary." *Wilkins v. Gaddy*, 734 F.3d 344, 349 (4th Cir. 2013) (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814–15 (1994)). Rule 54(d) of the Federal Rules of Civil Procedure creates a presumption that litigation "costs—other than attorney's fees—should be allowed to the prevailing party" in any lawsuit brought in federal court. Fed. R. Civ. P. 54(d)(1); *see Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013). "The opposite presumption exists with respect to attorney's fees." *Marx*, 568 U.S. at 382. The court's authority to award attorney's fees flows from—and is strictly defined by—the specific statutory provision allowing such fees in the particular action. *See, e.g.*, *N.C. Dep't of Transp. v. Crest Street Comm. Council, Inc.*, 479 U.S. 6, 12 (1986) ("On its face, [42 U.S.C.] § 1988 does not authorize a court to award attorney's fees except in an action to enforce the listed [federal] civil rights laws."); *Rishell v. Computer Sci. Corp.*, 702 F. App'x 103, 104 n.* (4th Cir. 2017) ("We have recognized that state laws concerning the award of attorney's fees are generally substantive laws." (citing *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 631 (4th Cir. 1999)).

A.    *Attorney's Fees*

Congress has authorized the award of reasonable attorney's fees to the "prevailing party" in civil actions brought under certain federal civil-rights statutes, including 42 U.S.C. §§ 1985 and 1986. *See* 42 U.S.C. § 1988(b) ("the court, in its discretion, may allow the prevailing party, . . . a reasonable attorney's fee as part of the costs" of litigation). "[T]o qualify as a prevailing party [under § 1988], a civil rights plaintiff must obtain at least some relief on the merits of [the] claim" for which Congress authorized fee shifting. *Farrar v. Hobby*, 506 U.S. 103, 111 (1992). That relief must "materially alter[] the legal relationship between the parties by modifying the

4

defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 112. If the claim is tried by jury, "[t]he plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought," *id.* at 111, even if the jury merely found that defendant liable for nominal damages, *id.* at 113 ("A judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay."). "[L]iability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against . . . on the merits" of the plaintiff's substantive claim for relief, "§ 1988 does not authorize a fee award against that defendant." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The jury did not return a verdict either on Plaintiffs' § 1985(3) claim in Count I or on their § 1986 claim in Count II. The Court declared a mistrial on those Counts and dismissed them without entering judgment on the merits. *See* J. 4. Accordingly, § 1988(b) does not allow Plaintiffs to recover any "attorney's fee as part of the costs" of litigating their federal civil-rights claims. *Cf. Ge v. U.S. Citizenship & Immigration Servs.*, 20 F.4th 147, 156 (4th Cir. 2021) ("Parties who obtain merely procedural orders are not prevailing parties for the purposes of fee-shifting statutes[.]" (citing *Buckhannon*, 532 U.S. at 605)).

The Court entered an enforceable judgment in Plaintiffs' favor on the merits of their Virginia state-law claims in: (a) Count III (common-law conspiracy); (b) Count IV (Va. Code § 8.01-42.1(A)); and (c) Count V (assault or battery). *See* J. 3 (affirming the jury's findings of Defendants' liability and holding that "[a]ll Defendants will be jointly and severally liable for the nominal and compensatory damages awarded by the jury on Counts III, IV, and V, which amount is $1,303,284 (emphasis omitted)). It also entered an enforceable judgment in certain Plaintiffs' favor against Fields on the merits of those Plaintiffs' state-law claim in Count VI

5

(intentional infliction of emotional distress ("IIED")). *See id.* ("Defendant Fields is additionally liable for the compensatory damages award on Count VI, which amount is $704,459."). Determining whether Plaintiffs may recover attorney's fees for prevailing on their state-law causes of action requires this federal court to apply Virginia's substantive law governing that issue. *See Fairfax v. CBS Corp.*, 2 F.4th 286, 296–97 (4th Cir. 2021). If Virginia law is not clear, then this Court must predict how the Supreme Court of Virginia "would [rule] if confronted with the same fact pattern." *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994). It may look to "recent pronouncements of general rules or policies by the state's highest court," among other sources, in making that prediction. *Wells v. Liddy*, 186 F.3d 505, 527–28 (4th Cir. 1999). But it "should not create or expand" Virginia law in the process. *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).

Virginia's version of the American Rule creates a presumption that, "absent a specific contractual or statutory provision to the contrary, attorney's fees are not recoverable by a prevailing litigant from the losing litigant." *Mullins v. Richlands Nat'l Bank*, 403 S.E.2d 334, 449 (Va. 1991); *see Sidya v. World Telecom Exchange Comm'ncs*, 870 S.E.2d 199, 207 (Va. 2022) (statute); *Manchester Oaks Homeowner's Ass'n, Inc. v. Batt*, 732 S.E.2d 690, 702 (Va. 2012) (statute); *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 49 (Va. 2006) (contract). *But see St. John v. Thompson*, 854 S.E.2d 648, 650 (Va. 2021) (equitable exception in fraud cases). Plaintiffs do not "identify a specific statutory grant of authority that enables [the] court to award attorney's fees to" any Plaintiff, *Cnty. Dep't of Soc. Servs. v. O'Quinn*, 523 S.E.2d 492, 493 (Va. 2000), for prevailing on the common-law conspiracy claim against all Defendants (Count III) or the assault or battery and IIED claims against Defendant Fields (Counts V&VI).

6

Virginia Code § 8.01-42.1 allows courts to award "reasonable" attorney's fees to "[a]ny aggrieved party who initiates and prevails in an action authorized by th[at] section," Va. Code § 8.01-42.1(B). As relevant here, § 8.01-42.1 creates a right of "action for injunctive relief or civil damages, or both, . . . for any person who is subjected to" racial, religious, or ethnic harassment, intimidation, or violence directed to his or her person. *Id.* § 8.01-42.1(A); *see* Jury Verdict ¶¶ 6, 8 (Count IV). Plaintiffs' "claim for fees [is] compensable, if at all, only if [they] proved a violation of . . . [that] statue." *Sidya*, 870 S.E.2d at 207. The jury's favorable verdict on Count IV establishes that Romero and Willis "prevailed" against Kessler, Spencer, Kline, Ray, and Cantwell on their claim under § 8.01-42.1(A) related to those Defendants' racially or religiously motivated harassment at the torchlight march on August 11, 2017, and that Romero, Muñiz, Wispelwey, Sines, Blair, Martin, and Willis prevailed against Fields on a separate claim under § 8.01-42.1(A) related to Fields's racially or religiously motivated violence at Unite the Right on August 12, 2017.[4] Jury Verdict ¶¶ 6, 8; *Sines v. Kessler*, No. 3:17cv72, 2022 WL 18026336, at *2–3, *9–12, *18, *21 (W.D. Va. Dec. 30, 2022) (Moon, J.) ("*Sines IV*"), *appeal docketed*, No. 23-1122 (4th Cir. Feb. 2, 2023); *see generally Chase v. DaimlerChrysler Corp.*, 587 S.E.2d 521, 523 (Va. 2003) (explaining that, for the purposes of determining "prevailing party" status under a Virginia fee-shifting statute, the prevailing party is the "party in whose favor a judgment is rendered, regardless of the amount of damages awarded" (cleaned up)).

But no Plaintiff plausibly alleged—let alone proved—that Damigo, Heimbach, Parrott, Hill, Tubbs, Schoep, Vanguard America, Identity Evropa, TWP, LOS, or NSM subjected him or her to racially, religiously, or ethnically motivated harassment, intimidation, or violence in violation of § 8.01-42.1(A). *See Sines v. Kessler*, 324 F. Supp. 3d 765, 800–01 (W.D. Va. 2018)

---

[4] Plaintiffs Alvarado and Baker did not bring any claim under § 8.01-42.1(A). *See* Jury Verdict ¶¶ 6, 8.

(Moon, J.) ("*Sines I*"); Second Am. Compl. ¶¶ 364–67, ECF No. 557; Jury Verdict ¶¶ 6, 8. The Virginia Supreme Court would not consider any Plaintiff to have "prevailed" against any of those Defendants in an action authorized by § 8.01-42.1. *See Sidya*, 870 S.E.2d at 208; *Ulloa*, 624 S.E.2d at 50. Nonetheless, Plaintiffs argue that they may recover more than $12.7 million in attorney's fees incurred pursuing the entire litigation—and hold all seventeen Defendants jointly and severally liable for those fees—because Plaintiffs' other claims were factually "related" to or "intertwined" with certain Plaintiffs' successful claims against Kessler, Spencer, Kline, Ray, Cantwell, and Fields under § 8.01-42.1 in Count IV; and the jury found all seventeen Defendants liable on Plaintiffs' Virginia common-law conspiracy claim in Count III.[5] *See* Pls.' Mot. 21–25, 30; Pls.' Reply 7, 9–10. Their position presents two threshold legal questions: First, given that § 8.01-42.1(B) is the sole source of authority to shift attorney's fees in this action, can Plaintiffs recover such fees for time spent litigating *other* causes of action (successful or unsuccessful) that were factually intertwined with their successful claims under § 8.01-42.1(A)? *See* Pls.' Mot. 19, 24–25; Pls.' Reply 7–9. Second, does § 8.01-42.1(B) allow Plaintiffs to recover attorney's fees from a Defendant who has *not* been found liable to any Plaintiff under § 8.01-42.1(A)? *See* Pls.' Reply 9–10.

Plaintiffs say the answer to both questions is "yes." *See generally* Pls.' Mot. 21–25, 30; Pls.' Reply 7, 9–10. But they rely entirely on *federal* cases discussing attorney's fees awarded under *federal* fee-shifting statutes—most notably *Hensley v. Eckerhart*, 461 U.S. 424 (1983)—to support their position. As relevant here, *Hensley* instructed federal district courts how to calculate "a reasonable attorney's fee to prevailing parties in civil rights litigation," 461 U.S. at

---

[5] For simplicity, the Court refers to Kessler, Spencer, Kline, Ray, Cantwell, and Fields as the six "Count IV Defendants," and to Damigo, Heimbach, Parrott, Hill, Tubbs, Schoep, Vanguard America, Identity Evropa, TWP, LOS, and NSM as the Count IV Defendants' "conspirators."

429; *see* 42 U.S.C. § 1988, "where a plaintiff is deemed 'prevailing' even though he [or she] succeeded on only some of his [or her] claims for relief," *Hensley*, 461 U.S. at 434, but all of those claims, if successful, would have allowed the plaintiff to recover attorney's fees, *see Kelley v. Little Charlie's Auto*, No. 4:04cv83, 2006 WL 2456355, at *6 (W.D. Va. Aug. 22, 2006) (rejecting prevailing plaintiff's reliance on *Hensley* where "only one of Plaintiff's claims that was ultimately submitted to the [jury] contained a guarantee of attorney's fees" if she prevailed, *see* Va. Code § 59.1-204, whereas "all of the claims initially brought by the *Hensley* plaintiffs guaranteed attorney's fees even though the plaintiffs only prevailed on some of them").

In those situations, the federal court answers two questions to determine whether the "initial fee calculation"—i.e., "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate"—is, in fact, "reasonable" in the prevailing plaintiff's case. *See Hensley*, 461 U.S. at 433–34. "First, did the plaintiff fail to prevail on claims that were *unrelated to the claims* on which he [or she] succeeded?" *id.* at 434 (emphasis added). "Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* If the answer to the first question is "yes," then the court should exclude from the award all hours spent litigating those unsuccessful, unrelated claims. *See id.* ("The congressional intent to limit awards to prevailing parties requires that these *unrelated claims* be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." (emphasis added)). But *Hensley* also recognized there will be cases where "[m]uch of counsel's time is devoted to the litigation as a whole" because the plaintiff's *successful* claims for relief "involve[d] a common core of facts" or were "based on related legal theories" as the plaintiff's *unsuccessful* claims. *See id.* at 435. In those cases, "the district court should focus on the significance of the overall relief obtained by

the plaintiff in relation to the hours reasonably expended on the litigation" as a whole rather than trying to "divide the hours expended on a claim-by-claim basis." *Id.* "Where a plaintiff has obtained excellent results, his [or her] attorney should recover a fully compensatory fee" that "encompass[es] all hours reasonably expended on the litigation[.]" *Id.* "If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436.

Plaintiffs argue persuasively that their unsuccessful federal conspiracy claims in Counts I & II and their successful common-law conspiracy claim in Count III were "intertwined" with their successful § 8.01-42.1(A) claims in Count IV, as all four claims involved evidence tending to show each that Defendant's misconduct was racially motivated (Counts I & II) or motivated by racial, religious, or ethnic animosity (Counts III & IV). *See* Pls.' Mot. 24–25; *see, e.g.*, *Sines IV*, 2022 WL 18026336, at *10 (noting the jury heard "substantial evidence that Kessler had labored ceaselessly for months to create a violent racial flashpoint in Charlottesville that weekend" and praised the violent events as "'an incredible moment for white people'"); *id.* at *20 ("Spencer's racist invectives made behind closed doors to the Unite the Right organizers in its immediate aftermath [and] his stated intent to 'ritualistically humiliate' those in Charlottesville who had opposed him including Jewish and African American persons (to whom he referred by racial epithets) . . . provided strong evidence to the jury that Spencer and his codefendants had been co-conspirators engaged in a Virginia state law civil conspiracy to commit various unlawful acts, including racial, religious, or ethnic violence and intimidation in violation of **Va. Code § 8.01-42.1**."); *id.* at *23 (holding that Hill, Tubbs, and LOS were not entitled to directed verdict on Counts I & II because evidence presented to the jury of "League of

10

Filed 05/08/23

Doc 100

the South's communications—both in public and in private—more than substantiate[d] that they agreed with their codefendants to commit racially motivated violence . . . at Unite the Right"). Plaintiffs also assert that the jury's decision to award more than $26 million in damages on four of the six claims presented to it shows that Plaintiffs achieved "excellent results" overall, even though the jury did not return a verdict on Plaintiffs' claims that Defendants conspired to commit racially motivated violence in violation of federal law (Counts I & II). *See* Pls.' Mot. 28; Pls.' Reply 12–13.

But Plaintiffs do not cite a single Virginia Supreme Court decision holding that courts should follow *Hensley*'s "related claims" approach in awarding attorney's fees under Virginia law. *See* Pls.' Mot. 21, 23–24; Pls.' Reply 7–8 (citing Pls.' Mot. 21, 23–24). Nor could they. The Virginia Supreme Court "has steadfastly rejected this approach," *Zoroastrian Ctr. & Dabr-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 754 n.8 (4th Cir. 2016) (noting that Virginia law does not allow a prevailing party to recover fees for unsuccessful claims (citing *Ulloa*, 624 S.E.2d at 50)). *See, e.g.*, *Sidya*, 870 S.E.2d at 207–08; *Manchester Oaks*, 732 S.E.2d at 702; *Ulloa*, 624 S.E.2d at 49–50. Instead, "Virginia courts have held that where multiple claims exist, only one of which permits the recovery of attorney's fees, the party requesting attorney's fees must fairly and reasonably separate out its attorney's fees with specificity. *A party is not entitled to recover fees for work performed on claims which do not allow for attorney's fees*." *Couch v. Manassas Autocars, Inc.*, No. 62623, 2008 WL 8201041, at *2 (Va. Cir. Ct. July 17, 2008) (emphasis added) (citing *Ulloa*, 624 S.E.2d at 49); *accord Sidya*, 870 S.E.2d at 207–08; *Manchester Oaks*, 732 S.E.2d at 702. Accordingly, "*Hensley* and its progeny [are] simply not analogous—and therefore not helpful—to resolve the present matter." *Kelley*, 2006 WL 2456355, at *6.

*

The Virginia Supreme Court has not interpreted § 8.01-42.1(B), so this federal court "must apply state law to predict how that court would" resolve Plaintiffs' fee petition. *Fairfax*, 2 F.4th at 296. "When interpreting statutes, the Supreme Court of Virginia has instructed that the intent of the legislature 'must be gathered from the words used, unless a literal construction would involve a manifest absurdity.'" *Id.* (quoting *Chase*, 587 S.E.2d at 522). "Under basic principles of statutory construction, [the court] consider[s] all relevant provisions of a statute and do[es] not isolate particular words or phrases." *Lee Cnty. v. Town of St. Charles*, 568 S.E.2d 680, 682 (Va. 2002). "When the language in a statute is clear and unambiguous, [the court is] bound by the plain meaning of that language." *Id.* Statutory language is "ambiguous" if, read in context, "the text can be understood in more than one way or refers to two or more things simultaneously, [or when] the language is difficult to comprehend, is of doubtful import, or lacks clearness or definiteness." *JSR Mech., Inc. v. Aireco Supply, Inc.*, 786 S.E.2d 144, 147 (Va. 2016) (cleaned up). In that case, the "[c]ourt must apply the interpretation that will carry out the legislative intent behind the statute." *Id.* at 146 (quotation marks omitted).

The Virginia Supreme Court has recognized that at least some statutory "fee-shifting provisions . . . are designed to encourage private enforcement of the [substantive] provisions of the statute." *Wilkins v. Peninsula Motor Cars, Inc.*, 587 S.E.2d 581, 584 (Va. 2003) (discussing the Virginia Consumer Protection Act, Va. Code § 59.1-204(B)). Nonetheless, statutes allowing attorney's fees to a prevailing party are "subject to strict interpretation" because they derogate Virginia's consistent adherence to the American Rule. *Chacey v. Garvey*, 781 S.E.2d 357, 361 (Va. 2015); *see, e.g.*, *id.* at 360–61 (holding that a state statute allowing the prevailing party to recover her "directly associated legal costs" did not authorize attorney's fee award); *O'Quinn*,

12

Filed 05/08/23 · Doc 100

523 S.E.2d at 493 (noting that the prevailing party "must identify a specific statutory grant of authority that enables a court to award attorney's fees to her" and holding that the phrase "further relief" in Virginia's Declaratory Judgment Act did not authorize attorney's fees); *cf. Lannon v. Lee Connor Realty Corp.*, 385 S.E.2d 380, 383 (Va. 1989) (reversing trial court's award of attorney's fees, which relied on a federal bankruptcy court's decision recognizing federal courts' inherent power to sanction bad-faith litigation conduct, because Virginia did not have "a specific . . . statutory provision" authorizing such awards at that time).

Section 8.01-42.1(B) states, "[a]ny aggrieved party who initiates and prevails in an action authorized by this section shall be entitled . . . in the discretion of the court to an award of . . . reasonable attorney fees in an amount to be fixed by the court." Va. Code § 8.01-42.1(B). "[T]his section" includes § 8.01-42.1(A), which provides (as relevant here) that "[a]n action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment [or] (ii) violence directed against his [or her] person . . . where such acts are motivated by racial, religious, . . . or ethnic animosity." *Id.* § 8.01-42.1(A). But, "[t]he provisions of this section shall not apply to any actions between an employee and his [or her] employer, or between or among employees of the same employer, for damages arising out of incidents occurring in the workplace or arising out of the employee-employer relationship." *Id.* § 8.01-42.1(C). The question is whether the phrase "in an action authorized by this section," *id.* § 8.01-42.1(B), refers to the entire civil action involving all Plaintiffs' factually related legal claims, as Plaintiffs argue, *see generally* Pls.' Mot. 21–25, 30; Pls.' Reply 7, 9–10, or only to certain Plaintiffs' statutory causes of action under § 8.01-42.1(A), as some Defendants suggest, *see, e.g.*, Defs. Kessler, Damigo & Identity Evropa's Br. in Opp'n 3–4.

13

"An 'action' and a 'cause of action' are quite different" under Virginia law. *Trout v. Comm'w Transp. Comm'r of Va.*, 400 S.E.2d 172, 173 (Va. 1991). Virginia's civil code states that, "unless the [statutory] context otherwise requires, the term[s] 'Action' and 'suit' may be used interchangeably and shall include *all civil proceedings upon claims at law, in equity, or statutory in nature* and whether in circuit courts or district courts[.]" Va. Code § 8.01-2(1) (emphasis added). A "cause of action," on the other hand, is "a set of operative facts which, under the substantive law, may give rise to a right of action." *Trout*, 400 S.E.2d at 174 (internal quotation marks omitted); *see* Va. Code § 8.01-273(A). "A right of action is a remedial right to presently enforce a cause of action." *Stone v. Ethan Allen, Inc.*, 350 S.E.2d 629, 631 (Va. 1986). A "claim" is the procedural vehicle for a plaintiff (or defendant bringing a counterclaim or crossclaim) to assert, or "plead," that remedial right in a complaint or other pleading. Va. Code § 8.01-272 ("In any civil action, *a party may plead* as many matters, whether of law or fact, as he shall think necessary. A party may join *a claim* in tort with one in contract provided that all *claims* so joined arise out of the same transaction or occurrence. The court . . . may order a separate trial for any *claim*." (emphasis added)); *see also id.* § 8.01-233 ("A defendant who pleads a counterclaim or cross-claim shall be deemed to have brought an action at the time he files such pleading.").

Read together, and applying the Virginia Supreme Court's "strict interpretation" standard, § 8.01-41.2(A), (B), and (C) make clear the Virginia General Assembly intended to allow a prevailing plaintiff to recover his or her reasonable attorney's fees incurred litigating a successful § 8.01-42.1(A) claim only, not fees incurred litigating any other claims. Subsection (A) identifies a specific cause of action and right of action "authorized by" § 8.01-42.1 and sets forth the elements of "an action for injunctive relief or civil damages, or both . . . for any person

14

Filed 05/06/23                    Doc 100

who is subjected to acts of" racially, religiously, or ethnically motivated harassment,

intimidation, or violence against his or her person. *Id.* § 8.01-42.1(A). Subsection (B) says that it

applies only to the party who "initiated and prevailed in *an action* authorized by *this section*," *id.*

§ 8.01-42.1(B) (emphasis added), not "that it applies 'in *any* action' . . . , suggesting the

legislature did not mean the former to mean the latter," *Sines IV*, 2022 WL 18026336, at *28

(quoting Va. Code § 8.01-38.1). Moreover, subsection (C) identifies certain "actions" that *are*

*not* "authorized by this section"—i.e., "*any actions* between an employee and his employer [or

coworkers] *for damages* arising out of incidents occurring in the workplace or arising out of the

employee-employer relationship." *Id.* § 8.01-42.1(C) (emphasis added). This provision further

suggests that the General Assembly intended to restrict attorney's fees awards to the reasonable

fees the plaintiff incurred successfully litigating only the claim "authorized by this section," *id.* §

8.01-42.1(B), and did not authorize awards for attorney's fees incurred litigating any other claim.

*Cf. Ulloa*, 624 S.E.2d at 49 (holding that a contractual provision that allowed the prevailing

employer to recover all attorney's fees "by reason of any action relating to" the employment

contract authorized fees related to successful breach of contract claim, but not those related to the

successful statutory claim because proving a violation of the statute was "not dependent upon

provisions contained in [the] contract between the parties").

**

Even if the statute's text is ambiguous, the Virginia Supreme Court has unequivocally

held that "in an action *encompassing several claims* the prevailing party is entitled to an award of

costs and attorneys' fees *only for those claims* for which (a) there is a contractual or statutory

basis for such an award and (b) the party has prevailed." *Manchester Oaks*, 732 S.E.2d at 702

(emphasis added) (citing *Ulloa*, 624 S.E.2d at 50). Thus, the party seeking attorney's fees under

15

a contractual or statutory fee-shifting provision has "the burden to establish to a reasonable degree of specificity those attorney's fees associated with" the successful claim that authorizes such award. *Ulloa*, 624 S.E.2d at 50. Under Virginia law, it simply does not matter if the party's other claims, successful or unsuccessful, "were intimately intertwined [with] and depended on a common factual basis" as that claim. *Ulloa*, 624 S.E.2d at 49; *see Hair Club for Men v. Ehson*, No. 1:16cv236, 2017 WL 1250998, at *4 (E.D. Va. Apr. 3, 2017) ("Virginia courts have applied this reasoning in rejecting attorney's fees for successful claims . . . [lacking an] independent statutory or contractual right to recovery."). A party cannot "recover fees for work performed on claims [that] do not allow for attorney's fees." *Couch*, 2008 WL 8201041, at *2 (citing *Ulloa*, 624 S.E.2d at 49); *cf. AV Auto. LLC v. Gebreyessus*, 877 S.E.2d 493, 500–02 (Va. 2022) (rejecting trial court's conclusion "that 'it would be impossible to separate time spent solely defending against the frivolous . . . claim because [plaintiff] mixed in that frivolous claim with its request for damages within nearly every count,'" reversing "award of sanctions in the full amount of [defendant's] requested attorney's fees" where defendant's "attorneys provided detailed billing statements" but trial "court failed to make any attempt to segregate the amounts incurred because of the [plaintiff's] sanctionable conduct" from the amount of fees requested, and remanding "for a recalculation of the attorney's fees" under § 8.01-271.1); *West Square, LLC v. Commc'n Techs., Inc.*, 649 S.E.2d 698, 703 (Va. 2007) ("Even though claims may be intertwined and have a common factual basis, West Square, as the party seeking an award of costs and expenses, had 'the burden to establish to a reasonable degree of specificity' those costs and expenses associated with the [qualifying] dispute." (quoting *Ulloa*, 624 S.E.2d at 50)).

The Virginia Supreme Court first articulated this "claim-by-claim" approach in *Ulloa* and *West Square*, both of which involved costs or attorney's fees sought under private contracts. In

*Manchester Oaks* (2012), it extended this approach to cases involving fee-shifting statutes. 732

S.E.2d at 702 ("Plaintiffs bear the burden of establishing the amount of costs and fees arising

from the [statutory] breach of contract claim for which the statute entitles them to an award."

(citing *Ulloa*, 624 S.E.2d at 50)). *Contra* Pls.' Reply 9 (arguing that *Ulloa* and *West Square* do

not apply here because "[i]n both of those cases, fees were awarded not under a Virginia statute,

but rather under contractual provisions that clearly specified the terms of the fee awards"). The

Virginia Supreme Court's strongest pronouncement of its claim-by-claim approach came in

March 2022, shortly after Plaintiffs filed this Motion. *See generally Sidya*, 870 S.E.2d at 207–08.

The *Sidya* Court held that Virginia's fee-shifting statutes "*only* authorize fees incurred in the

prosecution of th[ose] specific statutory claims—*not causes of action created by other statutes or

by common law*." *Id.* at 207 (emphasis added). "For a fee award to survive appellate scrutiny, it

must be supported by sufficient evidence that tailors the fees to the specific successful claims

triggering the [statutory] right to such an award . . . and to the specific defendants against whom

the claims could be asserted." *Id.* at 208 (citing *Manchester Oaks*, 732 S.E.2d at 702); *cf. AV

Auto.*, 877 S.E.2d at 501 ("[T]he circuit court abused its discretion in failing to segregate the

sanctionable [frivolous] claim from the attorney's fees requested.").

It is worth noting that *Ulloa*, *West Square*, *Manchester Oaks*, and *Sidya* were relatively

straight-forward cases in which the nature of the prevailing party's substantive claims, the

litigation's procedural history, or both, provided some logical way for the court to separate the

attorney's fees or costs "associated with" a successful "triggering" claim from the fees or costs

associated with either unsuccessful claims or successful claims that did not allow fee-shifting.

*See, e.g.*, *Ulloa*, 624 S.E.2d at 49 (contractual provision that allowed prevailing employer to

recover all attorney's fees "by reason of any action relating to" employment contract did not

authorize attorney's fees for successful statutory claim that was "not dependent upon provisions

contained in [the] contract between the parties"); *Manchester Oaks*, 732 S.E.2d at 702

(explaining, in a case where statute authorized plaintiffs to recover fees "only on claims that (a)

were brought to enforce the Declaration and (b) they prevailed upon," plaintiffs' "claim for

breach of fiduciary duties satisfie[d] neither criterion," their claim for declaratory and injunctive

relief satisfied the first criterion, but it did "not satisfy the second because it was abandoned,"

and the "breach of contract claim satifie[d] both criteria" so plaintiffs were "statutorily entitled to

an award of costs and fees on it" but not the other two). This case, on the other hand, was not at

all straightforward. Plaintiffs' litigation team claims 46,950 hours spent investigating,

developing, and litigating an extraordinarily complex, *see* Pls.' Mot. 19–20, "fact-intensive,

multiple-defendant, civil-rights conspiracy case in which [P]laintiffs prevailed on fewer than all

claims and seek fees pursuant to a fee-shifting provision applicable to just one of those claims,"

Pls.' Mot. Ex. 30, Decl. of David Dinielli, Esq. ¶ 9, ECF No. 1552-30. The difficulty here is not

so much that Plaintiffs' § 8.01-42.1 claim *itself* was "intimately intertwined" with or "depended

upon a common factual basis" as their other claims, *Ulloa*, 624 S.E.2d at 50; *see* Pls.' Mot. 24–

25, but that the *nature and amount of work* necessary to successfully litigate the § 8.01-42.1

claims necessarily overlapped with work done on claims for which Plaintiffs cannot recover any

attorney's fees under Virginia law, *see* Dinielli Decl. ¶¶ 9, 17–18, 20–28.

      This overlap is especially apparent for the work associated with Counts I–IV. *See* Dinielli

Decl. ¶¶ 18, 20–22, 27. For example, "Plaintiffs reasonably sought myriad communications,

documents, and ESI that could help them prove each Defendant entered into an agreement with a

specific co-conspirator to engage in racially motivated violence at the August 11th and 12th

events," *Sines v. Kessler*, No. 3:17cv72, 2021 WL 1143291, at *5 (W.D. Va. Mar. 24, 2021)

("*Sines II*"), the central legal issue in Counts I and II, and a potential basis for all seventeen Defendants' liability in Count III, *see Sines I*, 324 F. Supp. 3d at 799–801. Much of that information would have revealed circumstantial facts about the alleged agreement itself, such as individuals' communications and relationships with potential conspirators. *See Sines II*, 2021 WL 1143291, at *10; Pls.' Mot. 16 ("Plaintiffs likewise had to pursue discovery directly from cellular phone providers . . . in order to show the extent of Defendants' communications with other Defendants and third parties leading up to and during the weekend of August 11 and 12, 2017."). But at least some of that information also would have "reveal[ed] insights about the individuals' intent and motivation," Dinielli Decl. ¶ 21, to engage in racial, religious, or ethnic harassment, intimidation, or violence in violation of § 8.01-42.1, the central legal issue in Count IV. *See Sines I*, 324 F. Supp. 3d at 799–801. Indeed, the jury saw and heard multiple communications where alleged conspirators openly expressed "animosity" toward Jewish and African American persons, Va. Code § 8.01-42.1(A), while planning Unite the Right. *See Sines IV*, 2022 WL 18026336, at *10, *20, *23.

There are no Virginia Supreme Court decisions reviewing an award of attorney's fees in a case comparable to this one. Nonetheless, I must follow Virginia's claim-by-claim approach in resolving Plaintiffs' request for attorney's fees under § 8.01-42.01(B). *See AV Auto*, 877 S.E.2d at 500–02. In doing so, I must ensure that Plaintiffs present "sufficient evidence," such as reliable billing records or "witness estimations," that the requested fees compensate work associated with their successful § 8.01-42.01(A) claims against Kessler, Spencer, Kline, Ray, Cantwell, and Fields. *See Sidya*, 870 S.E.2d at 207–08 (rejecting prevailing plaintiffs' assertion that their attorney's "fees did not need to be divided by claim or by defendant because all of the legal work compensated by the requested fees would have had to be performed to support the

specific [successful] fee-shifting claims" against the losing defendant, and vacating $1.6 million award of attorney's fees attributed to jury trial because "plaintiffs had only testified from a brief summary of the fees, and no further documentation was provided" to support their request); *AV Auto.*, 877 S.E.2d at 501 ("We do not find that it would impose additional and unnecessary burdens on the circuit court to segregate fees related to the [sanctionable] claim, as [defendant's] attorneys provided detailed billing statements and invoices." (quotation marks omitted)). But I am "not require[d] . . . to pore over pages and pages of billing records to evaluate the reasonableness of each line item." *Lambert v. Sea Oats Condo. Ass'n*, 798 S.E.2d 177, 184 (Va. 2017) (cleaned up). Moreover, I do not read *Sidya* or its predecessors as precluding an award of reasonable attorney's fees for work Plaintiffs' litigation team did on the successful § 8.01-42.1 claims just because that work was *also* used to advance another claim—successful or unsuccessful—that does not allow fee-shifting. *See, e.g.*, *Sidya*, 870 S.E.2d at 208 (affirming award of attorney's fees to prevailing plaintiff, under two Virginia fee-shifting statutes, over defendant's objection that plaintiff "failed to demonstrate that the fees were incurred *only* on the" two statutory claims (emphasis added)); *Manchester Oaks*, 732 S.E.2d at 702 ("[T]he Plaintiffs bear the burden of establishing the amount of costs and fees arising from the breach of contract claim for which the statute entitles them to an award."); *Schlegel v. Bank of Am., N.A.*, 628 S.E.2d 362, 369 (Va. 2006) (reversing and remanding fee award where prevailing interpleader's billing records contained "entries that relate *solely* to attorney's fees incurred" defending against Schlegel's non-triggering claims and the trial court "did not determine whether the amount awarded represented compensation for services that were necessary and appropriate to the cross-bill for interpleader" that authorized fee award); *cf. Signature Flight Support Corp. v. Landow Aviation Ltd. P'Ship*, 730 F. Supp. 2d 513, 528 (E.D. Va. 2010) ("[T]he holding in *Ulloa* simply

places the burden on a party seeking attorney's fees to establish that the fees sought are

'associated' with a successful claim. Thus, Plaintiff is not precluded from recovering attorneys'

fees on the work that it performed on a successful claim just because the associated work was

also used to advance an unsuccessful claim." (quoting *Ulloa*, 624 S.E.2d at 43)).

The Virginia Supreme Court has also indicated that a prevailing plaintiff may collect

attorney's fees only from a defendant, or defendants, who has been found liable to the plaintiff

on the underlying claim for which the fee award is authorized.[6] *See, e.g.*, *Sidya*, 870 S.E.2d at

---

[6] The only Fourth Circuit case on point, *Johnson v. Hugo's Skateway*, 949 F.2d 1338, 1352 (4th Cir. 1991) (*Johnson I*), *vacated on other grounds*, 974 F.2d 1408, 1419 (4th Cir. 1992) (en banc) (*Johnson II*), is not inconsistent. In *Johnson I*, the panel explained that Plaintiff Johnson's counsel had "submitted billing sheets for the entire course of the litigation, making no distinction between *actions pursued against* [Defendant] Wines and those pursued against [Defendant] Hugo's Skateway." 949 F.2d at 1352 (emphasis added). "Johnson did not prevail against Wines on the [§ 8.01-42.1] racial harassment claim," but he did prevail against Hugo's Skateway on that statutory claim. *See id.* "Wines, on the other hand, had judgment entered against him on the [42 U.S.C. §] 1983 claim, the false arrest and false imprisonment claims, and on an assault and battery claim." *Id.* The panel held that Virginia Code § 8.01-42.1(B) did not allow Johnson to recover *from Hugo's Skateway* any "attorney's fees for claims as to which [Johnson] did not, in fact, prevail against Hugo's Skateway, but as to which he did prevail against Wines." 949 F.3d at 1352. Rather, Hugo's Skateway could be held responsible only for attorney's fees related to Johnson's successful § 8.01-42.1 "action[] pursued against" Hugo's Skateway. *See id.* (distinguishing *Hensley*, 461 U.S. 424, "for the simple reason that Johnson did prevail in every one of his claims, but partly only against *different defendants*" and explaining that Johnson was "seeking reimbursement from Hugo's Skateway for prevailing on three out of four claims against Wines though not against Hugo's"). To that end, *Johnson I* supports a conclusion that Plaintiffs' failure to name the Count IV Defendants' conspirators as party-defendants to the § 8.01-42.1(A) claims in Count IV necessarily protects those individuals and organizations from fee liability under § 8.01-42.1(B).

On rehearing en banc, the Fourth Circuit vacated *Johnson I* and, as relevant here, remanded the attorney's fee issue to the district court because it appeared "that the district court may . . . have reduced the ultimate fee award as a result of Johnson's success on only *one of the three counts raised against Hugo's*, despite the fact that he received a sizeable verdict and that *all three counts* arose from 'a common core of facts.'" *Johnson II*, 974 F.2d at 1419 (emphasis added) (quoting *Hensley*, 461 U.S. at 435). Thus, *Johnson II* was not about whether, under Virginia law, one defendant can be held liable to the plaintiff for attorney's fees incurred litigating successful claims "raised against" *other* defendants. It was simply an application of *Hensley*'s framework instructing federal courts how to calculate "reasonable" attorney's fees in civil-rights cases when the "prevailing" plaintiff succeeded on some, but not all, of his claims for relief against a defendant and those claims "involve[d] a common core of facts or [were] based on related legal theories." *See* 974 F.2d at 1419 (citing *Hensley*, 461 U.S. at 434–37). Nothing in *Johnson II* suggests Plaintiffs may hold the conspirator Defendants liable for attorney's fees under Virginia Code § 8.01-42.1(B).

21

207–08; *Ulloa*, 624 S.E.2d at 50. The two cases Plaintiffs cite to support their request for holding

the conspirator Defendants jointly and severally liable for attorney's fees under § 8.01-42.1(B),

*see* Pls.' Reply 9–10, both involved defendants who were all found liable to the plaintiff on the

underlying federal statutory claim that authorized fee-shifting. *See Jones v. Southpeak*

*Interactive Corp. of Del.*, 777 F.3d 658, 676–78 (4th Cir. 2015) (Sarbanes-Oxley Act); *Essex v.*

*Randall*, No. Civ. A. DKC20033276, 2006 WL 83424, at *1, *5, *7 (D. Md. Jan. 11, 2006)

(ERISA). Put differently, the plaintiffs in those cases established "the 'crucial connection'

between [each defendant's] liability on the merits" of the unlawful act and the defendant's

"liability for attorneys' fees under [the] fee-shifting statute[]." *In re Crescent City Estates*, 588

F.3d 822, 827 (4th Cir. 2009) (quoting *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754,

762 (1989)). Conversely, a defendant's "status as a nonparty" to a specific claim for relief that

allows fees to the prevailing plaintiff necessarily "protects" that defendant "from [fee] liability

arising from that claim." *Johnson v. City of Aiken*, 278 F.3d 333, 338 (4th Cir. 2002) (citing

*Zipes*, 491 U.S. at 762; *Graham*, 473 U.S. at 161–62). I am confident the Virginia Supreme

Court would reach the same conclusion in this case. *Cf. Reineck v. Lemen*, 792 S.E.2d 269, 275–

76 (Va. 2016) (holding that Virginia Code § 64.2-795, which allows courts in any "judicial

proceeding involving the administration of a trust" to award "reasonable attorney fees, to any

party, to be paid by another party or from the trust that is the subject of the controversy," did not

authorize "an award of attorney's fees against a litigant personally when that litigant is acting in

a representative capacity" as the trust's curator).

**

  To summarize, Plaintiffs Romero, Muñiz, Wispelwey, Sines, Blair, Martin, and Willis

may recover their "reasonable and necessary" attorney's fees "associated with" their successful

22

claims that Defendants Kessler, Spencer, Kline, Ray, Cantwell, and Fields subjected those Plaintiffs to racial, religious, or ethnic harassment, intimidation, or violence on August 11–12, 2017, in violation of Virginia Code § 8.01-42.1(A).[7] *See Sidya*, 870 S.E.2d at 207–08. The Court may hold Kessler, Spencer, Kline, Ray, Cantwell, and Fields jointly and severally liable for those attorney's fees. *Cf. Boyce v. Pruitt*, No. 05-3315, 2010 WL 7375630, at *7 (Va. Cir. Ct. July 28, 2010) (holding attorney and client jointly and severally liable for attorney's fees awarded under Virginia statute where their litigation misconduct "was a coordinated effort"). Additionally, Plaintiffs' counsel "may be reimbursed for [their] time spent in seeking fees under a fee-shifting statute," as long as they have not billed for time spent on "merely housekeeping [tasks] or unnecessary work." *Couch*, 2008 WL 8201041, at *7. The Court may not award attorney's fees (as opposed to Rule 54 costs) against any Defendant not named as a party-defendant to Plaintiffs' § 8.01-42.1 claims in Count IV. *See Reineck*, 792 S.E.2d at 275–76.

***

Plaintiffs Romero, Muñiz, Wispelwey, Sines, Blair, Martin, and Willis also bear the burden to show "that the requested fees are reasonable and that they were necessary" to litigating their successful § 8.01-42.1(A) claims against Kessler, Spencer, Kline, Ray, Cantwell, and Fields. *See Sidya*, 870 S.E.2d at 208; *Chawla v. BurgerBusters, Inc.*, 499 S.E.2d 829, 833 (Va. 1998). "[T]he amount of recoverable attorney's fees rests within the sound discretion of the trial court," *Cangiano v. LSH Bldg. Co.*, 623 S.E.2d 889, 894 (Va. 2006), guided by certain relevant factors. The Virginia Supreme Court has "identified seven factors for courts to consider" in determining a "reasonable" attorney's fee award:

---

[7] As noted, Plaintiffs Alvarado and Baker did not bring any claim under § 8.01-42.1(A). *See* Jury Verdict ¶¶ 6, 8. Accordingly, any such award should be made to Plaintiffs Romero, Muñiz, Wispelwey, Sines, Blair, Martin, and Willis.

(1) the time and effort expended by the attorney, (2) the nature of the services rendered, (3) the complexity of the services, (4) the value of the services to the client, (5) the results obtained, (6) whether the fees incurred were consistent with those generally charged for similar services, and (7) whether the services were necessary and appropriate.

*Lambert*, 798 S.E.2d at 182 (cleaned up).[8] A trial court abuses its discretion when it does not consider a "relevant factor that should have been given significant weight," when it "give[s] significant weight" to an "irrelevant or improper factor," or "when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Id.* (quotation marks omitted). Within those parameters, the trial court enjoys wide latitude to determine the extent to which the prevailing party has "prov[en] 'that the requested fees are reasonable *and* that they were necessary,'" *Sidya*, 870 S.E.2d at 208 (emphasis added) (quoting *West Square*, 649 S.E.2d at 702), to successfully litigating the claim on which that party may recover fees. *See Portsmouth 2174 Elmhurst*, 837 S.E.2d at 515 (noting that the trial court "is not required to consider all of the factors . . . in every situation, and particular factors may have added or lessened significance depending on the circumstances of each case" (internal quotation marks omitted)); *Denton v. Browntown Valley Assocs.*, 803 S.E.2d 490, 497 (Va. 2017) (affirming amount of attorney's fee award where the trial court's order "expressly referred to" each *Lambert* factor and the "record reflect[ed] that the court received evidence and expert opinion testimony to support each of them"); *Dewberry & Davis, Inc. v. C3NS, Inc.* 732 S.E.2d 239, 246 (Va. 2012) (reiterating that it is the "province of the trial court to determine" if

---

[8] Plaintiffs briefed their motion using the twelve "*Johnson/Kimbrell*" factors that the Fourth Circuit requires federal district courts to consider when determining a reasonable attorney's fee award under federal law. Pls.' Mot. 23–28. The Virginia Supreme Court has never adopted this "federal" standard as its own. *Cerroni v. Douglas*, No. 0389-22-4, 2023 WL 138144, at * (Va. Ct. App. Jan. 10, 2023) (citing *Portsmouth 2174 Elmhurst, LLC v. City of Portsmouth*, 837 S.E.2d 504, 515 (Va. 2020)); *see also West Square*, 649 S.E.2d at 703. Accordingly, I will consider the seven factors articulated in *Lambert* and its numerous predecessors.

requested fees are "reasonable, necessary, and appropriate to the particular circumstances of the litigation," but remanding fee award because trial court's conclusion that the amount awarded was "'fair and reasonable' did not resolve the [separate] issue of whether those fees were necessary" to prevailing party's success).

## B.      Other Costs

Rule 54(d) creates a presumption that "costs—other than attorney's fee—should be allowed to the prevailing party" in any lawsuit brought in federal court, Fed. R. Civ. P. 54(d)(1).[9] *See Marx*, 568 U.S. at 377. The phrase "prevailing party" generally means the same thing as in federal fee-shifting statutes—i.e., the "'party in whose favor a judgment is rendered'" effecting some "'judicially sanctioned change in the legal relationship of the parties.'" *Malibu Media, LLC v. Baiazid*, 152 F. Supp. 3d 496, 500 (E.D. Va. 2015) (quoting *Buckhannon Bd. & Home Care*, 532 U.S. at 601). This Court's judgment affirming the jury's verdict as to Defendants' liability on Counts III–VI establishes that all nine Plaintiffs "prevailed" against all seventeen Defendants who went to trial. *See* J. 3–4; Jury Verdict ¶¶ 3, 6, 8, 10, 13. Thus, Plaintiffs may recover from those Defendants the following costs:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification ad the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;

---

[9] While Plaintiffs say they are bringing this request under both Rule 54(d)(1) and Virginia Code § 8.01-42.1(B), *see* Pls.' Mot. 30, they rely entirely on Rule 54(d)(1) and 28 U.S.C. § 1920, as well as federal court decisions applying those federal authorities, to support the request. *See id.* at 30–31 & n.12. They have made no effort to show that any of their requested costs are allowed under Virginia law. *See generally Chacey*, 781 S.E.2d at 361 ("[T]he term 'costs' is limited to the costs necessary for the prosecution of a suit[.]"). Accordingly, this R&R does not address any requests for costs under § 8.01-42.1(B). *See Hughes v. B/E Aerospace, Inc.*, No. 1:12cv717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect the court to do the work that it elected not to do.").

25

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretations services under section 1828 of this title.

28 U.S.C. § 1920(1)–(6); *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 565–66 (2012).

Rule 54(d)(1) does not allow the Court to award Plaintiffs any costs or litigation expenses "not

enumerated in § 1920." *Taniguchi*, 566 U.S. at 565. "The prevailing party bears the [initial]

burden of showing that the requested costs are allowed by § 1920." *Fells v. Va. Dep't of Transp.*,

605 F. Supp. 2d 470, 743 (E.D. Va. 2009).

Additionally, "the decision whether to award costs ultimately lies within the sound

discretion of the district court." *Marx*, 568 U.S. at 377. "Factors justifying denying costs include

misconduct by the prevailing party, the losing party's inability to pay, excessiveness of the costs

in a particular case, the limited value of the prevailing party's victory, and the closeness and

difficulty of the issues decided." *McLaurin v. Liberty Univ.*, No. 6:21cv38, 2022 WL 16953656,

at *2 (W.D. Va. Nov. 15, 2022) (Moon, J.) (citing *Cherry v. Champion Int'l Corp.*,186 F.3d 442,

446 (4th Cir. 1999)). Nevertheless, "it is incumbent upon the unsuccessful party to show" costs

should not be awarded to the prevailing party. *Ellis v. Grant Thornton LLP*, 434 F. App'x 232,

235 (4th Cir. 2011) (citing *Teague v. Bakker*, 35 F.3d 978, 996 (4th Cir. 1994)); *see Fells*, 605 F.

Supp. 2d at 742.

### III. Discussion

A.    *Attorney's Fees*

Plaintiffs submitted more than 1,300 pages of detailed "accountings, based on

contemporaneous records," documenting specific litigation-related tasks that 26 attorneys and

26

paralegals performed in this case between August 2017 and March 2022.[10] *See generally* Decl.

of Yotam Barkai, Esq. ¶¶ 18–24 (Kaplan, Hecker & Fink ("KHF")), ECF No. 1552-1; Barkai

Decl. Ex. A, KHF Billing R. 2–780, ECF No. 1552-2; Decl. of Karen Dunn, Esq. ¶¶ 13–18 (Paul,

Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss")), ECF No. 1552-24; Dunn Decl. Ex.

A, Paul Weiss Billing R. 2–93, ECF No. 1552-25; Decl. of Alan Levine, Esq. ¶¶ 12–18 (Cooley,

LLP), ECF No. 1552-26; Levine Decl. Ex. A, Cooley Billing R. 2–280, ECF No. 1552-27; Decl.

of Jessica Phillips, Esq. ¶¶ 12–18 (Boies Schiller Flexner ("BSF")), ECF No. 1552-28; Phillips

Decl. Ex. A, BSF Billing R. 2–226, ECF No. 1552-27. Those accountings show **46,610.8** hours

spent investigating, developing, and litigating all six Counts that Plaintiffs presented to the jury,

plus **339.4 hours** spent on this fee petition:

| Litigation Phase | Date Range | Hours Claimed | Total Fee Claimed |
|---|---|---|---|
| Investigation & Complaint | Aug. 24 – Oct. 10, 2017 | 317.9 | $69,160.00 |
| Motions to Dismiss | Oct. 11, 2017 – Mar. 6, 2018 | 903.4 | $252,247.50 |
| Discovery & Summary Judgment | Mar. 7, 2018 – Aug. 23, 2021 | 30,666.1 | $8,302,588.00 |
| Pretrial Disclosures & Motions | Aug. 24 – Oct. 24, 2021 | 8,098.7 | $2,233,788.00 |
| Jury Trial | Oct. 25 – Nov. 23, 2021 | 6,624.7 | $1,941,880.00 |
| Motion for Fees & Costs | Nov. 24, 2021 – Mar. 2, 2022 | 339.4 | $73,677.00 |
| *Prior Fee Motions* | | | *-$147,236.65* |
| **Total** | | **46,950.2** | **$12,726,103.85** |

---

[10] Plaintiffs' counsel "removed any attorney hours for non-legal or administrative tasks, and also adjusted hours that exceeded what would typically be charged to a client for this kind of work" at their firm before submitting these records. Barkai Decl. ¶ 23; Dunn Decl. ¶ 18; Levine Decl. ¶ 18; Phillips Decl. ¶ 18.

*See* Pls.' Mot. 19–20. Plaintiffs' counsel did not follow Virginia's claim-by-claim approach when preparing their billing records. *See generally* Pls.' Mot. 21, 23–25, 29–30; Pls.' Reply 7–10. Given that the legislative policy behind fee-shifting provisions in civil rights statutes is to "encourage private enforcement" of those statutes, *Wilkins*, 587 S.E.2d at 584; *see also Commn'w ex rel. Fair Hous. Bd. v. Windsor Plaza Condo Ass'n*, 768 S.E.2d 79, 95 (Va. 2014), however, the Court should exercise its discretion to award reasonable attorney's fees to Plaintiffs for successfully litigating their § 8.01-42.1(A) claims in this case. Accordingly, before analyzing the reasonableness of the attorney's fees, I have endeavored "to segregate the amounts [Plaintiffs] incurred" on Count IV, *see AV Auto.*, 877 S.E.2d at 501, from the amounts related solely to Plaintiffs' claims in Counts I, II, III, V, and/or VI, *see Sidya*, 870 S.E.2d at 208; *Schlegel*, 628 S.E.2d at 369.

      1.     *Attorney's Fees Associated With Count IV*

     Plaintiffs' billing records clearly show they incurred attorney's fees "associated with" their successful § 8.01-42.1 claims in Count IV at each stage of the litigation. For example, their complaint alleged that Defendants subjected (or conspired to subject) certain Plaintiffs to racial, religious, or ethnic harassment, intimidation, or violence in violation of Virginia Code § 8.01-42.1. *See* Compl. ¶¶ 322–25, 334–37. Plaintiffs' counsel should be fairly compensated for some portion of the 318 hours it took to investigate, "research, write, and file" that pleading, *Lambert*, 798 S.E.2d at 184, even though it also included other legal claims and factual allegations, *cf. West Square*, 649 S.E.2d at 703–04 (prevailing party was entitled to recover the civil filing fee, costs of serving witness subpoenas, and court reporter expenses, but was not entitled to recover "requested expenses for depositions and miscellaneous items" because party "did not 'establish to a reasonable degree of specificity' what portion of those expenses were incurred with regard

to the lease dispute, as opposed to the non-suited claim" (quoting *Ulloa*, 624 S.E.2d at 50)). Kessler, Spencer, Kline, Ray, and Cantwell each moved to dismiss Plaintiffs' original § 8.01-42.1 claim against them, *see Sines I*, 765 F. Supp. 3d at 800–01, so Plaintiffs also necessarily incurred attorney's fees "associated with" that claim for time spent researching, writing, and arguing those motions, *see*, *e.g.*, KHF Billing R. 16, 27–28, 50–53; BSF Billing R. 2, 19–25, 29–33,25; Cooley Billing R. 10, 26, 98. *See Lambert*, 798 S.E.2d at 184 ("There may be pretrial motions to research, write, and argue.").

Fact discovery in this case was complex, expansive, and voluminous. *See* Dinielli Decl. ¶ 27 ("The complexity of the facts determines the amount and type of discovery necessary to uncover them, not the number of claims."). Plaintiffs' outside expert, David Dinielli, Esq., submitted a declaration illustrating just how complex and time-consuming discovery can be in a "fact-intensive, multi-defendant, civil-rights conspiracy case" like this one. *Id.* ¶ 9. When Plaintiffs filed this lawsuit in October 2017, the world had seen and heard reports of the torch march, overtly racist and antisemitic chants, and violent clashes in Charlottesville a few months earlier. *See id.* ¶ 18. But "[t]he world had not yet seen or heard about the planning and coordination that enabled the conflagration." *Id.* "Understanding the planning and coordination was important not just for the sake of completing the historical record; it was also crucial to understanding who bore responsibility for the events and who should pay damages for injuries suffered as a result." *Id.* "The universe of potentially relevant facts" in this case was "not just large, it was also diffuse." *Id.* ¶ 22(a); *accord Sines II*, 2021 WL 1143291, at *5.

The parties served 78 sets of written discovery, Barkai Decl. ¶¶ 13–14, that needed to be propounded or answered, *see Lambert*, 798 S.E.2d at 183. Plaintiffs' counsel took 16 depositions of Defendants, at which they introduced roughly 770 exhibits, and they took 17 third-party

depositions. Barkai Decl. ¶¶ 13, 16. Plaintiffs also served 92 subpoenas on approximately 60

non-parties, including multiple social-media companies and cell phone providers, in part because

certain Defendants had deleted discoverable ESI or refused to produce it themselves. *See id.* ¶

15; *see* Dinielli Decl. ¶ 21 ("The responsible plaintiffs' lawyer will gather all those materials,

mostly from third parties."). In the end, they "collected more than 1.5 million documents from

approximately 62 custodians, including more than 356,000 images and over 6,000 audiovisual

files." Barkai Decl. ¶ 17. Plaintiffs' litigation team had "to scrape all those sources and then

piece the information together," Dinielli Decl. ¶ 22(a), to develop a comprehensive factual record

that they believed would persuade the jury, *see id.* ¶ 17 ("As is true in this case, the outcome and

success of [fact-driven impact] cases often depended as much or more on the extent and quality

of the factual record [plaintiffs' counsel] developed as it did on legal questions put to the

court."). *See also id.* ¶ 31 ("This is the way you build a factual record in a case such as this. The

process is tedious and time-consuming, and it demands precision and patience.").

To be sure, Plaintiffs' primary goal during fact discovery was to gather as much

information as possible "that could help them prove each Defendant entered into an agreement

with a specific co-conspirator to engage in racially motivated violence at the August 11th and

12th events," *Sines II*, 2021 WL 1143291, *5, the central legal issue in Counts I and II, and a

potential ground for liability in Count III. *See Sines I*, 324 F. Supp. 3d at 798–99. But some of

that information would have "reveal[ed] insights about the individuals' intent and motivation,"

Dinielli Decl. ¶ 21, to engage in racial, religious, or ethnic harassment, intimidation, or violence

in violation of Virginia Code § 8.01-42.1, the central legal issue in Count IV. *See Sines I*, 324 F.

Supp. 3d at 799–801. Thus, the hours Plaintiffs' litigation team spent propounding, reviewing,

and analyzing this discovery would be "associated with" their successful § 8.01-42.1 claims in

Count IV, as well as their conspiracy claims in Counts I–III. *See Signature Flight Support Corp.*, 730 F. Supp. 2d at 528 ("[T]he holding in *Ulloa* simply places the burden on a party seeking attorney's fees to establish that the fees sought are 'associated' with a successful claim." (quoting *Ulloa*, 624 S.E.2d at 43)). Plaintiffs' litigation team also spent time gathering photos, videos, and witness testimony concerning Fields's car attack on August 12, 2017, to develop their successful assault or battery claim (Count V) and IIED claim (Count VI) against Fields. *See, e.g.*, BSF Billing R. 66, 68–73, 76–80, 82, 85, 169, 189–91; Cooley Billing R. 36–37, 52–54, 50, 72, 85, 87, 92–94, 97–99, 136, 139. Attorney's fees incurred for those tasks were "associated with" Plaintiffs' successful § 8.01-42.1 claim against Fields because each Plaintiff needed to prove that Fields intentionally "subjected [that Plaintiff] to acts of . . . violence against his [or her] person," Va. Code § 8.01-42.1(A). *See Manchester Oaks*, 732 S.E.2d at 703 (affirming attorney's fee award to prevailing party where triggering breach-of-contact claim "largely subsume[d] the claim for declaratory judgment," which did not allow fees, "because the circuit court was required to ascertain what the [contract] required in order to determine whether the [defendant] had breached it").

At the same time, Plaintiffs have not "establish[ed] to a reasonable degree of specificity" that all 30,666 hours billed during the Discovery & Summary Judgment phase of this litigation were "associated with" Plaintiffs' successful § 8.01-42.1 claims. *Ulloa*, 624 S.E.2d at 50. For example, the substantial amount of time spent on tasks related to deposing Defendants Damigo, Heimbach, Parrott, Hill, Tubbs, Schoep, Vanguard America, Identity Evropa, TWP, LOS, and NSM, *see, e.g.*, BSF Billing R. 153–55, 169, 172–76, 180, 185, 189, 194–200, 203; KHF Billing R. 227, 231–33, 238–39, 242, 247–54, 542–43; Cooley Billing R. 65–66, 70–71, 93–94, 96–99, 133–34, was not "associated with" the § 8.01-42.1 claims because Plaintiffs did not sue those

Defendants under § 8.01-42.1(A). That work was devoted entirely to developing Plaintiffs'

conspiracy claims against those Defendants in Counts I–III, none of which allow attorney's fees

in this case. Thus, Plaintiffs cannot recover those attorney's fees. *See Sidya*, 780 S.E.2d at 208;

*Manchester Oaks*, 732 S.E.2d at 703.

Plaintiffs also have not established an entitlement to attorney's fees for the full 14,723.4

hours billed during the "Pretrial Disclosures & Motions" and "Jury Trial" phases of this

litigation. Clearly, some portion of the time Plaintiffs' litigation team spent making pretrial

disclosures; researching, writing, and arguing evidentiary motions; preparing dozens of witnesses

to testify; working on stipulations and exhibits; and presenting each Plaintiff's case during the

four-week jury trial was "associated with" those Plaintiffs' successful § 8.01-42.1 claims. *See,*

*e.g.*, KHF Billing R. 531, 558, 634, 637–68, 647, 655, 657, 658, 666–67, 675–78, 687, 700–07,

723–64; Cooley Billing R. 225, 230, 240, 245–46, 269–80; Paul Weiss Billing R. 58–92. "Each

of these tasks require[d] an attorney's [or paralegal's] time and, provided the time is reasonable

in light of [their] experience and the nature of the case, [they] may expect compensation for that

time at a reasonable rate." *Lambert*, 798 S.E.2d at 185. Even the Count IV Defendants concede

that Plaintiffs should be reimbursed "for the costs necessary to effectively litigate the claim

that—after all—[they] prevailed on," *id.* (emphasis omitted). *See* Defs. Kessler, Damigo &

Identity Evropa's Br. in Opp'n 1–5; Def. Fields's Br. in Opp'n 1–3; Pls.' Reply 6, 13 n.5.

Here, the challenge lies in determining the extent to which Plaintiffs produced "sufficient

evidence" that the requested fees compensate tasks or services associated with their successful §

8.01-42.01(A) claims against Kessler, Spencer, Kline, Ray, Cantwell, and Fields—but not those

related solely to "causes of action created by other statutes or by common law." *Sidya*, 870

S.E.2d at 207–08; *see also Schlegel*, 628 S.E.2d at 369. Taking a rigid mathematical approach—

such as finding that only one-sixth of the 46,950 hours billed were associated with the one claim

(of six) presented to the jury that allows Plaintiffs to recover any attorney's fees under Virginia

law—is not appropriate in a complex, fact-intensive, civil-rights conspiracy case, like this one,

where the type and amount of work that Plaintiffs' counsel performed on that one claim at each

stage of the litigation overlapped to varying degrees with their work on the other five claims. *See*

Dinielli Decl. ¶¶ 17–27.

 Based on my extensive familiarity with the litigation, I find Plaintiffs' billing records and

supporting affidavits "establish to a reasonable degree of specificity" that Plaintiffs' 26-member

litigation team spent **11,737.5 hours** on compensable tasks "associated with," *Ulloa*, 624 S.E.2d

at 50, Plaintiffs' successful § 8.01-42.1 claims against Kessler, Spencer, Kline, Ray, Cantwell,

and Fields. This figure represents **25%** of the **46,950.2 hours** billed for the entire four-year

litigation. In their brief, Plaintiffs recognize that their attorneys spent significantly more time and

effort developing and litigating all Plaintiffs' conspiracy claims in Counts I–III, which required

them to show that each of seventeen Defendants (including organizations) agreed with at least

one other conspirator to commit racially motivated violence (Counts I & II), and to commit any

*one* of the substantive torts (Count III) alleged in Counts IV, V, or VI, than they did developing

or litigating certain Plaintiffs' § 8.01-42.1(A) claims against six individual Defendants in Count

IV. *See generally* Pls.' Mot. 8–17, 23–27, 29–30; *accord* Dinielli Decl. ¶¶ 18, 20–22.

Conversely, their attorneys spent relatively little time developing and litigating certain Plaintiffs'

assault or battery claim (Count V) and IIED claim (Count VI) against Fields alone, neither of

which required proof that Fields's car attack was "motivated by racial, religious, . . . or ethnic

animosity," Va. Code § 8.01-42.1(A). Allowing certain Plaintiffs to claim **11,737.5 hours** for the

entire litigation strikes a reasonable balance between compensating their counsel for work

associated with those Plaintiffs' successful § 8.01-42.1(A) claims, as the General Assembly clearly intended, *see Lambert*, 798 S.E.2d at 185, and not compensating them for work related solely to the claims that do not allow fee shifting in this case, *see Sidya*, 870 S.E.2d at 207–08.

Each member of Plaintiffs' litigation team—from partners billing $450 or $400 per hour, to associate attorneys billing $225 per hour, to paralegals billing $100 per hour—contributed to those overall hours. Plaintiffs' billing records are too detailed and voluminous to identify the individual attorney(s) and/or paralegal(s) who performed this work. *Cf. Lambert*, 798 S.E.2d at 185 (awarding attorney's fees "does not require the court to pore over pages and pages of billing records to determine the reasonableness of each line-item"). Accordingly, I find that Plaintiffs Romero, Muñiz, Wispelwey, Sines, Blair, Martin, and Willis incurred **$3.18 million** in attorney's fees successfully litigating their § 8.01-42.1 claims in Count IV. As above, this figure represents **25%** of the **$12,726,103.86** billed for the entire litigation.

2.       *Reasonable Attorney's Fee Award*

Plaintiffs Romero, Muñiz, Wispelwey, Sines, Blair, Martin, and Willis must also show $3.18 million in attorney's fees "are reasonable and that they were necessary" to successfully litigating their § 8.01-42.1 claims. *Sidya*, 870 S.E.2d at 280. "[T]he amount of recoverable attorney's fees rests within the sound discretion of the trial court," *Cangiano*, 623 S.E.2d at 894, guided by certain relevant factors. The Virginia Supreme Court has "identified seven factors for courts to consider" in determining a "reasonable" attorney's fee award:

> (1) the time and effort expended by the attorney, (2) the nature of the services rendered, (3) the complexity of the services, (4) the value of the services to the client, (5) the results obtained, (6) whether the fees incurred were consistent with those generally charged for similar services, and (7) whether the services were necessary and appropriate.

*Lambert*, 798 S.E.2d at 183. Defendants Kessler and Fields assert that a court cannot award any attorney's fees against them "based on their inability to pay." Defs. Kessler, Damigo & Identity

Evropa's Br. in Opp'n 5; *see* Def. Fields's Br. in Opp'n 2–3. The Virginia Supreme Court has

not identified the losing party's financial condition as a relevant factor that courts may consider

in determining a reasonable attorney's fee award, and Defendants do not cite any Virginia court

decision suggesting that courts should consider it. *See* Def. Fields's Br. in Opp'n 2. Accordingly,

I consider only the seven factors above. *See Lambert*, 798 S.E.2d at 182 (noting that a trial court

abuses its discretion when it "give[s] significant weight" to an "irrelevant or improper factor").

### a.    *Plaintiffs' litigation team expended reasonable time and effort on necessary and appropriate tasks*

The declarations submitted by Plaintiffs' lead counsel, as well as their outside expert,

persuasively demonstrate that Plaintiffs' litigation team spent a reasonable amount of time and

effort on tasks necessary to investigate, develop, and effectively litigate Plaintiffs' successful §

8.01-42.1 claims against six individual Defendants, *see Lambert*, 798 S.E.2d at 185, all of whom

"adhere to right-wing extremist ideologies," Dinielli Decl. ¶ 22(b). *See generally* Dinielli Decl.

¶¶ 21–22, 32(d)–(f); Barkai Decl. ¶¶ 7–18, 22–24; Dunn Decl. ¶¶ 15, 17–19; Levine Decl. ¶¶ 17–

19; Phillips Decl. ¶¶ 17–19. Plaintiffs also faced seemingly endless "unique and complicated"

problems obtaining discovery from most of those Defendants, *Sines v. Kessler*, No. 3:17cv72,

2022 WL 972600, at *5 (W.D. Va. Mar. 30, 2022) ("*Sines III*") (published), which required their

attorneys to devote even more time and effort to developing Plaintiffs' § 8.01-42.1 claims and

generally made their jobs more difficult. Pls.' Mot. 11–17; *see, e.g.*, *Sines v. Kessler*, No.

3:17cv72, 2021 WL 5492826, at *1 (W.D. Va. Nov. 19, 2021) (Kline, Ray); *Sines v. Kessler*,

No. 3:17cv72, 2021 WL 4820683, at *10–11, *15 (W.D. Va. Oct. 15, 2021) (Fields); *Sines v.

Kessler*, No. 3:17cv72, 2021 WL 1143291, at *5 (W.D. Va. Mar. 24, 2021) (discussing the

parties' ESI Stipulation & Order, ECF No. 383, applicable to Kessler, Spencer, and Cantwell).

Cantwell, who was incarcerated and represented himself for most of the four-year litigation, was

particularly vigorous in opposing Plaintiffs Romero and Willis's § 8.01-42.1(A) claim against him before, during, and after trial. *See Lambert*, 798 S.E.2d at 185 ("Undoubtedly, the number of tasks and the time required for them will vary . . . based on the vigor with which the opposing party responds.").

        b.      *The legal services rendered were novel, complex, and valuable*

Virginia's General Assembly enacted § 8.01-42.1 in 1988. "Very few courts ha[d] provided elaboration of the statute" when Plaintiffs brought this lawsuit in October 2017. *Sines I*, 324 F. Supp. 3d at 800; *see* Pls.' Mot. 25. Even fewer had addressed the "intersection between the First Amendment—a defense frequently raised by" several Count IV Defendants, Pls.' Mot. 26—and liability under § 8.01-42.1. *See Sines I*, 324 F. Supp. 3d at 800–04. In an uncharted legal landscape like this, developing a persuasive factual record supporting each Plaintiff's § 8.01-42.1 claim required exceptional skill and resources. *See* Dinielli Decl. ¶¶ 17, 22(b)–(c). Those challenges were only compounded by the facts that four Count IV Defendants represented themselves for most of the litigation (Ray, Kline, Cantwell, Spencer) and two of those Defendants were held in civil contempt for violating numerous discovery orders.

        c.      *Plaintiffs obtained very good results on their § 8.01-42.1 claims.*

The "results obtained" factor looks at the "effectiveness of the attorney's representation in achieving the client's goals." *Lambert*, 798 S.E.2d at 184. As noted, the jury found all six Defendants liable to each Plaintiff under § 8.01-42.1(A), *see* J. 2–3, and it awarded $250,000 compensatory damages each to Romero and Willis, and $200,000 punitive damages each against Kessler, Spencer, Kline, Ray, and Cantwell for his conduct at the torchlight march on August 11, 2017. While the jury did not require Fields to pay any damages to Romero, Muñiz, Wispelwey, Sines, Blair, Martin, or Willis under § 8.01-42.1(A) for subjecting them to his violent "car attack" on August 12, 2017, it awarded at least $50,000 compensatory damages to each of them,

plus $12 million punitive damages, against Fields for that same misconduct on Counts V–VI. *See*
*id.* (citing Jury Verdict ¶¶ 11–12, 14–15). Accordingly, the jury's failure to assess damages
against Fields under § 8.01-42.1(A), specifically, does not detract from the effectiveness of
counsel's representation in obtaining "substantial" damages awards both to compensate each
Plaintiff for his or her injuries, *Sines IV*, 2022 WL 18026336, at *38, and to "punish offensive or
unlawful conduct and deter it in the future," *Wilkins*, 587 S.E.2d at 584.

   d.     *The fees incurred were consistent with those generally charged for similar*
          *services*

   Each member of Plaintiffs' 26-member litigation team—from partners billing $450 or
$400 per hour, to associate attorneys billing $225 per hour, to paralegals billing $100 per hour—
contributed to the $3.1 million in attorney's fees Plaintiffs incurred on Count IV. These hourly
rates are, objectively, "consistent with those generally charged for similar services," *Lambert*,
798 S.E.2d at 183, and with the prevailing market rates for this type of work in the
Charlottesville area. *See Comm'w v. Orndoff*, No. CL19-955, 2020 WL 8839685, at *3 (Va.
Cir. Jan. 3, 2020) (noting that this "is an objective factor" that can be "determined by expert
testimony or the experience of the trial judge," and finding that $350 per hour for attorneys and
$200 per hour for paralegals were rates "generally charged for similar services [by] lawyers and
paralegals" with comparable experience in Shenandoah County). I have approved most of those
hourly rates in awarding Plaintiffs attorney's fees in discovery disputes throughout this litigation.
*See, e.g.*, *Sines III*, 2022 WL 972600, at *5. Additionally, no Defendant objected to these
proposed hourly rates. *See* Pls.' Reply 6 & n.1.

   Accordingly, I find that **$3.18 million** is a reasonable amount to compensate Plaintiffs
Romero, Muñiz, Wispelwey, Sines, Blair, Martin, and Willis for the attorney's fees necessarily

incurred to effectively litigate their successful § 8.01-42.1 claims against Defendants Kessler,

Spencer, Kline, Ray, Cantwell, and Fields. *See Lambert*, 798 S.E.2d at 185.

B.    *Other Costs Under Rule 54(d)(1)*

Plaintiffs submitted a Bill of Costs, ECF No. 1553, and copies of invoices, ECF Nos.

1552-4 to 1552-21, seeking three categories of costs under Rule 54(d)(1) and 28 U.S.C. § 1920:

| | |
|---|---|
| Fees of the clerk and marshal: | $16,117.74 |
| Fees for printed or electronically recorded transcripts necessarily obtained for use in the case: | $241,908.99 |
| Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case: | $287,994.73 |
| **Total:** | **$546,018.46** |

Pls.' Mot. 20 (citing 28 U.S.C. § 1920(1)–(2), (4)). The $16,117.74 in "fees of the clerk and

marshal" went entirely to private "legal process service provider[s]" that served, or tried to serve,

pleadings and/or subpoenas on various Defendants, third parties, and nonparties. *See* Pls.' Mot.

Ex. A, Decl. of Yotam Barkai, Esq. ¶ 25(a)–(b), (d), (f)–(g), (i)–(l), (n), (r), ECF No. 1551-1.

Plaintiffs paid $287,994.73 in fees to three litigation-support companies for printing copies of

exhibits, deposition and trial transcripts, and other materials used for witness preparation,

meetings, and depositions throughout the course of litigation. *See id.* ¶ 25(c), (e), (m). Finally,

Plaintiffs paid $241,908.99 in fees to private companies for making video recordings and/or

transcripts of multiple depositions or attempted depositions, as well as to this Court's official

court reporter for same-day transcripts of the four-week jury trial. *See id.* ¶ 25(h), (o)–(q).

No Defendant objected to Plaintiffs' requested costs under Rule 54(d)(1). *See* Pls.' Reply

6, n.1, 13 n.5. Nonetheless, this Court has an independent obligation to review Plaintiffs'

expense records to ensure that any payment order issued under Rule 54(d)(1) extends only to

those "costs" enumerated in 28 U.S.C. § 1920. *Taniguchi*, 566 U.S. at 565; *cf. Sines III*, 2022

WL 972600, at *6 n.4 (noting the Court had the same obligation to review Plaintiffs' billing

records before awarding attorney's fees under Rule 37(b) or (d)).

     *1.     No Fees for Private Process Servers*

     "There is a longstanding circuit split" on whether fees paid to "private process servers are

recoverable under § 1920(1), which provides that '[f]ees of the clerk and marshal' are taxable

costs." *Qayumi v. Duke Univ.*, 350 F. Supp. 3d 432, 435 (M.D.N.C. 2018) (citing *Schwarz &*

*Schwarz of Va. v. Certain Underwriters at Lloyds*, No. 6:07cv42, 2010 WL 452743, at *3 (W.D.

Va. Feb. 8, 2010) (Moon, J.) (collecting cases)). The Fourth Circuit has not weighed in on that

question. *See McLaurin*, 2022 WL 16953656, at *3. The trend in the Western District of Virginia

is to deny such requests because federal courts cannot award costs "not enumerated in § 1920,"

*Taniguchi*, 566 U.S. at 565, and that statute's text does not reference fees for "private process

severs," *Scates v. Shenandoah Mem'l Hosp.*, No. 5:15cv32, 2016 WL 6879269, at *1 (W.D. Va.

Nov. 21, 2016) (collecting cases). *See, e.g.*, *McLaurin*, 2022 WL 16953656, at *3, *5. Plaintiffs

do not cite any caselaw supporting their request to recover $16,117.74 in fees paid to private

process services under § 1920(1). *See* Pls.' Mot. 20, 30–31. Accordingly, that amount should be

cut from their Bill of Costs. *See Scates*, 2016 WL 6879269, at *1; *Schwarz & Schwarz of Va.*,

2010 WL 452743, at *3.

     *2.     Reduced Fees for Copying Case Materials*

     Plaintiffs paid $287,994.73 in fees to three litigation-support companies for printing

copies of exhibits, deposition and trial transcripts, and other materials for use in the case:

- Case Driven Technologies: $250,888.31 for "items printed throughout trial" in
  October and November 2021, "including binders of exhibits, deposition and trial

Filed 05/08/23

Doc 100

transcripts, witness materials, and courtesy copies for each Defendant and the Court," Barkai Decl. ¶ 25(c);

- Epiq eDiscovery Solutions: $4,286.36 for "printing materials and binders in May 2019," *id.* ¶ 25(e); and

- TransPerfect Legal Solutions: $32,820.16 for printing and delivering "materials for witness preparation, meetings, and depositions," *id.* ¶ 25(m), from April 2018 through December 2021, *see id.* Ex. O, ECF No. 155-16, at 2–69.

*See* Pls.' Mot. 20 (citing 20 U.S.C. § 1920(4)). Section 1920(4) allows courts to tax as costs "[f]ees for exemplification and . . . making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(4). Plaintiffs bear the initial burden to show that these copies were "reasonably necessary at the time" they were made. *Fells v. Va. Dep't of Transp.*, 605 F. Supp. 2d 740, 742 (E.D. Va. 2009) (quoting *LaVay Corp. v. Dominion Fed. Sav. & Loan Ass'n*, 830 F.2d 522, 528 (4th Cir. 1987)).

Plaintiffs should be allowed **$250,888.31** in fees for making "binders of exhibits, deposition and trial transcripts, witness materials, and courtesy copies for each Defendant and the Court" during the jury trial. Barkai Decl. ¶ 25(c); *see Simmons v. O'Malley*, 235 F. Supp. 2d 442, 444 (D. Md. 2002) (the phrase "necessarily obtained for use in the case," § 1920(4), "includes, at a minimum, documents used at trial and copies furnished to the court and opposing counsel"). "Copies obtained merely for the convenience of [the prevailing party's] counsel, however, ordinarily are not allowed." *Simmons*, 235 F. Supp. 2d at 444 (collecting cases). Plaintiffs have not shown that the $37,106.42 in combined "charges for printing materials and binders in May 2019," Barkai Decl. ¶ 25(e) ($4,286.26), and "for the printing and delivery of materials for witness preparation, meetings, and depositions" throughout litigation, *see id.* ¶ 25(m) ($32,820.16), paid for copies of materials that were "reasonably necessary" for use in the

case, rather than obtaining copies for their attorneys' convenience. Accordingly, that amount should be cut from their Bill of Costs.

### 3. Reduced Fees for Transcripts or Recordings

Plaintiffs paid $193,520.14 in fees to companies for "deposition services, including videos," or "transcripts and videos," from the depositions or "attempted depositions" of multiple parties and nonparty witnesses, Barkai Decl. ¶ 25(h), (o), (q) (citing *id.* Exs. J, Q, S), plus $48,388.85 in fees to this Court's official court reporter for "real time" transcriptions of live court proceedings and same-day productions of both a "rough draft" copy and a certified "daily" copy of the transcript from each day of the four-week jury trial, *id.* Ex. R, ECF No. 1552-19, at 2. *See* Pl.s' Mot. 20 (citing 28 U.S.C. § 1920(2)). The court reporter's invoice shows that Plaintiffs paid $23,807.70 for an original and two copies of the real time transcription and/or rough draft transcript—each of which cost $7,935.90 ($2.10 per page x 3,779 pages). *See* Barkai Decl. Ex. R, at 2. They paid $24,581.15 ($6.05 per page x 4,063 pages) for same-day production of the certified "daily" transcripts. *See id.*

Section 1920(2) allows courts to tax as costs "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2). Plaintiffs bear the initial burden to show those costs were "'reasonably necessary at the time' they were incurred." *Fells*, 605 F. Supp. 2d at 742 (quoting *LaVay Corp.*, 830 F.2d at 528). Based on my extensive familiarity with pretrial discovery in this case, I find that Plaintiffs' costs related to recording or transcribing depositions generally were "necessary to counsel's effective performance and proper handling of the case." *Delapp v. Shearer's Foods, Inc.* No. 1:15cv20, 2016 WL 1718395, at *2 (W.D. Va. Apr. 29, 2016) (quoting *Scallet v. Rosenblum*, 176 F.R.D. 522, 526 (W.D. Va. 1997)). Thus, Plaintiffs may recover the full **$193,520.14** for those fees under § 1920(2).

41

The $48,388 for same-day trial transcripts is a different matter. First, Plaintiffs do not explain why their attorneys needed *three versions* of each day's trial transcript—one "real time" transcription, one "rough draft" copy, and one certified copy of the transcript "delivered daily" throughout trial—to try this case. *See generally* Pls.' Mot. 17–18, 30–31; *cf. Cherry*, 186 F.3d at 448–49 (explaining that, although § 1920(2) allows the prevailing party to recover fees for recording a deposition by any permitted method, including stenographic transcription or video recording, the party generally cannot recover the costs of recording by more than one method). In *Cherry*, the Fourth Circuit held that a prevailing party cannot "recover costs for *both* videotaping and transcribing [a] deposition" unless the party "demonstrates that both costs were 'necessarily obtained for use in the case.'" 186 F.3d at 449 (quoting 28 U.S.C. § 1920(2)). If the party fails to "show[] why either a transcript or a videotape would not have been sufficient for the need it identified," then the court should "allow only [the] transcription costs." *Id.* The same logic applies to trial transcripts and recordings. Assuming Plaintiffs needed both the real-time transcriptions of live court proceedings *and* a rough draft copy of those same transcriptions ($23,807.70) delivered to them the same day, Plaintiffs have not shown that they *also* needed a certified copy of each transcript delivered daily throughout trial ($24,581.15). Accordingly, the Court should cut $24,581.15 from Plaintiffs' Bill of Costs. *See* Barkai Decl. Ex. R, at 2.

### 4.   *No Further Reductions in Recoverable Costs*

To recap, Plaintiffs carried their initial burden to show they are entitled to recover $468,216.15 in costs under Rule 54(d)(1) and 28 U.S.C. § 1920, broken down as follows:

- $217,327.84 in fees for printed or electronically record deposition and trial transcripts necessarily obtained for use in the case, § 1920(2); and

- $250,888.31 in fees for exemplification and the costs of copying materials that were necessarily obtained for use in the case, § 1920(4).

Defendants now bear the burden to show why the Court should reduce that amount or deny costs altogether. *See Ellis*, 434 F. App'x at 235; *Fells*, 605 F. Supp. 2d at 742. "Factors justifying denying costs include misconduct by the prevailing party, the losing party's inability to pay, excessiveness of the costs in a particular case, the limited value of the prevailing party's victory, and the closeness and difficulty of the issues decided." *McLaurin*, 2022 WL 16953656, at *2 (citing *Cherry*,186 F.3d at 446). "[I]t is incumbent upon the unsuccessful party to show" that recoverable costs should not be awarded to the prevailing party. *Ellis*, 434 F. App'x at 235 (citing *Teague*, 35 F.3d at 996).

Defendants Spencer, Kline, Ray, Jeff Schoep, Vanguard America, NSM, Hill, Tubbs, and LOS did not respond to Plaintiffs' request for costs under Rule 54(d)(1). *See* Pls.' Reply 6 n.1; Defs. LOS, Hill & Tubbs's Br. in Opp'n 1–2 (opposing Plaintiffs' request for attorney's fees under Va. Code § 8.01-42.1). Defendants Fields, Cantwell, Heimbach, Parrott, and TWP filed opposition briefs *suggesting* some relevant circumstances existed in this case, *see, e.g*., Def. Fields's Br. in Opp'n 3 ("Finally, Fields manifestly has no ability to pay any award, much less the excessive award sought by Plaintiffs."); Cantwell Br. in Opp'n ¶ 9 ("Plaintiffs are not to be compensated in any way for this abuse of the legal system and Cantwell cannot pay anyway."); Defs. Heimbach, Parrott & TWP's Br. in Opp'n 2–3, 5 (noting that the jury deadlocked on Counts I and II and awarded at most nominal damages on Count III), but none presented any information or evidence *showing* "circumstances sufficient to overcome the presumption," *Ellis*, 434 F. App'x at 234, that Plaintiffs are entitled to taxable costs under Rule 54(d)(1).

Defendants Kessler, Damigo, and Identity Evropa also assert that they "cannot afford to pay the requested fees and costs." Defs. Kessler, Damigo & Identity Evropa's Br. in Opp'n 4 (emphasis omitted). A court may "deny costs to the prevailing party" if the "losing party is of such modest means that it would be unjust or inequitable to enforce Rule 54(d)(1) against him." *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 517 (D. Md. 2005) (citing *Cherry*, 186 F.3d at 447). But "the losing party must provide sufficient documentation establishing his inability to pay costs." *Id.*; *see McLaurin*, 2022 WL 16953656, at *4. "[M]ere allegations of hardship are insufficient." *Arthur v. Pet Dairy*, No. 6:11cv42, 2013 WL 6228732, at *2 (W.D. Va. Dec. 2, 2013) (Moon, J.).

Kessler submitted a sworn declaration attesting that he "cannot afford to pay" those fees and costs and that he "do[es] not expect that [he would] be able to do so in the future," Decl. of Jason Kessler ¶ 6 (Apr. 6, 2022), ECF No. 1570-3, because "it is not reasonable to expect [his] donors to send [him] money that they know is merely being passed through to the [P]laintiffs," *id.* ¶ 5. Damigo submitted a sworn declaration attesting that "[t]hroughout this litigation [he has] relied on money that is protected by law from garnishment or other collection activity to meet [his] financial obligations to [his] attorneys. Other than exempt income [he has] no money with which to pay the [P]laintiffs' requested fees and costs." Decl. of Nathan Damigo ¶¶ 4–5 (Apr. 6, 2022), ECF No. 1570-2. He did not identify this income's source or amount. Nor did he claim that he lacks *non-cash* assets that could be used to meet his financial obligations under Rule 54(d)(1). Nonparty Patrick Casey submitted a sworn declaration on Identity Evropa's behalf attesting that "Identity Evropa is a defunct organization that has no assets or revenue of any kind" and "cannot afford to pay the attorney fees and costs requested by the [P]laintiffs." Decl. of P. Casey ¶¶ 5–6 (Apr. 6, 2022), ECF No. 1570-1. No Defendant submitted financial

44

documents, or any other evidence, to substantiate his self-serving, conclusory assertion that he "cannot afford" or has "no money" to pay Plaintiffs' costs. Accordingly, they have not demonstrated "circumstances sufficient to overcome the presumption," *Ellis*, 434 F. App'x at 234, that Plaintiffs are entitled to taxable costs under Rule 54(d)(1).

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT IN PART** Plaintiffs' post-trial Motion for Attorney's Fees and Costs, ECF No. 1552, and Bill of Costs, ECF No. 1553. Specifically, Plaintiffs Romero, Muñiz, Wispelwey, Sines, Blair, Martin, and Willis should be awarded **$3.18 million** in reasonable attorney's fees necessary to litigate their successful claims in Count IV that Defendants Kessler, Spencer, Kline, Ray, Cantwell, and Fields subjected those Plaintiffs to acts of racially, religiously, or ethnically motivated harassment, intimidation, or violence on August 11–12, 2017, in violation of Virginia Code § 8.01-42.1(A). *See* Va. Code § 8.01-42.1(B). The Court may hold Defendants Kessler, Spencer, Kline, Ray, Cantwell, and Fields jointly and severally liable for those attorney's fees. The Court may not award attorney's fees (as opposed to Rule 54 costs) against any Defendant not named as a party-defendant to Plaintiffs' § 8.01-42.1 claims in Count IV, or to any Plaintiff who did not bring a substantive claim under Virginia Code § 8.01-42.1(A).

Plaintiffs should be awarded **$468,216.15** in costs under Rule 54(d)(1) and 28 U.S.C. § 1920, broken down as follows:

- $217,327.84 in fees for printed or electronically record deposition and trial transcripts necessarily obtained for use in the case, § 1920(2); and

- $250,888.31 in fees for exemplification and the costs of copying materials that were necessarily obtained for use in the case, § 1920(4).

The Court may hold all Defendants jointly and severally liable for these costs under Rule 54(d)(1). Plaintiffs have not shown that they are entitled to costs for private process servers under 28 U.S.C. § 1920(1).

I will address Plaintiffs' request for $1,266,420.84 in reimbursement for certain discovery expenses under the parties' Stipulation & Order for the Imaging, Preservation, and Production of Documents, *see* Pls.' Mot. 32 (citing ECF No. 383 (Nov. 19, 2018) (Hoppe, M.J.)), in a separate Order.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk of Court shall send a certified copy of this Report & Recommendation to all counsel and pro se parties at their addresses of record.

ENTERED: March 7, 2023

Joel C. Hoppe
United States Magistrate Judge

# JOINT EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| ELIZABETH SINES et al., | ) | |
| Plaintiffs, | ) | Civil Action No. 3:17-cv-00072 |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| JASON KESSLER et al., | ) | By: Joel C. Hoppe |
| Defendants. | ) | United States Magistrate Judge |

This matter is before the Court on Plaintiffs' post-trial Motion for Attorney's Fees and Costs ("Pls.' Mot."), ECF No. 1552, and Bill of Costs, ECF No. 1553. *See* Order of Jan. 5, 2023, ECF No. 1624. The Report & Recommendation entered this date addresses Plaintiffs' requests for $12,726,103.35 in attorney's fees under Virginia Code § 8.01-42.1(B), *see* Pls.' Mot. 8, 19, 21, 30, and for $546,018.46 in other costs under Rule 54(d) of the Federal Rules of Civil Procedure, *see id.* at 20, 30–31.

Separately, Plaintiffs seek $1,266,420.84 in costs associated with hiring a third-party discovery vendor to collect and produce electronically stored information ("ESI") from Electronic Devices and Social Media Accounts belonging to certain Defendants or their agents. *See* Pls.' Mot. 20, 32 (citing ECF No. 383); Decl. of Yotam Barkai, Esq. ¶¶ 27–28 (citing ECF Nos. 379, 383). They make this request specifically under the parties' Stipulation & Order for the Imaging, Preservation, and Production of Documents, ECF No. 383 ("ESI Stip. & Order"), and not under Rule 54(d)(1) of the Federal Rules of Civil Procedure. *See* Pls.' Mot. 20, 32 (citing ECF No. 383); Barkai Decl. ¶ 28 (citing ECF Nos. 379, 383). No Defendant has opposed Plaintiffs' request to be reimbursed for these specific e-discovery expenses under the terms of the ESI Stipulation & Order. *See* Pls.' Reply 6 & n.1; Pretrial Order ¶ 7, ECF No. 101.

1

I signed and entered the ESI Stipulation & Order on November 19, 2018, shortly after granting Plaintiffs' motion to compel seventeen Defendants to permit inspection and imaging of their electronic devices. *See* Order of Nov. 13, 2018, ¶¶ 1–2, ECF No. 379; Pls.' Mot. to Compel Defs. to Permit Insp. & Imaging of Elec. Devices 2–4, ECF No. 354 (Oct. 2, 2018); Fed. R. Civ. P. 37(a)(3)(B)(iv). The ESI Stipulation & Order was drafted by the Parties[1] and "put in place specifically to help" the seventeen named Defendants "'collect and preserve' ESI from identified social media accounts and 'electronic devices that [was] potentially relevant to this litigation and/or responsive to Plaintiffs' discovery requests' originally served on January 25, 2018." Mem. Op. of Aug. 19, 2019, at 19, ECF No. 539 (quoting Stip. & Order ¶ I(1)); *see* Order of Mar. 26, 2018, at 3 (noting that all Defendants failed to timely respond to Plaintiffs' discovery requests and directing each Defendant to answer, respond, or object to those requests within twenty-one days), ECF No. 287. It contains the following agreed-upon terms:

> Within 21 days of the entry of this Stipulation and Order, *the Parties shall engage, at Plaintiffs' expense*, a Third Party Discovery Vendor *to conduct the collection and production of ESI from Defendants' Electronic Devices and Social Media Accounts* required by this Stipulation and Order. Pursuant to the Court's November 13, 2018 Order, ECF No. 379, *such engagement shall be without prejudice to Plaintiffs' ability to seek to recover from Defendants expenses arising from this engagement at a later date*. This Stipulation and Order does not obligate Defendants to pay any fees or costs incurred by the Third Party Discovery Vendor at this time, and does not prejudice Defendants' rights to oppose any request made by Plaintiffs to recover those expenses, any such obligation to be determined at a later date.

---

[1] "Plaintiffs and Defendants Christopher Cantwell, Nathan Damigo, Matthew Heimbach, Michael Hill, Identity Ervopa, Jason Kessler, League of the South, Eli Mosely [a.k.a. Elliott Kline], Nationalist Front, National Socialist Movement, Matthew Parrott, Robert ['Azzmador'] Ray, Jeff Schoep, Richard Spencer, Traditionalist Worker Party, Michael Tubbs, and Vanguard America (collectively, the 'Defendants,' and with Plaintiffs, the 'Parties') hav[e] stipulated and agreed to the terms set forth herein[.]" *Id.* The ESI Stipulation & Order does not apply to Defendant James Fields Jr. *See* ESI Stip. & Order 2; Mem. Op. of June 11, 2020, ECF No. 759.

ESI Stip. & Order ¶ II(4) (emphasis added). The Parties engaged iDiscovery Solutions ("iDS") in Washington, D.C., to image, collect, and produce ESI from these Defendants' electronic devices and social media accounts. *See* Barkai Decl. ¶ 27. There is no indication that iDS handled any Electronic Device or Social Media Account belonging to Plaintiffs. *See id.* ¶¶ 27–28.

Plaintiffs submitted invoices from iDS showing that Plaintiffs incurred $1,266,420.84 in fees for imaging, collection, production, preservation, and related tasks performed between March 1, 2019, and October 31, 2021. *See* Barkai Decl. Ex. V, at 2–229. The Parties' agreement contemplated that Plaintiffs would incur expenses "arising from" the Vendor's work "conduct[ing] the collection and production of ESI from Defendants' Electronic Devices and Social Media Accounts required by th[e] Stipulation and Order," including taking measures to "preserve evidence" from those devices and accounts, and that Plaintiffs could later seek to "recover those expenses" from Defendants. ESI Stip. & Order ¶¶ I(1), II(4).

Accordingly, Plaintiffs are entitled to recover **$1,266,420.84** in reimbursable expenses under the terms of the ESI Stipulation & Order. *See Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 324 (4th Cir. 2001) (en banc) (acknowledging "the rule in this circuit that a district court . . . is best able to interpret its own orders" (quotation marks omitted)). Defendants Christopher Cantwell, Nathan Damigo, Matthew Heimbach, Michael Hill, Identity Ervopa, Jason Kessler, League of the South, Eli Mosely (a.k.a. Elliott Kline), Nationalist Front, National Socialist Movement, Matthew Parrott, Robert "Azzmador" Ray, Jeff Schoep, Richard Spencer, Traditionalist Worker Party, Michael Tubbs, and Vanguard America shall be jointly and several liable to Plaintiffs for this amount.

ENTERED: March 7, 2023

3

Joel C. Hoppe
United States Magistrate Judge

JXV-2_Page 599

# JOINT EXHIBIT 15

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1119**

---

ELIZABETH SINES; SETH WISPELWEY; MARISSA BLAIR; APRIL MUNIZ; MARCUS MARTIN; JOHN DOE; NATALIE ROMERO; CHELSEA ALVARADO; THOMAS BAKER,

>    Plaintiffs – Appellees,

and

TYLER MAGILL; HANNAH PEARCE,

>    Plaintiffs,

>    v.

MICHAEL HILL; MICHAEL TUBBS; LEAGUE OF THE SOUTH,

>    Defendants – Appellants,

and

JASON KESSLER; RICHARD SPENCER; CHRISTOPHER CANTWELL; JAMES ALEX FIELDS, JR.; VANGUARD AMERICA; ANDREW ANGLIN; MOONBASE HOLDINGS, LLC.; ROBERT AZZMADOR RAY; NATHAN DAMIGO; ELLIOTT KLINE, a/k/a Eli Mosely; IDENTITY EVROPA; MATTHEW HEIMBACH; DAVID MATTHEW PARROTT, a/k/a Matthew Parrott; TRADITIONALIST WORKER PARTY; JEFF SCHOEP; NATIONAL SOCIALIST MOVEMENT; NATIONALIST FRONT; AUGUSTUS SOL INVICTUS; FRATERNAL ORDER OF THE ALT-KNIGHTS; MICHAEL ENOCH PEINOVICH; LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN; EAST COAST KNIGHTS OF THE KU KLUX KLAN, a/k/a East Coast Knights of the True Invisible Empire,

>    Defendants.

-------------------------------

HUMAN RIGHTS CAMPAIGN FOUNDATION; LEGAL AID JUSTICE CENTER; SOUTHERN POVERTY LAW CENTER; VIRGINIA LAW PROFESSORS,

Amici Supporting Appellees.

—————————————

No. 23-1122

—————————————

ELIZABETH SINES; SETH WISPELWEY; MARISSA BLAIR; APRIL MUNIZ; MARCUS MARTIN; JOHN DOE; NATALIE ROMERO; CHELSEA ALVARADO; THOMAS BAKER,

Plaintiffs – Appellees,

and

TYLER MAGILL; HANNAH PEARCE,

Plaintiffs,

v.

NATHAN DAMIGO,

Defendant – Appellant,

and

JASON KESSLER; RICHARD SPENCER; CHRISTOPHER CANTWELL; JAMES ALEX FIELDS, JR.; VANGUARD AMERICA; ANDREW ANGLIN; MOONBASE HOLDINGS, LLC.; ROBERT AZZMADOR RAY; NATHAN DAMIGO; ELLIOTT KLINE, a/k/a Eli Mosely; IDENTITY EVROPA; MATTHEW HEIMBACH; DAVID MATTHEW PARROTT, a/k/a Matthew Parrott; TRADITIONALIST WORKER PARTY; JEFF SCHOEP; NATIONAL SOCIALIST MOVEMENT; NATIONALIST FRONT; AUGUSTUS SOL INVICTUS; FRATERNAL ORDER OF THE ALT-KNIGHTS; MICHAEL ENOCH PEINOVICH; LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN; EAST COAST KNIGHTS OF THE KU KLUX KLAN, a/k/a East Coast Knights of the True Invisible Empire,

Defendants.

--------------------------------
HUMAN RIGHTS CAMPAIGN FOUNDATION; LEGAL AID JUSTICE CENTER; SOUTHERN POVERTY LAW CENTER; VIRGINIA LAW PROFESSORS,

Amici Supporting Appellees.

---

**No. 23-1154**

---

ELIZABETH SINES; SETH WISPELWEY; MARISSA BLAIR; APRIL MUNIZ; MARCUS MARTIN; JOHN DOE; NATALIE ROMERO; CHELSEA ALVARADO; THOMAS BAKER,

Plaintiffs – Appellants,

and

TYLER MAGILL; HANNAH PEARCE,

Plaintiffs,

v.

JASON KESSLER; RICHARD SPENCER; CHRISTOPHER CANTWELL; JAMES ALEX FIELDS, JR.; VANGUARD AMERICA; ANDREW ANGLIN; MOONBASE HOLDINGS, LLC.; ROBERT AZZMADOR RAY; NATHAN DAMIGO; ELLIOTT KLINE; IDENTITY EVROPA; MATTHEW HEIMBACH; DAVID MATTHEW PARROTT, a/k/a Matthew Parrott; MICHAEL HILL; MICHAEL TUBBS; LEAGUE OF THE SOUTH; JEFF SCHOEP; NATIONAL SOCIALIST MOVEMENT; NATIONALIST FRONT; AUGUSTUS SOL INVICTUS; FRATERNAL ORDER OF THE ALT-KNIGHTS; LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN; EAST COAST KNIGHTS OF THE KU KLUX KLAN, a/k/a East Coast Knights of the True Invisible Empire,

Defendants – Appellees,

and

MICHAEL ENOCH PEINOVICH

Defendant.

3

------------------------------

HUMAN RIGHTS CAMPAIGN FOUNDATION; LEGAL AID JUSTICE CENTER; SOUTHERN POVERTY LAW CENTER; VIRGINIA LAW PROFESSORS,

Amici Supporting Appellants.

--------

Appeals from the United States District Court for the Western District of Virginia, at Charlottesville. Norman K. Moon, Senior District Judge. (3:17−cv−00072−NKM−JCH)

--------

Argued: January 25, 2024                                    Decided: July 1, 2024

--------

Before DIAZ, Chief Judge, and NIEMEYER and WYNN, Circuit Judges.

--------

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Chief Judge Diaz wrote the opinion, in which Judge Niemeyer and Judge Wynn joined.

--------

**ARGUED:** Bryan Jeffrey Jones, BRYAN J. JONES, LLC, Charlottesville, Virginia; James Edward Kolenich, KOLENICH LAW OFFICE, Cincinnati, Ohio, for Appellants/Cross-Appellees. David E. Mills, COOLEY LLP, Washington, D.C.; Raymond P. Tolentino, KAPLAN HECKER & FINK LLP, Washington, D.C., for Appellees/Cross-Appellants. **ON BRIEF:** Joshua M. Siegel, Caitlin B. Munley, Robby Lee Ray Saldaña, Khary J. Anderson, Washington, D.C., Alan D. Levine, COOLEY LLP, New York, New York; Roberta A. Kaplan, Gabrielle E. Tenzer, KAPLAN HECKER & FINK LLP, New York, New York; Karen L. Dunn, Jessica E. Phillips, Washington, D.C., Yotam Barkai, Melina Maria Meneguin Layerenza, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, for Appellees/Cross-Appellants. Sarah Warbelow, Cynthia Cheng-Wun Weaver, JP Schnapper-Casteras, HUMAN RIGHTS CAMPAIGN FOUNDATION, Washington, D.C.; Elizabeth Littrell, Decatur, Georgia, Scott D. McCoy, SOUTHERN POVERTY LAW CENTER, Miami, Florida; Edward J. Jacobs, Michelle N. Tanney, Jonathan A. Forman, Robyn M. Feldstein, J'Naia L. Boyd, Shade I. Quailey, Sydney W. Park, New York, New York, Kendall C. Kash, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Amici The Human Rights Campaign Foundation, The Southern Poverty Law Center, and Legal Aid Justice Center. Kyle McNew, David Thomas, MICHIEHAMLETT, Charlottesville, Virginia, for Amici Virginia Law Professors.

--------

4

Filed 05/08/25    Case 19-09006    Doc 100

DIAZ, Chief Judge:

In August 2017, a group of protesters traveled to Charlottesville, Virginia, to demonstrate against the City's decision to remove a statue of Robert E. Lee. The organizers called this event the "Unite the Right" rally, or the "Battle of Charlottesville." What followed was a harrowing weekend in our Nation's history.

As a later civil jury trial proved, these protesters (among whom were white nationalists, white supremacists, and neo-Nazis) conspired to commit racially motivated violence to, in part, "defend Western civilization and white men against perceived enemies—specifically, Jewish persons, Black persons, and their white gentile traitor allies." *Sines v. Kessler*, No. 3:17-cv-00072, 2022 WL 18026336, at *23 (W.D. Va. Dec. 30, 2022) (cleaned up). The protesters "sought violence, planned for violence, sparked violence, engaged in violence, and afterwards, glorified the violence" committed. *Id.* at *33.

The jury's damages award against the protester-defendants totaled over $26 million, split among compensatory damages the district court assigned jointly and severally against the defendants, and a historic $24 million in punitive damages. But the district court ultimately slashed those punitive damages to $350,000 by applying Virginia's so-called punitive damages cap across the eight plaintiffs who sought them, *see* Va. Code Ann. § 8.01-38.1. The compensatory and punitive damages form the bedrock of this consolidated cross-appeal.

Filed 05/08/25

Defendants Michael Hill, Michael Tubbs, League of the South, and Nathan Damigo,[1] challenge the district court's decision to hold them jointly and severally liable for the jury's compensatory damages award. Meanwhile, the plaintiffs challenge the district court's decision to apply Virginia's punitive damages cap across all plaintiffs. This latter issue is one of first impression for both our court and the Supreme Court of Virginia.

We affirm the district court's imposition of joint-and-several liability for the compensatory damages. But because we hold that Virginia's punitive damages cap applies on a per-plaintiff basis, we vacate the district court's ruling on that question and remand with instructions to apply the cap accordingly.

I.

A.

In June and July 2017, Jason Kessler began organizing the Unite the Right rally and inviting various Alternative Right (or Alt-Right) and white supremacist groups to attend. Among those attendees were Damigo (and the organization he founded, Identity Evropa), Hill (and the organization he founded, League of the South), and Tubbs.

Damigo had gained some renown within these groups after he was filmed punching a woman at a protest in Berkeley, California, a few months earlier. And Hill had published an online "Pledge of Allegiance," "in which he stated: 'I pledge to be a white supremacist,

---

[1] The other defendants who appeared at trial, including Jason Kessler, are not parties to the portion of the appeal involving joint-and-several liability. All defendants other than Michael Enoch Peinovich join in the appeal involving punitive damages.

6

Filed 05/08/25    Case 19-09006    Doc 100

a racist, an anti-Semite, a homophobe, a xenophobe, an Islamophobe, and any sort of 'phobe that benefits my people.'" *Sines*, 2022 WL 18026336, at *22 (cleaned up).

Kessler's planning was extensive, and from the beginning contemplated violence. He and his codefendants "planned for months to provoke Antifa and its followers into a violent battle at Unite the Right." [2] *Id.* at *3. Outfitted with "helmets, shields, and body armor, and armed with weapons," the defendant-protesters "strategized how any punch thrown by an Antifa supporter would give them a chance to respond with brutal and overwhelming violence." *Id.* Kessler sought to "rais[e] an army" and "encouraged attendees to bring signposts, shields, and other 'self-defense implements,' which could be transformed from 'free speech tools into self-defense weapons should things turn ugly.'" *Id.* at *9 (cleaned up).

Damigo believed that "violence might be necessary to secure [a] white ethnostate." *Id.* at *3 (cleaned up). And he wasn't alone. Using the online communications platform Discord, the codefendants' servers were "replete" with messages "demonstrating that they shared expectations of, hoped for, planned for, and purposefully sought to instigate violence at Unite the Right—including discussing whether someone could drive a car through a crowd of demonstrators that might be blocking the street." *Id.* at *5.

"As numerous private social media messages reflect, Kessler undertook several steps ahead of time to spark violence at Unite the Right between the rally-goers and

---

[2] Antifa—a portmanteau of the words, "anti" and "fascists"—has become known for opposing the views of the Alt-Right and for clashing with Alt-Right groups, often violently.

JXV-2_Page 607

Antifa." *Id.* at *8 (cleaned up). For example, he asked that his followers "taunt[] [Antifa] a little on social media," and "tip off Antifa" about the rally location to ensure confrontations. *Id.* at *8; *accord id.* ("We definitely want to play these people into our hands Saturday in Charlottesville." (cleaned up)); *id.* at *19 (explaining that evidence showed codefendants "shared similar motives and sought various methods to spark violence at which point Unite the Right rallygoers would be prepared to respond with overwhelming force and violence").

Kessler and the codefendants planned and executed two events over the Unite the Right weekend. First, they "led hundreds wielding lit tiki torches and chanting[,] 'You will not replace us,' 'Jews will not replace us,' 'Blood and soil,' and 'Sieg Heil,' through University of Virginia grounds up to the Rotunda and down to the Thomas Jefferson statue." *Id.* at *6. There, the marchers encountered and surrounded counterprotesters (including several plaintiffs), where they "prevented [the counterprotesters] from escaping, pepper sprayed [them], and subjected [them] to racist insults," *id.*, in a show "of dominance," *id.* at *10 (cleaned up).

The next day, the violence from the night before reached its "flashpoint," *id.* at *10, as protesters and counterprotesters clashed near and around the Lee statue. The defendants "le[d] the troops into battle and coordinat[ed their] attack," *id.* at *23, using weapons and words against both violent Antifa and peaceful counterprotesters alike, *see id.* at *24 (Hill conceding at trial that League of the South members "engaged in some violence *that they*

*initiated*").[3]  The mayhem ended with defendant James Alex Fields, Jr., driving his car into a group of counterprotesters, killing Heather Heyer, and injuring other plaintiffs.

After the rally, the protesters celebrated, saying that they "'couldn't be happier' with the outcome" and that they "would not go back and change a thing." *Id.* at *25 (cleaned up).  They reiterated their support for Fields, "expressing numerous times that Heather Heyer . . . was to blame for her own death," *id.* at *9, and even "refer[ing] to [her] grave as a urinal," *id.* at *12 (cleaned up).  "Hail victory," they proclaimed.  *Id.* at *6 (cleaned up). "This is just the beginning . . . the war goes on."  *Id.* (cleaned up).

## B.

Following these events, Elizabeth Sines and eight others sued twenty-three individual and organizational defendants, thirteen of whom appeared at trial.  As relevant here, all the plaintiffs alleged against all the defendants a Virginia state-law civil conspiracy claim (Count III).  A subset of the plaintiffs also alleged against a subset of the defendants a Virginia state-law claim for racial, religious, or ethnic harassment under Virginia's hate-crime statute (Count IV); and Virginia state-law tort claims for assault and battery (Count V), and intentional infliction of emotional distress (Count VI).[4]

The trial lasted over four weeks and saw the parties admit over 900 exhibits and call 35 witnesses.

---

[3] The jury rejected the defendants' self-defense justification at trial.  *See Sines*, 2022 WL 18026336, at *9.

[4] Plaintiffs also alleged federal civil rights and conspiracy claims (Counts I and II). The jury didn't reach a verdict on those claims, and they aren't at issue in this appeal.

Filed 05/08/25    Case 19-09006    Doc 100

In its final jury instructions, the district court explained for Count III that "[u]nder Virginia law, persons who conspired together to commit one or more unlawful acts may be held liable for the injuries that result from that conspiracy." J.A. 4706. It then defined the five "unlawful or tortious" predicate acts of the conspiracy:

- Subjecting persons to actions of intimidation or harassment, motivated by racial, religious, or ethnic animosity in violation of Virginia Code § 8.01-42.1 (often referred to as Virginia's hate[-]crime[] statute);

- Directing violence at another person, motivated by racial, religious, or ethnic animosity in violation of Virginia Code § 8.01-42.1;

- Committing an unwanted touching that was neither consent[ed] to, excused, or justified (battery);

- Engaging in an overt act intended to inflict bodily harm, or intended to place the victim in fear or apprehension of bodily harm (assault); and

- Causing a reasonable apprehension that force will be used unless a person willingly submits and causing him to submit to the extent that he is denied freedom of action (false imprisonment).

J.A. 4706–07.

The district court emphasized that "Plaintiffs need only prove that Defendants conspired to commit *one* of these underlying acts to impose liability." J.A. 4707. And it said that it would instruct the jury "on the elements that plaintiffs must prove" for each of those five predicate acts. J.A. 4708.

The district court then provided those elements for Count IV (violations of the Virginia hate-crime statute) and Count V (assault and battery). It described those two counts as "standalone claim[s]," J.A. 4709, 4711, brought in addition to the plaintiffs' civil

JXV-2_Page 610

conspiracy claim that the defendants collectively violated the hate-crime statute and committed assault and battery.

But when the court instructed the jury on Count VI (intentional infliction of emotional distress), it didn't include such "standalone" language, nor did it relate that claim to the broader conspiracy charge.

## C.

After three days of deliberation, the jury found for the plaintiffs on Counts III, IV, V, and VI.

On Count III, the jury awarded nominal damages to the plaintiffs (except for Sines and another plaintiff). It also awarded $500,000 in punitive damages against each individual defendant and $1,000,000 in punitive damages against each organizational defendant.

On Count IV, the jury awarded each of the two plaintiffs bringing that claim $250,000 in compensatory damages against Kessler, Richard Spencer, Elliot Kline, Robert "Azzmador" Ray, and Christopher Cantwell.[5] It also awarded $200,000 in punitive damages against each of these defendants.

---

[5] The jury found a fifth defendant, Fields, liable under Count IV, but it didn't assess any compensatory or punitive damages against him on that Count. Instead, as discussed more fully, *infra* p. 12, the jury assessed a substantial punitive damages award against him on Counts V and VI.

On Count V, the jury awarded the five plaintiffs who brought that claim a total of $803,277 in compensatory damages against the one defendant, Fields, who it found liable. It then awarded $6,000,000 in punitive damages against Fields.

Finally on Count VI, the jury awarded the six plaintiffs who brought that claim a total of $701,459 in compensatory damages against the one defendant—again, Fields— who it found liable. And once more, it awarded $6,000,000 in punitive damages against Fields.

Because the jury found that all the defendants engaged in a conspiracy under Count III, the district court applied the collective compensatory damages for the conspiracy's predicate acts—Counts IV and V—jointly and severally. It didn't, however, apply the damages for Count VI jointly and severally because the intentional infliction of emotional distress wasn't one of the conspiracy's predicate acts.

### D.

The parties exchanged a flurry of post-trial motions. As relevant here, Damigo, Hill, Tubbs, and League of the South, argued that Virginia's punitive damages cap should apply to the jury's punitive damages award, reducing them to $350,000, and that the damages were constitutionally excessive.

The plaintiffs, in turn, moved for default judgments against defendants Andrew Anglin, Moonbase Holdings, LLC, East Coast Knights of the KKK, Fraternal Order of the Alt-Knights, August Sol Invictus, The Loyal Knights of the KKK, and the Nationalist Front, none of whom appeared at trial. The plaintiffs maintained that the defaulted defendants should be jointly and severally liable with the trial defendants for the

compensatory damage awards under Counts III and IV as coconspirators.  The plaintiffs also sought punitive damages against the defaulted defendants.

E.

The district court addressed the parties' post-trial motions in two orders.  Because Virginia's punitive damages cap figures prominently in the court's rulings, we recite it at length here:

> In any action . . . including an action for medical malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact.  In no event shall the total amount awarded for punitive damages exceed $350,000 . . . . [I]f a jury returns a verdict for punitive damages in excess of the maximum amount specified in this section, the judge shall reduce the award and enter judgment for damages in the maximum amount provided by this section.

Va. Code Ann. § 8.01-38.1.

The district court first ruled on the defendants' combined post-trial motions, which it almost uniformly rejected, in a thoughtful nearly-90-page order.  *See Sines*, 2022 WL 18026336, at *1.  Critically, however, the district court agreed that the Virginia punitive damages cap applied.

In doing so, the district court rebuffed the plaintiffs' arguments that the punitive damages cap applied only in "run-of-the-mill" tort and insurance cases rather than in the hate-crime context.  *Id.* at *27 (cleaned up).  The plaintiffs had asserted that because the statute singles out "an action for medical malpractice" as a type of claim to which the cap applies, the legislature intended to limit recovery only in these garden-variety cases—not in a civil rights lawsuit for racially motivated crimes.  *Id.* (cleaned up).

13

Filed 05/08/25    Case 19-09006    Doc 100

The district court also rejected the plaintiffs' fallback contention that the cap applies on a per-plaintiff basis, with *each* plaintiff receiving $350,000.

While it acknowledged that this court expressly "left th[is] [per-plaintiff] issue open" in *Al-Abood v. El-Shamari*, 217 F.3d 225, 237 n.10 (4th Cir. 2000), it found persuasive that in *Al-Abood* we had held that the cap didn't apply on a per-defendant basis. *Id.* at *28. And the district court reasoned that the statutory language mandated that the cap applied "'[i]n *any action*,' not '*a plaintiff's* action,' or '*each plaintiff's* right of action.'" *Id.* (cleaned up). Taken together, the district court found that our *Al-Abood* defendant-cap holding and the statutory language "strongly indicate[d]" the cap applied no matter how many plaintiffs. *Id.*

But the district court rejected the defendants' additional argument that the punitive damages award was unconstitutionally excessive given the purportedly outsized ratio between punitive and compensatory damages.

The defendants had claimed that the court should compare any such ratio on a claim-by-claim basis. The plaintiffs responded that, because the defendants were jointly and severally liable for Counts III, IV, and V, the court should compare the *aggregate* compensatory damages for those counts to the *aggregate* punitive damages. In his separate reply brief, Damigo dismissed this "argument regarding joint and several liability" as "miss[ing] the mark" for the appropriate punitive damages ratio because the plaintiffs hadn't sued Damigo under either Count IV or Count V. Defs.' Reply Br. as to Punitive Damages at 4, *Sines*, 2022 WL 18026336 (No. 3:17-cv-00072), ECF No. 1593.

14

The district court agreed with the plaintiffs' aggregate approach because "the jury found Defendants liable for a civil conspiracy," which "meant that Defendants were held jointly and severally liable for the damages award." *Sines*, 2022 WL 18026336, at *34 (cleaned up). The district court thus determined that the punitive damages award wasn't constitutionally excessive.

Then in a separate order, the district court granted the plaintiffs' default judgment motion, finding the defaulted defendants jointly and severally liable for the compensatory damages stemming from the unlawful conspiracy. But it held that the punitive damages cap applied to the punitive damages award against those defendants too. The court therefore reduced the jury's punitive damages from $24 million to a final $350,000.

This appeal followed.

## II.

Hill, Tubbs, League of the South, and Damigo first challenge the district court's decision to impose the jury's compensatory damage awards for Counts IV and V jointly and severally. They contend that Virginia law and the Seventh Amendment foreclose doing so because none of these four defendants were charged under those two counts. Plaintiffs respond that defendants forfeited this argument by failing to raise it in the district court, and that the argument is otherwise meritless.

In their cross-appeal, plaintiffs ask us to reverse the district court's order reducing the jury's punitive damages to $350,000 under Virginia's punitive damages cap. They urge us to hold (1) that the punitive damages cap doesn't apply at all to awards remedying

15

violations of Virginia's hate-crime statute, or (2) alternatively, that the cap applies on a per-plaintiff (not an *all-plaintiff*) basis.

## A.

We turn first to the joint-and-several liability challenge. We're inclined to agree with plaintiffs that this argument was forfeited. As we've explained, "issues raised for the first time on appeal are generally not considered absent exceptional circumstances." *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 267 (4th Cir. 2006) (cleaned up). And in the waiver context,[6] we've held that "tak[ing] a passing shot at [an] issue" cannot preserve that issue for appellate review. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (cleaned up); *see also Muhammad v. Giant Food Inc.*, 108 F. App'x 757, 764 (4th Cir. 2004) (holding that appellants forfeited issue on appeal after only a "passing mention" of that issue to the district court).

The best that defendants can muster is a single such "passing shot." They claim that "Damigo specifically made the joint and several liability argument in post-trial briefing." Appellants' Reply Br. at 7.

To be sure, Damigo wrote the words "joint and several liability" in his brief, but only as a rejoinder to plaintiffs' arguments on aggregating the ratio between the jury's

---

[6] There are important distinctions between waiver and forfeiture not implicated here. But in sum, "forfeiture is the failure to make the timely assertion of a right, [while] waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (cleaned up). Thus, for a waived argument, the parties may have exchanged briefing on the issue that the district court evaluated. *See, e.g.*, *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 271 (4th Cir. 2019). By contrast, a forfeited argument would have left no similar footprint in the record.

compensatory and punitive damages awards for constitutional purposes.  Defs.' Reply Br. as to Punitive Damages at 4, *Sines*, 2022 WL 18026336 (No. 3:17-cv-00072), ECF No. 1593.  And neither Damigo nor any other defendant elaborated any further or developed any argument substantively challenging the court's joint-and-several liability finding.  *See M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*, No. 22-1420, 2023 WL 8798086, at *6 (4th Cir. Dec. 20, 2023) (holding that appellants forfeited issue on appeal even after raising argument in summary judgment briefing where it didn't "elaborate or provide any citations on the record or argument on this point").

Perhaps reading the tea leaves, defendants say that we should still consider their claim because "the equities require [review]."  Appellants' Reply Br. at 7 (cleaned up).  But even then, our standard is more demanding than defendants admit.  Indeed, "[w]hen a party in a civil case . . . raises an argument for the first time before us, we may reverse only if the newly raised argument establishes fundamental error or a denial of fundamental justice." *Tarashuk v. Givens*, 53 F.4th 154, 167 (4th Cir. 2022) (cleaned up).  And this "newly raised argument" doesn't simply fail to establish a fundamental error, it identifies no error at all.  Nor could it.

That's because "a civil conspiracy [claim] is a mechanism for spreading liability among coconspirators for damages sustained as a result of the underlying act that is itself wrongful or tortious." *La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC*, 805 S.E.2d 399, 406 (Va. 2017) (cleaned up); *see also Gelber v. Glock*, 800 S.E.2d 800, 821 (Va. 2017) ("The object of a civil conspiracy claim is to spread liability to persons other

Filed 05/08/25    Case 19-09006    Doc 100

than the primary tortfeasor.").  That's precisely what the district court did here: It jointly allocated the liability among the coconspirators for the conspiracy and its predicate acts.

In insisting that Virginia law permits joint-and-several liability only among joint tortfeasors who "produce a single injury," Appellants' Br. at 5 (cleaned up), defendants overlook that the jury found that they weren't simply joint tortfeasors, they were *coconspirators*, and so were liable for all damage stemming from that conspiracy.

Confoundingly, defendants concede that "[they] were found liable under the Count III state law conspiracy claim," *id.* at 6, yet they insist that the jury was somehow "specifically prohibited from finding them liable on Counts IV or V by the Court's instructions to the jury and the jury verdict form," *id.* at 5.  Not so.

The court instructed the jury that "persons who conspired together to commit one or more unlawful acts may be held liable for the injuries that result from that conspiracy." J.A. 4706.  The court then listed the five predicate acts, which included violations of Virginia's hate-crime statute and common law assault or battery.  Count IV and Count V's "standalone" claims were those very predicate acts (and the objects of the conspiracy), which the jury found defendants committed.  We need look no further for confirmation than the district court's own post-judgment ruling, where it affirmed that it "instructed the jury" that Counts IV and V "would constitute predicate unlawful acts of the conspiracy" in Count III.  *Sines*, 2022 WL 18026336, at *34 n.31.[7]

---

[7] The verdict form required a liability finding on Count III for the conspiracy (and to all coconspirators) before assessing the specific damages for that conspiracy (and jointly to all coconspirators) in Counts IV and V.  That Count III awarded nominal damages and

JXV-2_Page 618

Thus, the district court committed no fundamental error that would forgive a forfeiture, nor did it commit any error that would justify our disturbing its joint-and-several liability finding even absent forfeiture. We affirm.

### B.

We turn next to the harder question about Virginia's punitive damages cap. Plaintiffs would have us not apply it at all or apply it on a per-plaintiff basis. Defendants would have us affirm the district court's application of the cap or certify the question to the Supreme Court of Virginia.[8] As we did in *Al-Abood*, we choose instead to "predict what the Supreme Court of Virginia would decide were the [per-plaintiff] issue presented to it." 217 F.3d at 237.

As we explain, we hold that the cap applies generally in the hate-crime context but that it applies on a per-plaintiff basis.

### 1.

"The proper application of [Virginia's punitive damages cap] is a question of law" that we review de novo. *Al-Abood*, 217 F.3d at 237. And though we acknowledge, as did the district court, that the interpretative question before us is somewhat unsettled under

_____

Counts IV and V awarded compensatory (and punitive) damages ensured that the plaintiffs didn't receive duplicative damages for the conspiracy and its predicate acts.

[8] The district court considered certifying this question to Virginia's high court but opted not to "given the challenges to the merits of the jury verdict and other federal and state law challenges to the damages award." *Sines*, 2022 WL 18026336, at *30 n.29.

Filed 05/08/25
Doc 100

Virginia law, we agree that we needn't begin on a "blank slate."  *Sines*, 2022 WL 18026336, at *28.

Two cases guide our inquiry.  First, in *Wackenhut Applied Technologies Center, Inc. v. Sygnetron Protection Systems, Inc.*, we considered whether "the Virginia legislature intended that the punitive damages cap should apply only in unintentional tort actions." 979 F.2d 980, 984 (4th Cir. 1992).  After reviewing the statute's text, and particularly its inclusion of the broad term "[i]n any action," we rejected this argument.  *Id.* (cleaned up).

We reasoned that "[t]he drafters of the Virginia statute, in limiting punitive damages, chose the phrase 'any action' to define the class of cases to which the statute would apply—they did not further define 'any action.'"  *Id.*  We declared that phrase, therefore, "unequivocal," because there was simply "no definitional language indicating that . . . 'any action' is limited to unintentional tort actions."  *Id.*

Nor were we convinced that "the legislative history or intent of the statute" changed that straightforward interpretation.  *Id.*  Instead, "[i]n our view, the history of this legislation indicate[d] that the Virginia legislature intended that the punitive damages cap be applied 'in any action.'"  *Id.*  So "in interpreting the statute," we declined to "deviate from [its] plain meaning."  *Id.*

We also have our decision in *Al-Abood*.  There, we addressed whether the district court erred by reducing a punitive damages award under the cap but applying it on a per-defendant basis.  *Al-Abood*, 217 F.3d at 236–37.  The defendants argued that the cap operated instead on a per-lawsuit basis, such that the award "should have been lowered to

"$350,000" total, because the cap applied to "the total amount awarded. . . against all defendants." *Id.* at 237 (cleaned up).

We agreed. Turning first to the statutory text (as we did in *Wackenhut*), we found "no ambiguity . . . and conclude[d] that its plain meaning dictate[d] that the cap on punitive damage awards applie[d] to the action as a whole, and not to each defendant." *Id.*

We treated as dispositive that the first sentence of the statute referred to both "the total amount" and "against all defendants," thus "mandat[ing] that the *entirety* of the punitive damages awarded in the action amount to no more than to $350,000." *Id.* (emphasis added). But our holding was narrow: We "expressed no opinion on how the cap would be applied in a case involving multiple plaintiffs." *Id.* at 237 n.10.

That's the question before us today.

But before reaching it, we reject plaintiffs' contention that the punitive damages cap doesn't apply at all. Plaintiffs reiterate that, in enacting the cap, the General Assembly was concerned with "run-of-the-mill tort claims, such as medical malpractice claims," Appellees' Br. at 22, not with "proceedings involving Virginia's hate-crime statute," or similar intentional torts, *id.* at 21. And they contend that the statute's text and legislative history supports this view.

We cannot agree. While the misconduct here was egregious, and was fueled by a repugnant desire to commit (and celebrate) racially motivated violence, our decision in *Wackenhut* forecloses plaintiffs' argument. We held there that neither the statute nor its legislative history brokered any ambiguity about a carve-out for intentional torts. *Wackenhut*, 979 F.2d at 984.

Plaintiffs nonetheless mobilize *noscitur a sociis*—a canon of construction by which one interprets an *ambiguous* term by the words around it—to argue that the statute's use of "action" "keeps very specific company: 'an action for medical malpractice.'" *Id.* at 22 (cleaned up). And because of this textual neighborhood, the General Assembly didn't intend "action" to apply to a civil rights lawsuit such as the one brought by plaintiffs here.

But that argument doesn't work because the statutory language isn't ambiguous. *See United States v. Stevens*, 559 U.S. 460, 474 (2010) ("[A]n ambiguous term may be given more precise content by the neighboring words with which it is associated." (cleaned up)); *Andrews v. Ring*, 585 S.E. 2d 780, 784 (Va. 2003) (using canons of construction to interpret "the meaning of *doubtful* words in a statute" (emphasis added)).

Equally unavailing is plaintiffs' invocation of the "mischief rule," which "dictates that every statute must be interpreted to promote the ability of the enactment to remedy the mischief at which it is directed." Appellees' Br. at 23 (cleaned up). Plaintiffs maintain that the General Assembly enacted the cap "to ensure predictability and stability for the insurance industry." *Id.* at 25. But Virginia passed its hate-crime statute only a year after passing its punitive damages cap. *Compare* Va. Code Ann. § 8.01-42.1 (1988), *with id.* § 8.01-38.1 (1987). It therefore had an opportunity to exclude hate crimes from the cap's purview.

But it didn't. The legislature's choice precludes the argument that the only mischief the cap addressed was in common tort and insurance claims. We have no mandate to second-guess that policy decision.

2.

With that issue settled, we return to plaintiffs' second argument: That even if the cap applies, it does so on a per-plaintiff basis. We agree that it does.[9]

First, recall the relevant statutory language:

In any action . . . including an action for medical malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact. In no event shall the total amount awarded for punitive damages exceed $350,000 . . . . [I]f a jury returns a verdict for punitive damages in excess of the maximum amount specified in this section, the judge shall reduce the award and enter judgment for damages in the maximum amount provided by this section.

Va. Code Ann. § 8.01-38.1.

The district court was convinced that we had sent strong signals in *Al-Abood* that the cap should apply against all plaintiffs. Indeed, we did say that "even without the 'against all defendants' phrase, the statute refers to the 'total amount awarded' '[i]n any action,'" *Al-Abood*, 217 F.3d at 237, which suggests that the inclusion of that phrase alone doesn't change the "total amount awarded" for multiple plaintiffs.

---

[9] Defendants point us to a Virginia trial court decision that they say comes to the opposite conclusion. *Bavely v. Geneva Enterprises, Inc.*, 112 Va. Cir. 323, 2023 WL 7708506 (Va. Cir. Ct. 2023). The court's central holding was that the punitive damages cap doesn't apply on a per-claim basis, *id.* at *13, a construction the district court found the plaintiffs didn't advance here, *Sines*, 2022 WL 18026336, at *29 n.24. And though the *Bavely* court casually remarked that the cap didn't allow a per-plaintiff interpretation, it did so merely by citing to our decision in *Al-Abood* and the district court's decision below. 2023 WL 7708506, at *5. Absent a more thorough engagement with this question, the case holds little weight.

23

But with the per-plaintiff question squarely in our sights, we'll take more than just a passing glance.

Our first reaction is that the statute doesn't include similar "all plaintiffs" language as it does "all defendants."  We think that legislative drafting choice means something.  And if we treated defendants and plaintiffs equally under the statute, even with the "all defendants" qualifier, we would render that term superfluous.  *See Commonwealth v. Squire*, 685 S.E.2d 631, 634 (Va. 2009) ("We do not consider actions of the General Assembly to be superfluous; instead, we seek to provide meaning to all words of a statute."); *see also Northamptom Cnty. Bd. of Zoning Appeals v. E. Shore Dev. Corp.*, 671 S.E.2d 160, 162 (Va. 2009) ("It is the duty of the Court to read legislative enactments to give meaning to all the words used.").  To give the "all defendants" phrase meaning (as we must), we would have to find that the statute applies to "all defendants" and not to all parties.

And we think there's good reason why the General Assembly didn't similarly single out "all plaintiffs," considering how it originally understood the word "action" when it enacted the punitive damages cap.  This, in turn, requires a historical understanding of joinder in Virginia.

The common law largely didn't permit separate plaintiffs to jointly adjudicate their claims.[10]  *See* Thomas O. Main, *Traditional Equity and Contemporary Procedure*, 78

---

[10] Common law did, however, permit joinder in some cases.  *See Carufel v. Am. Isuzu Motors, Inc.*, 47 Va. Cir. 529, 1999 WL 33198, at *1 (Va. Cir. Ct. 1999) ("At common law and as a general rule of pleading, persons jointly affected by a tort are

Wash. L. Rev. 429, 454 (2003) ("Single-issue pleading precluded the joinder of multiple claims or defenses, the joinder of multiple parties, and pleading in the alternative."); *Baker v. Doe*, 176 S.E.2d 436, 437 (Va. 1970) ("Our research makes clear that at common law parties could not be joined unless their interests were joint."). So at common law, an "action" was typically one plaintiff prosecuting one claim. *See generally id.* at 437; *Rasnick v. Pittston Co.*, 5 Va. Cir. 336, 1986 WL 740411, at *1 (Va. Cir. Ct. 1986); *Dixon v. Robertson*, 5 Va. Cir. 544, 1979 WL 201327, at *1–2 (Va. Cir. Ct. 1979).

Virginia adhered to this common-law approach until 1995, when the General Assembly permitted, for example, a court to join separate actions, or six or more plaintiffs to join in a single action. *See* Va. Code Ann. §§ 8.01-267.1, -267.5 (1995).[11] These modern joinder principles were enacted after the punitive damages cap passed in 1987. As a matter of text and history then, the General Assembly could not have contemplated including a

---

permitted to join as parties plaintiff in an action to recover the injury. For example, tenants in common should jointly sue a trespasser who has damaged their land; and co-owners of personal property should jointly sue for damages resulting from wrongful conversion."); *see also Va. Hot Springs Co. v. Hoover*, 130 S.E. 408, 410 (Va. 1925) (allowing joinder where plaintiffs' "rights have been invaded by one and the same defendant and by one and the same means" so "they have a common remedy if they elect to pursue it").

[11] Virginia embraced these more modern joinder principles in the Multiple Claimant Litigation Act, *see* Va. Code. Ann. § 8.01-267.1 et seq., a state-law analogue to the Federal Rule of Civil Procedure 20. This Act also allowed the court to join a civil action when "[t]he common questions of law or fact predominate and are significant to the actions," and when the joinder "will promote the ends of justice and the just and efficient conduct . . . of the actions" without prejudicing the parties or violating their due process rights. *Id.* § 8.01-267.1(2)–(3).

Filed 05/08/25    Case 19-09006                                    Doc 100

multi-plaintiff limitation in the punitive damages cap because single-plaintiff actions were the norm.

3.

Beyond our historical understanding of joinder principles, we also agree that a per-plaintiff reading serves public policy interests by incentivizing plaintiffs to join their claims where appropriate. Were we to hold otherwise, any plaintiffs seeking punitive damages against a defendant (or defendants) for a single occurrence would have 350,000 reasons not to join their claims. And had that been the law here, the district court likely would have faced eight trials in a loop of repeat operative facts and players.

In fact, it was this policy concern that propelled other jurisdictions to interpret similar punitive damages caps as applying on a per-plaintiff basis. Both Georgia and North Carolina, for instance, have adopted a per-plaintiff construction on judicial economy principles. *See Bagley v. Shortt*, 410 S.E.2d 738, 739 (Ga. 1991); *Rhyne v. K-Mart Corp.*, 562 S.E.2d 82, 93 (N.C. Ct. App. 2002), *aff'd*, 594 S.E.2d 1 (N.C. 2004).

The *Bagley* court reasoned that capping the maximum award "without regard to the number of plaintiffs" "would likely produce a proliferation of case filings," thus "encourag[ing] the splitting of causes of action with sophistry and quibble that would rival medieval Schoolmen." 410 S.E.2d at 739. Then more recently, the *Rhyne* court noted that applying the cap as the district court did here "would *discourage* parties from joining" because "[p]laintiffs would not take the chance that their possible recoveries would be diluted, not by any defect in their claims, but solely because there was more than one plaintiff." 562 S.E.2d at 93.

26

We find these state court decisions persuasive and so hold that Virginia's punitive damages cap is best understood as applying on a per-plaintiff basis.

## C.

We briefly address Defendants' request that we certify this per-plaintiff question to the Supreme Court of Virginia. We've opted not to, as we did in *Al-Abood*, because we find the statute's language and history clear enough to predict how Virginia's high court would rule. And while there are cases in which our notions of justice would support further delay, this is not one of them.

Over two years ago, the jury used its $24 million punitive damages award to send an unmistakable message to the defendants and to the public about the outrageous misconduct that took place in Charlottesville, Virginia. While the law compels us to reduce the award, it's long past time for that message to be delivered.

## III.

For these reasons, we affirm the district court's order imposing joint-and-several liability for the compensatory damages in Counts IV and V. But we vacate the district court's order to the extent that it reduces the jury's punitive damages to $350,000 for all plaintiffs under the Virginia punitive damages cap. And we remand with instructions that the district court apply the cap instead on a per-plaintiff basis.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*

JXV-2_Page 627

# JOINT EXHIBIT 16

FILED: July 23, 2024

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 23-1119 (L)
(3:17-cv-00072-NKM-JCH)
_____

ELIZABETH SINES; SETH WISPELWEY; MARISSA BLAIR; APRIL
MUNIZ; MARCUS MARTIN; JOHN DOE; NATALIE ROMERO; CHELSEA
ALVARADO; THOMAS BAKER

Plaintiffs - Appellees

and

TYLER MAGILL; HANNAH PEARCE

Plaintiffs

v.

MICHAEL HILL; MICHAEL TUBBS; LEAGUE OF THE SOUTH

Defendants - Appellants

and

JASON KESSLER; RICHARD SPENCER; CHRISTOPHER CANTWELL;
JAMES ALEX FIELDS, JR.; VANGUARD AMERICA; ANDREW ANGLIN;
MOONBASE HOLDINGS, LLC.; ROBERT AZZMADOR RAY; NATHAN
DAMIGO; ELLIOTT KLINE, a/k/a Eli Mosely; IDENTITY EVROPA;
MATTHEW HEIMBACH; DAVID MATTHEW PARROTT, a/k/a Matthew
Parrott; TRADITIONALIST WORKER PARTY; JEFF SCHOEP; NATIONAL
SOCIALIST MOVEMENT; NATIONALIST FRONT; AUGUSTUS SOL
INVICTUS; FRATERNAL ORDER OF THE ALT-KNIGHTS; MICHAEL

ENOCH PEINOVICH; LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN;
EAST COAST KNIGHTS OF THE KU KLUX KLAN, a/k/a East Coast Knights
of the True Invisible Empire

                    Defendants

-------------------------------

HUMAN RIGHTS CAMPAIGN FOUNDATION; LEGAL AID JUSTICE
CENTER; SOUTHERN POVERTY LAW CENTER; VIRGINIA LAW
PROFESSORS

Amici Supporting Appellees

                    _____

                    No. 23-1122
                    (3:17-cv-00072-NKM-JCH)
                    _____

ELIZABETH SINES; SETH WISPELWEY; MARISSA BLAIR; APRIL
MUNIZ; MARCUS MARTIN; JOHN DOE; NATALIE ROMERO; CHELSEA
ALVARADO; THOMAS BAKER

                    Plaintiffs - Appellees

 and

TYLER MAGILL; HANNAH PEARCE

                    Plaintiffs

v.

NATHAN DAMIGO

                    Defendant - Appellant

 and

JASON KESSLER; RICHARD SPENCER; CHRISTOPHER CANTWELL;

JXV-2_Page 630

JAMES ALEX FIELDS, JR.; VANGUARD AMERICA; ANDREW ANGLIN; MOONBASE HOLDINGS, LLC.; ROBERT AZZMADOR RAY; ELLIOTT KLINE, a/k/a Eli Mosely; IDENTITY EVROPA; MATTHEW HEIMBACH; DAVID MATTHEW PARROTT, a/k/a Matthew Parrott; TRADITIONALIST WORKER PARTY; MICHAEL HILL; MICHAEL TUBBS; LEAGUE OF THE SOUTH; JEFF SCHOEP; NATIONAL SOCIALIST MOVEMENT; NATIONALIST FRONT; AUGUSTUS SOL INVICTUS; FRATERNAL ORDER OF THE ALT-KNIGHTS; MICHAEL ENOCH PEINOVICH; LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN; EAST COAST KNIGHTS OF THE KU KLUX KLAN, a/k/a East Coast Knights of the True Invisible Empire

        Defendants

------------------------------

HUMAN RIGHTS CAMPAIGN FOUNDATION; LEGAL AID JUSTICE CENTER; SOUTHERN POVERTY LAW CENTER; VIRGINIA LAW PROFESSORS

Amici Supporting Appellees

---------------------

No. 23-1154
(3:17-cv-00072-NKM-JCH)

---------------------

ELIZABETH SINES; SETH WISPELWEY; MARISSA BLAIR; APRIL MUNIZ; MARCUS MARTIN; JOHN DOE; NATALIE ROMERO; CHELSEA ALVARADO; THOMAS BAKER

        Plaintiffs - Appellants

 and

TYLER MAGILL; HANNAH PEARCE

        Plaintiffs

v.

Filed 05/08/25    Case 19-09006    Doc 100

JASON KESSLER; RICHARD SPENCER; CHRISTOPHER CANTWELL;
JAMES ALEX FIELDS, JR.; VANGUARD AMERICA; ANDREW ANGLIN;
MOONBASE HOLDINGS, LLC.; ROBERT AZZMADOR RAY; NATHAN
DAMIGO; ELLIOTT KLINE; IDENTITY EVROPA; MATTHEW HEIMBACH;
DAVID MATTHEW PARROTT, a/k/a Matthew Parrott; MICHAEL HILL;
MICHAEL TUBBS; LEAGUE OF THE SOUTH; JEFF SCHOEP; NATIONAL
SOCIALIST MOVEMENT; NATIONALIST FRONT; AUGUSTUS SOL
INVICTUS; FRATERNAL ORDER OF THE ALT-KNIGHTS; LOYAL WHITE
KNIGHTS OF THE KU KLUX KLAN; EAST COAST KNIGHTS OF THE KU
KLUX KLAN, a/k/a East Coast Knights of the True Invisible Empire

       Defendants - Appellees

 and

MICHAEL ENOCH PEINOVICH

       Defendant

------------------------------

HUMAN RIGHTS CAMPAIGN FOUNDATION; LEGAL AID JUSTICE
CENTER; SOUTHERN POVERTY LAW CENTER; VIRGINIA LAW
PROFESSORS

       Amici Supporting Appellants

-----------------------

# M A N D A T E

-----------------------

The judgment of this court, entered July 1, 2024, takes effect today.

This constitutes the formal mandate of this court issued pursuant to Rule
41(a) of the Federal Rules of Appellate Procedure.

*/s/Nwamaka Anowi, Clerk*

# JOINT EXHIBIT 17

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

October 08, 2024

LAURA A. AUSTIN, CLERK
BY   s/ S. MELVIN
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, APRIL MUÑIZ, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, JOHN DOE, and THOMAS BAKER,

                              Plaintiffs,

        v.

JASON KESSLER, et al.,

                              Defendants.

AMENDED JUDGMENT

Civil Action No. 3:17-cv-00072-NKM

**AMENDED JUDGMENT**

A jury heard this matter from October 25, 2021 to November 23, 2021 and returned a verdict in favor of the Plaintiffs as to liability on Counts III, IV, V and VI. The jury did not reach a verdict on Counts I or II.

The Court entered judgment on January 9, 2023, affirming the jury verdict in part and awarding nominal and compensatory damages as follows:

i.  On <u>Count III</u>, nominal damages of $1.00 each to Plaintiffs Natalie Romero, April Muñiz, Thomas Baker, Marissa Blair, Marcus Martin, Chelsea Alvarado, and Devin Willis;

ii.  On <u>Count IV</u>, compensatory damages of $250,000 each to Plaintiffs Romero and Willis;

iii.  On <u>Count V</u>, compensatory damages of $217,715 to Romero; $108,000 to Muñiz; $318,575 to Baker; $2,000 to Blair; and $156,987 to Martin;

iv.  On <u>Count VI</u>, compensatory damages of $155,715 to Romero; $50,000 to Muñiz; $246,757 to Baker; $50,000 to Sines; $100,000 to Blair; and $98,987 to Martin. <u>See</u> Dkt. 1631.

The Court held all Defendants jointly and severally liable for the nominal and compensatory damages awards on Counts III, IV, and V, which amount is $1,303,284. The Court held Defendant Fields liable for the compensatory damages awarded on Count VI, which amount is $701,459. In a July 1, 2024 decision, the United States Court of Appeals for the Fourth Circuit affirmed these portions of this Court's Judgment, including this Court's imposition of joint-and-several liability on all Defendants for the damages awarded on Counts III, IV, and V. See Dkt. 1683 at 6.

Eight Plaintiffs in this action (Alvarado, Baker, Blair, Martin, Muñiz, Romero, Sines, and Willis) also sought punitive damages. The jury awarded a total of $24 million in punitive damages in its verdict, including $12.5 million against Fields; $1 million against each of Vanguard America, League of the South, Identity Evropa, Traditionalist Worker Party, and National Socialist Movement; $700,000 against each of Kessler, Spencer, Cantwell, Ray, and Kline; and $500,000 against each of Damigo, Heimbach, Parrott, Hill, Tubbs, and Schoep. See Dkt. 1478 at 5-9. Applying Virginia's statutory cap on punitive damages, this Court reduced the jury's punitive damages award to a total of $350,000. See Dkt. 1631 at 3-4. However, the Fourth Circuit vacated this portion of the Court's Judgment and remanded with instructions to apply the $350,000 statutory cap on a per-plaintiff basis. See Dkt. 1683 at 27.

Accordingly, it is hereby **ADJUDGED AND ORDERED** that the Court's Judgment dated January 9, 2023 is amended to **cap the jury's punitive damages award at $2,800,000**, or $350,000 for each of the eight Plaintiffs who sought punitive damages. In addition to their nominal and compensatory damages liability, each Defendant found liable by the jury at trial for punitive damages is also liable for their pro rata portion of the amended punitive damages award of $2,800,000, as follows: $1,458,333.32 for Fields; $116,666.67 for each of Vanguard America,

League of the South, Identity Evropa, Traditionalist Worker Party, and National Socialist

Movement; $81,666.67 for each of Kessler, Spencer, Cantwell, Ray, and Kline; and $58,333.33

for each of Damigo, Heimbach, Parrott, Hill, Tubbs, and Schoep.

In all other respects besides the punitive damages award, as noted above, the Court

affirmed the jury verdict. The Court also determined, in separate Orders following its January 9,

2023 Judgment, that Defendants Kessler, Spencer, Kline, Ray, Cantwell, and Fields were jointly

and severally liable for a total of $3.18 million in reasonable attorney's fees to Plaintiffs Romero,

Muñiz, Wispelwey, Sines, Blair, Martin, and Willis; that all Defendants were jointly and

severally liable for a total of $468,216.15 in costs to all Plaintiffs; and that Defendants Cantwell,

Damigo, Heimbach, Hill, Identity Evropa, Kessler, League of the South, Kline, Nationalist Front,

National Socialist Movement, Parrott, Ray, Schoep, Spencer, Traditionalist Worker Party,

Tubbs, and Vanguard America were jointly and severally liable for a total of $1,266,420.84 in

reimbursable expenses to all Plaintiffs under the terms of the ESI Stipulation & Order. See Dkt.

1660 at 3; Dkt. 1656 at 3; Fed. R. Civ. P. 58(a)(3). No party appealed from either of these

Orders.

It is therefore **ADJUDGED AND ORDERED** that this Amended Judgment is entered in

favor of Plaintiffs on Counts III, IV, V, and VI; Counts I and II remain **DISMISSED**, see Dkt.

1672; and this case is **DISMISSED** from the Court's active docket. Plaintiffs are further entitled

to post-judgment interest under 28 U.S.C. § 1961.

The Clerk of Court is directed to send this Amended Judgment to the parties.

ENTERED this 8th day of October, 2024.

_____

THE HONORABLE NORMAN K. MOON
Senior United States District Judge